IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

KENNETH C. GROVES, SR.,

                    Plaintiff,                        Civil Action No.
          v.                                          9:09-CV-0412 (GLS/DEP)

THE STATE OF NEW YORK, et al.

                    Defendants.

_____


APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

KENNETH C. GROVES, Sr., *Pro Se*
Central New York Psychiatric Center
Sexual Offenders Treatment Program 304
P.O. Box 330/River Road
Marcy, NY 13403

FOR DEFENDANTS:

HON. ANDREW M. CUOMO            CHRISTINA L. ROBERTS-RYBA, ESQ.
Attorney General of the State   Assistant Attorney General
of New York
The Capitol
Albany, New York 12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT, RECOMMENDATION AND ORDER</u>

Plaintiff Kenneth C. Groves, Sr., a former New York State prison inmate who is currently confined in the Central New York Psychiatric Center ("CNYPC" or "Center") in Marcy, New York, has commenced this action pursuant to 42 U.S.C. § 1983 complaining of civil rights violations. In his complaint, plaintiff chronicles events that followed his refusal to submit to a strip search ordered by CNYPC officials, alleging that as a result of his failure to consent to the search he was denied food and medication and was reduced to a lower standing at the facility without due process of law. Plaintiff's complaint seeks compensatory damages in the amount of $10 million as well as declaratory and injunctive relief.

Presently before the court is defendants' motion to dismiss plaintiff's complaint on the grounds that plaintiff has failed to state a claim upon which relief may be granted or allege sufficient personal involvement of certain of the defendants, including Michael Hogan, Donald Sawyer, and Jeff Nowicki, in the offending conduct. Defendants also assert that their entitlement to both Eleventh Amendment and qualified immunity from suit as a further grounds for dismissal.[1] Having carefully considered

---

[1]    In their motion, defendants also seek a stay of discovery pending determination of the pending motion, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure.

defendants' motion, which plaintiff has not opposed, I recommend dismissal of all claims against the State of New York, the CNYPC, and the New York State Office of Mental Health ("OMH"), with prejudice, and that all other claims set forth in plaintiff's complaint be dismissed but with leave to replead.

I.     BACKGROUND[2]

Although not explicitly stated in his complaint, it appears that plaintiff is and was at the relevant times a former New York State prison inmate involuntarily committed to the CNYPC for the purpose of undergoing sex offender treatment.  *See generally* Complaint (Dkt. No. 4).  According to publically available information, plaintiff was released by the New York State Department of Correctional Services ("DOCS") "to another agency" on June 18, 2008.[3]

The circumstances surrounding plaintiff's claims were set in motion

---

[2]     In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion.  *See Erickson v. Pardus,* 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).  I have also considered the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S. Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

[3]     *See* http://nysdocs.lookup.docs.state.ny.us/GCA00P00/Wiq3/Winq130.

on February 2, 2009 when he and other residents of his ward were ordered to submit to a strip search based upon a suspicion that one or more of them possessed a controlled substance. Complaint (Dkt. No. 1) § 7 ¶¶ A-C. Plaintiff as well as six other patients involved refused to comply with that directive and instead asked to speak with someone of authority concerning the matter. *Id.*

As a result of that request defendant Charmaine Bill, the Treatment Team Leader for the ward, and Dr. Teri Maxymillian, the Sex Offender Treatment Program ("SOTP") Director, were summoned. *Id.* Upon their arrival at the scene the two Center employees ordered the seven residents to cooperate, indicating that if they did not the New York State Police would be called for the purpose of conducting a forcible strip search of each of them. *Id.* At that time, defendant Maxymillian explained that the search was warranted due to the suspicion that one or more patients possessed a controlled substance and that the residents would not be permitted to call their attorneys until they consented to the requested search. *Id.*

During the ensuing hours the plaintiff and the other non-consenting patients were monitored and restricted in their ability to use restroom facilities. Complaint (Dkt. No. 1) § 7 ¶¶ D-F. The defiant patients'

suggestion that they be permitted to submit to a pat frisk and drug screening in lieu of a strip search was rejected by defendants Maxymillian and Bill. *Id.* In the interim, plaintiff and the other six residents were detained in the facility dining room. *Id.*

At approximately 8:25 p.m. on that same day plaintiff was informed that he would be placed in an empty room for the evening. Complaint (Dkt. No. 1) § 7 ¶ I. A few moments later, at 8:45 p.m., Groves was offered his evening snack; he refused to accept it, however, stating doctor's orders required that it be given to him between 7:00 and 7:30 p.m. pursuant to doctor's orders and that he would be unable to sleep if he consumed it at that late hour. *Id.* § 7 ¶ J. Plaintiff also declined medication offered to him by the ward nurse at 9:15 p.m., claiming that he was too frightened to come out of the room to retrieve it. *Id.* § 7 ¶ K.

On February 4, 2009, the plaintiff refused his breakfast, which was brought to the room in which he was being held, but inquired concerning his medication.[4] Complaint (Dkt. No. 1) § 7 ¶¶ (L-M). As of 9:30 a.m. plaintiff still had not received his morning medication or been afforded the

---

[4] It is not clear from plaintiff's complaint whether he meant to reference February 3, 2009, the next day after the strip search request was made, rather than February 4, 2009, and if not what, if anything, of significance to his claims occurred on that intervening day.

opportunity to contact his attorney, although his medication was ultimately provided at approximately 10:05 a.m. on that morning.[5]  *Id.* § 7 ¶¶ (N-O). While plaintiff did accept his afternoon medication, he refused lunch.  *Id.* § 7 ¶¶ (Q-R).

After submitting to a drug screening test, the results of which were negative, plaintiff was permitted to return to his room at or about 8:30 p.m. on February 4, 2009.  The next day, plaintiff was informed by his primary therapist, Mr. Morren, that in light of his refusal to submit to a strip search he "was being taken off AP status and dropped back to MOD status".[6]  *Id.* § 7 ¶ Z.  In light of that development, Groves advised officials at the Center that he would not participate in therapy sessions until he was returned to AP status.  *Id.*

Plaintiff complained of defendants' allegedly unlawful action through various channels.  Groves submitted a resident's request for an individual session with both his primary therapist at the time, James J. Carroll, and with defendant Bill.  *See* Complaint (Dkt. No. 1) § 4(b).  Plaintiff also alleges to have mailed a "Residents [sic] Concer[n] Form" detailing the

---

[5]    Plaintiff was eventually permitted to contact his attorney at approximately 10:40 p.m. that evening.  *Id.* § 7 ¶ P.

[6]    Plaintiff's complaint does not elaborate as to the significance of that change and its effect, if any, on the conditions of his confinement.

facts of his "concerns and complaints" to defendant Maxymillian. *Id.* In addition, the plaintiff sent a "detailed letter of concern" to defendant Sawyer, the Executive Director of the CNYPC, both detailing the facts of his complaint and listing the previous steps taken to address the matter. *Id.* The plaintiff alleges that as of the date of his complaint he had received no response from any of those individuals, and nothing was done by the administration within the OMH or at the Center to address his grievances. *See id.*

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on April 8, 2009 and was thereafter granted *in forma pauperis* ("IFP") status.[7]  Complaint (Dkt. No. 1).  Named

---

[7]    Title 28 U.S.C. § 1915(b), a provision added through enactment of the Prison Litigation Reform Act ("PLRA"), requires a prison inmate who seeks IFP status to pay, over a period of time, the full amount of the filing fee provided for in 28 U.S.C. § 1914(a), which is currently $350.00 for most civil actions. In addition, this district requires all inmates granted IFP status to submit an inmate authorization form issued by the clerk's office. *See* Northern District of New York Local Rule 5.4(b). As a civil detainee, however, plaintiff is not considered a "prisoner" under the PLRA, and the requirement that he eventually defray the entire filing fee therefore does not apply in this instance.  *See Makas v. Miraglia,* No. 05 CIV 7180, 2007 WL 724603, at *12 n. 6 (S.D.N.Y. March 5, 2007) (copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff); *Gibson v. Comm'r of Mental Health,* No. 04 Civ. 4350, 2006 WL 1234971, at *3 (S.D.N.Y. May 8, 2006) (the definition of "prisoner" in the PLRA does not include a civil detainee). *See also Michau v. Charleston County,* S.C., 434 F.3d 725, 727-28 (4th Cir.2006) (civil detainee is not a "prisoner" under the PLRA); *Perkins v. Hedricks,* 340 F.3d 582, 583 (8th Cir.2003) (same); *Page v. Torrey,* 201 F.3d 1136, 1139-40 (9th Cir.2000) (person civilly detained following completion of criminal sentence is not a "prisoner" within the meaning of the PLRA).

as defendants in plaintiff's complaint are the State of New York; the New York State OMH; the CNYPC; Michael Hogan, the Commissioner of the OMH; Donald Sawyer, the Executive Director at the CNYPC; Teri Maxymillian, Director of the SOTP at the Center; Charmaine Bill, Plaintiff's Ward Treatment Team Leader; and Jeff Nowicki, Chief of Mental Health Treatment Services. *Id.* Plaintiff's complaint does not formally identify any causes of action. Instead, he merely alleges that by their actions defendants violated his constitutional rights.

On May 15, 2009, in lieu of answering, the defendants moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of plaintiff's claims against them for failure to state a cause of action upon which relief may be granted; defendants also assert lack of personal involvement with respect to defendants Hogan, Sawyer, and Nowicki, the Eleventh Amendment, and qualified immunity as further grounds for dismissal. Dkt. No. 7. Plaintiff has not opposed defendants' motion.[8]

---

[8]    Plaintiff's failure to respond to the pending motion does not preclude me from recommending its disposition without the benefit of his submission. *See, e.g., White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan. 18, 2001). Such a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki*, 232 F.3d 321, 322-23

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and North District of New York Local Rule 72.3 (c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement

---

(2d Cir. 2000).

It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance; under this court's local rules, a party's failure to respond to a properly filed motion can be considered as consent to the granting of that motion, provided the court determines that the moving party has met its burden demonstrating entitlement to the relief requested.  N.D.N.Y.L.R. 7.1(b)(3); *see also McCall*, 232 F.3d at 322-23 (holding that plaintiff's failure to respond to a motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall*).

of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft,* ___ U.S. at ___, 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003);

10

*Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).

The burden undertaken by a party requesting dismissal of a complaint

under Rule 12(b)(6) is substantial; the question presented by such a

motion is not whether the plaintiff is likely ultimately to prevail, "'but

whether the claimant is entitled to offer evidence to support the claims.'"

*Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d

435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69

F.3d 669, 673 (2d Cir. 1995)) (other quotations omitted).

When assessing the sufficiency of a complaint against this

backdrop, particular deference should be afforded to a *pro se* litigant

whose complaint merits a generous construction by the court when

determining whether it states a cognizable cause of action.  *Erickson v.*

*Pardus*, 552 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) ("'[A] *pro se*

complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers'") (quoting *Estelle v.*

*Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations

omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation

omitted); *Donhauser v. Goord*, 314 F. Supp.2d 119, 121 (N.D.N.Y. 2004)

(Hurd, J.).  In the event of a perceived deficiency in a *pro se* plaintiff's

complaint, a court should not dismiss without granting leave to amend at

11

least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

B.    Analysis of Plaintiff's Claims

Plaintiff's complaint does not delineate any causes of action being asserted.  Instead, it simply recites the salient facts and "request[s] an order declaring that the Defendants have acted in violation of the United States Constitution."  Complaint (Dkt. No. 1) § 8.  In their motion defendants argue that plaintiff's complaint fails to set forth a cognizable constitutional violation sufficient to support a claim under section 1983.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citing *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)).  As can be seen, an essential element of a section 1983 claim is proof that a violation of a right guaranteed under the Constitution has occurred.  *Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (McAvoy,

C. J.) (holding that section 1983 "is the vehicle by which individuals may

seek redress for violations of their constitutional rights) (citations omitted).

      1.    <u>Fourth Amendment</u>

It appears from the allegations in his complaint that the plaintiff may

be attempting to assert a claim under the Fourth Amendment, which

provides that "[t]he right of the people to be secure in their persons against

unreasonable searches and seizures, shall not be violated. . ." U.S. Const.

amend. IV; *see also Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861

(1979).  Because the CNYPC is a state psychiatric center, the members of

its staff are government actors subject to the strictures of the Fourth

Amendment.  *New Jersey v. T.L.O.*, 469 U.S. 325, 335, 105 S.Ct. 733,

739 (1985).

As an involuntarily committed patient, the plaintiff is entitled to some

protection under the Fourth Amendment; courts have recognized that

although civilly committed patients do not have an expectation of privacy

equal to an individual in society generally, they do not "check their

constitutional rights at the door".  *Aiken v. Nixon*, 236 F. Supp.2d 211, 233

(N.D.N.Y. 2002); *see also, Jennings v. New York State Office of Mental

Health*, 786 F.Supp. 376, 382, 384 (S.D.N.Y. 1992), *aff'd*, 977 F.2d 731

(2d Cir. 1992).  The privacy expectation of the involuntarily committed

must be balanced against "the societal interest in protecting the health, safety, and welfare of the patients and staff of these units who would be detrimentally affected without sufficient precautionary measures." *Aiken*, 236 F.Supp.2d at 232-33 (*citing Jennings*, 786 F.Supp. at 382-84).

In this instance, had plaintiff been involuntarily searched by CNYPC employees, he could have asserted a potentially plausible Fourth Amendment claim, in which case the court would have been required to analyze that claim against the backdrop of appropriate Fourth Amendment jurisprudence.  Plaintiff, however, refused the request that he submit to a strip search, and as a result, by his own admission, no strip search was conducted.  The mere act of requesting that a person submit to a search does not, in and of itself, run afoul of the Fourth Amendment, particularly since a person may freely consent to a search, as unreasonable it may otherwise be.  *See United States v. Drayton*, 536 U.S. 194, 197, 122 S. Ct. 2105, 2108 (2002) (stating that the Fourth Amendment does not prohibit requests for consent to search where a reasonable person would understand that he or she is free to refuse) (citations omitted).

It is true that plaintiff ultimately submitted to a urine test and that such a test is considered as a search within the meaning of the Fourth Amendment.  *Skinner v. Ry. Labor Executives' Ass'n.*, 489 U.S. 602, 617,

14

109 S.Ct. 1402, 1413 (1989).[9]  In this case, however, again by his own admission, plaintiff voluntarily agreed to submit to the urine drug test. Complaint (Dkt. No. 1) § 7 ¶ S.  Accordingly, that allegation provides no basis to support a Fourth Amendment violation.

Considering that he has attached the portion of the OMH policy manual governing patient searches to his complaint, it may be that plaintiff is alleging a violation of an OMH policy.  It should be noted, however, that "[a]  violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983."  *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).  Moreover, a violation of a department directive or policy such as that cited does not support a claim of a violation of a New York state law or regulation, much less of section 1983.  *Cabassa v. Gummerson*, 01-CV-1039, 2008 WL 4416411, at *6 n. 24 (N.D.N.Y. Sept. 24, 2008) (Hurd, J.).  This is so because such directives merely provide a system which the particular

---

[9]      The Supreme Court has observed that "in our special needs cases, we have routinely treated urine screens taken by state agents as searches within the meaning of the Fourth Amendment even though the results were not reported to the police, see, *e.g., Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997); *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995); *Skinner v. Railway Labor Executives' Assn.,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Treasury Employees v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). . . ."  *Ferguson v. City of Charleston*, 532 U.S. 67, n. 9, 121 S.Ct. 1281 (2001).  Notably, here, the plaintiff does not even allege that the negative urine results were reported to any law enforcement official.

agency, in this case the OMH, has established to assist it in exercising discretion, which the agency nonetheless retains despite any violation of those directives.  *Id.*  Accordingly, any alleged violation of the OMH manual alone cannot supply the missing element necessary to support a violation of 42 U.S.C. § 1983."  *Cusamano,* 604 F.Supp.2d at 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).[10]

In sum, even affording when affording it the most generous of construction, plaintiff's complaint does not support a section 1983 claim against the defendants for violation of the Fourth Amendment.

> 2.   Substantive Due Process

Plaintiff's complaint alleges that on February 2, 2009, after he refused to consent to a strip search certain CNYPC staff members temporarily denied him his medication, a nightly snack, and access to a bathroom.  Liberally construed, these allegations could be interpreted as an attempt to assert a substantive due process claim under the Fourteenth

---

[10]   In his complaint, plaintiff appears to allege that a K-9 unit was brought in and that his room was searched.  Complaint (Dkt. No. 1) § 7 ¶ D.  The viability of such a claim is doubtful since at least one court in this Circuit has held that "involuntarily committed persons have no right to privacy in their cells."  *Lombardo v. Holanchock*, No.  07 Civ. 8674(DLC), 2008 WL 2543573, at * 8 (S.D.N.Y. June 24, 2008).  Furthermore, plaintiff's complaint fails to allege the participation of any of the named defendants participated in that search – a prerequisite to finding liability with regard to that claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) ("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983.").

Amendment.

"The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.'" *Beck v. Wilson*, 377 F.3d 884, 889 (8th Cir. 2004) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005-06 (1989)). Since the plaintiff in this case was not a sentenced prison inmate at the time the alleged deprivations occurred, the Eighth Amendment, which prohibits cruel and unusual punishment of those convicted of crimes, is not applicable under the circumstances. *Youngberg v. Romeo*, 457 U.S. 307, 312, 102 S. Ct. 2452, 2456 (1982). Instead, any claim arising from his confinement must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York*, No. 03-CV-5052, 2007 WL 805786, at * 7 (S.D.N.Y. March 15, 2007) (citing cases); *see, also, Vallen v. Carrol*, No. 02 Civ. 5666, 2005 WL 2296620, at *8-9 (S.D.N.Y. Sept. 20, 2005) (holding that the Fourteenth Amendment, rather than the Eighth Amendment protects psychiatric facility patients); *Lombardo v. Stone,* 2001 WL 940559, *7 n. 7 (S.D.N.Y. Aug. 20, 2001) (rejecting the Eighth Amendment as a basis for claims of a

patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment).

a)    Medical Care

"Courts have consistently held, in a variety of contexts, that the due process rights of persons in a nonpunitive detention are greater than the Eighth Amendment protections afforded to convicted prisoners." *Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1043 (E.D.N.Y.1993) (citing cases); *Owens v. Colburn*, 860 F.Supp. 966, 974 (N.D.N.Y. 1994), *aff'd,* 60 F.3d 812 (2d Cir. 1995) (citing cases).  The rights of patients who are involuntarily committed have been likened to the rights of detainees awaiting trial.  *See Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir.) (involuntarily committed person's Constitutional claim "should be evaluated under the. . . standard usually applied to . . . claims brought by pretrial detainees"), *cert. denied*,  ___ U.S. ___, 130 S. Ct. 465 (2009); *Buthy v. Comm'r of Office of Mental Health of N.Y.*, 818 F.2d 1046, 1051 (2d Cir. 1987) (applying the levels of protection afforded pre-trial detainees under the Due Process Clause to persons confined due to an acquittal by reason of insanity or to their incompetence to stand trial).  "Persons in nonpunitive detention have a right to 'reasonable medical care,' a standard demonstrably higher than the Eighth Amendment standard that

protects prisoners: 'deliberate indifference to serious medical needs.'"
*Owens*, 860 F. Supp. at 974 (quoting *Haitian Ctrs. Council*, 823 F. Supp.
at 1043-44).  At a minimum, due process forbids conduct that is
deliberately indifferent to one that is involuntarily committed.[11]  *Haitian
Ctrs. Council*, 823 F. Supp. at 1044.

There are two elements to a claim of medical indifference; "[the
plaintiff] must show that she [or he] had a "serious medical condition' and
that it was met with 'deliberate indifference.'"  *Caiozzo v. Koreman,* 581
F.3d 63, 72 (2d Cir. 2009) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 106
(2d Cir. 2000)).  A serious medical condition must be "a condition of
urgency, one that may produce death, degeneration, or extreme pain."
*Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied,* 115
S.Ct. 1108 (1995) (quotations and citation omitted).  The Second Circuit
recently joined its sister circuits in reaching the conclusion that, post
*Farmer,*[12] a subjective standard should be used in assessing deliberate

---

[11]      In the Eighth Amendment context, a "prison official's 'deliberate indifference' to
a substantial risk of serious harm to an inmate violates" the inmate's constitutional
protection."  *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S. Ct. 1970, 1974 (1994).

[12]      In *Farmer*, the Supreme Court addressed the question of whether a "subjective"
or "objective" standard applies in determining deliberate indifference in the context of a
convicted prisoner's rights under the Eighth Amendment.  *Cuoco*, 222 F.3d at 69
(quoting *Farmer*, 511 U.S. at 837-38, 114 S. Ct. at 1979).  The Court concluded that
the subjective test should apply under the Eighth Amendment because it prohibits cruel
and unusual punishment, and a prison official's action or inaction cannot properly be

indifference.  *Caiozzo*, 581 F.3d at 70.   Thus, a "defendant prison official .

. . is liable for a Fourteenth Amendment violation only if he [or she]

disregards a risk of harm to a detainee which he [or she] is aware."  *Id.*  In

other words, a defendant is deliberately indifferent under the *Farmer* test if

that person "knows of and disregards an excessive risk to inmate health or

safety; [he or she] must both be aware of facts from which the inference

could be drawn that a substantial risk of serious harm exists, and he must

also draw the inference" in order to be liable.  *Farmer*, 511 U.S. at 837,

114 S.Ct. at 1979; *see also Caiozzo*, 581 F.3d at 72.

Plaintiff's medical indifference claim fails in the first prong of the

analysis.  In his complaint, the plaintiff alleges only that he was denied his

request for medication on one occasion, on the evening of February 2,

2009.[13]  *See* Complaint (Dkt. No. 1) at § 7(G).  That plaintiff was not in

dire need of his medication is evidenced by the fact that a little more than

_____

termed "punishment" of the detainee if the official was not actually aware of an
excessive risk to an inmate's health or safety.  *Cuoco*, 222 F.3d at 69, (quoting *Farmer*,
511 U.S. at 837-38, 114 S. Ct. at 1979).

[13]    The following morning when breakfast was delivered to the plaintiff, he was not
offered his medication.  This apparent confusion between the nurse and the Secure
Care Treatment Assistant ("SCTA") involved may constitute a failure on CNYPC's part
to properly administer the plaintiff's medication, but this incident does not seem to
present a deliberate denial of medication, particularly since it appears the facility nurse
was under the impression that it had been offered.  *See* Complaint (Dkt. No. 1) at 10.

four hours later he refused his medication when it was offered to him.[14]  *Id.*
at § 7 ¶ (K).  Additionally, the snack that plaintiff alleges was "doctor-
ordered" was also offered to the plaintiff approximately one hour and
fifteen minutes after he was initially denied it. *See id.* at 8-9.

Even liberally construing the complaint it is difficult to discern the
existence of needs arising to the level of a serious medical condition.  A
the outset, plaintiff does not even identify the medical condition for which
he required the medication at issued.  He does not allege any facts
suggesting that he suffered from a medical condition of urgency (such as
one that may produce death, degeneration, or even extreme pain) that
was affected by the defendants' behavior.  *See Hathaway*, 37 F.3d at 66.
Additionally, there is no indication that his condition was worsened, and
his health put in serious risk, by the delay in his nightly medicine.  *See*
*generally* Complaint (Dkt. No. 1).   As a result, the plaintiff has failed to
meet his initial burden showing that he has a sufficiently serious medical
condition.  *See Smith v. Hughes*, No. 9:08-CV-1147, 2009 WL 3644279,
at *4 (N.D.N.Y. Oct. 29, 2009) (plaintiff prisoner's allegation that he
required medication, without further alleging that his condition was serious

---

[14]     The nurse who plaintiff alleges denied him his medication on February 2, 2009
is not listed as a defendant in this action.

enough to cause death, degeneration or pain, was not sufficient to state a

claim for serious medical condition); *Osacio v. Greene*, No. 08-CV-0018,

2009 WL 369838,2 at *4 (N.D.N.Y. Nov. 2, 2009) (fracture to a plaintiff

prisoner's third metacarpal "does not rise to the level of a serious medical

condition").

      Turning to the subjective prong of the relevant test, it is equally

difficult to classify the alleged deprivations as deliberately indifferent to the

plaintiff's medical needs, whatever they may be.  The complaint does not

suggest that any of the defendants or SCTAs involved in the alleged

denial of the plaintiff's medicine and snack knew that such deprivations

would result in a substantial risk of serious harm to the plaintiff.  In fact,

the complaint does not allege that plaintiff experienced any pain or other

serious side effects due to the four hour and fifteen minute lapse of his

medication, the hour and fifteen minute lapse of his snack, or the two hour

lapse for his request to use the bathroom.[15]  Because plaintiff's complaint

---

[15]    Although persons in custody have no constitutional right to use the bathroom whenever they please, s*ee e.g.*, *Odom v. Keane*, No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997), "reasonable adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs . . ." *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994).  While a cognizable claim regarding bathroom needs may be based on ailments such as an enlarged prostate and irritable bowel syndrome, plaintiff fails to allege any such condition requiring treatment.  *Smith v. Hughes*, No. 9:08-CV-1147, 2009 WL 3644279, at *4 (N.D.N.Y. Oct. 29, 2009) (McAvoy, S.J.) (citing *Hazelton v. NH Dep't of Corrections*, No. 08-cv-419-JL, 2009 WL 229664 *2 (D.N.H. Jan. 27, 2009)).  In light of my ultimate finding, if plaintiff so chooses, he may amend

is devoid of any facts suggesting that defendants knew of and disregarded any excessive risk to the plaintiff's health, it is fatally deficient and should be dismissed. *See Smith,* 2009 WL 3644279 at *4 (dismissing a plaintiff's deliberate indifference claim where it lacked an allegation that a defendant had knowledge that the plaintiff would suffer serious harm as a result of a temporary deprivation); *see also Bourdon v. Roney*, 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (dismissing a pre-trial detainee plaintiff's claim where he was denied access to a bathroom for a maximum of three hours.). Even if evaluated under a reasonableness standard, there are no facts alleged in the complaint that would suggest

---

his complaint to include any medical conditions that were exacerbated to a level of deliberate indifference by the defendants' alleged denial of the plaintiff's use of a bathroom for two hours.

Broadly construed, plaintiff's complaint also challenges the manner in which he was allowed to go to the bathroom. The plaintiff alleges that he was allowed to go to the bathroom on February 2, 2009 at approximately 4:30 p.m. but only under the direct observation of two SCTAs. *See* Complaint (Dkt. No. 1) at 8. Plaintiff further details that if he or one of the other patients had to "do more than urinate", that person would need to place all soiled tissue in a plastic bag and not flush the toilet. *Id.* The plaintiff was allegedly allowed to use the bathroom under these same conditions the following morning. *Id.* at 10. The complaint does not allege that the plaintiff suffered any injury from the SCTAs presence in the bathroom. However embarrassing this incident might have been to the plaintiff, it does not rise to the level of a constitutional violation. *See, e.g., Robinson v. Middaugh,* No. 95-CV-0836(RSP)(GJD), 1997 WL 567961, at *4 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf. Farmer,* 511 U.S. at 834, 114 S. Ct. at 1977.

that any person denied the plaintiff reasonable medical care.

Before proceeding to the next possible constitutional claim alleged, it should also be noted that the plaintiff has not alleged that any of the defendants named in his complaint were the ones who engaged in an alleged deprivation of medication.  It is well established that in order to bear liability for a civil rights violation under section 1983, a party must be personally involved in the unconstitutional conduct.[16]  *Wright v. Smith,* 21 F.3d at 501 (citations omitted).  Although the plaintiff asserts that defendant Maxymillian denied his request to use the bathroom, he further alleges that both a non-party nurse and various non-party SCTAs were responsible for the denial of his medicine.  *See* Complaint (Dkt. No. 1) at 8.  Moreover, the plaintiff does not identify the person who denied him his nightly snack.  *See id.*

Notwithstanding these fatal deficiencies, in deference to plaintiff's *pro se* status, I recommend that the plaintiff be granted leave to amend his complaint in order to develop his Fourteenth Amendment claim for medical indifference.  If he so chooses, the amended complaint must identify a serious medical condition and specifically identify the named defendants

---

[16]     The issue of personal involvement is more fully discussed further on in this report.  *See* pp. 34-38, *post.*

24

involved in the deprivation and indicate how they are alleged to have acted with knowledge that their actions could cause serious harm to the plaintiff's health.

### 3.   Procedural Due Process

Also potentially encompassed within the plaintiff's complaint is a procedural due process deprivation cause of action.  It appears that plaintiff attempts to premise this claim upon the defendants' allegedly lowering his status from "AP" to "MOD" without providing him sufficient due process.  The complaint alleges that while the plaintiff was apparently punished by the lowered status, other patients were rewarded for their compliance with the strip search by being transferred to regular wards. Plaintiff further alleges that he was required to remain in the dining hall under the supervision of non-party SCTAs for about eight hours and was later sent to an "empty room" for the night and following day until his drug test results came back negative, at which time he was allowed to return to his own room.  During the time spent in the empty room plaintiff was offered food and was allowed to use the bathroom on multiple occasions. Liberally construed, the complaint appears to assert that the plaintiff was deprived of a liberty interest without the opportunity to be heard.

The Fourteenth Amendment provides that a state may not deprive a

25

person of liberty or property "without due process of law."  U.S. Const. amend. XIV.  To successfully state a claim under section 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty or property interest, and 2) was deprived of that interest without being afforded sufficient process.  *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004); *see also Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.) *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (Oct. 5, 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

"[T]he first inquiry in the analysis of an alleged due process violation is whether there exists a protected liberty interest" that is at stake in the case.  *Barna v. Travis*, No. CIV97CV1146 (FJS/RWS), 1999 WL 305515, at *1 (N.D.N.Y. Apr. 22, 1999) (Smith, M.J.) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S.454, 460, 109 S. Ct. 1904, 1908 (1989)).  "In addition to the protected interests which originate in the Constitution itself, a constitutionally protected liberty or property interest may be found in laws enacted by the state or federal government creating a substantive entitlement to a specific government benefit.  *Zigmund v. Foster*, 106 F. Supp.2d 352, 360 (D. Conn. 2000) (citing *Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir. 1984)).  If such a deprivation has occurred, the court then must

consider what process was due and whether it was provided.  *See Matthews v. Eldrige*, 424 U.S. 319, 333-34, 96 S. Ct. 893, 902 (1976).

"[D]ue process rights of prisoners and pretrial detainees are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution." *Bell v. Wolfish*, 441 U.S. 520, 554, 99 S. Ct. 1861, 1882 (1979).  In *Bell,* the Supreme Court held that pretrial detainees cannot be punished without procedural due process protections, but qualified that rule, adding that "[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* at 539 n. 21 (quoting *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S. Ct. 1401, 1414 (1974)).

Thus, the first inquiry is whether the plaintiff had a protected liberty interest in his "AP" status which was allegedly rescinded as a result of his refusal to comply with the strip search, and whether he had an interest in sleeping in his own room rather than in an empty one the night of the strip search request.  The plaintiff does not provide any rule or law that might create an entitlement to either his own private room or retention of his "AP" status.  *See Zigmund*, 106 F.Supp.2d at 361.  In fact, in his complaint he acknowledges that defendant Maxymillian offered a justification for the initial request for a strip search stating that the administration "had

27

reasonable cause to believe that one of the residents had in their pocession an [sic] controlled substance, and that gave them the right to conduct any type of search they deemed fit with out a Court order etc. [sic]".  Complaint (Dkt. No. 1) §7 ¶ C.  Plaintiff also acknowledges later in his complaint that defendant Bill told him he was not allowed to sleep in his own room because at that point in time the rooms had been searched, but the plaintiff himself had not.  *Id.* at § 7 ¶ K.

In *Youngberg,* the  Supreme Court held that individuals involuntarily committed to a state institution enjoy constitutionally protected liberty interests in conditions of reasonable care and safety and freedom from undue bodily restraint and are entitled to such training as may be required to ensure their safety, and facilitate their ability to function free of restraints. *See Youngberg,* 457 U.S. at 322-23, 102 S.Ct. at 2461-62.  The Second Circuit, however, has rejected the claim that a due process right exists for a specific type of treatment.  *See Kulak v. City of New* York, 88 F.3d 63, 73 (2d Cir. 1996) (ruling that the civilly confined do not have a right to be placed in the least restrictive appropriate treatment environment); *see also Soc'y for Good Will to Retarded Children, Inc. v. Cuomo ("Society"),* 737 F.2d 1239, 1250 (2d Cir.1984) ("We do not find a due process right to a specific type of treatment or training beyond that

28

geared toward safeguarding basic liberty interests.").  Thus, the right to treatment exists only in order to safeguard the basic liberty interests of reasonable care and safety and freedom from undue bodily restraint.  *Id.*

It should be noted, moreover, that in order to decide whether a bodily restraint being utilized is medically necessary, and thus not undue, courts will defer to professional judgment.  In *Youngberg,* for example, the Court noted that the standard requiring that "the courts make certain that professional judgment in fact was exercised" affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints.  457 U.S. at 321, 102 S.Ct at 2461.  The Second Circuit has held that while locking of doors, and confinement of otherwise ambulatory persons into wheelchairs may represent a violation of residents' freedom from undue restraints, there are no liberty interests at stake when a resident is denied the opportunity to visit shops, restaurants and recreational facilities outside of the community.  *Society*, 737 F.2d at 1247; *compare with*, *Holly v. Anderson*, No. 04-CV-1489, 2008 WL1773093, at *7-8 (D. Minn. 2008) (no protected liberty interest where a civilly confined person was kept "in administrative isolation for eight days before he received a hearing.") *and*

*Tran v. Kriz*, No. 08-C-228, 2008 WL 794546, at *5 (E.D. Wis. 2008) (finding it "questionable" whether the standard was met when the plaintiff lost certain privileges for twenty days and a reduced status for two weeks that restricted his use of personal electronics, the library, group activities, and demoted him to the lowest pay scale).

The face of Grove's complaint does not disclose any fact that would show the significance of a change from "AP" or "MOD" status, how either status affected his way of living within the CNYPC, or how long this change in status affected him, if at all. Additionally, the complaint merely alleges that the plaintiff was confined in an empty room on February 2, 2009. There is no indication, however, that any defendant acted in a way that unreasonably restrained the plaintiff. Indeed, rather than being refused the opportunity to participate in programing while on MOD status, it was the plaintiff who advised officials at CNYPC that in light of the reduction in status he would no longer participate in program groups until returned to AP status. There is nothing in plaintiff's complaint suggesting that he was denied reasonable care and safety or freedom from undue bodily restraint. Plaintiff's complaint, as presently constituted, thus fails to allege facts rising to a level to support a plausible claim that by their actions defendants deprived him of a protected liberty interest. I therefore

30

recommend dismissal of plaintiff's potential procedural due process claim with leave to replead.

### 4.   Sixth Amendment

In his complaint the plaintiff alleges that he was not allowed to contact or communicate with his attorney after refusing to consent to a strip search requested by CNYPC staff members.  Broadly construed, the plaintiff may be asserting that the conduct resulted in a violation of his rights under the Sixth Amendment.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right  ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.   However, "[w]hile the Sixth Amendment, by its express language, protect those in  *criminal* proceeding, the Fourteenth Amendment protects all [civilly committed] detainees against governmental interference in their right of access to the courts."  *Hydrick v. Hunter*, 466 F.3d 676, 701 (9th Cir. 2006) (emphasis in original).

In his complaint the plaintiff does not allege that he was in police custody at the time he was not allowed to call his attorney.  There is also no allegation in the complaint that the plaintiff was forced to appear at a hearing of any sort, let alone judicial, before he was allowed to contact his

attorney.  Although CNYPC staff members threatened to have the police

forcibly search the plaintiff and other residents' bodies, and the K-9 unit

was on the scene, the plaintiff does not allege that he had any direct

contact with police officials.  The plaintiff was not subjected to a criminal

prosecution at the time of the alleged deprivations and, in any event, the

plaintiff was allowed to call his attorney less than twenty-four hours after

his request to do so.  Under the circumstances presented, because the

defendants did not interfere with plaintiff's access to the courts, as a civil

detainee his right to counsel is not implicated.  *See Lynch v. Baxley*, 385

F.Supp. 378, 389 n.5 (D.C. Ala. 1974) (noting that the right to counsel in

involuntary civil commitment proceedings pertains only to "all judicial

proceedings"). I therefore recommend dismissal of plaintiff's potential

Sixth Amendment claim, without leave to replead, in light of the fact that

the amendment is inapplicable under the fact presented.

      C.    <u>Eleventh Amendment</u>

     As one of the grounds for their dismissal motion, the defendants

argue that the State of New York, the New York OHM, and the CNYPC

are not "persons" within the meaning of 42 U.S.C. § 1983 and that these

defendants are, therefore, entitled to Eleventh Amendment immunity.

     The Eleventh Amendment protects a state against suits brought in

federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978).[17]  This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest.  *Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91 102 S. Ct. 2325, 2328-2329 (1982)).  To the extent that a state official is sued for damages in his official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[18]  *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

In this instance, the plaintiff's claims against the State of New York are precluded by the Eleventh Amendment.  *Richards*, 597 F. Supp. at

---

[17]  In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the state.  As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  *Northern Ins. Co of New York v. Chatam County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

[18]  By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

691.   Additionally, because plaintiff's section 1983 claims against the OMH

and the CNYPC are in reality claims against the State of New York, they

typify those against which the Eleventh Amendment protects and are also

subject to dismissal on this basis.   *See Wylie v. Bedford Hills Correct.*

*Facility of the State of N.Y.*, No. 07 Civ. 6045, 2008 WL 2009287, *1

(S.D.N.Y. May 8, 2008) (dismissing claims against CNYPC because it is

an agency of the state); *Daisernia v. State of New York,* 582 F. Supp. 792,

798-99 (N.D.N.Y. 1984) (McCurn, J.).  I therefore recommend dismissal of

plaintiff's claims against the State of New York , the OMH and the CNYPC.

> D.     Personal Involvement

In their motion to dismiss defendants further assert that plaintiff has

pleaded no facts demonstrating defendants Hogan, Sawyer, and Nowicki

were personally involved in the alleged constitutional deprivations.

Personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under section 1983.

*Wright,* 21 F.3d at 501 (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880,

885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.

1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to

prevail on a section 1983 cause of action against an individual, a plaintiff

must show some tangible connection between the constitutional violation

alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

   1.   Defendants Hogan and Nowicki

Plaintiff's claims against defendants Hogan, Commissioner of New York State OMH, and Nowicki, Chief of Mental Health Treatment Services, are apparently predicated exclusively upon their roles as supervisors.  The plaintiff alleges no specific contact with either of those defendants nor does he allege that either participated in the alleged constitutional deprivations in any manner.

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that

unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143, 152-53

(2d Cir. 2007), *rev'd on other grounds*, *sub nom*., *Ashcroft v. Iqbal*, ___

U.S. ___, 129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435;

*Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir.

1986).

Even if the plaintiff is alleging that defendants Hogan and Nowicki

are responsible for the training, supervision, discipline, or control of the

staff at CNYPC, without more, these allegations are insufficient to

establish personal involvement.  *See Lombardo v. Stone*, No. 99 CIV

4603, 2001 WL 940559, *6 (S.D.N.Y. Aug. 20, 2001) (dismissing claims

against the commissioner of the New York OMH where he was never

informed that a violation had occurred).  Vague and conclusory allegations

that a supervisor has failed to train or properly monitor the actions of

subordinate employees will not suffice to establish the requisite personal

involvement and support a finding of liability.  *Pettus v. Morgenthau*, 554

F.3d 293, 300 (2d Cir. 2009) ("To the extent that [a] complaint attempts to

assert a failure-to-supervise claim . . .  [that claim is insufficient where] it

lacks any hint that [the supervisor] acted with deliberate indifference to the

possibility that his subordinates would violate [plaintiff's] constitutional

rights.").

Accordingly, I recommend dismissal of plaintiff's claims as against defendants Hogan and Nowicki with leave to replead.  *See Orraca v. McCreery*, No. 9:04-CV-1183, 2006 WL 1133254, at *6 (N.D.N.Y. Apr. 25, 2006) (dismissing plaintiff's claim against a defendant with leave to replead where defendant was named in caption but not described in body of complaint).

### 2.   Defendant Sawyer

The plaintiff alleges in his complaint that he sent a letter of concern to defendant Sawyer, Director of the CNYPC, regarding the relevant events, but he received no reply from Sawyer, and "nothing was done" by the CNYPC administration in relation to the events that took place on February 2, 2009 through February 5, 2009.  Even if true, these allegations alone are nonetheless insufficient to establish the requisite personal involvement on the part of defendant Sawyer in the constitutional violations alleged.  *See Greenwaldt v. Coughlin*, No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent

of prison where only allegation was that he ignored inmate's request for an investigation)).  I therefore also recommend dismissal of the plaintiff's claims as against defendant Sawyer with leave to replead.

     E.   Protective Order

In their motion defendants also move pursuant to Federal Rules of Civil Procedure Rule 26(c)(1) for a protective order barring discovery pending the resolution of defendants' motion to dismiss. That rule provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure of discovery.

Fed. R. Civ. P. 26(c)(1).  In light of my recommendation that that court dismiss plaintiff's complaint with leave to amend, I find that good cause exists for issuing an order to protect the defendants from the burden of discovery until the court acts upon this report and, if adopted, until the plaintiff files an amended complaint that is accepted for filing by the court.

## IV.   SUMMARY AND RECOMMENDATION

Having carefully considered defendants' motion in view of the formative stage of the proceedings at which it is made, I find that

defendant State of New York, the OMH, and the CNYPC are entitled to dismissal on the basis of immunity afforded by the Eleventh Amendment, and further that defendants Hogan, Sawyer and Nowicki are entitled to dismissal based upon plaintiff's failure to plead facts showing their personal involvement in the constitutional violations alleged. I further recommend, however, that plaintiff be afforded leave to replead with regard to those three individual defendants in order to attempt to show the requisite level of personal involvement in the deprivations at issue.

Turning to the merits, after analyzing the potential claims which could be considered as having been asserted based upon the facts alleged in plaintiff's complaint, I find that he has failed to plead a plausible constitutional deprivation upon which relief may be granted and therefore recommend dismissal of his complaint on the merits, again with leave to replead, except as to any Sixth Amendment claim .[19] Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion to dismiss (Dkt. No. 7) be GRANTED and that plaintiff's claims for deprivations of due process and adequate medical care and those against defendants Hogan, Nowicki,

---

[19]    In light of this recommendation I have not addressed the additional argument by defendants claiming entitlement to qualified immunity from suit based upon the circumstances outlined in plaintiff's complaint.

and Sawyer be DISMISSED, with leave to amend, and that plaintiff's claim for violation of the Sixth Amendment as well as those against the State of New York, the CNYPC and the OMH be DISMISSED, without leave to replead; and it is further hereby

ORDERED, that pending a determination by the assigned district judge with respect to this report, and the plaintiff's filing of an amended complaint, discovery in this action is hereby STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:       March 1, 2010
             Syracuse, New York

40



Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

☛   Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Timothy MAKAS Plaintiff,
v.
Richard MIRAGLIA, Howard Holanchock, Mr. Halik,
Beth Judge, Salil Kathpalia, Sue Stevens, and New York
State Office of Mental Health Defendants.
Timothy MAKAS Plaintiff,
v.
Kristin ORLANDO, Ms. Shah, Mr. Malik, Mr. Wiredu,
Beth Judge, Mr. Carbona, Howard Holanchock, Zelma
Armstrong, Ms. G. Shivashankar, and Mr. Kathpalia
Defendants.
**No. 05 CIV 7180 DAB FM, 06 CIV 14305 DAB FM.**

March 5, 2007.

Timothy Makas, New Hampton, New York, pro se.

*ADOPTION OF REPORT AND RECOMMENDATION,
AND FURTHER ORDER OF THE COURT*

BATTS, J.

## *I. BACKGROUND*

**\*1** On August 12, 2005, Plaintiff filed an Amended
Complaint in Case No. 05 Civ. 7180(DAB)(FM)
("Complaint # 1") against Defendant New York State
Office of Mental Health ("OMH") and several OMH
employees. Complaint # 1 alleges, *inter alia,* that
Plaintiff's constitutional rights were violated when OMH
representatives submitted him to routine blood tests and
then left open the records of those test results to OMH
employees. Complaint # 1 prays for compensatory and

exemplary damages. (Compl. # 1 at 20.) Defendants have
moved to dismiss that Complaint.

On December 11, 2006, Plaintiff filed a Complaint in Case
No. 06 Civ. 14305(DAB)(FM) ("Complaint # 2") against
OMH employees, some of whom are Defendants named in
the first action. Complaint # 2 alleges that Defendants
violated his constitutional rights by continuing to draw
blood from him in retaliation for the first lawsuit and by
threatening to keep him confined to a psychiatric center
until he dismisses that lawsuit. (No. 06 Civ. 14305, ¶¶ 20,
38.)

On December 28, 2006, United States Magistrate Judge
Frank Maas issued a Report and Recommendation
("Report"), recommending that Defendants' Motion to
Dismiss Complaint # 1 pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure be granted. (Report at
16.) Pursuant to 28 U.S.C. § 636(b)(1)(c), "[w]ithin ten
days after being served with a copy [of the Magistrate
Judge's Report], any party may serve and file written
objections to such proposed findings and
recommendations." 28 U.S.C. § 636(b)(1)(c); *see
also*Fed.R.Civ.P. 72(b) (stating that "[w]ithin 10 days after
being served with a copy of the recommended disposition,
a party may serve and file specific, written objections to
the proposed findings and recommendations."). Plaintiff
filed timely objections to the Report.

For the reasons contained herein, Magistrate Judge Maas'
Report shall be ADOPTED in its entirety, and Complaint
# 2 shall be DISMISSED by the Court *sua sponte.*
Plaintiff shall be GRANTED leave to amend Complaint #
2 within 45 days of the date of this Order.

## *II. DISCUSSION*

A. *Plaintiff's Objections to the Magistrate's Report*

When reviewing the portions of a report and

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

recommendation to which no objections have been filed, "a district court need only satisfy itself there is no clear error on the face of the record." *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). However, the District Court is required under 28 U.S.C. 636(b)(1)(c) to make a "de novo determination of those portions of the report or specified proposed findings or recommendations to which [an] objection is made." Plaintiff submitted five objections to the Magistrate's Report.

(1) *First Objection: OMH Immunity*

Plaintiff first objects to the Magistrate's conclusion that sovereign immunity shields Defendant OMH, a state agency, from this suit. As the Magistrate states, "[u]nder the Eleventh Amendment, a state and its agencies are generally immune from suit in federal court unless the state consents to be sued." Report at 31, *citing Seminole Tribe of Florida,* 517 U.S. 44, 54-59 (1996); *Papasan v. Allain,* 478 U.S. 265, 276 (1986); *De La Nueces v. United States,* 780 F.Supp. 216, 217 (S.D.N.Y.1992). Plaintiff cites a host of cases to argue that immunity under the Eleventh Amendment does not bar absolutely suits brought by individual citizens against states or their agencies. But none of the cases cited by Plaintiff apply here. The cases to which he refers were either cases brought against state officials; *see* Pl.'s Obj. at 2-5, *citing Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833 (1992); *Papasan v. Allain,* 478 U.S. 265 (1986); *Dunn v. Blumstein,* 405 U.S. 330 (1972); *Shapiro v. Thompson,* 394 U.S. 618 (1969); suits initiated by the state itself; *see* Pl.'s Obj. at 2-5, *citing New Jersey v. T.L.O.,* 469 U.S. 325 (1985); *Skinner v. Oklahoma ex rel. Williamson* 316 U.S. 535 (1942); a suit brought against a political subdivision of a state, *see* Pl.'s Obj. at 2-5, *citing Kramer v. Union Free School Dist. # 15,* 395 U.S. 621 (1969); or a suit against a state that was not commenced in federal court, but was later appealed from that state's high court to the Supreme Court; *see* Pl.'s Obj., *citing Whitney v. California,* 274 U.S. 357 (1927).

**\*2** Because Plaintiff cites no case to counter this well-established precept of Eleventh Amendment law, his objection to the Magistrate's conclusion on OMH's immunity is without merit.

(2) *Second Objection: Liberty Interest in Refusing Bloodwork*

Plaintiff objects to the Magistrate's finding that his liberty interest in refusing routine blood tests is not protected by the Constitution. To this end, Plaintiff cites three cases, but those cases merely stand for the general proposition that the Fourteenth Amendment protects the "freedom to care for one's health and person". *See* Pl.'s Obj. at 6, *citing Planned Parenthood,* 505 U.S. 833; *Washington v. Harper,* 494 U.S. 210 (1990); *Doe v. Bolton,* 410 U.S. 179 (1973). Plaintiff cites nothing to counter the Magistrate's correct conclusion that because blood tests "are commonplace" and involve "virtually no trauma", occasional routine blood tests of a resident at a psychiatric facility to protect his health are not so conscience-shocking as to constitute a violation of the Fourteenth Amendment. *See County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998) (finding that a due process violation must "shock the conscience" or do violence to the "decencies of civilized conduct"); *cf. Stanley v. Swinson,* 47 F.3d 1176 (9th Cir.1995) (finding that forced non HIV-related blood tests of prisoners for the purpose of diagnosing serious disease and preventing its transmission were not repugnant to a person's due process rights).

Because Plaintiff alleges no conscience-shocking or repugnant measure taken by Defendants during the administration of his blood tests, the Court finds that the Magistrate correctly concluded that the blood tests have not encroached on Plaintiff's due process rights.

(3) *Third Objection: Right to Privacy*

Plaintiff objects to the Magistrate's conclusion that there has been no violation of his constitutional privacy right meriting the recovery of damages. According to Plaintiff, the Magistrate misunderstood his privacy claim as one against a particular OMH employee or employees who disclosed personal information from his medical records. Plaintiff writes, however, that his grievance is not with a particular employee's actions, but with the general OMH policy that permits all employees at the Mid-Hudson Psychiatric Center to view his medical records. (Pl.'s Obj.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

at 3.) Plaintiff argues that even if Complaint # 1 does not allege that specific OMH employees improperly disclosed his personal records, he should recover damages for the office-wide policy that permits such disclosure.

Whether Plaintiff has a liberty interest in an OMH policy of nondisclosure is inapposite. As stated *supra,* neither a state nor any of its agencies are proper defendants in a suit commenced by a citizen in federal court. Plaintiff's privacy claim, therefore, is not sustainable against OMH. Because the only relief sought in Complaint # 1 is damages, the privacy claim also is not sustainable against any of the OMH employees in their official capacities. *SeePapasan,* 478 U.S. at 278 (noting that successful damages suits against state officials in their official capacity would deplete the public fisc and therefore are proscribed under the Eleventh Amendment); *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974) (same).

**\*3** Accordingly, Plaintiff's third objection fails.

(4) *Fourth Objection: Psychological Pain*

Plaintiff's fourth objection is twofold. First, he contends that psychological pain is a cognizable constitutional injury, and that therefore he should recover damages. (Pl.'s Obj. at 8.) Second, he objects to the Magistrate's conclusion that his alleged psychological pain is not a violation of the Eighth Amendment.[FN1] (Pl.'s Obj. at 9.)

> FN1. Because Plaintiff's claims against OMH and the OMH employees in their official capacities are prohibited under the Eleventh Amendment, *seesupra,* this objection is only relevant to Plaintiff's claims against Defendants in their individual capacities.

While Plaintiff may be correct that psychological pain is a cognizable injury under the law, Plaintiff's argument misapprehends the thrust of the Magistrate's recommendations. The Magistrate has not recommended dismissal of those claims because of any distrust about Plaintiff's claim that he was emotionally distraught by

Defendants' actions. Rather, the Magistrate's reasoning was based on his finding that Defendants' conduct that allegedly invoked Plaintiff's psychological pain, i.e., the routine blood tests, was not so egregious as to shock the conscience of a reasonable person. (*See* Report at 21.)

The Magistrate also correctly concluded that Plaintiff's alleged injury is not cognizable under the Eighth Amendment. The Eighth Amendment's prohibition of cruel and unusual punishment only applies once the State "has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977). Plaintiff has not been convicted of, nor pled guilty to, any crime.

The cases cited by Plaintiff do nothing to counter this precept of Eighth Amendment jurisprudence. *See* Pl.'s Obj. at 9, *citing Ferguson v. City of Charleston,* 532 U.S. 67 (2001) (Fourth Amendment case); *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189 (1989) (state owed no Fourteenth Amendment duty to protect abused child from father); *New Jersey v. T.L.O.,* 469 U.S. 325 (1985) (Fourth Amendment case); *City of Revere v. Massachusetts General Hosp.,* 463 U.S. 239, 243-44 (1983) ("[t]he Eighth Amendment's proscription of cruel and unusual punishments is violated by deliberate indifference to serious medical needs of prisoners", but not when there has been "no formal adjudication of guilt at the time ... medical care [was required]."); *Ingraham,* 430 U.S. at 664 (1977) (Eighth Amendment was "designed to protect those convicted of crimes" and did not protect schoolchildren from disciplinary corporal punishment); *Matter of Anonymous,* 663 N.Y.S.2d 492 (Sup.Ct.1997) (insanity acquitees are not entitled under state law to have their criminal records under seal); *People v. Davis,* 606 N.Y.S.2d 899 (1st Dept.1994) (for purposes of speedy trial requirements, criminal proceeding commenced when criminal defendant withdrew plea of not responsible for reason of insanity).

Accordingly, Plaintiff's objections pertaining to psychological pain are without merit.

(5) *Fifth Objection: Alleged Forceful Hold-Down*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

Plaintiff argues that Defendant Beth Judge's holding him down to draw blood rose to the level of a constitutional violation. Because Plaintiff's claim against Defendant Judge in her official capacity is improper on sovereign immunity grounds, *see supra,* Plaintiff's objection is relevant only to Defendant Judge's potential liability in her individual capacity. For a government official performing discretionary functions to be shielded from individual liability for civil damages, the official's conduct must have violated clearly established rights, or the official reasonably should have known that the conduct violated Plaintiff's rights. *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003).

*4 Physical restraint of a person with mental or developmental disabilities does not violate due process if the interests of the state outweigh the person's liberty interest in freedom of movement. *Youngberg v. Romeo,* 457 U.S. 301, 320-21 (1982). In *Youngberg,* a state shackled an individual with developmental disabilities for prolonged periods of the day so that he would not harm himself or others. *Id.* The Supreme Court remanded the case so that the jury could properly consider whether the shackles unconstitutionally infringed on the restrained respondent's due process liberties, and whether the respondent had successfully rebutted the presumption of correctness afforded to the decisions of medical and social services personnel. *Id.* at 324 (the State "may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training").

Plaintiff's allegations significantly differ from the facts in *Youngberg.* He does not allege that he was shackled for extended periods of time. Rather, Defendant Judge allegedly held down Plaintiff for a brief time to facilitate the administration of his blood test. It is objectively reasonable for Defendant Judge to have believed that her conduct did not violate Plaintiff's rights. OMH has an interest in protecting the safety and health of its wards, including-as is the case here-the health and safety of Plaintiff. It is reasonable for Defendant Judge to have concluded that the only way to achieve that state interest was to restrain temporarily Plaintiff for the duration of a blood test. Therefore, neither Judge-nor any other individual Defendant-may be held liable in their individual capacities for restraining Plaintiff.

Accordingly, Plaintiff's fifth objection is without merit. Having considered each of Plaintiff's objections, this Court finds that Complaint # 1 cannot survive Defendants' Motion to Dismiss.

B. *Plaintiff's Second Complaint (No. 06 Civ. 14305(DAB)(FM))*

(1) *Dismissal of Complaint # 2*

Complaint # 2 also cannot survive. As with the damages claims in Complaint # 1, the prayers for damages in Complaint # 2 shall be dismissed on sovereign immunity grounds, to the extent that the damages are sought against Defendants in their official capacities.

What this leaves from Complaint # 2 are Plaintiff's claims which involve injunctive relief against any Defendant in his or her official capacity, and his claims which involve damages against any Defendant in his individual capacity. Those claims are: 1) that Defendants extracted his blood in retaliation for his litigation, and 2) that Defendants decided to confine him to the Mid-Hudson Psychiatric Center indefinitely until he stops litigating.

The blood extraction claim shall be dismissed because, as explained *supra,* routine and occasional blood testing of residents of psychiatric centers does not shock a reasonable person's conscience. The retaliatory confinement claim also shall be dismissed. That claim does not make clear which Defendants decided to confine Plaintiff or which Defendants even have the authority to do so. Nor does that claim make clear whether the decision to confine him was because his litigiousness, in Defendants' reasonably professional opinion, was symptomatic of a psychiatric condition requiring confinement, or whether Plaintiff's litigiousness of itself incited a purely retaliatory response.

*5 Accordingly, Complaint # 2 is DISMISSED in its entirety. *See Liner v. Goord,* 196 F.3d 132, 134 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

Cir.1999) (permitting court to dismiss *sua sponte* claims it deems frivolous or when no claim has been stated).

(2) *Leave to Amend*

Even when a complaint has been dismissed, permission to amend it "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). While it is the usual practice to allow leave to replead, *Cohen v. Citibank,* No. 95 Civ 4826, 1997 WL 883789, at *2 (S.D.N .Y. Feb. 28, 1997), a court may dismiss without leave to amend when amendment would be futile. *Oneida Indian Nation of New York v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Forman v. Davis,* 371 U.S. 178, 182 (1962)).

Granting leave to amend the allegations in Complaint # 2 relating to Plaintiff's Section 1983 retaliatory confinement claims may not be futile. Plaintiff alleges that a "team" of Defendants told him: "Stop lawsuits or you will never leave [the Mid-Hudson Psychiatric Center]." (Compl. # 2 ¶ 38.) Plaintiff also alleges that Defendant Orlando "decreed" in September of 2004 to "hold Plaintiff at [the Mid-Hudson Psychiatric Center] for another two years because of 'renewed focus on litigation, low level psychosis [sic]." (Compl. # 2 ¶ 20.) These allegations suggest that amendment of Plaintiff's Section 1983 retaliatory confinement claim may not be futile.

Accordingly, Plaintiff shall be GRANTED 45 days from the date of this Order to amend Complaint # 2 to state his Section 1983 retaliatory confinement claim with more particularity.

### III. CONCLUSION

Having reviewed the specific objected-to portions of the Report de novo, and having reviewed the remainder of the Report for clear error, it is hereby:

ORDERED AND ADJUDGED as follows: the Report and Recommendation of United States Magistrate Judge Frank Maas, dated December 28, 2006, is APPROVED, ADOPTED, and RATIFIED by the Court in its entirety.

Accordingly, Defendants' motion to dismiss Plaintiff's Complaint in No. 05 Civ. 7180(DAB)(FM) pursuant to Fed.R.Civ.P. 12(b)(6) is hereby GRANTED.

Plaintiff's Complaint in No. 06 Civ. 14305(DAB)(FM) is hereby DISMISSED. Plaintiff is hereby GRANTED LEAVE TO AMEND Complaint No. 06 Civ. 14305(DAB)(FM) within 45 days of the date of this Order.

The Clerk of the Court is DIRECTED TO CLOSE No. 05 Civ. 7180(DAB)(FM) and remove it from the docket.

SO ORDERED.

### REPORT AND RECOMMENDATION TO THE HONORABLE DEBORAH A. BATTS

MAAS, Magistrate J.

### I. *Introduction*

Plaintiff Timothy Makas ("Makas") is a patient at the Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"), a secure hospital operated by the State of New York ("State") in New Hampton, New York. He brings this civil rights action, pursuant to 42 U.S.C. § 1983 ("Section 1983"), to recover damages for emotional and physical injuries arising out of blood draws that periodically were taken from him at Mid-Hudson without a warrant and without his consent. Makas also contends that his confidential medical test results were improperly disseminated to persons who had no right to be privy to them. The defendants are Richard Miraglia ("Miraglia"), who is alleged to be the Commissioner of the New York State Office of Mental Health ("OMH");[FN1] Howard Holanchock ("Holanchock"), the Director of Mid-Hudson; Drs. Malik ("Malik"), Beth A. Judge ("Judge"), and Salil Kathpalia ("Kathpalia"), who are alleged to be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

psychiatrists at Mid-Hudson; Sue Stevens ("Stevens"), a Security Hospital Treatment Assistant ("SHTA")[FN2] at Mid-Hudson; and OMH (collectively, the "Defendants").[FN3]

> FN1. The Defendants indicate that Miraglia is actually Associate Commissioner of the OMH Division of Forensic Services. (*See* Defs .' Mem. at 1).

> FN2.*See* *Jennings v. N.Y.S. OMH,* 977 F.2d 731, 732 (2d Cir.1992).

> FN3. On May 31, 2006, defendant Woode, a former psychiatrist at Mid-Hudson, was dismissed from this action after Makas confirmed that he did not intend to proceed against him. (*See* Docket No. 21).

*6 In his *pro se* amended complaint ("Complaint" or "Compl ."), Makas contends that the Defendants' actions violated his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and his "statutory right of privacy," and give rise to claims of intentional infliction of emotional distress and negligence.

The Defendants have moved to dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that (a) Makas has failed to state a claim upon which relief can be granted, (b) the Eleventh Amendment bars Makas' claim against OMH, (c) the Defendants are entitled to qualified immunity, and (d) Makas has failed to allege sufficient personal involvement on the part of Miraglia and Holanchock. For the reasons set forth below, I recommend that this motion be granted, and that the Complaint be dismissed.

II. *Background*

A. *Facts*

The facts set forth below are derived principally from the Complaint and the exhibits thereto, and for present purposes are assumed to be true.

1. *Charges Leading to Civil Commitment*

In 1998, Makas set fire to one of two adjoining properties that he owned in the Village of Hurley in Ulster County. *See* *People v. Makas,* 709 N.Y.S.2d 650, 651 (3d Dep't 2000). Makas then called "911" to report the fire, stating that he wanted the police to respond and shoot him. *Id.* He was indicted on arson charges and eventually was found competent to stand trial. *Id.* at 651-52. He pleaded guilty to Arson in the Second Degree, but his conviction was set aside on appeal because his allocution failed to establish all of the necessary elements of that crime. *Id.* at 652-53.

Thereafter, Makas was permitted to plead "not responsible by reason of mental disease or defect" pursuant to Section 220.15 of the New York Criminal Procedure Law ("CPL"). Following that plea, Makas was placed in the custody of the OMH Commissioner and committed to Mid-Hudson. *See* *Makas v. Schlenker,* 793 N.Y.S.2d 604 (3d Dep't 2005). He has since been housed in at least two different wards of Mid-Hudson. (*See* Compl. ¶ 5).

2. *Blood Draws at Mid-Hudson*

From January 2001 until January 2003, Makas was assigned to Building 4 at Mid-Hudson. While he was there, several "John Does" not named as defendants in this case drew blood from him on a yearly basis. (*Id.* ¶¶ 5, 7). "[A]mid threats of physical violence," Makas "tried to resist" these bloods draws and demanded that the OMH staff first obtain a court order. (*Id.* ¶ 8). Nevertheless, "fearing for his further physical and mental health," Makas "gave blood under duress." (*Id.* ¶ 9).

In or around January 2003, Makas was transferred to Building 2 at Mid-Hudson, where the "threats and painful blood stabbings continued and escalated." (*Id.* ¶ 10). Beginning in the summer of 2003, Makas' blood was drawn every three months; by the summer of 2004 the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

frequency of the draws had escalated to monthly. (*Id*.). Makas does not know which OMH employees actually drew his blood on these occasions because Judge prevented him from reviewing his medical chart. (*Id*. n.1).

**\*7** In July 2004, Makas learned that "Albany" was now requiring that patients' blood be tested once every three months. (*See* Compl. Ex. F).<sup>FN4</sup>

> FN4. The exhibits to the Complaint are untabbed. For ease of reference, I have inserted letters on them on the Court's original Complaint.

In February 2005, Judge and Stevens attempted to draw Makas' blood, explaining that Mid-Hudson now required a blood draw once every three months. (*Id*. ¶ 11). When Makas resisted, he was not required to give blood. (*Id*.).

On March 9, 2005, Makas wrote to Holanchock because Judge sought to draw his blood every three months to monitor his cholesterol levels and liver health. (*See* Compl. Ex. A (letter dated Mar. 9, 2005, from Makas to Holanchock)). Makas explained his understanding that the OMH policy required only annual blood-testing, and he expressed "constitutional" concerns about the manner in which that policy was being implemented. (*Id*.).

In or around late March 2005, Judge warned Makas that if he resisted further blood draws, SHTAs would "hold [him] down and forcibly take blood without a court order," after which he would be removed from Mid-Hudson's "honor ward." (Compl.¶ 12). The following day, Malik, who is Judge's supervisor at Mid-Hudson, informed Makas that Mid-Hudson would draw his blood once every six months. (*Id*. ¶ 14). Makas felt "under duress, intimidated, uncomfortable and pressured ... [,] so he agreed to give blood." (*Id*. ¶ 15).

On April 10, 2005, a Mid-Hudson nurse declined Makas' request that she draw blood from his hand rather than his arm. (*Id*. ¶ 16). After Makas refused to let the nurse draw blood from his arm, Stevens "jumped at [Makas] saying 'why are you refusing again?' " (*Id*. ¶ 17 (internal quotation marks and question mark added)). That same day, Makas wrote to Miraglia to report that Judge and Stevens had threatened to "tak[e his] blood, by force, without court order." (*See* Compl. Ex. B (letter dated Apr. 10, 2005, from Makas to Miraglia)). Makas added that, "[b]esides having needles deliberately twisted around in the arm/hand causing extreme pain and bruising," he had "been threatened with physical force and/or legal action." (*Id*.). Makas explained that the blood draws caused him "extreme emotional pain-sleepless nights and all; not to mention the physical trauma of being stabbed repeatedly." (*Id*.). In his letter, Makas again asserted that these blood draws violated his constitutional rights. (*Id*.).

On April 11, 2005, the Mid-Hudson clinic drew blood from Makas in a procedure that he characterizes as having been "stabbed" in the arm "amid protests." (Compl.¶ 18). That same day, Makas wrote to an unidentified Mid-Hudson "Unit Chief" to request that he be permitted to see his medical records. Makas also reported that Judge and Stevens had "threatened physical harm" and that he would be "held down [without] court order to obtain blood" if he resisted. (*See* Compl. Ex. C (letter dated Apr. 11, 2005, from Makas to Unit Chief)). Four days later, Judge prescribed anti-depression medication that Makas took for "fear of retaliation for refusing medication." (Compl.¶ 20). The medicine, which later was discontinued, made Makas both physically and mentally ill. (*Id*.).

**\*8** On April 20, 2005, Judge informed Makas that he could refuse the blood draws, but that he would be removed from the "Honor/Discharge Ward" if he did. (*Id*. ¶ 22).

In mid-May 2005, Makas gained access to his medical records and learned that Mid-Hudson was testing his blood for [syphilis] and [hepatitis] and to monitor his thyroid level. (*Id*. ¶¶ 23-24). Accordingly, on May 15, 2005, Makas wrote to Miraglia to complain that the testing was an invasion of his privacy. In the letter, Makas asked, "What[']s next-DNA?" (Compl. Ex. D (letter dated May 15, 2005, from Makas to Miraglia)). Makas also stated that, even though Judge had informed him that he could refuse blood draws, Mid-Hudson's "overall" blood-drawing policy remained unclear. (*Id*.). Five days

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

later, Miraglia responded to Makas' letter, suggesting that Makas work with his "treatment team and have them arrange with the appropriate clinical staff that a more thorough explanation be provided to you the next time it is necessary for your blood to be drawn." (*See* Compl. Ex. E (letter dated May 20, 2005, from Miraglia to Makas)). Kathpalia was sent a copy of this letter. (*Id.*).

At some point, Makas also complained to a Mid-Hudson hotline about the blood draws, but he received no further response from the facility's administration. (Compl.¶ 25).

On May 28, 2005, Makas was returned to Building 4. (*Id.* ¶ 6). Thereafter, for the remainder of the year, he refused to allow Mid-Hudson to draw his blood. (*Id.* ¶¶ 28-30).

### 3. *Sharing of Medical Information*

Makas also contends that his medical records were shared without his consent with "DA's[,] attorney generals, social workers, unit chiefs, guards (SHTAs), etc." (*Id.* ¶ 41 n.2 (block capitalization omitted)).

### B. *Complaint*

Makas' original *prose* complaint is dated July 17, 2005, and was received by the Pro Se Office of this Court on July 22, 2005. Thereafter, Makas amended his complaint on January 31, 2006. (*See* Docket No. 28). In his amended pleading, Makas asserts numerous claims.

First, Makas asserts several federal claims. Specifically, Makas contends that Malik, Judge, Stevens, and OMH violated his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments by (i) drawing his blood without his consent or a court order, and (ii) making "intentional threats to physically take [his] blood with or without court order." (Compl. at 13-14, 19). Makas also claims that Miraglia and Holanchock are liable for "tolerating such misconduct" and refusing "to adequately train, direct, [and] supervise [Mid-Hudson] staff" on proper procedures. (*Id.*). Makas further alleges that Kathpalia,

Miraglia, and Holanchock violated his constitutional rights to due process and to be free of unreasonable search and seizure, as well as his "statutory right to privacy," by authorizing the testing of his blood for infectious diseases. (*Id.* at 19). Additionally, Makas alleges that Miraglia and Holanchock violated his rights because "other defendants" acting within the scope of their employment disseminated his "private blood test results to [third] parties." (*Id.* at 19.5). Finally, Makas claims that Malik, Judge, Kathpalia, and Stevens conspired to violate his rights "by acting in concert to ignore [his] requests for no blood work and together creating an environment of intimidation and coercion[,] including the use of verbal abuse." (*Id.* at 16).

**\*9** Makas also asserts two state law claims. First, he alleges that Judge and Stevens are liable to him for intentional infliction of emotional distress because they ignored his rights "of not giving blood [and] of being free of intentional verbal abuse" and acted in an "extreme, outrageous, and unjustified" manner that caused him "to suffer physical and emotional distress." (*Id.* at 17). Second, Makas claims that the Defendants were negligent because they failed to perform their duties "without the use of intimidation, coercion and verbal abuse and refus[ed him] his constitutional rights." (*Id.* at 18).

In his Complaint, Makas seeks compensatory and exemplary damages, as well as costs and attorney's fees.

### C. *Motion to Dismiss*

On September 13, 2006, the Defendants filed their motion to dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Defendants maintain that Makas does not have a constitutional right to resist routine diagnostic blood draws while he is civilly committed to a secure state hospital. The Defendants further contend that, even if Makas has a constitutional right not to be tested, the individuals he has sued are entitled to qualified immunity, and the Eleventh Amendment bars any recovery against OMH. The Defendants also allege that Miraglia and Holanchock had no personal involvement in the alleged wrongs. Finally, the Defendants maintain that Makas has no right to have his medical records kept private under the circumstances

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

of this case.

Makas has filed a memorandum of law in opposition to the motion to dismiss, (Docket No. 33), and the Defendants have filed a reply memorandum (Docket No. 35). Accordingly, the motion is fully submitted.

III. *Discussion*

A. *Standard of Review*

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle." *In re Nortel Networks Corp. Sec. Litig.,* 238 F.Supp.2d 613, 621 (S.D.N.Y.2003) (quoting *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999)). In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must "limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996) (quoting *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Additionally, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). The Court may grant the motion only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

**\*10** "Where a party proceeds *prose,* the Court is obligated to "read [the *prose* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Sloane v. Mazzuca,* No. 04 Civ. 8266(KMK), 2006 WL 3096031, at \*3 (S.D.N.Y. Oct. 31, 2006) (citing *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)) (brackets and ellipsis in original); *see also Davis v. Kelly,* 160 F.3d 917, 922 (2d Cir.1998) ("Though a court need not act as an advocate for *prose* litigants, in *prose* cases there is a greater burden and a

correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done.") (internal quotation marks and citation omitted)). This principle applies with particular force in cases such as this in which a *prose* plaintiff alleges civil rights violations. *See, e.g., Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993); *Contes v. City of New York,* No. 99 Civ. 1597(SAS), 1999 WL 500140, at \*2 (S.D.N.Y. July 14, 1999). "However, even when assessing a *prose* plaintiff's claim under the Rule 12(b)(6) standard, 'a conclusory allegation ... without evidentiary support or allegations of particularized incidents, does not state a valid claim.' " *Sloane,* 2006 WL 3096031, at \*3 (quoting *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)) (ellipsis in original).

B. *Section 1983* Claims

Section 1983 provides a means by which a person alleging a constitutional deprivation may bring a claim, but does not itself create any substantive rights. *Sykes,* 13 F.3d at 519. Accordingly, to state a claim under Section 1983, a plaintiff must allege that a defendant acting under color of state law has deprived him of a right, privilege, or immunity guaranteed by the United States Constitution. *See* 42 U.S.C. § 1983; *Fox v. City of New York,* No. 03 Civ. 2268(FM), 2004 WL 856299, at \*4 (S.D.N.Y. Apr. 20, 2004). Here, Makas alleges that the Defendants, acting under the color of state law, violated his Fourth, Fifth, Eighth, and Fourteenth Amendment rights.

1. *Fourth Amendment*

Makas contends that his Fourth Amendment rights have been violated because the blood draws taken by the Defendants without a warrant constitute an unreasonable search and seizure. (*See* Compl. ¶ 44). The Fourth Amendment provides that, "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend IV. The Fourth Amendment thus is "a vital safeguard of the right of the citizen to be free from *unreasonable* governmental intrusions into any area in which he has a *reasonable* expectation of privacy." *Winston v. Lee,* 470

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

Blood testing unquestionably constitutes a search under the Fourth Amendment because it is an invasive procedure. *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 624-26 (1989). Furthermore, "[b]ecause [Mid-Hudson] is a state hospital, the members of its staff are government actors, subject to the strictures of the Fourth Amendment." *Ferguson v. City of Charleston,* 532 U.S. 67, 76 (2001). To establish a Fourth Amendment violation, Makas nevertheless must establish that the searches to which he objects were unreasonable. *See Skinner,* 489 U.S. at 619.

*11 Warrantless searches, such as the ones to which Makas objects, are *"per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967) (Harlan, J., concurring). One such exception applies when an important governmental interest or immediate hazard gives rise to a "special need." *See Ferguson,* 532 U.S. at 75 n.7. In such circumstances, the Supreme Court has "tolerated suspension of the Fourth Amendment's warrant or probable-cause requirement in part because there [is] no law enforcement purpose behind the searches ..., and there [i]s little, if any, entanglement with law enforcement." *Id.* at 79 n.15.

*Ferguson,* like this case, arose in a hospital setting. There, a hospital had entered into an agreement with local law enforcement officials to turn over the results of urine drug screens of pregnant women or those who had given birth if they tested positive for cocaine. *Id.* at 70-71. Pursuant to the agreed protocol, the women were given an opportunity to avoid arrest if they participated in substance abuse treatment. *Id.* at 72. While the "ultimate goal" of the program was to wean the women from drugs, the Supreme Court noted that local prosecutors and police were "extensively involved in the day-to-day administration" of the program, had access to the patients' medical files, and "took pains to coordinate the timing and circumstances of the arrests with [hospital] staff." *Id.* at 81-82. Accordingly, because "the immediate objective of the searches was to generate evidence for law enforcement purposes," the Court held that the defendants' actions did not "fit within the closely guarded category of special

needs." *Id.* at 83-84 (emphasis and footnotes omitted).

By comparison, courts have found the special needs exception applicable in a hospital setting when there is no evidence that the medical tests are intended to serve a law enforcement purpose. For example, in *Anthony v. City of New York,* 339 F.3d 129 (2d Cir.2003), the Second Circuit found that mandatory blood and urine tests undertaken by a state hospital to facilitate diagnosis, treatment, and patient health were constitutionally permissible. In that case, the police detained Anthony and transported her to a state psychiatric hospital. *Id.* at 133-34. After a psychiatric examination at the hospital, which resulted in a finding that Anthony was "fearful, anxious, delusional, and paranoid," hospital staff drew blood and collected a urine sample from her before providing her with anti-psychotic medication. *Id.* at 134. Rejecting Anthony's Section 1983 claim, Judge Sotomayor observed that, even though the hospital examined Anthony's blood and urine in order to determine whether she was using drugs or had a physiological imbalance, there was no law enforcement purpose behind the tests. *Id.* at 142. The tests in *Anthony* thus fell within the "special needs" exception to the Fourth Amendment's warrant requirement because they were undertaken to help the hospital treat Anthony, rather than to incriminate or otherwise harm her. *Id.* at 142; *see also Roe v. Marcotte,* 193 F.3d 72, 78 (2d Cir.1999) (warrantless collection of blood samples from convicted sex offenders in prisons approved under the "special needs" exception because significant governmental interest in maintaining institutional security, public safety, and order outweighed minimal intrusions on individual privacy).

*12 The applicability of the special needs exception therefore turns on the principal use for which the blood tests in this case were intended. If the purpose was to foster institutional or inmate health or safety, the tests pass constitutional muster. On the other hand, if the purpose was to bolster a criminal prosecution, a warrant would be required before obtaining a sample.

In his papers, Makas concedes that the purpose of many of his blood tests was to detect syphilis and hepatitis, to monitor his cholesterol and thyroid levels, and to check his liver function. (*See* Compl. ¶¶ 23-24, Ex. A). Such testing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

plainly was undertaken to ensure that Makas remained healthy while at Mid-Hudson and did not infect others, rather than to further a law enforcement purpose. There consequently was no need for the Defendants to secure a warrant or court order before drawing Makas' blood.

Makas further alleges that Mid-Hudson permitted the District Attorney and Attorney General, among others, to review his medical records, which presumably contained the results of the tests conducted on his blood. (*See id.* ¶ 41 n.2). He also suggests that DNA tests of his blood may have been conducted. (*See id.* ¶ 24). However, even if these allegations were to be accepted at face value, there is no indication that the sharing of his medical information served or was intended to serve a law enforcement purpose.

Accordingly, in the absence of any allegation or evidence that the principal purpose for testing Makas' blood was to further a criminal prosecution of him, the special needs exception applies and Makas cannot establish a violation of his Fourth Amendment rights.[FN5]

> FN5. Makas contends that there was no legitimate need to test his blood for sexually transmitted diseases because he "does not have sex (dirty sex)," "washes his hands," and "doesn't use dirty items," such as dirty needles or razors, and therefore is "not at risk." (Pl.'s Mem. in Opp'n at 22 (block capitalization omitted)). Makas has not cited any authority which suggests that the special needs exception is inapplicable when the person to be tested pledges not to engage in activities which might put him at risk. Obviously, if self-serving statements such as these were sufficient to insulate a prisoner or person confined in a mental hospital from mandatory blood testing, government officials could easily be stymied in their efforts to ensure the safety of the persons entrusted to their custody.

*2. Fifth Amendment*

Liberally construed, the Complaint can also be read to allege that the Defendants have forced Makas to incriminate himself in violation of his Fifth Amendment rights. (*See* Compl. ¶ 41 n.2 & *id.* at 19.5)

The Fifth Amendment provides that no person "shall be compelled *in any criminal case* to be a witness against himself ." U.S. Const. amend. V (emphasis added). The applicability of this protection has been extended to the States pursuant to the Fourteenth Amendment. *See Malloy v. Hogan,* 378 U.S. 1, 8 (1964).

The privilege against self incrimination only applies, however, when the government seeks to make a criminal defendant "a 'witness' against himself." *Chavez v. Martinez,* 538 U.S. 760, 767 (2003). Here, it is undisputed that the prosecution of Makas was terminated following his insanity plea and commitment to Mid-Hudson. Accordingly, because there is no criminal case currently pending or contemplated against him, the Fifth Amendment privilege against self-incrimination is not implicated by the State's decision to draw and analyze samples of Makas' blood.

*3. Eighth Amendment*

Makas also alleges that the Defendants' blood draws, which he characterizes as stabbings, constituted a violation of the Eighth Amendment. (*See* Compl. at 14). That amendment makes it unlawful to impose punishment that is "cruel and unusual." U.S. Const. amend. VIII. However, this proscription does not apply "until after [the State] has secured a formal adjudication of guilt in accordance with due process of law."[FN6] *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977).

> FN6. Makas also is not a "prisoner" within the meaning of the Prison Litigation Reform Act ("PLRA"). The PLRA defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

or diversionary program." 28 U.S.C. § 1915(h). This definition does not include an individual who has been involuntarily committed to a state hospital following a verdict of not guilty by reason of insanity. *Gibson v. Comm'r of Mental Health,* No. 04 Civ. 4350(SAS), 2006 WL 1234971, at *3 n.24 (S.D.N.Y. May 8, 2006) (citing *Kolocotronis v. Reddy,* 247 F.3d 726, 728 (8th Cir.2001)).

**\*13** In this case, the Court can take judicial notice that Makas has not been found guilty of any crime. *See*Fed.R.Evid. 201. Instead, the acceptance of his plea was expressly predicated upon a finding that he was "not responsible" by reason of a mental disease or defect, and it resulted in his *civil* commitment rather than a jail sentence. Accordingly, the Eighth Amendment does not afford Makas any rights.

4. *Fourteenth Amendment*

Although the Eighth Amendment is, as a matter of law, inapplicable on the facts of this case, Makas' claims regarding the constitutionality of the Defendants' actions nevertheless may implicate his rights under the Fourteenth Amendment. *See**Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *7 n.7 (S.D.N.Y. Aug. 20, 2001). Liberally construed, the Complaint in this action can be read to assert two such claims: first, that the involuntary blood draws violated Makas' procedural and substantive due process rights; second, that the disclosure of his test results to third parties violated his right to privacy.

a. *Due Process*

i. *Procedural Due Process*

The Fourteenth Amendment provides that a state may not deprive a person of liberty or property "without due process of law." U.S. Const. amend. XIV. Consequently, in order to establish a procedural due process violation, a plaintiff first must show that he was deprived of a liberty

or property interest. *See**Bd. of Regents v. Roth,* 408 U.S. 564, 571 (1972); *Finley v. Giacobbe,* 79 F.3d 1285, 1296 (2d Cir.1996). If such a deprivation occurred, the Court then must consider what process was due and whether it was provided. *See**Matthews v. Eldridge,* 424 U.S. 319, 333-34 (1976).

There does not appear to be any legal basis for Makas' claim that he has an absolute right not to have his blood drawn by Mid-Hudson officials in the absence of a court order or his consent. To be sure, "[a]n involuntary civil commitment is a massive curtailment of liberty." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (internal quotation marks omitted). Moreover, New York law allows someone who is civilly committed to refuse medical treatment. *See*N.Y. Comp.Codes R. & Regs. tit. 14, § 527.8 (1993). There are, however, specific exceptions to this general rule, two of which apply to routine physical examinations and routine blood work. *Id.* § 527.8(a)(7).

In his Complaint, Makas concedes that the State had a policy of drawing blood from patients at Mid-Hudson periodically. (*See* Compl. Ex. F). Accordingly, he had no reasonable expectation that his blood would *never* be drawn without his consent. On the other hand, to the extent that the frequency of Makas' blood draws exceeded that which was dictated by OMH policy or was customary, Makas may have a claim that his blood work was non-routine and, therefore, required his consent. If so, the State arguably may have been required to afford him some level of due process before forcibly taking blood samples from him.

ii. *Substantive Due Process*

**\*14** The Due Process Clause of the Fourteenth Amendment also embodies a substantive component "intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998) (internal quotation marks and brackets deleted). To constitute a violation of substantive due process, conduct must be so offensive that it "shocks the conscience" and violates the "decencies of civilized

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

conduct." *Id.* at 846-47 (collecting cases). In an apparent effort to meet this threshold, Makas refers to instances in which his blood was drawn as "stabbings" and alleges, in conclusory fashion, that they were "egregious and shock[ ] the conscience." (Pl.'s Mem. in Opp'n at 22 (block capitalization omitted)). Despite these characterizations, however, the Supreme Court has recognized that blood tests "are a commonplace in these days of periodic physical examination and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no ... trauma." *Schmerber v. California,* 384 U.S. 757, 771 (1966). Accordingly, even if Makas is unusually sensitive to needle pricks, as he seems to suggest, Mid-Hudson's periodic testing of his blood is not an action that is so outrageous that it shocks the conscience. Therefore, as a matter of law, Makas has failed to assert a viable substantive due process claim.[FN7]

> FN7. Makas notes that on at least one occasion he asked to have blood drawn from his hand, instead of his arm, to minimize the pain. Although Mid-Hudson did not accede to this request, its failure to do so plainly does not shock the conscience or violate the decencies of civilized conduct.

b. *Right to Privacy*

The Supreme Court has held the Fourteenth Amendment and other provisions of the United States Constitution and Bill of Rights give rise to a "right of personal privacy." *See Roe v. Wade,* 410 U.S. 113, 152 (1973). This right incorporates an individual's "interest in avoiding disclosure of [certain] personal matters." *Whalen v. Roe,* 429 U.S. 589, 599 (1977). The right of privacy, however, is not absolute. *Id.* at 602. For example, the disclosure of personal medical information to "representatives of the State having responsibility for the health of the community ... does not automatically amount to an impermissible invasion of privacy." *Id.*

In his Complaint, Makas alleges that the results of his medical tests were "nonagreeingly left open (shared) with DA's[,] attorney generals, social workers, unit chiefs,

guards (SHTA's) etc." (Compl. ¶ 41 n.2 (block capitalization omitted)). There is no suggestion, however, that any of his medical information has been shared with any person not employed by the State.

The defendants have three responses to Makas' privacy claim. First, they allege that the District Attorney and OMH are entitled by statute to obtain the information to which Makas objects. Specifically, they note that the District Attorney is a necessary party to the process by which the State's right to continue to retain a civilly-committed patient is periodically reviewed at a hearing. (*See* Def.'s Mem. at 22 (citing CPL §§ 330.20(8)-(13), (15), (18)). They further observe that the Attorney General has a statutory duty to defend OMH, which is a state agency, pursuant to his duty to defend New York State in "all actions and proceedings in which the [S]tate is interested." N.Y. Exec. Law § 63(1) (McKinney 2006). Finally, the Defendants note that Mid-Hudson is required to maintain a record of all treatment administered to its patients pursuant to Section 33.13(a) of the New York Mental Hygiene Law. (*See* Defs.' Mem. at 23). They contend that there consequently can be no improper sharing of information among social workers, unit chiefs and SHTAs because these are the very individuals whose duty it is to create the required records. (*Id.*).

*15 Although the District Attorney's Office is entitled to participate in retention proceedings, it by no means follows that the disclosure of information unrelated to a civilly-committed individual's mental status, such as his cholesterol or thyroid levels, is equally permissible. Similarly, the fact that the Office of the Attorney General is required to represent OMH in all actions and proceedings, including presumably retention hearings, does not establish that the Attorney General has the right to obtain the disclosure of medical information unrelated to the purpose of the hearing.

Although the dissemination of information about cholesterol or thyroid levels to officials outside OMH seems innocuous, Makas suggests that they may have also been privy to information about whether he has syphilis or hepatitis, conditions which arguably could subject him to opprobrium and which are unrelated to the issue of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

eligibility to be released from a secure environment. Nonetheless, in his Complaint, Makas has failed to allege who specifically obtained or permitted others to gain improper access to such confidential medical information. In the absence of any allegations establishing the personal involvement of particular defendants, Makas cannot maintain his privacy claim. *See Smith v. Masterson,* No. 05 Civ. 2897(RWS), 2006 WL 297393, at *2 (S.D.N .Y. Oct. 17, 2006) (quoting *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999)) ("It is well-settled that 'where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.' ").

5. *Conspiracy to Violate Constitutional Rights*

Makas also alleges that the defendants engaged in a Section 1983 conspiracy. The elements of such a conspiracy claim are: "( [a] ) an agreement between two or more state actors or between a state actor and a private entity; ( [b] ) to act in concert to inflict an unconstitutional injury; and ( [c] ) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Here, Makas alleges that defendants Malik, Kathpalia, Judge, and Stevens "act [ed] in concert to ignore [his] requests for no blood work." (Compl. at 16). Makas also contends that they conspired to intimidate him. However, as shown above, the Defendants were entitled to require him to submit to *routine* blood tests. Thus, the mere fact that some of them may have worked together to ensure that Makas complied with their routine requests to draw blood does not subject them to any additional liability. *See Curley v. Vill. of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir.1995). His conspiracy claim therefore does not entitle him to any relief insofar as it is based on *routine* blood tests.

*16 Moreover, even if the individual defendants conspired to draw blood from Makas on a nonroutine basis, they nevertheless would be entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

C. *Qualified Immunity*

"Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003). These criteria, as a practical matter, allow government officials to insulate themselves from damages for constitutional violations unless they are "plainly incompetent" or "knowingly violate the law."

To determine whether a particular right is "clearly established" at the time of an alleged constitutional violation, the court must consider whether: "(1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (brackets in original)).

Makas contends that he has an absolute federal right not to be subjected to blood draws while he is civilly committed to a state mental institution. As noted earlier, however, there is no such clearly established federal right. At best, Makas had a due process right not to give *non-routine* blood specimens without a prior court order or hearing. Nonetheless, State officials have an obligation to ensure the safety and well-being of mental patients entrusted to their custody. *See Woe by Woe v. Cuomo,* 729 F.2d 96, 102 (2d Cir.1984) (noting that New York Mental Hygiene Law § 29.13(a) requires OMH to provide mentally ill persons with "care and treatment"). It therefore would have been objectively reasonable for such officials to believe that they had the right to test Makas' blood even if the frequency of those tests exceeded State policy. For this reason, the individual defendants are entitled to qualified immunity with respect to Makas' claims concerning the Defendants' drawing of his blood, even if, as he alleges, they conspired to take blood samples from him on a schedule which was not "routine."

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

As previously noted, Makas also contends that he has a federal right not to have the results of his blood tests disseminated beyond Mid-Hudson's medical staff. The Second Circuit has recognized a constitutional right to keep one's medical records confidential in limited circumstances where their disclosure might lead to social opprobrium. *See, e.g., Doe v. City of New York,* 15 F.3d 264, 267 (2d Cir.1994) ("An individual revealing that she is HIV seropositive potentially exposes herself not to understanding or compassion but to discrimination and intolerance, further necessitating the extension of the right to confidentiality over such information. We therefore hold that Doe possesses a constitutional right to confidentiality ... in his HIV status."); *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999) ("We now hold, as the logic of *Doe* requires, that individuals who are transsexuals are among those who possess a constitutional right to maintain medical confidentiality."). As the *Powell* court confirmed, however, "the interest in the privacy of medical information will vary with the condition." *Powell,* 175 F.3d at 111 (citing *Doe* ).

**\*17** The Complaint in this action contains no suggestion that Makas has tested positive for any sexually-transmitted disease. Indeed, it appears that he has not since he contends that much of the testing conducted by the Defendants was unnecessary given his abstinent lifestyle and careful washing of his hands. (*See* Compl. at 22). Clearly, the dissemination of test results which establish the absence of a controversial disease or condition does not carry with it the same potential for harm as the dissemination of results which establish its existence. Moreover, while a patient's cholesterol or thyroid level also constitutes personal medical information, its disclosure obviously does not carry with it the same potential for adverse effects as the disclosure of information about a sexually-transmitted disease or transsexualism.

In short, the information that Makas suggests was improperly disseminated is not comparable to that which the Second Circuit has recognized gives rise to a constitutional right of privacy. Accordingly, Makas has not established, as he must, that the Defendants distributed any of his confidential medical information in violation of

his *clearlyestablished* federal rights.[FN8]

> FN8. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320, *etseq.,* health care providers are required to protect the confidentiality of patient records. The Complaint could therefore be liberally construed to assert a claim under HIPAA. Courts considering that statute, however, have overwhelmingly concluded that it does not afford a patient a private right of action. *See, e.g., Cassidy v. Nicolo,* No. 03 Civ. 6603(CJS), 2005 WL 3334523, at \*5 (W.D.N.Y. Dec. 7, 2005) (collecting cases).

Moreover, even if the relatively benign information that Makas suggests may have been divulged were protected under the holdings of cases such as *Doe* and *Powell,* the individual defendants still could reasonably have concluded that such institutional concerns as the need to prevent the spread of communicable diseases and to ensure the physical well being of persons committed to OMH's custody warranted the testing that they undertook. Accordingly, the individual defendants are entitled to qualified immunity for any constitutional violations that may have occurred as a result of the information-sharing that Makas contends took place.

D. *Personal Involvement*

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001). The doctrine of respondeat superior does not suffice to establish personal liability. *See Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973). Consequently, to recover damages from a supervisor based upon an alleged constitutional violation, a plaintiff must show that the supervisor either directly participated in the violation, learned of it through a report or appeal but failed to take action, created or maintained the policy or custom that gave rise to it, or was grossly negligent in the supervision of subordinates who caused the violation to occur. *See Newburgh Enlarged Sch. Dist.,* 239 F.3d at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

254 (quoting *Colon v.. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

There is no suggestion that Miraglia, a senior official of OMH, or Holanchock, the Director of Mid-Hudson, personally participated in Makas' blood draws or the alleged dissemination of his medical information. Makas does indicate, however, that he sent two letters to Miraglia and one letter to Holanchock raising concerns about the drawing of his blood. In those letters, Makas complained that his blood was being drawn forcibly without a warrant as frequently as every three months. (*See* Compl. Exs. A, B, D). Miraglia's response to one of those letters suggested that Makas "talk with [his] treatment team and have them arrange with the appropriate clinical staff that a more thorough explanation be provided to [him] the next time it is necessary for his blood to be drawn." (*Id.* Ex. E). Miraglia also expressed the hope that this recommendation would prove "helpful." (*Id.*). This response hardly evinces indifference on Miraglia's part. In any event, even if Miraglia and Holanchock were shown to have ignored Makas' complaints about the frequency of his blood tests, such inaction would, as a matter of law, be insufficient to establish their personal involvement. *See, e.g., Pritchett v. Artuz,* 99 Civ. 3957(SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000); *Thomas v. Coombe,* No. 95 Civ. 10342(HB), 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998).

**\*18** Moreover, none of the letters that Makas sent contains any mention of the privacy violations that he now contends occurred. Accordingly, there is nothing to indicate that Miraglia and Holanchock were aware of these alleged violations, much less ignored them. They consequently cannot be held liable on a *respondeat superior* theory for any breach of privacy that may have occurred.

Finally, although Makas contends that Miraglia and Holanchock wrongfully promulgated, or failed to object to, an OMH policy of periodically taking blood samples from persons committed to Mid-Hudson without securing their consent or a court order, his claim necessarily fails because neither the Constitution nor any federal statute proscribes the taking of blood for medical purposes in such circumstances. Furthermore, even if OMH policy

required that a patient's blood only be drawn every three months, there is no case law establishing that the more frequent draws that Makas contends occurred in this case violated federal law. It follows that even if Miraglia and Holanchock failed to monitor the frequency with which Makas' blood was being drawn at Mid-Hudson, this would not amount to grossly negligent supervision of the other defendants entitling Makas to recover damages from them.

For these reasons, Miraglia and Holanchock are entitled to the dismissal of the Complaint as against them for lack of personal involvement.

E. *Eleventh Amendment*

The Defendants also argue that the Eleventh Amendment bars a suit by Makas against OMH. (*See* Defs.' Mem. at 18).

Under the Eleventh Amendment, a state and its agencies are generally immune from suit in federal court unless the state consents to be sued. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54-59 (1996); *Papasan v. Allain,* 478 U.S. 265, 276 (1986); *see also De La Nueces v. United States,* 780 F.Supp. 216, 217 (S.D.N.Y.1992). There are two exceptions to this general rule: an explicit and unequivocal waiver of immunity by a state or a similarly clear abrogation of the immunity by Congress. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984); *Hallett v. N.Y.S. Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 197 (S.D.N.Y.2000); *Burrell v. City Univ. of N.Y.,* 995 F.Supp. 398, 410-11 (S.D.N.Y.1998).

In this case, it is clear that OMH is a State agency. *See* N.Y. Mental Hyg. Law §§ 7.01, 7.07 (McKinney 2002). OMH thus is entitled to assert New York State's immunity under the Eleventh Amendment because "New York has not waived its immunity from suit, either generally or specifically, for OMH," *Vallen v. Mid-Hudson Forensic Office of Mental Health,* No. 02 Civ. 5666(PKC), 2004 WL 1948756, at *3 (S.D.N.Y. Sept. 2, 2004), and because Congress has not abrogated the states' Eleventh Amendment immunity by creating a federal cause of action under Section 1983, *Quern v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)
(Cite as: 2007 WL 724603 (S.D.N.Y.))

*Jordan,* 440 U.S. 332, 342 (1979).

Moreover, Eleventh Amendment immunity extends to state officials if the relief to be granted "would bind the state or where the state is the real party in interest." *Melo v. Combes,* No. 97 Civ. 204(JGK), 1998 WL 67667, at *3 (S.D.N.Y. Feb. 18, 1998) (quoting *Russell v. Dunston,* 896 F.2d 664, 667 (2d Cir.1990)). When an official is sued in his official capacity, rather than his personal capacity, the state is the real party in interest. *Id.* (citing *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)). A plaintiff therefore may not recover damages in federal court from a state official acting in his official capacity. *See, e.g.,Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998) (citing *Graham,* 473 U.S. at 169).

**\*19** In this case, the Complaint does not indicate whether the individual defendants are sued in their personal or official capacities. To the extent they are named in their official capacity, however, Makas' claims against them would be barred by the Eleventh Amendment.

### F. *State Law Claims*

In addition to his federal claims, Makas asserts two state law claims seeking damages for intentional infliction of emotional distress and negligence. In the absence of any colorable federal claim, this Court should decline to exercise jurisdiction over these pendent state law claims. *SeeKlein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y.,* 464 F.3d 255, 262 (2d Cir.2006) ("It is well settled that where ... the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."); *see also*28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if-the district court has dismissed all claims over which it had original jurisdiction.").

### IV. *Conclusion*

For the foregoing reasons, the Court should grant the Defendants' motion to dismiss Makas' Complaint. (Docket

No. 28).

### V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Deborah A. Batts, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. *See*28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Batts. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *SeeThomas v. Arn,* 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

S.D.N.Y.,2007.
Makas v. Miraglia
Not Reported in F.Supp.2d, 2007 WL 724603 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Bennie GIBSON, Plaintiff,
v.
COMMISSIONER OF MENTAL HEALTH; Executive
Administrator Holanchock; Richard Bennet; Peggy
Healy; County of Orange; Town of New Hampton;
Governor Pataki; Mr. Cadett and other treatment
assistants responding to incident at Mid-Hudson
Psychiatric in February or March 2003; Micheal March;
Mr. Catizone; An unknown female investigator from
Risk Management or unknown unit affiliated with
Mid-Hudson; Dr. Bai or Bey at Mid-Hudson,
Defendants.
No. 04 Civ. 4350(SAS).

May 8, 2006.

Bennie Gibson, Queens Village, NY, Plaintiff pro se.

Michael E. Peeples, Assistant Attorney General of the
State of New York, New York, NY, for State Defendants.

Laura Wong-Pan, County of Orange Department of Law,
Goshen, NY, for Defendant County of Orange.

*OPINION AND ORDER*

SCHEINDLIN, J.

I. INTRODUCTION

**\*1** Bennie Gibson brings this action pursuant to section

1983 of Title 42 of the United States Code ("section
1983"), alleging that his civil rights were violated during
his confinement at the Mid-Hudson Forensic Psychiatric
Center ("Mid-Hudson"). Several defendants now move to
dismiss the Complaint. The Commissioner of Mental
Health ("Commissioner"), Howard Holanchock, Thomas
Catizone, Peggi Hearly and Governor Pataki (collectively,
"State defendants") move to dismiss pursuant to the Prison
Litigation Reform Act ("PLRA").[FN1] The County of
Orange brings a separate motion to dismiss pursuant to
Federal Rules of Civil Procedure 8 and 12(b)(6), as well
as the notice of claim requirement under section 50-e of
the New York General Municipal Law. Certain State
defendants-the Commissioner, Holanchock, Healy and
Pataki-also move to dismiss on the grounds that Gibson
failed to allege defendants' "personal involvement" in the
alleged constitutional violation, and that the Eleventh
Amendment bars his claims. Gibson has also filed a
motion to reconsider and a motion for extension of time to
serve defendants, which I consider at the end of this
Opinion.

FN1.Pub.L. No. 104-134, 110 Stat. 1321 (1996).

II. BACKGROUND

A. Procedural History

In October 2001, Bennie Gibson was indicted on one
count of Auto Stripping in the Second Degree and one
count of Possession of Burglar's Tools.[FN2] While the
charges against him were pending, the court ordered
Gibson committed as an "incapacitated" defendant
pursuant to Article 730 of the New York Criminal
Procedure Law ("CPL").[FN3] Article 730 allows a court
to order a criminal defendant to be examined by psychiatrists
to determine whether "as a result of mental disease or
defect," the defendant "lacks capacity to understand the
proceedings against him or to assist in his own defense."
[FN4] If the court finds that the defendant is incapacitated,
"such court must issue a final or temporary order of
observation committing him to the custody of the [New

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

York State Commissioner of Mental Health] for care and treatment in an appropriate institution for a period not to exceed ninety days from the date of the order." [FN5]

> FN2. *See* 10/22/01 Certification of Affirmative Grand Jury Action, Ex. A to 1/24/06 Declaration of Assistant Attorney General of the State of New York Michael Peeples ("Peeples Decl.").

> FN3. *See generally People of the State of N.Y. v. Ben Gibson,* No. 6326/2001 (N.Y.Sup.Ct. Nov. 10, 2005) ("11/10/05 Decision and Order"), Ex. C to Peeples Decl.

> FN4. N.Y.Crim. Proc. Law § 730.10 (defining "incapacitated"). *See generally id.* §§ 730.10-730.70.

> FN5. *Id.* § 730.40.

The court that handled Gibson's criminal case described the proceedings concerning his "capacity" as follows:

During the course of this case which commenced with this defendant's arrest on August 21, 2001, this defendant has been committed pursuant to CPL Article 730, as an incapacitated defendant, on nine occasions. He has asserted that there is a conspiracy against him involving the New York City Police Department in Queens and New York counties, the prosecutor, defense counsel, junk yard dealers, the Mafia and this Court in relation to his arrest in this case.... He has persistently lacked a rational understanding of the charges and proceedings against him and the capacity to assist counsel in his defense in a rational manner. [FN6]

> FN6. 11/10/05 Decision and Order at 1.

Gibson maintains that he is not mentally ill, [FN7] but because the court repeatedly found him to be incapacitated, his case never went to trial. On November 10, 2005, more

than four years after Gibson's arrest, the prosecutor conceded that Gibson had "served the equivalent of two-thirds of the maximum sentence that could be imposed upon him if he was convicted." [FN8] The indictment was thus dismissed pursuant to section 730.50(3) of the CPL. [FN9]

> FN7. *See* Second Amended Complaint ("Complaint") at 9.

> FN8. *Id.*

> FN9. *See id* at 2. Section 730.50(3) of the CPL states that "the first order of retention [for incapacitation] and all subsequent orders of retention must not exceed two-thirds of the authorized maximum term of imprisonment for the highest class felony charged in the indictment or for the highest class felony of which [defendant] was convicted."

*2 On June 9, 2004, Gibson filed this action. At the time, he was committed to Mid-Hudson pursuant to the court order. [FN10] On October 10, 2004, Chief Judge Mukasey issued an order and entered judgment denying Gibson leave to proceed in forma pauperis in accordance with the "three strikes provision" of the Prisoner Litigation Reform Act ("PLRA"), which states:

> FN10. Gibson was confined to this facility continuously from May 6, 2004 to July 9, 2004 as an incapacitated defendant "in the custody of the New York State Commissioner of Mental Health." 1/19/06 Affidavit of Howard Holanchock, Executive Director of the Mid-Hudson Forensic Psychiatric Center, ¶ 3.

In no event shall a *prisoner* bring a civil action or appeal a judgment in a civil action or proceeding [in forma pauperis] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.[FN11]

>     FN11.28 U.S.C. § 1915(g) (emphasis added).

Gibson appealed the order and judgment on December 15, 2004.

In a mandate issued on July 5, 2005, the Second Circuit Court of Appeals instructed the district court "to determine: (1) the nature of Appellant's detention at the Mid-Hudson Forensic Psychiatric Center; and (2) whether Appellant, by virtue of this detention, qualifies as a 'prisoner' under the Prisoner Litigation Reform Act."[FN12] The mandate further instructed:

>     FN12.*Bennie Gibson v. Town of New Hampton et al.,* No. 04 Civ. 6580 (2d Cir. Jul. 5, 2005) ("7/5/05 Mandate") at 1.

If the district court determines, on remand, that Appellant is a 'prisoner' under the PLRA, then it properly denied him leave to proceed in forma pauperis, pursuant to the 'three strikes provision' of the PLRA, as Appellant's amended complaint gave no indication that he was under 'imminent danger of serious physical injury.' The district court, however, should have specified that its dismissal of Appellant's complaint was without prejudice to the reopening of Appellant's action if Appellant paid the full filing fee.[FN13]

>     FN13.*Id.* at 2 (quoting 28 U.S.C. § 1915(g)) (citations omitted).

In accordance with the Court of Appeal's mandate, Judge Mukasey issued an order vacating the October 12, 2004 order of dismissal.[FN14] The case was then assigned to my docket on September 28, 2005.

>     FN14. In this order, Judge Mukasey did not

address whether Gibson should be considered a prisoner under the PLRA.

B. Gibson's Allegations

The following allegations, drawn from Gibson's submissions, are presumed to be true for purposes of defendants' motions to dismiss. In January or February of 2003, while Gibson was a patient at Mid-Hudson, two Security Hospital Treatment Assistants violently assaulted him.[FN15] Several staff members were present during the beating, and refused to intervene.[FN16] The assault resulted in injuries including a sore back, neck, chest, and sides, "cut and bruised eyes swollen shut," and lacerations on the face; in addition, Gibson "could barely eat because of [a] swollen jaw."[FN17] Following this incident, Gibson was "forcibly medicated by staff by needle" and then "made to sit in chair for nine days."[FN18]

>     FN15.*See* Complaint at 7. Throughout this Opinion, I quote directly from Gibson's submissions to avoid misconstruing his meaning. The Complaint states: "[M]arch then grabbed Gibson from behind by dredlocks pushed his head down and knees Gibson in the face while Catizone held Gibsons arms Gibson was then punched in the head, eyes, stomach, chest, kicked, stomped head into floor by both Catizone and March simunetaneously ... for about five minutes as both took turns in the action and other staff wacthed [sic]." *Id.*

>     FN16.*See id.* at 7, 9.

>     FN17.*Id.* at 8.

>     FN18.*Id.* at 7, 8.

Although an investigation of this attack occurred a few days later and several witnesses testified on Gibson's behalf, Gibson was not permitted to see the results of the inquiry.[FN19] He then began to complain of the abuse,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

writing and making calls to the Office of Mental Health, the Inspector General, the State Attorney, the County of Orange, and the Town of New Hampton. [FN20] Gibson has suffered retaliatory abuse as a result of this advocacy: his legal work was thrown in the toilet and urinated on by staff, he was threatened and denied privileges, false accusations were lodged against him, and his mail and personal belongings were searched and damaged. [FN21]

FN19. *See id.* at 4, 8, 9.

FN20. *See id.* at 8.

FN21. *See id.* at 9.

III. LEGAL STANDARDS

A. Prison Litigation Reform Act

**\*3** State defendants move to dismiss this action based on the "three strikes" rule of the PLRA. [FN22] The PLRA defines prisoner as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." [FN23]

FN22. *See* Memorandum of Law in Support of Motion to Dismiss ("State Def. Mem.") at 6-7.

FN23. 28 U.S.C. § 1915(h).

Federal courts have examined the PLRA's definition of prisoner in various circumstances. Appellate courts have held, for example, that the definition does not include: a civil detainee, a person adjudicated not guilty by reason of insanity, or a person who challenges the terms of prison confinement after she has completed her sentence. [FN24] On the other hand, courts have determined that the PLRA does apply to a prisoner who filed a suit during his

confinement and thereafter was released from prison. [FN25]

FN24. *See, e.g., Michau v. Charleston County, S.C.,* 434 F.3d 725, 727-28 (4th Cir.2006) (civil detainee not a "prisoner" under the PLRA); *Perkins v. Hedricks,* 340 F.3d 582, 583 (8th Cir.2003) (same); *Troville v. Kenz,* 303 F.3d 1256, 1260 (11th Cir.2002) (PLRA does not apply to detainee civilly committed pending determination of sexually violent predator status); *Kolocotronis v.. Reddy,* 247 F.3d 726, 728 (8th Cir.2001) (person held on civil commitment following verdict of not guilty by reason of insanity is not a "prisoner" under the PLRA); *Page v. Torrey,* 201 F.3d 1136, 1139-40 (9th Cir.2000) (person detained civilly for non-punitive purposes following completion of criminal sentence not a "prisoner" within meaning of PLRA); *Greig v. Goord,* 169 F.3d 165, 167 (2d Cir.1999) (former prisoner not required to comply with the PLRA).

FN25. *See, e.g., Cox v. Mayer,* 332 F.3d 422, 425 (6th Cir.2003); *Ahmed v. Dragovich,* 297 F.3d 201, 210 (3d Cir.2002); *Dixon v. Page,* 291 F.3d 485, 488-89 (7th Cir.2002).

B. Rule 12(b)(6)

"A court may not dismiss an action" pursuant to Rule 12(b)(6) " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' [FN26] At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." ' [FN27]

FN26. *Leibowitz v. Cornell Univ.,*-F.3d-, 2006 WL 1046212, at *3 (2d Cir. Apr. 21, 2006) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

FN27. *Phelps v. Kapnolas,* 308 F.3d 180, 184-85

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

(2d Cir.2002) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)). Accord *In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d 281, 322-24 (S.D.N.Y.2003).

The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." [FN28] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.[FN29] Although the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[FN30] Accordingly, a claim can only be dismissed if " 'no relief could be granted under any set of facts that could be proved consistent with the allegations." ' [FN31]

FN28.*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 176 (2d Cir.2004) (quotation marks and citation omitted).

FN29.See *Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27, 30 (2d Cir.2004) (citation omitted).

FN30.See *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, L.L.P.,* 322 F.3d 147, 158 (2d Cir.2003); *Stamelman v. Fleishman-Hillard, Inc.,* No. 02 Civ. 8318, 2003 WL 21782645, at *2 (S.D.N.Y. Jul. 31, 2003).

FN31.*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513 (2002) (quoting *Hishon v. King & Spaulding,* 467 U.S. 69, 73 (1984)).

In addition, because "most pro se plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe pro se complaints liberally, applying a more

flexible standard to evaluate their sufficiency." [FN32] Finally, courts must remain "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." [FN33]

FN32.*Lerman v. Board of Elections in the City of N.Y.,* 232 F.3d 135, 140 (2d Cir.2000) (citing *Hughes v. Rose,* 449 U.S. 5, 9-10 (1980) and *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)).

FN33.*Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001).

C. Rules 8 and 12(e)

Rule 8(a) of the Federal Rules of Civil Procedure requires that the plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint "need not 'set out in detail the facts upon which" the claim is based" [FN34] or plead the legal theory or elements underlying the claim.[FN35] "Indeed, the Rules set forth a pleading standard under which a plaintiff is required to give a defendant fair notice of what the claim is and the grounds upon which it rests." [FN36] Fair notice is " 'that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." ' [FN37] This notice pleading standard "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." [FN38] If a party contends that a pleading nonetheless "is so vague or ambiguous that [it] cannot reasonably be required to frame a responsive pleading" the party is not left without a remedy, as the party "may move for a more definite statement" before responding to the pleading.[FN39]

FN34.*Twombly v. Bell Atlantic Corp.,* 425 F.3d 99, 107 (2d Cir.2005) (quoting *Conley,* 355 U.S. at 47).

FN35.See *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

FN36.*Leibowitz,* 2006 WL 1046212, at *3.

FN37.*Wynder v. McMahon,* 360 F.3d 73, 79 (2d Cir.2004) (quoting *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995)).

FN38.*Swierkiewicz,* 534 U.S. at 514.*Accord Conley,* 355 U.S. at 48 ("The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.").

FN39.Fed.R.Civ.P. 12(e). *Accord Swierkiewicz,* 534 U.S. at 514 ("If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding."); *Phillips,* 408 F.3d at 128.

D. Municipal Liability in a Section 1983 Action

**\*4**Section 1983 creates no substantive rights, but does provide a "mechanism for enforcing a right or benefit established elsewhere." [FN40] In order to state a cause of action under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[FN41]

FN40.*Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985)).

FN41.*See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004).

The Supreme Court does not interpret section 1983 to impose unbridled liability on municipalities: "[T]he language of [section] 1983, read against the background of the [ ] legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." [FN42] As subsequently reaffirmed and explained by the Supreme Court, municipalities such as the County of Orange may only be held liable when the municipality itself deprives an individual of a constitutional right. Thus, in order for an individual deprived of a constitutional right to have recourse against a municipality under section 1983, he must show that he was harmed by a municipal "policy" or "custom." [FN43]

FN42.*Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978).

FN43.*Id.* at 690-91.*Accord Board of County Comm'rs v. Brown,* 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479-81 (1986).

A municipality "may not be held liable on a theory of respondeat superior." [FN44] Moreover, courts apply " 'rigorous standards of culpability and causation" ' to ensure that the municipality is not held liable solely for the actions of its employees.[FN45] Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the state.[FN46]

FN44.*Jeffes v. Barnes,* 208 F.3d 49, 56 (2d Cir.2000). *Accord Monell,* 436 U.S. at 691.

FN45.*Jeffes,* 208 F.3d at 61 (quoting *Brown,* 520 U.S. at 405).

FN46.*See Tuttle,* 471 U.S. at 831 (Brennan, J., concurring in part and concurring in the judgment) (stating that "[t]o infer the existence of a city policy from the isolated misconduct of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict respondeat superior liability rejected in *Monell*" ).

In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a "policy" or "custom." The Supreme Court has identified at least two situations that constitute a municipal policy: (1) where there is an officially promulgated policy as that term is generally understood (i.e., a formal act by the municipality's governing body),[FN47] and (2) where a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken.[FN48]

FN47.*See Monell,* 436 U.S. at 690.

FN48.*See Pembaur,* 475 U.S. at 480-81.*See also Walton v. Safir,* 122 F.Supp.2d 466, 477 (S.D.N.Y.2001) (stating that "the act of an official with final decision-making authority, if it wrongfully causes the plaintiff's constitutional injury, may be treated as the official act of the municipality") (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988)).

A municipal "custom," on the other hand, need not receive formal approval by the appropriate decision-maker-"an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." [FN49] To succeed on this theory, plaintiff must prove the existence of a practice that is permanent. [FN50] "[O]ne method of showing custom is to demonstrate that the custom or practice is so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." [FN51]

FN49.*Brown,* 520 U.S. at 404.*Accord Tuttle,* 471 U.S. at 823-24.

FN50.*See Praprotnik,* 485 U.S. at 127.

FN51.*Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997) (quotation marks and citation omitted).

When either a "policy" or "custom" has been proven, section 1983 imposes liability because the City in its capacity as a municipality-as opposed to mere employees of the City-harmed the plaintiff for exercising a constitutionally protected right.[FN52]

FN52.*See, e.g., Brown,* 520 U.S. at 417 ("The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.") (quoting *Pembaur,* 475 U .S. at 479-80);*Pembaur,* 475 U.S. at 480 (*"Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'-that is, acts which the municipality has officially sanctioned or ordered.").

E. Municipal Liability and the Notice of Claim Requirement

**\*5** Section 50-i of the New York General Municipal Law provides that no tort action shall be prosecuted or maintained against a municipality or any of its officers, agents, or employees unless: (1) a notice of claim has been served against the City; (2) the City has refused adjustment or payment of the claim; and (3) the action is commenced within one year and ninety days after the event upon which the claim is based occurred.[FN53] The notice of claim is required to be filed "within ninety days after the claim arises." [FN54]

FN53.*See* N.Y. Gen. Mun. Law § 50-i.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

FN54.*Id.*§ 50-e.

New York's notice of claim requirements are not applicable to section 1983 claims brought in federal court.[FN55] However, the requirements do apply to state law personal injury claims that are brought in federal court as related to section 1983 cases.[FN56] Federal courts do not have jurisdiction to hear complaints from plaintiffs who have failed to comply with the notice of claim requirement, or to grant permission to file a late notice.[FN57]

FN55. *See Day v. Moscow,* 955 F.2d 807, 814 (2d Cir.1992). *Accord Horvath v. Daniel,* No. 04 Civ. 9207, 2006 WL 47683, at *3 (S.D.N.Y. Jan. 9, 2006) ("Courts in this Circuit have repeatedly held that the notice of claim requirement is not applicable to federal claims under section 1983.").

FN56. *See, e.g., Shakur v. McGrath,* 517 F.2d 983, 985 (2d Cir.1975) (state malpractice claims that were added to a section 1983 complaint nine months after the complaint was filed did not satisfy state notice of claim requirements and were dismissed). *See also Horvath v. Daniel,* No. 04 Civ. 9207, 2006 WL 950404, at *3 (S.D.N.Y. Apr. 7, 2006) ("Although we retain jurisdiction over plaintiff's [section] 1983 action, we lack authority to permit plaintiff to file a late Notice of Claim and therefore dismiss plaintiff's state law claims without prejudice.").

FN57. *See Jewel v. City of New York,* No. 94 Civ. 5454, 1995 WL 86432, at *1-2 (S.D.N.Y. Mar. 1, 1995); *Brown v. Metro. Transp. Auth.,* 717 F.Supp. 257, 260 (S.D.N.Y.1989) ("Until the state legislature amends § 50-e(7) to include federal trial courts, we have no choice but to dismiss for lack of jurisdiction plaintiff's application to file a late notice of claim or to have his notice of claim deemed timely filed.").

F. Personal Involvement

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983."[FN58] Broad, conclusory allegations that a high-ranking defendant was informed of an incident are insufficient to impose liability.[FN59] In *Colon v.. Coughlin,* the Second Circuit identified five ways in which the personal involvement of a defendant may be shown:

FN58. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001).

FN59. *See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003).

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[FN60]

FN60.58 F.3d 865, 873 (2d Cir.1995). *Accord Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004).

Employers are not liable under section 1983 for the constitutional torts of their employees unless the plaintiff proves that " 'action pursuant to official ... policy of some nature caused a constitutional tort.' "[FN61]

FN61.*Rojas v. Alexander's Dept. Store,* 924 F.2d 406, 408 (2d Cir.1990) (quoting *Monell,* 436 U.S. at 691).*Accord Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 687 (2d Cir.2005)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

("As the Supreme Court discussed in *Monell,* Congress chose not to impose a federal law of respondeat superior, in part because it believed the imposition of an obligation on municipalities to keep the peace would raise constitutional problems.").

G. Eleventh Amendment

The Eleventh Amendment bars suits in federal court by citizens against a state absent a waiver of immunity and consent to suit by the state or abrogation of constitutional immunity by Congress.FN62 Section 1983 does not abrogate a state's Eleventh Amendment immunity from suit in federal court, FN63 and New York has not waived its immunity.FN64 Thus, citizens of New York State may not sue the State in federal court under section 1983. State employees in their official capacities are also constitutionally immune from suit in federal court, because such a lawsuit is no different than a suit against the State itself.FN65 There is an exception, however, when a plaintiff alleging a violation of federal law sues a state employee for prospective injunctive relief against the employee's future official conduct. FN66

FN62.See *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 142-47 (1993).

FN63.See, e.g., *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594 (2d Cir.1990).

FN64.See *Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir.1977); *Bryant v. New York State Dept. of Corr. Serv. Albany,* 146 F.Supp.2d 422, 425-26 (S.D.N.Y.2001).

FN65.See *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) (citing *Kentucky v. Graham,* 473 U.S. 159, 166-67 (1985)).

FN66.See *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102-03 (1984).

IV. DISCUSSION

A. Prison Litigation Reform Act

**\*6** Gibson does not contest the accuracy of the relevant dates or procedural events in his criminal case. FN67 Gibson had criminal charges pending against him between October 2001, the date the indictment was issued, and November 2005 when it was dismissed. Gibson filed the first complaint in the instant action seventeen months before his indictment was dismissed, on June 9, 2004.FN68 State defendants argue that at that time, he fit within the plain language of the PLRA's definition of prisoner-he was a person detained in a facility who was accused of violations of criminal law .FN69 Thus, they conclude that his lawsuit should be dismissed in accordance with the July 5, 2005 mandate.

FN67. The most pertinent argument that Gibson makes is a challenge to the authenticity of State defendants' exhibits:

"Plaintiff furthertively asks the court to inspect document submitted by State Attorney (concerning the instant offense which brought plaintiff to Mid Hudson Psychiatric) Generals Office for authenticity and whether they conform to the rules of criminal procedure law of McKinneys Criminal Procedure Law of New York concerning i.e. committment orders to Mid Hudson are not signed by a Judge, Indictment are not stamped or filed with court nor is Grand Jury foremans signature on indictment furthermore order granting right to file a prosecutor information or grand jury Indictment makes no sence in accordance to CPL 1.20 a indictment is voted by 16 to 23 representatives -a information is filed by district attorney [sic]"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

"Response Notice of Motion Pursuant Fed.R.Civ P12 Opposition To Dismissal "inre" Attorney General Micheal Pepples esq. [sic]" ("Pl.Mem.") at 2. However, I find no reason to question the authenticity of the "Certificate of Affirmative Grand Jury Action" that was signed by Assistant District Attorney Matthew Bassiur, or of the other legal documents submitted by the New York State Attorney General's Office.

FN68. The relevant date for the application of the "three strikes" rule is the day that the plaintiff "bring[s] a civil action." 28 U .S.C. § 1915(g).

FN69.See State Def. Mem. at 6-7. See also Kalinowski v. Bond, 358 F.3d 978, 979 (7th Cir.2004) ("For a person held on unresolved criminal charges, however, there is no difficulty at all" in determining that he fits within the PLRA's definition of "prisoner."); Page, 201 F.3d at 1139 (holding that the "natural reading" of the PLRA's text "is that, to fall within the definition of 'prisoner,' the individual in question must be currently detained as a result of accusation, conviction, or sentence for a criminal offense.").

To dismiss Gibson's Complaint on PLRA grounds would constitute a victory of form over substance. In accordance with the Court of Appeals mandate, State defendants request only that the case be dismissed "without prejudice to reopening upon payment of the full filing fee." FN70 At this point, Gibson is no longer a prisoner under the case law and is no longer required to comply with the PLRA-thus, if his petition were dismissed now, he would not be required to pay a filing fee.FN71 Gibson would simply have to refile the same case as a non-prisoner in forma pauperis. Dismissal of this action would therefore cause a delay in the proceedings without fulfilling any of the goals of the PLRA. In addition, to dismiss this action and require Gibson to refile it could constitute a substantial hardship for this plaintiff, given that many of his submissions have been in the form of handwritten letters.

FN70. State Def. Mem. at 7-8. Accord 7/5/05 Mandate at 2 (citing Ortiz v. McBride, 380 F.3d 649, 658 n. 7 (2d Cir.2004) and Dupree v. Palmer, 284 F.3d 1234, 1236 (11th Cir.2002)).

FN71. See, e.g., Page, 201 F.3d at 1139-40;Greig, 169 F.3d at 167.

Gibson's Second Amended Complaint, filed with the Court's permission on November 21, 2006, was filed and entered when he was no longer a prisoner under the PLRA. In the interests of justice and judicial economy, I hereby accept his Second Amended Complaint as properly filed in forma pauperis and deem it to be a new filing. There is no reason to dismiss this action under the PLRA.

B. Section 1983 Claim Against the County of Orange

The County of Orange argues that the Court should consider Gibson's Complaint " 'so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." ' FN72 But Gibson offers more than vague allegations of abuse and retaliation-he describes several specific incidents that would be constitutional violations if proven. Although certain sentences in the Complaint are difficult to understand, the central allegations are themselves intelligible. Given the deference due a pro se plaintiff, Gibson's submissions constitute a short and plain statement of the alleged constitutional violations.

FN72. Orange County Memorandum of Law ("County Mem.") at 3 (quoting Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988)).

The County of Orange also argues that Gibson's Complaint fails to state a claim upon which relief may be granted as against the County .FN73 The only allegation that Gibson makes that specifically mentions the County of Orange states: "County of orange & towen odf new hampton are constantly called or written to by patients I myself on abuse at Mid Hudson no investigation has been commenced by these agencies although several local

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

newspaper articles talked of violence [sic]." [FN74] The County claims that this allegation is "incoherent," and also argues that "[t]here is no allegation or proof that the County of Orange owns, operates, supervises or in any way oversees operations at the Mid-Hudson Psychiatric Center. Therefore, the County could not have been responsible for events" at Mid-Hudson.[FN75]

FN73. See County Mem. at 5-7.

FN74. Complaint at 8-9.

FN75. County Mem. at 4-5.

*7 Accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in Gibson's favor, it is clear that he has alleged a *Monell* claim against the County of Orange. If it is true that the County of Orange received "constant" complaints of patient abuse at Mid Hudson and consistently failed to respond in any way, such a practice could be considered a custom so widespread as to have the force of law. Although the failure to respond to complaints of constitutional violations may not be a formally approved policy, it could be a practice so well settled that municipal officials have ignored either actual or constructive knowledge of the custom.

C. Notice of Claim Requirement

The County of Orange argues that any "cause of action founded upon tort law" against the County must be dismissed because Gibson failed to file a notice of claim as required by the New York General Municipal Law.[FN76] At this point in the litigation, it is not clear whether Gibson intends to argue that there was tortious conduct by the County. If Gibson is indeed bringing state law personal injury claims against the County, and further discovery does not demonstrate that he timely filed a notice of claim, such claims will not be permitted to proceed under the clear terms of the statute.

FN76. *Id.* at 8.

E. Personal Involvement

The Commissioner of Mental Health, Holanchock, Healy and Governor Pataki argue that they should be dismissed from this lawsuit because Gibson has not alleged their personal involvement in the claimed constitutional violations.[FN77] Because these individuals were not present at the time of the alleged incidents, Gibson cannot and does not allege their direct participation. Yet, he does allege personal involvement in other acceptable ways with respect to three of the defendants.

FN77. See State Def. Mem. at 8-9.

Gibson has sufficiently alleged personal involvement of the two defendants who work at Mid-Hudson, Healy and Holanchock. Gibson claims that Healy, "[a]s unit chief failed intervene to stop the amount of abuse against patients by staff treatment assistants or punish the wrong doers [sic]." [FN78] Executive Director Holanchock was also alleged to have exhibited deliberate indifference to the rights of inmates. Gibson claims that Holanchock "knows of abuse" and hires investigators that are former employees or members of the same union as Mid-Hudson employees, contributing to "routine coverups of physical violence against patients." [FN79] State defendants point out that Holanchock did not become Executive Director at Mid-Hudson until several months after the alleged attack on Gibson.[FN80] But this argument ignores the many allegations of harassment, abuse and retaliation in Gibson's Complaint that post-date the physical attack in early 2003. In sum, Gibson alleges that Healy and Holanchock promulgated policies that resulted in unconstitutional practices, failed to develop procedures to provide for the safety of Mid-Hudson residents, and failed to remedy the wrong after being informed of violations.

FN78. Pl. Mem. at 10. Because Gibson is proceeding pro se, the factual allegations raised in his responses to the motions to dismiss will also be treated as part of his Complaint. See *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

(considering pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim); *Donahue v. United States Dep't of Justice, 751 F.Supp. 45, 49 (S.D.N.Y.1990)* ("The policy reasons favoring liberal construction of pro se pleadings warrant the Court's consideration of the allegations contained in plaintiff's memorandum of law, at least where those allegations are consistent with the allegations in the complaint.").

FN79. Complaint at 8.

FN80.*See* State Def. Mem. at 9 n. 5.

**\*8** Reading Gibson's allegations in the light most favorable to him, the Commissioner of Mental Health could also be found liable to Gibson for failing to remedy constitutional violations after being informed that they were being committed. Gibson alleges that the Commissioner consistently failed to respond in any way to Gibson's numerous calls and letters complaining about abuse,[FN81] and alleges that the Commissioner's office has a "[c]ontinuing policy of failure to investigate, remedy or punish the wrongdoer." [FN82] Gibson thus sufficiently alleges that the Commissioner "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom" or that he "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." [FN83]

FN81. "Plaintiff states he has contact Commissioner of Mental Health on several occasion by phone at least once a wk or every 2 1/2 since and before incident. And wrote 5 letter which the desk secretary state were never recieved. To any extent when messages were left on phone no notice of acknowledgement were sent. Other patients sent or called in messages (wrote letters) no answer in return [sic]" Pl. Mem. at 13.

FN82.*Id.*

FN83.*Colon,* 58 F.3d at 873.

According to Gibson, Governor Pataki "failed to oversee the enforcement of State enacted laws" and his office also failed to respond to complaints by patients at Mid-Hudson.[FN84] Gibson additionally claims that "Pataki has failed to set up a official grievance numerical system where disciplinary actions are recorded, filed, and placed before a impartial administrator [sic]." [FN85] These allegations do not sufficiently plead personal involvement-it is clear that Gibson is attempting to sue Pataki as a representative of the State rather than because of his own actions. Therefore, the claims against Governor Pataki must be dismissed for failure to sufficiently allege personal involvement.

FN84. Pl. Mem. at 8-9.

FN85.*Id.* at 9.

The actual personal involvement of the Commissioner, Holanchock, and Healy is a matter to be further explored in discovery. Based on a review of the pleadings, Gibson may proceed on his claims against these defendants.

F. Eleventh Amendment

State defendants maintain that Commissioner, Holanchock, and Healy "are constitutionally immune from suit in federal court for damages." [FN86] There are three problems with defendants' argument. *First,* Gibson makes it clear that he intends to sue each of these individuals in their official and individual capacities.[FN87]*Second,* given the discussion above, Gibson has alleged that these defendants were personally involved in the alleged constitutional violations. For the time being, then, it may be assumed that these three individuals were not named as defendants based upon their supervisory status but rather because of their own actions or inactions. *Third,* Gibson appears to seek injunctive relief in addition to monetary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

compensation.[FN88] Accordingly, defendants' reliance on the Eleventh Amendment as a ground for dismissal is misplaced.

> FN86.*Id.* at 10-11.

> FN87.*See* Complaint at 1.

> FN88.*See id.* at 12.

G. Gibson's Motions

Gibson has sent voluminous letters to the Court, including four recent submissions that were styled as motions. Two of these submissions were actually opposition papers to the motions to dismiss, and may thus be closed by the Clerk of the Court. Gibson referred to another of his submissions as a "motion to reconsider" a temporary stay in discovery pending the outcome of the motions to dismiss. While the temporary stay was justified, it is now lifted given the resolution of the motions to dismiss. Thus, Gibson's motion to reconsider may be closed.

**\*9** Another letter styled as a motion, dated April 17, 2006, requests an extension of time to serve several defendants, in addition to copies of the Second Amended Complaint and the service and summons forms. Under Federal Rule of Civil Procedure 4(m), an action is generally dismissed without prejudice as to defendants who are not served within 120 days after the filing of the complaint. However, a court may extend the time for service "for an appropriate period" if a plaintiff "shows good cause for the failure" to effect timely service.[FN89]

> FN89.Fed.R.Civ.P. 4(m).

In his April 17 submission, Gibson describes a good faith effort to locate and serve the remaining defendants in this case.[FN90] He represents that he had no means of obtaining the addresses of defendants who retired or were fired from Mid-Hudson except through interrogatory responses from

State defendants, and he also mentions administrative difficulties that have hampered his ability to effect timely service.[FN91] Given what appear to be good faith efforts to prosecute his case in a timely manner, and good cause for the delay, I hereby grant the motion for an extension of time to serve defendants in this case. The time for Gibson to serve any remaining defendants is extended until June 30, 2006.

> FN90.*See* 4/17/06 Submission from Bennie Gibson to the Court at 3-4.

> FN91.*See id.*

Any future submissions must be served on all named defendants in addition to sending them to the Court. The Pro Se Office may reject for filing any documents that were not served on all defendants and/or do not clearly so indicate.

V. CONCLUSION

For the foregoing reasons, the County of Orange's motion to dismiss any state tort law claims against it for failure to file a timely notice of claim is granted. The State defendants' motion to dismiss claims against Governor Pataki is also granted. The remaining portions of defendants' motions to dismiss are denied, and Gibson's motion to extend time for service is granted. The Clerk of the Court is directed to close all motions currently pending in this case [Docket Nos. 25, 33, 39, 40, 50, 52].

SO ORDERED:

S.D.N.Y.,2006.
Gibson v. Commissioner of Mental Health
Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1234971 (S.D.N.Y.)
(Cite as: 2006 WL 1234971 (S.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Antwon WHITE, Plaintiff,
v.
Dr. J. MITCHELL, Arthur Kill Correctional Facility
Health Services Director, Dennis Breslin, Arthur Kill
Correctional Facility Superintendent and Edward
Checkett, D.D.S., Arthur Kill Correctional Facility
Dentist, Defendants.
**No. 99-CV-8519 (FB).**

Jan. 18, 2001.

Antwon White, Arthur Kill Correctional Facility, Staten
Island, New York, for the Plaintiff, pro se.

Eliot Spitzer, Attorney General of the State of New York,
By: Maria Filipakis, New York, New York, for the
Defendants.

*MEMORANDUM AND ORDER*

BLOCK, J.

**\*1** Plaintiff Antwon White ("White"), a prison inmate,
brings this action *pro se* pursuant to 42 U.S.C. § 1983 and
New York law alleging that defendants were both
negligent and deliberately indifferent to his medical needs
in connection with treatment for hearing loss he suffered
following the extraction of a wisdom tooth. White pleads
that this conduct violated his rights under the Eighth
Amendment, and seeks injunctive relief as well as
compensatory and punitive damages. While White does
not make the distinction clearly, the Court construes the
complaint as naming defendants in both their individual
and official capacities.[FN1] Defendants have moved to

dismiss White's complaint pursuant to Fed.R.Civ.P.
12(b)(6) asserting that (1) the complaint fails to state a
claim under the Eighth Amendment for deliberate
indifference to his medical needs; (2) the complaint fails
to allege personal involvement by defendant Dennis
Breslin ("Breslin"), Superintendent of Arthur Kill
Correctional Facility ("Arthur Kill"); and (3) defendants
are entitled to qualified immunity. Although White has
filed no opposition to defendants' motion, the Court can
decide the motion without the benefit of a submission
from him.[FN2] For the reasons set forth below, defendants'
motion is denied.

> FN1. "[T]he plaintiff ... should not have the
> complaint automatically construed as focusing on
> one capacity to the exclusion of the other."
> *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

> FN2.*See* *McCall v. Pataki,* 232 F.3d 321, 323
> (2d Cir.2000) ("If a complaint is sufficient to
> state a claim on which relief can be granted, the
> plaintiff's failure to respond to a Rule 12(b)(6)
> motion does not warrant dismissal").

BACKGROUND

The following facts are drawn from White's complaint and
the records attached thereto, and are accepted as true for
the purposes of this motion: On August 5, 1999, while
incarcerated at Arthur Kill, White had a wisdom tooth
extracted by defendant Edward Checkett ("Checkett"), a
dentist employed at Arthur Kill. Read broadly, the
complaint seems to allege that Checkett was aware that he
negligently injured White during the extraction procedure,
but failed to provide immediate medical attention.

Soon after the extraction, White began experiencing
ringing and hearing loss in his left ear. On several
occasions, White brought these complaints to the attention
of defendant Jennifer Mitchell ("Mitchell"), Arthur Kill's
Health Services Director. However, Mitchell did not

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

provide White with prompt medical attention, and, in particular, failed to refer him to an ear specialist.

On November 15, 1999, White filed an administrative complaint, pursuant to the Department of Correctional Services' grievance procedures, requesting medical attention for his hearing problem and, "if necessary," a referral to an ear specialist. Inmate Grievance Complaint attached to Compl. White alleges that Breslin denied his grievance, and "failed to direct his subordinates" to provide White with prompt medical attention.[FN3]

> FN3. Despite White's allegation to the contrary, the Inmate Grievance Resolution Committee ("IGRC") appears to have accepted White's grievance on November 30, 1999, and directed him to "report back to sick-call." Inmate Grievance Complaint attached to Compl.

On December 9, 1999, White was seen by an audiologist who described the degree of hearing loss in his left ear as "severe-profound." NYSDOCS Request & Report of Consultation attached to Compl. The audiologist recommended further medical consultation to determine the etiology of White's hearing loss and approval for a hearing aid evaluation. *See Id.* White filed the complaint in this action on December 23, 1999.

### DISCUSSION

I. Standard on a Motion to Dismiss

**\*2** In considering a motion to dismiss, the court's task is " 'necessarily a limited one.' " *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). "[I]n ruling on [the] defendant[s'] motion, the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d. Cir1997). The Court may consider the allegations in the complaint and "all papers and exhibits appended to the complaint, as well

as any matters of which judicial notice may be taken." *Hirsch v. Arthur Anderson & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). In addition, because White is a *pro se* plaintiff, his pleadings must be read liberally. *See Corcoran v. New York Power Auth.,* 202 F.3d 530, 536 (2d Cir.1999); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). The Court should grant such a motion only if, after viewing the plaintiff's allegations in the most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Feder v. Frost,* 220 F.3d 29, 32 (2d Cir.2000).

II. Section 1983 Individual Capacity Claims

Defendants contend that White's complaint must be dismissed because it fails to state an Eighth Amendment violation. To state a claim under § 1983 for deprivation of medical treatment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). A serious medical need exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)) (internal quotation marks omitted). The Second Circuit has recently held that refusal to treat a degenerative condition that tends to have serious medical implications if left untreated is a sufficient basis to support the existence of a serious medical need. *See Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (holding that a tooth cavity may be a serious medical condition).

To establish deliberate indifference, the plaintiff must prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). Deliberate indifference will exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). "[M]ere medical malpractice' is not tantamount

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

to deliberate indifference," but may rise to the level of deliberate indifference when it "involves culpable recklessness, *i.e.*, an act or failure to act ... that evinces 'a conscious disregard of a substantial risk of harm." ' *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted)).

\*3 White has alleged a "serious medical condition" under *Gamble.* He states that the ringing in his ear developed into a progressive loss of hearing. Indeed, the audiologist's report referred to above characterizes the degree of hearing loss in White's left ear as being "severe-profound."

*Gamble′* s "deliberate indifference" prong is satisfied in respect to each of the defendants in their individual capacities by a reasonably liberal reading of White's *pro se* complaint. With respect to Checkett, White appears to allege that the injury leading to his hearing loss occurred when Checkett negligently extracted his wisdom tooth. Dental malpractice, without more, does not state a claim cognizable under § 1983. White further alleges, however, that Checkett was deliberately indifferent to his medical condition because, once he knew that he had injured White during the extraction procedure, he failed to render timely medical treatment to abate the harm.

As for Mitchell, White alleges that she ignored his subsequent repeated requests for appropriate treatment while his condition worsened, and failed to supervise Arthur Kills's medical personnel in connection with his treatment. Mitchell, therefore, allegedly knew of White's serious medical need, and consciously failed to act to prevent further harm to White.

Finally, Breslin allegedly failed to adequately supervise White's treatment, and denied his grievance. Defendants assert that the complaint must be dismissed as to Breslin because it fails to allege his personal involvement in the Eighth Amendment violation. Because "[s]ection 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Blyden v. Mancusi,*

186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). However, "personal involvement of a supervisory defendant may be shown by evidence that ... the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong...." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). White alleges that his grievance made Breslin aware that his medical needs were being ignored. White's further allegations that Breslin denied the grievance, and failed to take steps to provide for White's treatment are sufficient to plead Breslin's personal involvement in the violation.

III. Section 1983 Official Capacity Claims

To the extent White has asserted claims seeking damages against defendants in their official capacities, they are barred by sovereign immunity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989). However, the complaint also seeks injunctive relief against the defendants. Injunctive relief may be obtained in a § 1983 action for deliberate indifference to a serious medical need, even absent an official's personal involvement, if the complaint alleges that the official had "responsibility to ensure that prisoners' basic needs were met, and the complaint adequately alleged deliberate indifference to a serious medical need." *Koehl v. Dalsheim,* 85 F.3d 86, 89 (2d Cir.1996); *see also New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 135 (2d Cir.1995) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) ("the Eleventh Amendment does not bar federal courts from issuing an injunction against a state official who is acting contrary to federal law"). White alleges that defendants have denied him treatment for his progressive hearing loss. If he can prove his contentions, he may be entitled to injunctive relief.

IV. Qualified Immunity

\*4 The defendants enjoy qualified immunity from White's suit if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Even where a prisoner's rights are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

clearly established, "qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.'" *Hathaway,* 37 F.3d at 67 (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

Defendants contend that their actions were objectively reasonable. (*See* Def. Mem. at 9). However, because the complaint adequately alleges a claim for deliberate indifference, defendants are not entitled to qualified immunity on their Fed.R.Civ.P. 12(b)(6) motion. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (the issue when considering qualified immunity in the context of Fed.R.Civ.P. 12(b)(6) "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). This allegation, if proved, could constitute a violation of White's Eighth Amendment rights, and more facts are necessary to resolve the qualified immunity question.

V. State Law Claims

As referred to above, the complaint, liberally construed, also alleges dental malpractice against Checkett and negligent supervision against Breslin and Mitchell in their individual capacities. Although theses claims are not cognizable in an action under § 1983, they do allege state law claims. Defendants do not address these claims in their motion to dismiss. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over these pendent claims. *See Shimon v. Department of Corr. Serv. for the State of N.Y.,* No. 93 Civ. 3144(DC), 1996 WL 15688, at *3 (S.D.N.Y. Jan. 17, 1996) (Section 24 of New York Correction Law does not bar federal court from hearing pendent state law medical malpractice claim asserted against New York State Department of Correctional Services employee in employee's individual capacity). However, the Eleventh Amendment bars White's claims for damages or injunctive relief against the defendants in their official capacities. *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974); *Fleet Bank, Nat'l Ass'n v. Burke,* 160 F.3d 883, 891 (2d Cir.1998).

CONCLUSION

Defendants' motion to dismiss is denied.

SO ORDERED.

E.D.N.Y.,2001.
White v. Mitchell
Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp., 1995 WL 236245 (N.D.N.Y.)
(Cite as: 1995 WL 236245 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
James N. MYERS, Jr., Plaintiff,
v.
Heather WOLLOWITZ, Attorney, Defendant.
**No. 95-CV-0272 (TJM) (RWS).**

April 10, 1995.

James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.

*I. Background*

**\*1** Presently before this Court is the above-captioned plaintiff's application to proceed in forma pauperis and civil rights complaint. Plaintiff has not paid the partial filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as without arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that plaintiff was represented by defendant Wollowitz, a public defender for the County of Rensselaer, in a County Court proceeding. Plaintiff alleges that after a criminal proceeding in that Court, plaintiff was "sentenced to a illegal sentence." *Id.* at 2. Plaintiff contends that due to the ineffective assistance of his counsel, defendant Wollowitz,

his constitutional rights were violated. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether the cause of action stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's inmate account statements, the Court has determined that plaintiff's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). Turning to the second inquiry, a court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 236245 (N.D.N.Y.)
(Cite as: 1995 WL 236245 (N.D.N.Y.))

the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* 91-CV-612, 1994 WL 688306, \*3, 1994 U.S.Dist. LEXIS 17698, \*8-9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). A party may not be held liable under this section unless it can be established that the defendant has acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3rd 625, 628 (2d Cir.1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* 92-Civ-4288, 1992 WL 380914, \*1, 1992 U.S.Dist. LEXIS 18864, \*2-3 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted).

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise,* 1992 WL 380914 at \*1, 1992 U.S.Dist. LEXIS 18864 at \*2-3;*see also D'Ottavio v. Depetris,* 91-Civ-6133, 1991 WL 206278, \*1, 1991 U.S.Dist. LEXIS 13526, \*1-2 (S.D.N.Y. Sept. 26, 1991).

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28

U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

N.D.N.Y.,1995.
Myers v. Wollowitz
Not Reported in F.Supp., 1995 WL 236245 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Samuel CABASSA, Plaintiff,
v.
Craig GUMMERSON, Corrections Captain, Auburn
Correctional Facility; Donald Selsky, Assistant Deputy
Commissioner, Director of Special
Housing/Disciplinary Program; Anthony Graceffo,
Chief Medical Officer, Auburn Correctional Facility;
Glenn S. Goord; Hans Walker; Gary Hodges; D.W.
Seitz; Terry Halcott; Christine Coyne Nancy O'Connor;
Ann Driscoll; John McClellen; John Rourke, Captain,
Security Services at Auburn Correctional Facility;
Koors, Head Pharmacist at Auburn Correctional
Facility; Robrt Mitchell, Correctional Counselor at
Auburn Correctional Facility; and Androsko, Registered
Nurse, Auburn Correctional Facility, Defendants.
No. 9:01-CV-1039.

Sept. 24, 2008.

Samuel Cabassa, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, David L. Fruchter, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

**ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Samuel Cabassa, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated June 30, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' second motion for summary
judgment (Docket No. 81) be granted in part and denied
in part. Objections to the Report Recommendation have
been filed by the parties.

Based upon a de novo review of the portions of the
Report-Recommendation to which the parties have
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and
DENIED in part as follows:

A. Plaintiffs Fourth Cause of Action is DISMISSED in its
entirety;

B. Plaintiffs Fifth Cause of Action is DISMISSED to the
extent that it asserts:

(a) Any Fourteenth Amendment procedural due process
claim whatsoever;

(b) A First Amendment access to courts claim against
defendant Hans Walker;

(c) A First Amendment retaliation claim against defendant
Hans Walker;

2. Defendants' second motion for summary judgment is
otherwise DENIED, so that, surviving that motion is:

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

(a) Plaintiffs First Amendment access-to-courts claim against defendants D.W. Seitz and Craig Gummerson asserted in the Fourth Amended Complaint's Fifth Cause of Action; and

(b) Plaintiffs First Amendment retaliation claim against defendants D.W. Seitz and Craig Gummerson also asserted in the Fifth Cause of Action.

IT IS SO ORDERED.

SAMUEL CABASSA,

Plaintiff,

v.

HANS WALKER, Superintendent, Auburn C.F.; D.W. SEITZ, Correctional Officer, Auburn C.F.; CRAIG GUMMERSON, Captain, Auburn C.F.,

Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit ("S.H.U.") without cause or

explanation, and by being deliberately indifferent to his serious medical needs, which included severe dehydration during his hunger strike, a painful eye condition, a painful hemorrhoid condition and a deteriorating mental health condition. (*See generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment. (Dkt. No. 58.) By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth Cause of Action). (Dkt. No. 68.)

**\*2** Currently before the Court is Defendants' *second* motion for summary judgment. (Dkt. No. 81.) [FN1] For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

> FN1. By Order filed March 30, 2006, I granted Defendants leave to file a second motion for summary judgment. (Dkt. No. 62.)

### I. APPLICABLE LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN3]

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN3.*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN4 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN5 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN6

FN4.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN5.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86;*see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

FN6.*Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N .Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* FN7 In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. FN8 (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.) FN9 In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. FN10 An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. FN11 Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN12

FN7.See *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN8.See *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

be relied upon to oppose summary judgment.");
*Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN9. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

FN10.*See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11.*See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert.*

denied, 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12.*See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant. For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.FN13 In one of those actions, he was awarded $1,000 following a jury trial.FN14 (He has also litigated numerous civil actions in state or federal courts since the filing of this action.) However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.FN15

FN13. *See, e.g., Cabassa v. Kuhlmann,* 569 N.Y.S.2d 824 (N.Y.S.App.Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 78 N.Y.2d 858 (N.Y.1991); *Cabassa v. Coughlin,* 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.,* Index No. 001846/1995 (N.Y.S. Sup.Ct., Erie County, filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat,* 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord,* 720 N.Y.2d 76 (N.Y.S.App.Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied,* 96 N.Y.2d 713 (N.Y., June 5, 2001).

FN14. *See Cabassa v. Rufat,* 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

FN15. "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord, Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

## II. ANALYSIS

### A. Plaintiff's Fourth Cause of Action

*3 Construed with the *extra* degree of leniency with which *pro se* civil rights claims are generally afforded,FN16 Plaintiff's Fourth Cause of Action alleges as follows: between **January 12, 1998,** and **June 22, 1998,** while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his [original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2) they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the legitimacy of[,] the need for his continued confinement [in Administration

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Segregation]," even though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally "retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to June 22, 1998) "by perfunctor[ily] rubber-stamping ... [Administrative Segregation] review forms. (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN16. Of course, a liberal construction must be afforded to *all* pleadings (whether brought by *pro se* litigants or not), under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). However, an *extra* liberal construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil rights claims). *See Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20, 1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action would be barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id.* at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First,

Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id.* at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

*4 Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments. First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit. (Dkt. No. 88, Part 1, at 1-2.) Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake. (*Id.* at 4-5.)

**1. Continuing Violation Doctrine**

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),FN17 I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

filed pursuant to 42 U.S.C. § 1983.[FN18] The first issue presented by the parties' arguments with regard to the continuing-violation doctrine is whether the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998). The second issue presented by the parties' arguments is whether Plaintiff has shown *compelling circumstances* to warrant the application of the continuing-violation doctrine.[FN19]

> FN17. (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord,* Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

> FN18. *Compare Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g, Pino v. Ryan,* 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin,* 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at *11 (N.D.N.Y. March 13, 1998) (Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr. 15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding, inter alia, the application of the continuing violation doctrine).

> FN19. The requirement that *compelling circumstances* be shown to warrant the application of the continuing-violation doctrine appears to be a different issue than whether the

acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts that occurred within the statutory period. *See Young v. Strack,* 05-CV-9764, 2007 WL 1575256, at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as something distinct from the requirement that a sufficient connection exist between the acts in question), *accord, McFadden v. Kralik,* 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y. March 28, 2007); *see also Blesdell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1415 (S.D.N.Y.1989) (stating that compelling circumstances are needed to warrant the application of the continuing-violation doctrine, and that a sufficient connection between the acts in question is necessary to warrant the application of the continuing-violation doctrine, but not stating that compelling circumstances and sufficient connection are the same thing).

According to the undisputed record evidence, the relevant acts of Defendants Walker and Seitz were as follows:

1. On January 12, 1998, Defendant Seitz signed a written recommendation that Plaintiff be placed in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact in question].) That recommendation was based on information provided by three confidential informants (each an inmate) that Plaintiff had threatened them. (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2. On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing. (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].) At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question). (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

**\*5** 3. On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933. (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].) [FN20] Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998. (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

> FN20. Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent. (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

4. Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions. They just send me papers periodically to sign. There is no actual committee that meets." (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].) [FN21]

> FN21. Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court

on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].) I do not understand, or agree with, Defendants' second reason. In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

5. On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation. (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 4, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord,* Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6. On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record." (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement, essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7. While it is unclear from the record, it appears that no correctional officials at Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of June 19, 2001. (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in the morning C.O. Exner (SHU Staff) informed plaintiff that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the 'A' Officer *had just received a call* that the plaintiff won his Article 78 [proceeding] ...."] [emphasis added]; *see also* Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf* . Dkt. No. 85, Part 4, at 39, 43 [Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on morning of June 19, 1998.)

**\*6** 8. On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E. Corning); and Defendant Seitz responded that Plaintiff was not going back into the general population because "Auburn's Administration runs the prison, not the Judge." (*See* Dkt. No. 85, Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation]; Dkt. No. 16, ¶ 6 [15] [Plf.'s Verified Fourth Am. Compl.].)

9. On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and returned to the facility's general population. (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf .'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17] [Plf.'s Verified Fourth Am. Compl.].)

Liberally construed, Plaintiff's argument in support of the application of the continuing-violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that Plaintiff be

placed in administrative segregation on January 12, 1998. (Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].) [FN22]

> **FN22.** I note that Plaintiff does not allege or assert, nor does any record evidence suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald Selsky. (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, ¶¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

For the sake of argument, I will set aside the fact that I have found no reason to believe that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, violated any provision of the Constitution. A prisoner enjoys no constitutional right against being issued an administrative segregation recommendation that turns out to be false. [FN23] Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983. [FN24] The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

> **FN23.** *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones,* 873 F.Supp. 737, 743-44 (N.D.N.Y.1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

FN24. A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983. See *Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted]. Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983). See *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) [citation omitted]; *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997). This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

For example, there is no record evidence that Defendant Seitz issued his written recommendation of January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false. Judge Corning's decision of May 26, 1998, certainly did not so find. Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in administrative segregation. (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].) FN25

FN25. Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was not fair and impartial, and had committed other procedural errors. (*See* Dkt. No. 85, Part 4, at

36-37 [Ex. H to Plf.'s Decl.].)

*7 Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue. To the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had based his recommendation solely on their reports. (*Id.*) FN26

FN26. It bears noting that Plaintiff's success in his Article 78 proceeding against Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims against Defendant Seitz (or Defendant Walker) in this action. Setting aside the issue of whether Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78 proceeding, and Defendant Walker was sued only in his official capacity. See *Zavaro v. Coughlin,* 775 F.Supp. 84, 87-88 (W.D.N .Y.1991) (judgment entered in Article 78 proceeding brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on uncorroborated testimony of confidential informers could not be given preclusive effect in inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where hearing officer was not even named as party in Article 78 proceeding, and Commissioner was sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise defenses available to him in civil rights action, including lack of personal involvement), *aff'd,* 970 F.2d 1148 (2d Cir.1992).

Furthermore, there is no record evidence that Defendant Seitz was a member of the aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty, under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status. (*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz on any of the relevant forms];

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting that the Periodic Review Committee was made up of individuals other than Def. Seitz].) Nor is there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful. For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent." (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].) As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate. Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the facility, without personally involving Defendant Walker in that issue.[FN27]

FN27. *See Brown v. Goord,* 04-CV-0785, 2007

WL 607396, at *6 (N.D . N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp .2d 123, 126 (W.D.N.Y.2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

**\*8** The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S .H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back ... per Superintendent Walker ... that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].) For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[FN28] (3) the fact that the unidentified corrections officers in question did not state that, whenever Defendant Walker made the statement, he did so knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way suggest that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Defendant Walker made the statement as part of a conspiracy with Defendant Seitz. The more serious problem with this piece of evidence is that, as explained above, there is no record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any malicious (or knowingly wrongful) acts by Defendant Seitz.

FN28. It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population. (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].) It bears noting also that any allegation regarding the referenced order by Defendant Walker is not contained in Plaintiff's Fourth Amended Complaint. (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As a result, I find that no rational fact finder could conclude, from the current record, that the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find that compelling circumstances do not exist to warrant the application of the continuing-violation doctrine. Compelling circumstances (for purposes of the continuing-violation doctrine) exist

where the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.,* 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y. Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged violations occurred. To the contrary, his Fourth Amended Complaint and papers in opposition to Defendants' motion are replete with allegations that events (including violations) occurred on exact dates. (*See, e.g.,* Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6[23], 6[30]-6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s Decl.].)

**\*9** Moreover, while Plaintiff has alleged that the wrongful actions taken against him were part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were part of an express and openly espoused *policy*. Nor has he adduced evidence that any such policy *discriminated* against him because of his membership in any protected class of individuals (e.g., classifications based on race, religion, etc.). Plaintiff would no doubt argue that Defendants Seitz and Walker treated him differently from other prisoners between June 19, 1998, and June 22, 1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78 proceeding in New York State Supreme Court on May 26, 1998. However, any such disparate treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in January, February, and March of 1998, which (again) have not been shown to have been malicious. Therefore, the two groups of actions cannot be rationally found to have been united under the umbrella of a single "policy" of disparate treatment.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Finally, there is no record evidence that the wrongful actions in question were committed *covertly* such that Plaintiff only belatedly recognized their unlawfulness. To the contrary, the record is clear that Plaintiff knew of the wrongful actions at the time they were committed. That is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation. (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl.].) That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation. (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].) That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court. (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far. There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998. Thus, there is no reason to toll the starting of the three-year limitations period until that date.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts. As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

**2. Protected-Liberty-Interest Requirement**

**\*10** The parties' arguments with regard to the protected-liberty-interest requirement present the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days, together with confinement in the Auburn C.F. S.H.U. for a total of 60

days, constituted an "atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison life," under *Sandin v. Connor*, 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be an atypical and significant hardship. However, Plaintiff has adduced record evidence that the restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he experienced in the Auburn C.F. S.H.U. (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl., describing conditions in Auburn C.F. Infirmary].) As a result, for purposes of Defendants' second motion for summary judgment, I will treat the entire 161-day period in question as a continuous period of administrative segregation under conditions of confinement that varied and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding the administrative segregation that he experienced during the 161-day period in question, it is necessary to consider not simply the length of that confinement but the specific circumstances of that confinement (and whether they were harsher than ordinary). *Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir.1997); *Vasquez v. Coughlin*, 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[ ] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[ ] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

*11 The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York State DOCS.[FN29] Moreover, I can find no evidence in the record that, during the 101 days which Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion of his administrative confinement), he was *completely* denied clothing, medicine and adequate nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running water, showers and bedding. (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

FN29.*See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of S.H .U. confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general

population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14).

Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161 days or more, under conditions of confinement that were, to varying degrees, more restrictive than those in the prison's general population.[FN30] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population,[FN31] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility,[FN32] especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional facility (as Plaintiff appears to be).[FN33]

FN30.*See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin, 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug. 27, 1996)* (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero, 905 F.Supp. 99, 103-04 (W.D.N.Y.1995)* (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN31.*See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren, 985 F.Supp. at 354-55;see also Ruiz, 1997 WL 137448, at *5* ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN32.*See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence

of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 1, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal feature of the New York prison regime."); *accord, Warren, 985 F.Supp. at 354.*

FN33.*See* N.Y.S. DOCS Inmate Locator Service http:// nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor, 515 U.S. 472, 479, n. 4 (1995).* However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary,* since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-andsignificant-hardship analysis.) FN34

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN34. *See Goros v. Pearlman,* 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J.) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review,* 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January through March of 1998.[FN35] For example, he received notice and a hearing; he received the opportunity to appeal the written hearing decision; and he received several written memoranda regarding his administrative segregation status signed by Defendant Walker and three members of the Periodic Review Committee. Most importantly, even if some sort of due process violation did occur during the period of January through March of 1998, I can find no evidence in the record that either Defendant Seitz or Defendant Walker committed that due process violation.

FN35. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460 (1989).

**\*12** As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no right under the Fourteenth Amendment (or any other constitutional provision) against being issued an administrative segregation recommendation that turns out to be false. Moreover, no record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative

segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had knowledge of the credibility of the three confidential informants at issue). Finally, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.

For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B. Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998,** and **June 22, 1998, Defendants Walker, Seitz,** and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment,** and his right "to access ... the court and ... seek redress" under the **First Amendment,** when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U. (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (Dkt. No. 81, Part 5, at 4-8

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

[Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments. First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an "atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest. (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants [ ] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].) Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id.* at 10-13.) In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint. (*Id.*) The first type of First Amendment claim was the "access to courts" claim described above. (*Id.*) [FN36] The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim. (*Id.*) Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id.*) [FN37]

FN36. I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] ... that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants ... cause[d] injury [to plaintiff] by delaying his release from SHU in

violation of his First ... Amendment right[ ] to access of the courts ...."].)

FN37. For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that ... if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]." (*Id.* at 11-12.)

*13 Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**1. Procedural Due Process Claim Under the Fourteenth Amendment**

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown*, 38 F.3d 379 (8th Cir.1994), and *Hershberger v. Scaletta*, 33 F.3d 955 (8th Cir.1994). The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown*, an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer. 38 F.3d 379, 379 (8th Cir.1994). The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury" *Id.* The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury. *Id.* at 379-80. Such a holding, which regards the requirement for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta,* for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir.1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates.* Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandlin v. Connor,* narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin'* s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0192, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, and but that his allegations-arising from same placement in

segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

**\*14** As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin'* s atypicality requirement simply by alleging (and presumptively adducing some evidence) that he has been subjected to retaliation. I turn, then, to the issue of whether Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical, significant hardship" for purposes of a due process claim.

I must answer this question in the negative for the reasons stated above in Part II.A.2. of this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by Defendants in their memorandum of law. (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].) Simply stated, considering the three-day length of Plaintiff's continued confinement in the Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which included one hour out of his cell per day, "good heating," and the ability to possess "personal books and correspondence[ ] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.] ), I find that the three-day continued confinement at issue did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed.R.Civ.P. 56.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[FN38] I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

> FN38. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], accord, Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; see also Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], accord, Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

**2. Claims Under the First Amendment**

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of Action. (Dkt. No. 85, Part 3, at 11-13.) Defendants are partly correct, and partly incorrect, when they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be dismissed

because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming). (Dkt. No. 88, Part 1, at 2-3.)

**a. Access-to-Courts Claim**

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting a First Amendment *retaliation* claim, that Complaint has alleged facts plausibly suggesting a First Amendment *access-to-courts claim*-at least against Defendants Seitz and Gummerson.[FN39]

> FN39. *See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment) [citing cases]; *Stokes v. Goord,* 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v. Torres,* 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment different than elements of access-to-courts claim arising under First Amendment); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *1, 6-7, & n. 2 (N .D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of retaliation claim arising under First Amendment as different than elements of access-to-courts claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F.Supp.2d 376, 381-82 (E.D.N.Y.2003) (recognizing distinction between [1] an access-to-courts claim arising under First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under First Amendment) [citing cases].

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

**\*15** Plaintiff's "Fifth Cause of Action" alleges as follows:

The action of defendants WALKER, GUMMERSON, and SEITZ stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's] release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First and Fourteenth Amendment [r]ights [under] the United States Constitution. (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].) In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (*Id.* at ¶¶ 6[13]-6 [15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker.* (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy" is "conclusory." (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.) I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the

morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor. (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].) I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory. (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts. Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court. I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. [FN40]

FN40. I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed.R.Civ.P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed.R.Civ.P. 56.

**\*16** For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker. I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument), [FN41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

FN41. "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker). Rather, that claim stands on its own. (Dkt. No. 16, "Fifth Cause of Action," & ¶ 6[15].) Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker). Rather, that claim also stands on its own. (*Id.* at "Fifth Cause of Action," & ¶ 6[14].) The issue, then, is whether these two claims are specific enough to survive an analysis under Fed.R.Civ.P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances." [FN42] This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." [FN43] "However, this right is not 'an abstract, freestanding right ...' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " [FN44] As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act.[FN45]

FN42. *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

FN43. *Bounds v. Smith,* 430 U.S. 817, 828 (1977), *modified on other grounds, Lewis v. Casey,* 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren,* 386 F.2d 88, 92 (2d Cir.2004) [citations omitted].

FN44. *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis v. Casey,* 518 U.S. 343, 351 [1996] ).

FN45. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C .F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days. In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment. The Southern District thoroughly and clearly so explained in a case similar to ours:

**\*17** [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding] ... implicates his constitutional right of access to the courts. The First Amendment to the U.S. Constitution prohibits any law abridging the freedom ... to petition

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

the government for a redress of grievances. That freedom ... encompasses the constitutional right of unfettered access to the courts....

.... The right of access is ... implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights.... Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.... [Plaintiff's] assertion of this right is not limited by *Sandin [v. Connor,* 115 S.Ct. 2293 (1995) ], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution. As the Supreme Court explicitly stated [in *Sandin* ], 'prisoners ... retain other protection from arbitrary state action .... They may invoke the First ... Amendment[ ] ... where appropriate ...' *Sandin,* 115 S.Ct. at 2302, n. 11.

*Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles,* 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment].... If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[FN46]

FN46.*Cf. Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949) ("[A] right which ... does not supply ... a remedy is no right at all ...."); *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997) ("[T]he source of this right [of access to the courts] has been variously located in the First Amendment right to petition for redress [of grievances], the Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the Fifth and Fourteenth Amendments.") [citations omitted]; *accord, Colondres v. Scoppetta,* 290 F. Supp .2d 376, 381 (E.D.N.Y.2003); *Brown v. Stone,* 66 F.Supp.2d 412, 433 (E.D.N.Y.1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. would make that official liable *also* for infringing upon the inmate's personal liberty protected by the *substantive* due process clause of the Fourteenth Amendment. Again, the Southern District of New York thoroughly and clearly so explained:

**\*18** A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.... This is not only when an official keeps an inmate in prison past the date when a court orders his permanent release ... but also when an official disregards a court order for the inmate's temporary release for work during daytime hours, ... *or disregards an order directing the inmate's release from SHU....* This principle is not disturbed by *Sandin [v. Connor,* 515 U.S. 472 (1995) ], since ... the *Sandin* test applies only to determine when a constitutional liberty interest arises from state prison regulations, thus requiring certain process to deny that liberty interest.... The liberty interest at stake in this case arises from the plaintiff's *nonderogable right to be free from restraints or punishments that a court has expressly deemed to be improper.*

*Coughlin,* 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 [internal quotation marks, citations and emphasis omitted; other emphasis added];

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*see also* *Acre,* 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27 ("[I]t is all but self-evident that a state official's knowing refusal to obey a state court order affecting a prisoner's rights would make the official liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *cf.* *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("Like the right of access to the courts, the right to petition [the government for the redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.") [internal quotation marks and citations omitted].[FN47]

FN47.*Accord,* *Fleming v. Dowdell,* 434 F.Supp.2d 1138, 1160 & n. 17 (M.D.Ala.2005) (recognizing that, where state official knows of court order, yet refuses to comply with it, he incurs liability under substantive due process clause of Fourteenth Amendment) [citations omitted]; *Rodriguez v. Northampton County,* 00-CV-1898, 2003 WL 22594318, at *4, n. 4, 2003 U.S. Dist. LEXIS 19567, *12, n. 4 (E.D.Pa. Oct. 21, 2003) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v. Shirley,* 787 F.Supp. 109, 111 (N.D.Miss.1992) ( "[I]t is undisputed that [defendant] continued to confine [plaintiff] in the county jail during the day in direct conflict with the state court order to release him as specified.... [This] refusal to obey the [court] order violated [plaintiff's] substantive due process rights."); *Tasker v. Moore,* 738 F.Supp. 1005, 1010-11 (S.D.W.Va.1990) ("It is beyond peradventure that officials who willfully, intentionally or recklessly keep an inmate in prison past the date he was ordered released are liable under section 1983 for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.") [citations omitted].

As to the precise issue of whether the delay alleged by Plaintiff was long enough to constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June 20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when Plaintiff was released from S.H.U. back into the general population). (Dkt. No. 16, ¶¶ 6[15]-6[17] [Plf.'s Fourth Am. Compl.].) As a result, I liberally construe Plaintiff's Fourth Amended Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length. [FN48] The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998-approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff. (*Id.* at ¶ 6[14].)

FN48. Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

*19 Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length. *See* *Arline v. City of Jacksonville,* 359 F.Supp.2d 1300, 1308-09 (M.D.Fla.2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan,* 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D.Ill. March 30, 2007) (denying defendants' Rule 12[b] [6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*Lewis v. O'Grady,* 853 F.2d 1366, 1368-70 & n. 9 (7th Cir.1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth and Fourteenth Amendments).[FN49] In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998. (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

FN49.*Cf. Brass v. County of Los Angeles,* 328 F.3d 1192,1195,1199-1202 (9th Cir.2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim. However, here, Defendants have not challenged Plaintiff's access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency. By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed.R.Civ.P. 56 and Local Rule 7.1. On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN50] This initial burden, while modest, is not without substance.[FN51]

FN50.Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff].");  *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN51.*See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

**\*20** Furthermore, even if Defendants had offered such argument, I am confident that I would find that a genuine issue of fact exists with regard to that claim, based on the current record. (*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on evening of June 20, 1998; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment accesso-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[FN52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days

after they mail to the petitioner a copy of the judgment and written notice of its entry[FN53] (which mailing presumably occurred, in this case, on the date of the notice, June 18, 1998).[FN54] As a result, such a rule would lead to the rather absurd result that, where the respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U. choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the deadline by which respondents must file an appeal from the judgment (and thus the prisoner's S.H.U. confinement) would be extended indefinitely-in total frustration of a court judgment that has not in any way been invalidated. Rather, I believe that the more sensible rule, and the operative one, is that the judgment is stayed (for purposes of a subsequent constitutional accessto-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the respondent (or the issuance of a court order granting such a stay).[FN55] No evidence exists in the record that such a notice of appeal was filed, or even considered.

FN52.*See Slone v. Herman,* 983 F.2d 107, 110 (8th Cir.1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera,* 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[ ] final by the conclusion of direct review or the expiration of the time for seeking such review ... in state court").

FN53. (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered ... and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

FN54.N.Y. C.P.L.R. § 5513(a); *see also* David

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

FN55. See *Tasker v. Moore,* 738 F.Supp. 1005, 1007, 1011 (S.D.W.Va.1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin,* 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

**b. Retaliation Claim**

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended Complaint labeled "Fifth Cause of Action." (*Id.*) This, of course, is true: Plaintiff's "Fifth Cause of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by "intentionally delaying his release from the 'SHU' after his successful Article 78 [petition], infringed upon his right to access to the court and to seek redress, in violation of his First ... Amendment [r]ights [under] the United States Constitution." (Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

**\*21** In order to convert the claim raised in this allegation from an access-to-courts claim to a retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker, Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of*] his successful Article 78 [petition] ...." (*Id.*) Fortunately, the Court need not engage in such a reconstruction.

This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint. (*Id.*) In those paragraphs, Plaintiff alleges facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected under the First Amendment). (*Id.* at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not the judge."] [internal quotation marks omitted].) FN56

FN56. Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading ....")

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted.] FN57 Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se. See Albert v. Carovano,* 851 F.2d 561, 571, n. 3 (2d Cir.1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters.") [citation omitted], *accord, Wynder v. McMahon,* 360 F.3d 73, 75, 77 & n. 11 (2d Cir.2004), *Northrup v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 46

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

(2d Cir.1997).

FN57. It should be noted that the Second Circuit, in *Phillips v. Girdich*, stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest. *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim .... [T]he court's imagination should be limited only by Philips' factual allegations ....") [emphasis added; citations omitted]. To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly,* 127 S.Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) ("*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted].

Simply stated, a plaintiff need not necessarily use the legal term "retaliation" FN58 in his complaint in order to assert a retaliation claim. *See Williams v. Manternach,* 192 F.Supp.2d 980, 986-87 (N.D.Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art for a 'retaliation' claim, it alleges both factual issues that implicated that legal proposition ..., and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal quotation marks and citations omitted]; *Baltoski v. Pretorius,* 291 F.Supp.2d 807, 810-11 (N.D.Ind.2003) ( "To state a claim for retaliatory treatment [under the First Amendment], a complaint need only allege a chronology of events from which retaliation may be inferred.") [citation omitted]; *cf. Thomas v. Hill,* 963 F.Supp. 753, 756 (N .D. Ill.1997) ("Mr. Thomas does

not claim that the defendants' verbal threats and abuse were motivated by retaliation, and the word 'retaliate' does not appear in his complaint. Nonetheless, the facts alleged would arguably state a retaliation claim."); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 470, n. 6 (W.D.N.Y.2005) ("Even though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, ... I construe his third claim as a ... claim against Aidala and Piccolo for cruel and unusual punishment by way of harassment ....").FN59 Rather, the governing standard is whether a plaintiff has alleged facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment. *That* is how the defendant receives fair notice of the plaintiff's claim under Fed.R.Civ.P. 8.

FN58.*See Trask v. Rios,* 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D.Ill.Dec. 18, 1995) ( " 'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance attaches. Alone, they are legal conclusions that do not place defendants on notice of the circumstances from which the accusations arise and therefore are inappropriate pleading devices.") [citations omitted].

FN59. This point of law has also been specifically recognized in the analogous context of prisoner grievances. *See Varela v. Demmon,* 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15 (S.D.N.Y.2007) ("Varela's grievance does not use the word 'retaliation' in describing what occurred. But, fairly read [for purposes of the issue of whether Varela exhausted his administrative remedies regarding his retaliation claim], it does suggest that the assault occurred in response to Varela's prior complaint to Demmon's supervisors."), *adopted,* 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord, Allah v. Greiner,* 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.,* 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*11 (D.Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v.. Prince,* 318 F.Supp.2d 767, 772, n. 3 (E.D.Ark.2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"). This point of law has also been recognized in other contexts. *See, e.g., Manzi v. DiCarlo,* 62 F.Supp.2d 780, 794 (E.D.N.Y.1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

*22 Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[FN60] As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

FN60. To the extent that Plaintiff's allegation that

Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express, openly espoused,* and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court. Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court. However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability. Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged. As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[FN61] That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way. It should be noted that Plaintiff has already amended his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

pleading *four* times.

FN61. (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

**\*23** One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition. I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).FN62 In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation. However, while some evidence exists in the record supporting such a fording, other evidence exists to the contrary.FN63 Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground. This is because Defendants did not base their motion on this ground.FN64 As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it. As stated earlier, on a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact. This initial burden, while modest, is not without substance.

FN62. (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex.

I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson ... retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord,* Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl ., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord,* Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

FN63. (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning].") [internal quotation marks omitted].) As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment. *See, supra,* Part I, and note 8, of this Report-Recommendation. Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].) Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent. *See* Fed.R.Evid. 801(d)(2). Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind. *See* Fed.R.Evid. 803(3).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

FN64. (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be *GRANTED* in part and *DENIED* in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be *DISMISSED* in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be *DISMISSED* to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment access-to-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise** *DENIED* so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and (b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**\*24 ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation.***See*28 U.S.C. §

636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**FN65

FN65.*See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at \*18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; see *also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued his findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4416411 (N.D.N.Y.)
(Cite as: 2008 WL 4416411 (N.D.N.Y.))

*other grounds by U.S. v. Hardesty,* 977 F.2d
1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v.
Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985,
990-91 (1st Cir.1988) ("[A]n unsuccessful party
is not entitled as of right to de novo review by
the judge of an argument never seasonably raised
before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely
objections to this Report-Recommendation will
PRECLUDE LATER APPELLATE REVIEW of any
Order of judgment that will be entered.** *Roldan v.
Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v.
Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.
Cabassa v. Gummerson
Not Reported in F.Supp.2d, 2008 WL 4416411
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Scott LOMBARDO, Plaintiff,
v.
Howard HOLANCHOCK, Dr. Chandrasekhara, Frank
Brusinski, Dr. Sheyas Baxi, Dr. Sadorra, Lynburgh
Burton, Zelma Armstrong, John Doe, Defendants.
**No. 07 Civ. 8674(DLC).**

June 25, 2008.

Scott Lombardo, New Hampton, NY, pro se.

Joshua Pepper, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** *Pro se* plaintiff Scott Lombardo brings this action
pursuant to 42 U.S.C. § 1983, alleging violations of his
constitutional rights by staff members at the Mid-Hudson
Psychiatric Center ("Mid-Hudson"), to which Lombardo
was civilly committed and where he currently resides.
Defendants have moved to dismiss, claiming principally
that Lombardo has failed to allege any violation of his
constitutionally protected rights. For the following
reasons, defendants' motion is granted in part.

BACKGROUND

The following facts are drawn from the complaint and are
assumed to be true, as they must be on a motion to
dismiss.[FN1] Lombardo is a patient-resident at
"Mid-Hudson," a secure New York State facility that
provides comprehensive evaluation, treatment, and
rehabilitation, pursuant to court order, for offenders who
have been found not guilty by reason of mental defect or
incompetent to stand trial.[FN2] He was civilly committed to
Mid-Hudson after he pleaded insanity "for a crime that he
committed."[FN3]

> **FN1.** Certain facts are also drawn from an
> "Addendum to Complaint," which the plaintiff
> did not file but did serve on the defendants. The
> Court became aware of this Addendum through
> references in defendants' motion to dismiss.
> Defendants provided the Court with a copy of the
> Addendum, which includes additional factual
> allegations as well as the twelfth cause of action.
> The Addendum has been docketed and filed by
> order of this Court. This Opinion treats the
> complaint and the Addendum together as the
> pleading to which the defendants' motion is
> addressed.

> **FN2.** This description of Mid-Hudson is not
> disputed. It is not contained in the complaint, but
> rather is drawn from the webpage of the New
> York State Office of Mental Health. *See* http://
> www.omh.state.ny.us/omhweb/facilities/mhpc/f
> acility.htm.

> **FN3.** This fact is drawn from Lombardo's
> opposition to defendants' motion to dismiss.

On August 15, 2006, Lombardo attended a Gold Card
Bingo game, which is restricted to patients with "Gold
Card" status. He sat next to patient Rebecca B. About an
hour into the game, Rebecca B. "announced that she was
going to the bathroom" and did not return. Later that
evening, Lombardo was informed by defendant Dr.
Sadorra that Rebecca B. claimed Lombardo "rubbed her

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

leg and made obscene comments to her such as[ ] he wanted to have sex with her."

The following day, Lombardo met with his treatment team, which included defendants Dr. Sheyas Baxi and Dr. Chandrasekhara, to discuss Rebecca B.'s allegations. Lombardo denied any wrongdoing. His treatment team suspended his Gold Card status and prohibited him from attending co-ed activities pending an investigation. On August 17, Lombardo was interviewed by a member of the institution's risk management team, to whom he provided a list of witnesses to testify on his behalf concerning Rebecca B.'s allegations.

On August 18, Lombardo was prohibited from attending Jewish services by Baxi, who explained that the services were co-ed and therefore off limits to Lombardo. Later that afternoon, Lombardo met with members of the Mental Hygiene Legal Services team, who told him that they would work on gaining him access to Jewish services. His Gold Card status was restored on October 31, but the restrictions on his attendance at co-ed activities remained in place. On November 22, Lombardo's treatment team informed him that he would slowly be phased back into co-ed activities. That day, he was permitted to attend a pizza party.

On December 7, Lombardo attended a Behavior Change Group, facilitated by defendant Zelma Armstrong. At that meeting, Lombardo spoke of recent problems he was having with his girlfriend. He also revealed that his girlfriend had been bringing him caffeinated coffee, which is contraband at Mid-Hudson. Armstrong told Lombardo that she was required to report his admission to the treatment team.

*2 The following day, Lombardo's treatment team, including defendant Frank Brusinski, informed Lombardo that his girlfriend would no longer be permitted to visit him because she had "introduced contraband to the facility." The team also searched Lombardo's room and found $34.10 in change. Six dollars of this was placed in Lombardo's personal account; the remainder was placed into the patients' general fund.

On December 26, a box of Christmas cookies was delivered to Lombardo's ward. Throughout the morning, Lombardo observed Mid-Hudson staff members eating the cookies. Believing that the cookies were reserved for patients only, Lombardo reported the staff members' behavior to two members of the ward's staff. At 10 p.m. that evening, Lombardo was awakened by Mid-Hudson staff who informed him that his room was to be searched because the staff had received information that Lombardo was in possession of contraband matches. This search-or "shake down"-was approved by Sadorra and supervised by defendant Lynburgh Burton. During the search, which lasted forty-five minutes, Mid-Hudson staff recovered sugar packets, ziplock bags, shoe laces, and two sexually provocative pictures. No matches were recovered. The following day, Lombardo met with his treatment team. He was placed on inappropriate sexual behavior alert by Baxi, which resulted in his segregation from the general population for approximately one week.

Lombardo was again required to meet with his treatment team on January 25, 2007, after he sent a birthday card to a female patient. Baxi informed Lombardo that he was not permitted to communicate with any female patients, except during religious services. Lombardo asked Baxi whether she "wanted him to be a homosexual." As a result, he was given an "X," which resulted in four weeks' additional suspension of his Gold Card status.

Lombardo regained his Gold Card status on March 2. On March 9, his treatment team informed him that he had been accused by a patient of pinching his buttocks in the shower. As a result, Lombardo was transferred to a different ward, where he was assigned a new treatment team. Only three days after his transfer, the new treatment team informed Lombardo that "there [we]re already rumors that plaintiff made passes at patients in the shower room." Accordingly, Sadorra restricted Lombardo to solitary showers.

On or before March 16, Lombardo attempted to send $600 in paper money through the mail. Paper money is contraband in the hospital, and it is unclear how Lombardo acquired it. Lombardo wrapped the money in a manila envelope and sealed it, and then gave the envelope to the ward social worker, along with money to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

pay the cost of postage. On March 16, Lombardo was told by a Mid-Hudson staff member that the envelope had been opened. The staff member did not provide any details, however, as to who had opened the envelope or why. It was only later, on August 7, 2007, that Lombardo learned that social worker Mildred Smith had opened the envelope. Chandrasekhara later informed Lombardo that he was to be placed on "mail restriction," meaning that all of his outgoing mail-including his legal mail-would be observed as it was being placed into the envelope. Three days later, Chandrasekhara informed Lombardo that he had also been placed on "phone restriction," meaning that all of his outgoing telephone calls-including his legal calls-would be monitored from his end. Lombardo objected, contending that certain calls should be excluded from surveillance by Mid-Hudson staff because they were "legal calls." He produced a list of such calls and provided it to his treatment team, which approved only part of the list. The team excluded calls to obviously non-legal telephone numbers, such as the New York State Office of Mental Health. The team also honored a request from Mental Hygiene Legal Services not to scrutinize any of Lombardo's legal mail upon receipt.

**\*3** Lombardo met with his treatment team on April 12. Dr. Phelan, the chief of Lombardo's unit, informed Lombardo that he would be taken off telephone restrictions if he divulged the source of the \$600 found in his outgoing mail. The complaint provides no account of Lombardo's response to Phelan's request. Nonetheless, Lombardo was taken off telephone restrictions on April 24. He remained on mail restrictions.

On May 1, Lombardo's treatment team told him that the \$600 discovered in his outgoing mail would be credited in its entirety to his account if he divulged a legitimate source of the money. If he could not provide a legitimate explanation, the money would be placed into the patients' general fund. It is not clear from the complaint whether Lombardo ever proffered an explanation to the treatment team. Nonetheless, by letter dated June 6, defendant Howard Holanchok informed Lombardo that only ten dollars of the confiscated money had been credited to his account, with the remainder placed in the patients' fund.

Lombardo was observed playing cards with another

patient on June 29. Believing that the two patients were gambling, a Mid-Hudson staff member summoned Brusinski, who approved a pat-frisk of Lombardo and a search of his quarters. When Lombardo returned to the ward that night, his quarters were searched upon Brusinski's orders. Twenty-five dollars in coins were confiscated from Lombardo's quarters.

Lombardo filed the complaint in this action on October 9, 2007, bringing eleven causes of action under 42 U.S.C. § 1983 for alleged violations of his constitutional rights and his rights under the New York State Mental Hygiene Law. A twelfth was added through the Addendum. Defendants moved to dismiss on January 25, 2008, arguing primarily that Lombardo failed to state a violation of his constitutional rights or any law of the United States. Further, they contended that they were immune from this action based on absolute or qualified immunity. Lombardo opposed the motion on March 4; defendants submitted their reply on March 28.

DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). A court must apply a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (citation omitted). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). Nonetheless, a *pro se* pleading must be more liberally construed. "A document filed *pro se* is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir.2008) (citation omitted).

**\*4** In their motion to dismiss, defendants helpfully analyze Lombardo's twelve causes of action according to the constitutional provisions and state law upon which they are based. The following analysis will proceed in the same fashion.

I. The Due Process Clause

Lombardo alleges the following violations of the Due Process Clause: (1) Baxi, Chandrasekhara, and Brusinski violated the Due Process Clause by restricting Lombardo's access to religious services, segregating him from the ward population, and prohibiting him from writing to female patients, based on allegations by a female patient and without interviewing Lombardo himself (First Cause of Action); (2) Armstrong violated Lombardo's "right to confidentiality" by reporting to her supervisors that Lombardo's girlfriend had brought him contraband caffeinated coffee (Fifth Cause of Action); (3) Brusinski unconstitutionally deprived Lombardo of the money that was found during searches of his quarters by depositing that money into the patients' general fund, rather than Lombardo's personal account (Seventh Cause of Action); (4) Holanchok unconstitutionally attempted to "coerce" Lombardo when he offered to end Lombardo's mail restrictions if he provided the source of the $600 confiscated from his outgoing mail (Tenth Cause of Action); and (5) Holanchok unconstitutionally deprived Lombardo of the money confiscated from his outgoing mail when he placed the $590 into the patients' general fund (Eleventh Cause of Action).

"In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir.2001) (citation omitted). The Supreme Court has recognized that patients involuntarily committed to state mental institutions enjoy a constitutionally protected liberty interest in safe conditions and freedom from bodily restraint. *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982). The plaintiff in

Romeo was violent, and was shackled while treated in the infirmary for a broken arm. *Id.* at 310. The Court held that such committed inmates also have a constitutionally protected liberty interest in "minimally adequate or reasonable training" to ensure safety and freedom from undue bodily restraint. *Id.* at 319.

In assessing whether rights under the Due Process Clause have been violated, a court weighs "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.* at 320. Any decision regarding a restraint on these liberty interests that is made by a professional "is presumptively valid." *Id.* at 323. To prevail on a due process claim, a plaintiff must show that the professional's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

**\*5** When a person is deprived of a liberty or property interest protected by the Constitution, the state must provide notice and an opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976). "The precise form of notice and hearing depends upon balancing (1) the state's interest; (2) the private interest affected by the state's action; and (3) the risk of erroneous deprivation and the value of additional safeguards." *Perry*, 280 F.3d at 174. "[T]he existence of an adequate state remedy to redress property damage inflicted by state officials avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment." *Parratt v. Taylor*, 451 U.S. 527, 542 (1981) (citation omitted), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *see Doe v. Dep't of Public Safety ex rel. Lee*, 271 F.3d 38, 55 (2d Cir.2001) (citation omitted), *rev'd on other grounds*, *Conn. Dep't of Public Safety v. Doe*, 538 U.S. 1 (2003).

With the exception of his assertion that his money was seized, Lombardo's due process claims do not recite a deprivation of a constitutionally protected interest. Specifically, the restrictions on his participation in prison activities and correspondence with female patients, the reporting of his violations of the institution's rules, and the requests that he divulge the source of contraband currency

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

do not constitute interference with constitutionally protected interests.

Lombardo complains of three seizures of money. On December 8, 2006, $28.10 of $34.10 found in his room was placed into the patients' general fund. On March 16, 2007, $590 of $600 was also placed in that fund.[FN4] Finally, on June 29, 2007, $25 in coins was seized from his room. These allegations describe a deprivation of property by officers acting under color of state law. *See Parratt,* 527 U.S. at 536-37. Nonetheless, Lombardo's claim for recovery of these moneys is a simple tort claim. As the Second Circuit has observed, "[t]he Supreme Court has been emphatic that not every tort committed by public officers is actionable under the Constitution, even though every one could be thought to deprive the tort's victim of an interest in the nature of liberty or property." *Dep't of Public Safety ex rel. Lee,* 271 F.3d at 55.

> FN4. As Lombardo's complaint acknowledges, the $600 in paper money was contraband, and in Lombardo's possession in violation of the institution's rules.

Lombardo has an adequate state remedy for the seizures of his money because he can bring an action for conversion of his property. *See Parratt,* 451 U.S. at 543-44; *Hudson v. Palmer,* 468 U.S. 517, 530, 533 (1984). The New York Court of Claims Act provides Lombardo with a cause of action against the State for this tort. *See* N.Y. Ct. of Claims Act § 9; *see Brown v. State,* 674 N.E .2d 1129, 1133-34 (N.Y.1996). Accordingly, he has failed to state a claim under § 1983 for violation of his rights under the Due Process Clause.

II. First Amendment Right to Religious Freedom

*6 Lombardo claims that Baxi, Chandrasekhara, and Brusinski violated his First Amendment right to freedom of religion by prohibiting him from attending religious services (Third Cause of Action). In his complaint, and in the cause of action concerning religious freedom, Lombardo mentions only one Jewish service he was unable to attend.[FN5] In opposition to this motion,

Lombardo adds that in lieu of attending the service he asked to see a rabbi but that the rabbi never came.

> FN5. An appendix attached to his complaint, however, lists four services-one Jewish, two Protestant, and one for "Spiritual Development"-that Lombardo was allegedly prohibited from attending. To prevail on a free exercise claim, the plaintiff must "demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002) (citation omitted). As a consequence, the complaint will be construed as asserting that the plaintiff is Jewish and that the defendants interfered with his practice of his Jewish faith.

In the Second Circuit, to prevail on a free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006) (citation omitted).[FN6] The First Amendment protects inmates' free exercise rights "even when the infringement results from the imposition of legitimate disciplinary measures." *McEachin v. McGuinnis,* 357 F.3d 197, 204 (2d Cir.2004); *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) (observing that "prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible"). Thus, defendants must "justify their restriction of [plaintiff's] free exercise rights" by reference to legitimate penological interests. *McEachin,* 357 F.3d at 204 (citation omitted).

> FN6. No party has suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims. Accordingly, the free exercise analysis applied in the prison context will apply here.

Lombardo has pleaded a violation of his First Amendment rights with his allegation that Baxi prohibited him from attending Jewish services on August 18, 2006. Defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

also claim that defendants are entitled to qualified immunity on Lombardo's free exercise claim because they "could not reasonably have thought that barring Plaintiff from a single service could constitute an infringement of his Free Exercise right."

Under the doctrine of qualified immunity, a government official may be shielded from liability "if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." *Reuland v. Hynes,* 460 F.3d 409, 419 (2d Cir.2006) (citation omitted). In determining whether a defendant is entitled to qualified immunity, the relevant inquiry is whether the right that was allegedly violated was "clearly established at the time of the defendant's behavior." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "The essence of the principle is that officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with a criminal offense." *Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005) (citation omitted). In assessing a qualified immunity claim, a court must consider:

(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7***Id.* (citation omitted).

The right of an incarcerated person to observe his religion and to attend congregate religious services was well-established in this Circuit before August 2006. *See Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young,* 866 F.2d at 570.[FN7] It was also well-established as of that time that the right is not abrogated when the incarcerated person is subject to disciplinary constraints, *see McEachin,* 357 F.3d at 204, but that restrictions may be imposed when they are "reasonably related to legitimate penological interests," *Young,* 866 F.2d at 570.

FN7. Defendants rely on an unpublished Second Circuit summary order, dated March 29, 2004, for their contention that they "could not reasonably have thought that barring Plaintiff from a single service could constitute an infringement of his Free Exercise right." Pursuant to the rules of the Second Circuit, citation to unpublished summary orders filed before January 1, 2007 is not permitted.2d Cir. R. 32.1. Regardless of what the order says, a summary, unpublished disposition cannot articulate the law of the Circuit with the clarity requisite for a qualified immunity defense.

The defendants are entitled to qualified immunity on Lombardo's free exercise claim. Relying solely on the allegations in the complaint and construing those allegations in the light most favorable to the plaintiff, it was objectively reasonable for the defendants to believe that the restriction on Lombardo's participation in a single co-ed religious service was reasonably related to legitimate penological interests. The service occurred just three days after Rebecca B. complained that Lombardo had touched her and had made obscene comments to her, and during that time Lombardo's treatment team was investigating those allegations. The claim based on the asserted violation of the Free Exercise Clause is dismissed. *See Young v. Goord,* No. 01 Civ. 0626(JG), 2005 WL 562756 (E.D.N.Y. Mar. 10, 2005), *aff'd,*192 Fed. App'x 31, 33 (2d Cir.2006).

**III. Illegal Searches and Seizures**

Lombardo contends in his Sixth and Twelfth Causes of Action that defendants Sadorra, Burton, and Brusinski violated his right to be free from searches and seizures "for harassment purposes" when they ordered or supervised searches of his quarters.[FN8] Lombardo was told that the search at issue in the Sixth Cause of Action was performed because "some unnamed person said that Plaintiff was in possession of matches," but suggests that the search was in retaliation for his complaints that staff members were eating the patients' Christmas cookies. As noted above, the search yielded no matches, but other contraband was discovered. As to the search at issue in the Twelfth Cause of Action, Lombardo observes that it was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

effected after a pat-frisk, conducted because of suspicions he was gambling, revealed no contraband on his person.

> FN8. Lombardo's Twelfth Cause of Action alleges that Brusinski violated Lombardo's rights "by approving 'shake-down' on Plaintiff after he was pat-frisked, with no contraband found." This cause of action thus challenges the "shake-down" search of Lombardo's quarters, and not the pat-frisk that preceded it.

As the defendants rightly observe, the Second Circuit has not articulated the level of privacy enjoyed by a civilly committed psychiatric patient such as Lombardo. *But see Buthy v. Commissioner of Office of Mental Health of New York State,* 818 F.2d 1046, 1051 (2d Cir.1987) (applying the levels of protection afforded pre-trial detainees under the Due Process Clause to persons confined due to an acquittal by reason of insanity or due to their incompetence to stand trial). *Youngberg v. Romeo* teaches that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Romeo,* 457 U.S. at 321-22. "At the same time, this standard is lower than the compelling or substantial necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety." *Id.* at 322. Moreover, Romeo makes clear that courts must defer to the considered judgment of professionals in institutions to which persons are involuntarily committed. *Id.* at 323.

*8 In the convicted prisoner and pretrial detainee contexts, the Supreme Court has permitted searches of inmates' cells, finding that such a search gives rise to neither a Fourth Amendment nor Fourteenth Amendment claim. *See Block v. Rutherford,* 468 U.S. 576, 590 (1984); *Hudson,* 468 U.S. 517 at 530. The Supreme Court observed that "it would be literally impossible to accomplish the prison objectives" of preventing the introduction of contraband and illicit weapons, detecting escape plots, and maintaining a sanitary environment "if inmates retained a right of privacy in their cells." *Hudson,* 468 U.S. at 527;*see Willis v. Artuz,* 301 F.3d 65, 69 (2d Cir.2002).[FN9]

> FN9. A pretrial detainee may retain a limited Fourth Amendment right when a search is instigated by non-prison officials acting for non-institutional security reasons. *Willis,* 301 F.3d at 68. Since Lombardo does not assert that the searches were instituted at the behest of officials outside Mid-Hudson, this limited right need not be discussed further.

The same rationale obtains in the context of an involuntarily committed person. *Romeo* makes clear that involuntarily committed persons should be free of "conditions of confinement [that] are designed to punish." *Romeo,* 457 U.S. at 322. The *Romeo* rule is thus animated by a concern that individuals who have not been convicted of a crime not be punished as criminals. The *Block/Hudson* rule, on the other hand, is motivated by concerns about institutional security and health. The protections accorded to involuntarily detained individuals under *Romeo* thus do not serve to undermine the *Block/Hudson* rationale that deprives institutionalized persons of their Fourth Amendment rights. As the Supreme Court has observed, "[i]t is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure ...." *Bell v. Wolfish,* 441 U.S. 520, 557 (1979);[FN10]*see also United States v. Willoughby,* 860 F.2d 15, 21 (2d Cir.1988). Accordingly, as an involuntarily detained person, Lombardo has no Fourth Amendment right against searches of his cell, and thus no claim under § 1983 for the alleged violations of his Fourth Amendment rights. His claims to this effect are therefore dismissed.

> FN10. In *Bell,* the Supreme Court assumed that a pretrial detainee had a diminished expectation of privacy after commitment to a custodial facility, and found that searches of these detainees' cells did not violate the Fourth Amendment. *Bell,* 441 U.S. at 557.

To the extent Lombardo argues that the first search was effected in retaliation for his complaint about the staff members, that claim also fails. "While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001); *see also Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). The courts of this district are unanimous in holding that even retaliatory searches of a prisoner's cell do not give rise to a claim under § 1983. *See Salahuddin v. Mead,* 95 Civ. 8581(MBM), 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002) (collecting cases). "Cell searches are so fundamental to the effective administration of persons and to the safety of prisoners and staff that the searches should not be second-guessed for motivation." *Id.* at *3. For the reasons discussed above, involuntarily committed persons have no right to privacy in their cells. Accordingly, Lombardo cannot state a retaliation claim for a search of his cell.

**IV. Right to Contact with Counsel**

**\*9** Read broadly, Lombardo's Ninth Cause of Action alleges that defendants violated his right "to confidential communications with attorneys" by refusing to allow him private telephone calls and by observing him as he placed his outgoing mail into envelopes. Lombardo's claim fails to the extent it is brought under the First and Fourteenth Amendments.

As the Second Circuit has observed, "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351.[FN11] Presumably the same holds true for legal communication by telephone and for the rights of inmates committed by reason of insanity. "To state a claim for denial of access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim," *id.* (citation omitted); for instance, actions that led to the dismissal of an otherwise meritorious legal claim, *id.*

FN11. Lombardo predicates the Ninth Cause of Action in part on the Sixth Amendment, which applies only in criminal cases. Presumably, his Sixth Amendment claim concerns defendants' alleged interference with Lombardo's

communication with his attorneys in connection with the underlying criminal case that resulted in his civil commitment. Defendants' treatment of this claim in their motion papers is cursory. In his opposition, Lombardo explains that he was committed to Mid-Hudson pursuant to New York Criminal Procedure Law. Liberally read, this argument suggests that his commitment proceedings and eventual exit proceedings from Mid-Hudson were criminal in nature, and that the Sixth Amendment therefore applies to him. Lombardo is therefore granted leave to replead his Ninth Cause of Action insofar as it raises a Sixth Amendment claim.

This claim fails for a number of reasons. First, Lombardo has failed to allege, as required by *Davis,* that defendants' actions "resulted in actual injury."[FN12] He has not alleged any way in which he was affected by defendants' mere observation of him sending mail, or surveilling his outgoing telephone calls. Second, Lombardo has not alleged that defendants searched his mail, only that they observed him placing the mail into envelopes. Observation of the mail, standing alone, cannot impinge on Lombardo's access to counsel, "since the mail would not be read." *Wolff v. McDonnell,* 418 U.S. 539, 577 (1974). Third, per his request and the request of Mental Hygiene Legal Services, defendants agreed not to scrutinize any mail to Lombardo from the Mental Hygiene Legal Service or to listen to any legal calls.[FN13] Accordingly, Lombardo's Ninth Cause of Action fails to the extent it is predicated on the First and Fourteenth Amendments.

FN12. If Lombardo's failure to allege that the defendants hindered his pursuit of a meritorious legal claim were the sole deficiency, then Lombardo would be granted leave to replead, since the defendants did not move to dismiss his Ninth Cause of Action on this ground. As it is, the other grounds for dismissal are sufficient to support dismissal.

FN13. In an appendix to his complaint, Lombardo lists thirty-two telephone calls, identifying the staff member "who assisted [Lombardo] in making" the calls and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

intended recipient. In his opposition to defendants' motion to dismiss, Lombardo identifies these calls for the first time as "legal telephone communications [that] were listened to on 32 occasions by members of Plaintiff's treatment team." Nowhere in his complaint does Lombardo allege that the staff members "listened to" these calls; he only claims that they "assisted [him] in making" them. Further, the calls were made to the Mental Health In-House Complaint Line, the Commission on Quality Care, the Joint Commission of Accreditors of Health Care Organizations, Mental Hygiene Legal Services, and a handful of unidentified individuals. Only Mental Hygiene Legal Services is identified as a legal services provider, and defendants agreed not to listen to any calls from this organization. Lombardo does not dispute this fact. Accordingly, the appendix does not support any plausible claim that Lombardo's counsel-related rights were violated by the defendants.

**V. Eighth Amendment**

In his Second Cause of Action, Lombardo alleges that defendants Baxi, Chandrasekhara, and Brusinski violated his Eighth Amendment right to be free from cruel and unusual punishment by preventing him from attending certain activities, segregating him from other patients, preventing written communication with female patients, and denying him visits from his girlfriend. Further, in his Tenth Cause of Action, Lombardo claims that defendant Holanchok violated his Eighth Amendment rights by "attempting to coerce him," when he offered to end Lombardo's mail restrictions if Lombardo identified the source of the $600 confiscated from his outgoing mail. These claims fail as Eighth Amendment claims because that constitutional amendment does not apply to one who has been civilly committed. By its terms, the Eighth Amendment applies only to "punishment," and as "an insanity acquittee ... was not convicted, he may not be punished." *Jones v. United States,* 463 U.S. 354, 369 (1983); *see also Youngberg,* 457 U.S. at 324-25.

**\*10** Reading the complaint liberally, Lombardo's Second and Tenth Causes of Action fail to state any constitutional

claims. For the most part, the injuries of which Lombardo complains have either been discussed and rejected in the preceding discussion or do not implicate any right protected by the Constitution. Only one claim requires further discussion: Lombardo asserts that he was denied visits from his girlfriend. This could be construed as raising a First Amendment claim. Assuming *arguendo* that Lombardo possessed a First Amendment right to freedom of association with his girlfriend, his claim fails. Lombardo acknowledges that his girlfriend brought him contraband caffeine, and that the restrictions on his visits with her were introduced as a result of these infractions. Lombardo does not argue that these restrictions were unreasonable, or that there was any impermissible reason for defendants' restrictions on his visits with his girlfriend. Further, Lombardo was permitted to receive other visitors, and to communicate with his girlfriend through other means, such as mail. *See Smith v. Coughlin,* 748 F.2d 783, 788 (2d Cir.1984).

**VI. State Law Claims**

Lombardo alleges two violations of the New York Mental Hygiene Law. First, in his Fourth Cause of Action, he claims that Baxi, Chandrasekhara, and Brusinski violated his rights under the New York Mental Hygiene Law by denying him access to religious services. Second, the Eighth Cause of Action seeks to hold defendant "John Doe" liable for violating Lombardo's rights under 14 N.Y.C.R.R. § 527.11, which prescribes guidelines governing mental health patients' free communication with others within and outside the facility to which they are committed. In his "Addendum to Complaint," Lombardo identifies "John Doe" as Mildred Smith, a Mid-Hudson social worker. These claims fails. "The Mental Hygiene Law is a regulatory statute." *McWilliams v. Catholic Diocese of Rochester,* 536 N.Y.S.2d 285, 286 (4th Dep't 1988). "No private cause of action is authorized for violations of the Mental Hygiene Law." *Id.*[FN14]

> [FN14]. Lombardo is surely aware of this principle. In a previous lawsuit, his claims under the New York Mental Hygiene Law were dismissed on the same basis. *See Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
(Cite as: 2008 WL 2543573 (S.D.N.Y.))

CONCLUSION

The Court has considered Lombardo's other arguments
and finds them to be without merit. Defendants' January
25, 2008 motion to dismiss is granted in part. Lombardo
is granted leave to replead his Ninth Cause of Action
under the Sixth Amendment A scheduling order
accompanies this Opinion.

SO ORDERED.

S.D.N.Y.,2008.
Lombardo v. Holanchock
Not Reported in F.Supp.2d, 2008 WL 2543573
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Horace DOVE, Plaintiff,
v.
CITY OF NEW YORK, Venessa Williams, Staff on
Ward 53 at Kings County Hospital, The Patients on
Ward 53, Jewish Board Family & Children Services,
Owners of Maple Street Residence, Jeffrey Clarke,
Arlene Bishop, Esther, The Staff at Maple Street, Lionel
Young, and Abbot Laboratory of Illinois, Defendants.
**No. 03-CV-5052 JFB LB.**

March 15, 2007.

Plaintiff appears pro se.

John P. Hewson and Lisa Fleming Grumet, Esqs.,
Corporation Counsel of the City of New York, Marc A.
Konowitz, Esq., New York State Attorney General's
Office, New York, NY, for Defendants.

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge.

**\*1** *Pro se* plaintiff Horace Dove ("Dove") brings this
action against the City of New York (the "City"), Vanessa
Williams ("Williams"), the staff on Ward 53 at Kings
County Hospital, and the patients on Ward 53
(collectively, "defendants"), alleging violations of
plaintiff's constitutional rights pursuant to 42 U.S.C. §
1983 and various state law claims.<sup>FN1</sup> Specifically, plaintiff
alleges that, during his time as a patient at Kings County
Hospital (the "Hospital"), (1) the Hospital's policy or
custom of permitting patients to smoke in the Hospital

violated plaintiff's rights, (2) the Hospital's staff and
several patients conspired to assault plaintiff, and (3) the
Hospital's staff failed to protect plaintiff from assaults by
other patients on four separate occasions between June 9,
2002 and July 10, 2002.

> FN1. Defendants Jewish Board of Family &
> Children Services, the owners of the Maple
> Street Residence, Jeffrey Clark, Arlene Bishop,
> Esther, the Staff at Maple Street, Lionel Young,
> and Abbot Laboratory of Illinois are no longer
> parties to this action.

Defendants now move for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure.<sup>FN2</sup> For the
reasons that follow, defendants' motion is granted.

> FN2. Plaintiff failed to serve the unidentified
> staff and patients named in the complaint. Thus,
> those defendants have not appeared in the instant
> action.

I. BACKGROUND

A. Facts

Upon consideration of a motion for summary judgment,
the Court construes the facts in the light most favorable to
plaintiff, the non-moving party.<sup>FN3</sup> *See Capobianco v. City
of New York,* 422 F .3d 47, 50 (2d Cir.2005).

> FN3. Defendants submitted a statement, pursuant
> to Local Civil Rule 56. 1, which asserts material
> facts that they claim are undisputed in this case.
> Defendants also complied with Local Civil Rule
> 56.2 by providing notice to plaintiff that he is not
> entitled simply to rely on allegations in his
> complaint, but is required to submit evidence,
> including sworn affidavits, witness statements

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

and documents to respond to the motion for summary judgment, pursuant to Fed.R.Civ.P. 56(e). (*See* Dkt. Entry # 84.) This action provided actual notice to plaintiff of the consequences of noncompliance with the requirements of Fed.R.Civ.P. 56. *See, e. g., Irby v. N.Y. Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that *pro se* litigants have actual notice, provided in an accessible manner, of the consequences of the *pro se* litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the *pro se* litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."). Although plaintiff did not respond to defendants' Rule 56.1 Statement in the precise form specified by the local rule, the Court overlooks this technical defect and reads plaintiff's responses liberally as he is *pro se,* and considers factual assertions made by plaintiff in his submissions to the Court as contesting defendants' statement of material undisputed facts, where his statements or evidence conflict. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 63, 73 (2d Cir.2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.") (citations omitted); *see, e.g., Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. April 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Therefore, where the Court cites to defendants' Rule 56.1 Statement, plaintiff has not contested that fact in any of his papers. *See, e.g., Pierre-Antoine v. City of New York,* No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006)* (deeming facts in defendants' Rule 56.1 statement as admitted by *pro se* plaintiff, where plaintiff was provided notice of his failure to properly respond to the summary judgment motion under Local Civil Rule 56.2 and the court's review of the record did not reveal that

there was a genuine issue of material fact); *Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund,* No. 03 Civ. 7421(KMK), 2005 WL 1026330, at *1 n. 2 (S.D.N.Y. May 3, 2005)* (deeming defendants' factual assertions admitted where *pro se* plaintiff was provided with notice under Local Civil Rule 56.2 and where plaintiff did not submit evidence controverting those factual assertions).

The Hospital is operated by defendant City and offers treatment to patients involuntarily committed for treatment of mental health issues. (Dfts.' 56.1 ¶¶ 7-14.) Defendant Williams is a Coordinating Manager in the Behavioral Health Division of the Hospital. According to the New York City Health and Hospitals Corporation's "Position Description" for a Coordinating Manager, Williams' duties include aiding in the maintenance of a safe and hygienic environment at the Hospital, procuring supplies to facilitate the comfort, safety and therapeutic aspects of the Hospital wards, and supervising the staff that maintains the Hospital's wards. (Dfts.' 56.1 ¶ 27; Hewson Decl., Ex. K.) Moreover, according to the City, Williams' duties do not include the supervision over, or responsibility for, any aspect of patient care. (*Id.*)

On June 9, 2002, New York City police officers brought plaintiff to the Hospital. (Dfts.' 56.1 ¶ 5.) After plaintiff's arrival, a treating physician and a social worker diagnosed plaintiff with schizophrenia of the chronic paranoid type. (*Id.* ¶ 7.) They also found that plaintiff was abusive and threatening to others, was a threat to himself and others, and that he suffered from persecutory delusions. (*Id.* ¶¶ 7, 9, 12.) On June 10, 2002, plaintiff was admitted to the Hospital pursuant to New York Mental Hygiene Law Section 9.39, and sent to Ward 53. (*Id.* ¶ 12; Compl. ¶ 29.) Plaintiff's claims arise out of a string of incidents that allegedly occurred while plaintiff was a patient at the Hospital.

1. Smoking in the Hospital

According to plaintiff, during his first night at the Hospital, plaintiff's roommates and other patients smoked marijuana and cigarettes in plaintiff's room. (Compl.¶ 30.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

The patients continued to smoke, plaintiff alleges, even though plaintiff told the patients that he had asthma, that he was allergic to marijuana and cigarette smoke, and that the smoke was harmful to him. (*Id.*) Plaintiff also alleges that he complained to the staff about other patients' smoking, but that the staff did nothing to stop the patients from smoking. (*Id.* ¶ 31.) According to plaintiff, the other patients told him that the Hospital staff allowed patients to smoke in their rooms. (*Id.* ¶ 33.)

2. The June 15, 2002 Incident

**\*2** On or about June 15, 2002, plaintiff and four other patients at the Hospital were involved in a physical altercation. (Hewson Decl., Ex. E.; Compl. ¶ 35.) According to plaintiff, six patients, including one of his roommates, surrounded plaintiff and "viciously assaulted" him. (Compl. ¶ 35.) Plaintiff alleges that "some of the staff in Ward 53" were warned of the attack in advance and "gave their approval." (*Id.* ¶ 38.) According to plaintiff's deposition testimony, the attackers hit him in the face with an iron rod, kicked him in the face, poured chemicals on his left hand, caused him to bleed from his nose and mouth and rendered him unconscious for two to three hours. (Hewson Decl., Ex. G.)

However, according to the Hospital's records, a physician examined plaintiff following the June 15, 2002 altercation and noted that plaintiff had "no visible injury," and did not indicate that plaintiff had any facial injuries, chemical burns on his hands, blood on his skin or clothes, or had suffered a loss of consciousness. (Hewson Decl., Ex. E.) However, the physician noted that plaintiff's eyeglasses were broken during the altercation. (*Id.*) The Hospital's records also indicate that members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 15, 2002, and there was no evidence that plaintiff had suffered any injuries during that time. (*Id.,* Ex. H.) According to the Hospital's records, the patients involved in the altercation were separated and counseled as to their behavior. (Hewson Decl., Ex. E.)

3. The Chair-Throwing Incident

According to plaintiff, on June 22, 2002, another patient threw "iron chairs at [plaintiff's] head." (Compl. ¶ 43.) Plaintiff alleges that, during the incident, the other patient said that plaintiff had complained too much to the staff. (*Id.* ¶ 44.) According to plaintiff, the assault rendered him unconscious for hours. (Hewson Decl., Ex. G.) Moreover, plaintiff alleges that, following the incident, he ran to the staff office and asked the staff to stop the other patient from assaulting him, but the staff did not tell the other patient to stop. (*Id.* ¶ 43.)

The Hospital's records show that plaintiff was involved in a "chair throwing" incident with another patient on July 2, 2002 rather than, as plaintiff alleges, on June 22, 2002. (Hewson Decl., Ex. F.) According to the Hospital's records, plaintiff was hit in the chest by one of his peers during the incident. (*Id.*) Plaintiff was examined by a physician following the incident on July 2, 2002; the physician found no injuries to plaintiff. (*Id.,* Ex. F.) Moreover, according to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 2, 2002, and there was no evidence that plaintiff had been lying on the floor unconscious or that plaintiff had suffered any injuries during that time. FN4 (Hewson Decl., Ex. H.) Also, according to the Hospital's records, a psychiatrist evaluated plaintiff on July 2, 2002 and found that he continued to be delusional. (*Id.*)

FN4. The Hospital's records also indicate that, on June 22, 2002-the alleged date of the chair-throwing incident according to plaintiff-members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day and there was no evidence that such an altercation had occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Ex. H.)

4. The June 27, 2002 Incident

**\*3** According to plaintiff, on June 27, 2002, he told Williams that he suffered from asthma and that the smoking by other patients was very harmful to him. (Compl. ¶ 46.) In response, according to plaintiff, Williams

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

told him that patients are permitted to smoke in all of the Hospital's wards and that plaintiff should not complain to the Hospital's staff about other patients smoking in the Hospital. (*Id.* ¶¶ 47, 54.) Moreover, plaintiff alleges that three other patients joined the conversation and that Williams told those three patients that they could "smoke all they want in Ward 53." (*Id.* ¶ 54.)

Plaintiff alleges that, following plaintiff's conversation with Williams, plaintiff saw Williams speak separately with the same three patients. (Compl.¶ 51.) Plaintiff concedes in the complaint that he could not hear what Williams and the three patients were saying during this separate conversation. (Compl.¶¶ 51-52.) Moreover, during his deposition, plaintiff confirmed that he had no direct knowledge of the content of the conversation between Williams and the three patients. (Hewson Decl., Ex. G.)

According to plaintiff, on the night of June 27, 2002, five patients, including the three patients with whom Williams had allegedly spoken to, "viciously assaulted" plaintiff in his room. (Compl.¶ 54.) Plaintiff alleges that Williams had conspired with the alleged attackers to harm plaintiff, and that, during the assault, the attackers allegedly told plaintiff that Williams "did not like" plaintiff. (Compl.¶¶ 56, 58.)

According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on June 27, 2002, and there was no evidence that an incident occurred or that plaintiff had suffered any injuries during that time. (Hewson Decl., Exs. F, H.)

5. The July 9, 2002 Incident

Plaintiff alleges that five patients "viciously assaulted [plaintiff] again" on July 9, 2002. (Compl.¶ 78.) According to plaintiff, the other patients once again assaulted plaintiff with an iron rod and rendered him unconscious. (Hewson Decl., Ex. G.) Plaintiff alleges that, during the alleged assault, he called out to the staff for help but no one came to help him. (Compl.¶ 79.)

The Hospital's records do not reflect that an incident occurred on July 9, 2002. According to the Hospital's records, members of the nursing staff had observed plaintiff at fifteen-minute intervals throughout the day on July 9, 2002, and there was no evidence that an incident had occurred or that plaintiff was injured on that day. (Hewson Decl., Exs. F, H.) In particular, according to the Hospital's records, plaintiff was examined by hospital personnel sometime after 1:00 p.m. and was found to be "cooperative and friendly," although still suffering from "persecutory delusions." (*Id.,* Ex. F.) Plaintiff was again observed at 10:00 p.m. and "no complaints [were] voiced" by him to the Hospital's staff. (*Id.*)

**\*4** On July 10, 2002, plaintiff was transferred from the Hospital to Kingsboro Psychiatric Center, a New York State facility. (Compl.¶ 84.) Upon arriving at Kingsboro, plaintiff was given a full physical exam by a doctor. (Hewson Decl., Ex. I.) Records of that examination indicate that plaintiff did not have any physical problems except for a rash on his left hand, and that he was in good physical health, had no injury or abnormalities to his head, and denied having any physical ailments. (*Id.*)

B. Procedural History

Plaintiff commenced the instant action against the City on October 6, 2003. On October 8, 2003, plaintiff filed an amended complaint naming several additional defendants. By Memorandum and Order dated September 28, 2005, the Honorable Nina Gershon dismissed plaintiff's claims against several defendants. On February 10, 2006, the case was reassigned to this Court. On July 17, 2006, defendants moved for summary judgment pursuant to Rule 56.

II. DISCUSSION

A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). Moreover, where the plaintiff is proceeding *pro se,* the Court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)).

The moving party bears the initial burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). However, once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *Tufariello v. Long Island R.R.,* 364 F.Supp.2d 252, 256 (E.D.N.Y.2005).

As such, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to defeat a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Instead, to overcome a motion for summary judgment, the non-moving party must provide this Court "with some basis to believe that his 'version of relevant events is not fanciful.' " *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 37-39 (2d Cir.1986)); *accord Perez v. N.Y. Presbyterian Hosp.,* No. 05 Civ. 5740(LBS), 2006 WL 585691, at *3 n. 1 (S.D.N.Y. March 20, 2006).

**B. Plaintiff's Allegations**

**\*5** The standard rule is that, at the summary judgment stage, the court "is ... to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). However, in *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005), the Second Circuit recognized that there is a narrow exception to this well-established rule in the "rare circumstances" where the sole basis for the disputed issues of fact is the plaintiff's "own testimony" which is so lacking in credibility that no reasonable juror could find for the plaintiff. In affirming the dismissal of the plaintiff's suit at the summary judgment stage, the Second Circuit explained:

[W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony-which was largely unsubstantiated by any other direct evidence-was "so replete with inconsistencies and improbabilities" that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.

*Id.* at 505 (citing *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 475 (S.D.N.Y.2003)) (dismissing excessive force claims brought under 42 U.S.C. § 1983)); *see also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (holding that the post-trial sworn statements of the president of plaintiff corporation did not create a factual issue because "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony"); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir.1975) (holding that plaintiff had failed to create an issue of fact where plaintiff's affidavits conflicted with plaintiff's earlier deposition); *Schmidt v. Tremmel,* No. 93 Civ. 8588(JSM), 1995 U.S. Dist. LEXIS 97, at *10-* 11 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of material fact where "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [plaintiffs] complaint or in her subsequent missives to the court"); *Ward v. Coughlin,* No. 93 Civ. 1250(FJS)(RWS), 1995 U.S. Dist. LEXIS 21297, at *11 (S.D.N.Y.1995) (finding plaintiff's self-serving affidavit incredible as a matter of law); *Price v. Worldvision Enters., Inc.,* 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

(addressing affidavit of party).

Here, the Court believes that there is a clear basis to find that the instant action presents one such "rare circumstance[ ]" where the plaintiff's testimony is "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys,* 275 F.Supp.2d at 475 (internal quotations and citation omitted). Plaintiff's allegations in his complaint and his deposition testimony provide the sole basis for the alleged disputed issues of fact in this case. However, the credibility of plaintiff's submissions is critically undermined by both the evidence presented by defendants, as well as the gross inconsistencies found in plaintiff's own submissions. *See Law Offices of Curtis V. Trinko, LLP v. Verizon Comm'ns. Inc.,* No. 00 Civ.1910(SHS), 2006 WL 2792690, at *9 (S.D.N.Y. Sep. 27, 2006).

**\*6** First, as set forth in the facts section, the Hospital's records contradict plaintiff's testimony as to the occurrence of several of the alleged assaults and as to the occurrence or the severity of all of plaintiff's alleged injuries.[FN5] Second, as discussed more fully below, plaintiff has undermined his own allegations regarding Williams' involvement in the alleged June 27, 2002 assault by conceding that he has no personal knowledge, or any other evidence, that Williams conspired to assault him.

> FN5. There is no credible evidence demonstrating that any of the incidents alleged by plaintiff even occurred, save for the June 15, 2002 incident and the chair-throwing incident. As discussed *supra,* the Hospital's records confirm that plaintiff was involved in a physical altercation with four other patients on June 15, 2002, as well as some type of "chair-throwing" incident with another patient on July 2, 2002. However, as to the June 15, 2002 incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the altercation, much less the severe injuries alleged by plaintiff, which include facial cuts, bleeding, chemical burns, and brain damage. Moreover, plaintiff's own submissions drastically diverge as

to the severity of the injuries he allegedly suffered during the June 15, 2002 altercation. Similarly, as to the chair-throwing incident, the Hospital's documentation indicates that plaintiff did not suffer any injury as a result of the incident, much less the severe injuries alleged by plaintiff. Moreover, plaintiff's own allegations regarding the chair-throwing incident are grossly inconsistent.

Finally, plaintiff's own submissions are replete with contradictory descriptions of the injuries he allegedly suffered as a result of the alleged assaults. As to the alleged June 15, 2002 assault, plaintiff variously asserts that he suffered just "headaches" (Compl.¶ 39), or "severe brain damage" (Dep. Tr., at 88), as a result of the assault. As to the chair-throwing incident, plaintiff contends both that he was assaulted by five patients (Dep. Tr. at 91), and that he was assaulted by just one patient (Compl.¶ 43). Also as to the chair-throwing incident, plaintiff fails to allege in the complaint that he suffered any injuries during the incident. However, plaintiff asserts in his deposition testimony that he was rendered unconscious as a result of the incident and remained so for "hours." (Pl.'s Dep. at 91-92.) As to the alleged July 9, 2002 assault, plaintiff asserts in his complaint that he "became unconscious" as a result of the assault, and fails to allege what, if any, weapons were used during the assault. However, in his deposition testimony, plaintiff contends that the assailants used an "iron rod" and left a "scar" on his forehead. (Pl.'s Dep. at 108.)

Therefore, the Court finds that, given the complete lack of evidence to support plaintiff's claims regarding these assaults and the alleged severe injuries resulting therefrom, the Hospital documentation fully contradicting such claims, and the drastic inconsistencies in plaintiff's own statements regarding these incidents, dismissal is warranted under *Jeffreys* because no reasonable juror could credit plaintiff's unsubstantiated testimony under these circumstances. However, even if the Court fully credited plaintiff's allegations regarding these incidents, summary judgment is still appropriate because he has produced no competent evidence demonstrating that these defendants are liable for the alleged actions of the other patients. As set forth more fully below, even assuming *arguendo* that the smoking by other patients and all of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

assaults referred to in plaintiff's testimony actually occurred, plaintiff has failed to establish a genuine issue as to defendants' liability for the alleged deprivations of plaintiff's rights.

### C. Claims Against the Unnamed Defendants

At this stage of the case, discovery has been completed and plaintiff has failed to identify or to serve with process any of the unnamed defendants allegedly responsible for the deprivation of plaintiff's rights. Moreover, plaintiff does not assert that additional discovery will help to ascertain the identities of such individuals. Accordingly, because a "tort victim who cannot identify the tortfeasor cannot bring suit," the Court grants summary judgment as to plaintiff's claims against the unnamed defendants. *Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1996); *see, e.g., Peterson v. Tomaselli,* --- F.Supp.2d ----, 2007 WL 102073, at *18 (S.D.N.Y.2007); *Alicea v. City of New York,* No. 04 Civ. 1243(RMB), 2005 WL 3071274, at *1 n. 1 (S.D.N.Y. Nov. 15, 2005).

### D. Due Process Claims

**\*7** Plaintiff asserts, *inter alia,* a violation of his rights under the Eighth and Fourteenth Amendments. However, because plaintiff was not a convicted prisoner at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted under the Due Process Clause of the Fourteenth Amendment, rather than the provisions of the Eighth Amendment. *See, e.g., Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir .1996); *Vallen v. Carrol,* No. 02 Civ. 5666(PKC), 2005 WL 2296620, at *9 (S.D.N.Y. Sept. 20, 2005); *see also Fair v. Weiburg,* No. 02 Civ. 9218(KMK), 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006).

"An involuntary civil commitment is a massive curtailment of liberty, ... and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1061 (2d Cir.1995) (citation and quotation omitted); *see Graves v. MidHudson,* No. 04 Civ. 3957(FB), 2006 WL 3103293, at *3 (E.D.N.Y. Nov. 2, 2006). However, in this case, the

complaint, even as liberally construed, fails to allege that plaintiff's rights were violated during the civil commitment process.[FN6]

FN6. The Court notes that plaintiff's brief in response to the instant motion consists principally of quotations from Supreme Court opinions regarding the process due to individuals prior to their involuntary commitment to a mental hospital. However, the entirety of plaintiff's remaining submissions to the Court-that is, other than his response brief-fail to allege or to address a claim that plaintiff's pre-commitment procedural rights were violated by defendants; nor has plaintiff requested leave to amend his complaint to allege such a claim. Moreover, at his deposition, plaintiff was asked to clarify whether he was, in fact, alleging a violation of his pre-commitment procedural rights. Plaintiff declined to do so. (Hewson Decl., Ex. G.) Accordingly, the Court declines to address any such claim at this time.

However, " '[t]he mere fact that an individual has been committed under proper procedures ... does not deprive him of all substantive liberty interests under the Fourteenth Amendment.' " *MidHudson,* 2006 WL 3103292, at *3 (citing *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982)). Such individuals retain a right to " 'conditions of reasonable care and safety' " during their confinement. *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (quoting *Youngberg,* 457 U.S. at 324);*Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *8 (S.D.N.Y. Aug. 20, 2001) (citing *Youngberg,* 457 U.S. at 315-16 ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions."); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."); *Beck v. Wilson,* 377 F.3d 884, 889-90 (8th Cir.2004) ("Because [plaintiff] was an involuntarily committed patient ... the Fourteenth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

Amendment imposed upon the defendants, as state actors, an affirmative duty to undertake some responsibility for providing [her] with a reasonably safe environment.").

In *Youngberg,* the Supreme Court set forth the standard for adjudicating Section 1983 claims brought by involuntarily committed mental patients against "professional" officials charged with the patients' care. *Youngberg,* 457 U.S. at 322-24; *see Vallen,* 2005 WL 2296620, at *9; *Warheit v. City of New York,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at *11 (S.D.N.Y. Aug. 15, 2006); *Lombardo,* 2001 WL 940559; *Marczeski v. Handy,* No. 01 Civ. 01437(AHN)(HBF), 2004 WL 2476440, at *8 (D.Conn. Sept. 9, 2004) (Fitzsimmons, Magistrate J.). In reviewing such claims, the critical question is whether the charged official's decision alleged to have caused a deprivation was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg,* 457 U.S. at 323; *see Kulak v. City of New York,* 88 F.3d 63, 75 (2d Cir.1996) ("This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference.").

*8 Notably, however, the Court in *Youngberg* specifically limited the substantial departure standard to claims against "professionals," or "person[s] competent, whether by education, training or experience, to make the particular decision at issue," and contrasted such persons with non-professionals, or "employees without formal training but who are subject to the supervision of qualified persons." *Youngberg,* 457 U.S. at 323 n. 30; *see Kulak,* 88 F.3d at 75. As such, some courts have declined to apply the *Youngberg* standard to officials deemed to be "low-level staff members," and, instead, apply a "deliberate indifference" standard to Section 1983 claims against such officials, asking whether "the [challenged] officials displayed a mental state of deliberate indifference with respect to [plaintiff's] rights." *Marczeski,* 2004 WL 2476440, at *8; *see Shaw by Strain v. Strackhouse,* 920 F.2d 1135, 1147 (3rd Cir.1990) ("Nonprofessional employees who provide care for involuntarily institutionalized mentally retarded individuals are subject even after *Youngberg,* only to a deliberate indifference standard."); *Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004) (applying deliberate indifference standard to

Section 1983 claims against staff at a group home for the mentally retarded); *see also Vallen,* 2005 WL 2296620, at *9 ("I am inclined to agree ... that the standard of 'deliberate indifference' is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights.").

However, in this case, the Court need not reach the issue of whether defendants' actions should be evaluated under the "substantial departure" or "deliberate indifference" standard because, under either standard, the result is the same: no reasonable factfinder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that defendants' conduct substantially departed from accepted professional judgment, practices, or standards, or was deliberately indifferent to plaintiff's constitutional rights. *See Vallen,* 2005 WL 2296620, at *9.

As the Second Circuit has observed:

Rule 56(e) of the Federal Rules of Civil Procedure states unequivocally that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.

*U.S. v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (quotations and citations omitted); *see Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (requiring that the party opposing summary judgment "bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful"). Here, the Court finds that plaintiff has failed to set forth any evidence, beyond mere "surmise or conjecture," in support of his allegations that defendants were personally involved in the alleged deprivations of plaintiff's constitutional rights or that a municipal policy or custom caused the alleged deprivations.

(i) Due Process Claims Against Williams

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

**\*9** In order to be held liable under § 1983, each defendant must have been personally involved in the alleged constitutional violation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("It is well settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (internal citation omitted); *see also Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). "[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). As such, the Second Circuit has held that the personal involvement of supervisory officials may be established by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited gross negligence or deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

In this case, plaintiff alleges that Williams was involved in the deprivation of his right to reasonable care and safety in two ways. First, plaintiff alleges that, on June 27, 2002, Williams told other patients that they could smoke in the Hospital. (Compl.¶ 54 .) Second, plaintiff alleges that Williams had foreknowledge of the alleged assault against Williams that occurred on June 27, 2002, and "conspired" with the alleged attackers to harm plaintiff. (Compl. ¶¶ 53, 56.) For the reasons set forth below, the Court finds that plaintiff fails to present facts from which a reasonable factfinder could conclude that Williams was personally involved in the deprivation of any rights guaranteed to plaintiff by the Fourteenth Amendment.

First, plaintiff alleges that Williams violated plaintiff's rights by telling other patients that they could smoke in the hospital, thus causing harm to plaintiff. In particular, plaintiff asserts that he informed Williams about the serious health risks posed to plaintiff by other patients' smoking habits and that he witnessed Williams tell other patients that they could smoke in the Hospital.

However, assuming *arguendo* that the alleged conduct, if true, would constitute a violation of plaintiff's right to reasonable care and safety, plaintiff has failed to produce any affirmative evidence in support of his allegations that Williams was personally involved in causing other patients to smoke. Specifically, in support of his allegations, plaintiff points to a single conversation with Williams on June 27, 2002, wherein Williams allegedly told plaintiff and three other patients that patients were permitted to smoke in the Hospital. (Compl.¶¶ 46-49, 51-53.) However, plaintiff has failed to present any facts demonstrating that this conversation actually caused any patients to smoke in the Hospital or even that, following the alleged conversation, other patients actually did smoke in the Hospital. Plaintiff points to specific instances of patients smoking in his room at times *preceding* the alleged conversation with Williams, but he fails to allege or to offer any evidence from which this Court could reasonably infer that Williams *caused* patients to smoke in the Hospital.

**\*10** Thus, the Court finds that plaintiff has failed to present any evidence, beyond conjecture, from which the Court could reasonably infer that Williams' conduct caused plaintiff to suffer "actual or imminent harm." *See Benjamin,* 343 F.3d at 51 n. 17 ("To establish the deprivation of a basic human need such as reasonable safety, an inmate must show 'actual or imminent harm.' ") (quoting *Lewis v. Casey,* 518 U.S. 343, 350 (1996)). Accordingly, plaintiff's claims against Williams arising from alleged smoking in the Hospital are dismissed.

Second, plaintiff has failed to set forth concrete evidence showing that Williams was personally involved in the alleged June 27, 2002 assault of plaintiff by other patients. Plaintiff offers nothing more than bald assertions that Williams condoned the assault and conspired with the alleged attackers to harm plaintiff. In support of these allegations, plaintiff points to a second conversation involving Williams and three other patients that allegedly also took place on June 27, 2002, wherein Williams and the patients allegedly "conspired and or agreed" that the patients would assault plaintiff that night. (*See* Compl. ¶ 62.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

However, even assuming *arguendo* that plaintiff observed a conversation between Williams and three other patients on June 27, 2002 and that plaintiff was actually assaulted that night, plaintiff has failed to raise a triable issue as to whether Williams conspired or agreed to assault plaintiff. In the complaint, plaintiff concedes that he has no direct knowledge of the contents of the alleged conversation; he claims that Williams pulled the three patients "aside so that she could talk to them without me hearing what they were talking about." (Compl.¶ 52.) Moreover, at his deposition, plaintiff confirmed that he had no direct knowledge of the conversation or of Williams' approval of the alleged assault. (Hewson Decl., Ex. G.) Although plaintiff also asserted at his deposition that he knew of other patients that had overheard staff members approve the alleged assault, plaintiff has failed to identify those witnesses. (*Id.*)

Accordingly, because plaintiff has failed to produce *any* affirmative evidence, beyond conjecture, demonstrating that Williams participated in, directed, or had knowledge of the alleged June 27, 2002 assault, the Court grants defendants' motion as to plaintiff's claims against Williams arising from that assault.

(ii) Due Process Claims against the City

It is well-settled that municipalities may not be liable under § 1983 for constitutional torts committed by its employees under a *respondeat superior* theory; rather, to prevail against a municipality, a plaintiff must demonstrate that his injury "was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.' " *Skehan v. Village of Mamaroneck,* 465 F.3d 96, 108-9 (2d Cir.2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986)); *accord Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 686 (2d Cir.2005). "In essence, 'municipalities such as the City of New York may only be held liable when the city itself deprives an individual of a constitutional right.' " *Warheit,* 2006 WL 2381871, at *12 (quoting *Davis v. City of New York,* 228 F.Supp.2d 327, 336 (S.D.N.Y.2002)).

**\*11** Moreover, courts must apply "rigorous standards of culpability and causation" to *Monell* claims in order to ensure that "the municipality is not held liable solely for the actions of its employee." *Bd. of Cty Com'rs of Bryan Cty, Okl. v. Brown,* 520 U .S. 397, 405 (1997). "Thus, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the state." *Davis,* 228 F.Supp.2d at 336 (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 831 (1985) (Brennan, J., concurring in part and concurring in the judgment)). Instead, to constitute a "policy," the municipality must have either enacted an official policy measure or an employee with "policy making authority" must have undertaken an unconstitutional act. *See Pembaur,* 475 U.S. at 480-81. A "custom," although it need not receive formal approval by the municipality, must be "so persistent or widespread as to constitute a custom or usage with the force of law" and "must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (quotation marks and citations omitted). "To succeed on this theory, plaintiff must prove the existence of a practice that is permanent." *Davis,* 228 F.Supp.2d at 337. For the reasons that follow, the Court finds that no reasonable factfinder could conclude that the alleged deprivation of plaintiff's rights was caused by a municipal policy or custom.

1. Smoking in the Hospital

Plaintiff alleges that it was the "policy or custom" of the City to permit patients to smoke in the Hospital, thus depriving plaintiff of his right to reasonable care and safety during his confinement. However, defendants have demonstrated that the City's official policy is to prohibit smoking in health care facilities, except in designated areas. *See* N.Y.C. Admin. Code § 17-503 ("Smoking is prohibited in ... [h]ealth care facilities including ... hospitals ... [and] psychiatric facilities ..., provided however, that this paragraph shall not prohibit smoking by patients in separate enclosed rooms of residential health care facilities or facilities where day treatment programs are provided, which are designated as smoking rooms for patients."). Plaintiff has failed to present any facts that create a triable issue as to whether City policymakers altered this policy at the Hospital or that it was the custom or practice of the City to deviate from this policy.[FN7] In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

addition, plaintiff has failed to identify any members of the Hospital's staff that allegedly permitted other patients to smoke or the other patients that allegedly told plaintiff they had received permission to smoke from members of the Hospital's staff.

> FN7. Even assuming *arguendo* that Williams told patients and staff members on June 27, 2002 that patients were permitted to smoke in the hospital, a "single instance" of improper conduct by Williams, who lacks final policymaking authority to suspend the smoking prohibition set forth in New York City Administrative Code § 17-503, would not create a triable issue of fact as to the existence of an unconstitutional policy or a custom or practice so widespread as to have the force of law. See *Sewell v. N.Y.C. Transit Auth., 809 F.Supp. 208, 217 (E.D.N.Y.1992)* ( "[W]hen an official's discretionary decisions are constrained by policies not of that official's making, those [municipal] policies, rather than the subordinate's departures from them, are the act of the municipality.") (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988)).

Accordingly, because plaintiff "points to no evidence, other than his own speculation, that such a custom or policy exists," *Warheit, 2006 WL 2381871, at *13,* the Court finds that plaintiff has failed to raise a genuine issue as to whether the City is liable under Section 1983 for permitting patients to smoke in the Hospital. See *Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 370 n. 3 (2d Cir.2003)* ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.' ") (quoting *Contemporary Mission v. U.S. Postal Serv., 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

2. Assaults on Plaintiff

*12 Plaintiff alleges that Hospital staff had foreknowledge of each of the alleged assaults against plaintiff by other patients and that it was the "policy and custom" of the City to allow such assaults to occur. (Compl.¶ 67.) As to the

alleged "policy" that harmed plaintiff, plaintiff fails to identify any municipal official with policy making authority who was involved in an assault against plaintiff or to provide any documents, affidavits, or other evidence from which a reasonable jury could find that such a policy actually exists. See *Warheit, 2006 WL 2381871, at *12 n. 4* (finding no unconstitutional policy where plaintiff "provides no evidence, other than his own bare allegations, that such a policy exists").

As to the alleged "custom" of Hospital staff to permit other patients to assault plaintiff, the Court finds that no reasonable factfinder could conclude that the alleged assaults were caused by an unofficial practice of the Hospital "so persistent or widespread as to constitute a custom or usage with the force of law." *Green,* 465 F.3d at 80.

Plaintiff has failed to specifically identify any defendants, other than Williams, who failed to protect plaintiff from attacks by other patients. Moreover, even as to the unnamed staff members who allegedly permitted assaults on plaintiff, plaintiff has failed to present evidence showing that a trial is needed on the issue of whether a practice existed among Hospital staff to allow assaults against plaintiff. Specifically, plaintiff has failed to present any facts, beyond mere conjecture, demonstrating that the Hospital staff had foreknowledge of the alleged assaults or that they failed to act or to intervene to protect plaintiff from such assaults. See *Vallen, 2005 WL 2296620, at *11* (granting summary judgment were there was "nothing in the record that shows whether [hospital staff] observed the attack and failed to act or intervene").

First, as to the June 15, 2002 incident, plaintiff fails to offer any facts demonstrating that members of the Hospital's staff knew of or condoned the alleged assault, other than his unsupported speculation that "some of the staff" knew of the assault and gave their approval. (*See* Compl. ¶¶ 35, 38.)

Second, as to the alleged chair-throwing incident, plaintiff fails to present any facts from which a reasonable factfinder could infer that Hospital staff knew of or failed to stop the alleged assault. Plaintiff merely alleges that,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

*following* the assault, he "told the staff to tell [the other patient] to stop but they did not tell him to stop it." (Compl.¶ 43.)

Third, as to the June 27, 2002 incident, the Court found *supra* that plaintiff has failed to present any facts that create a triable issue as to the alleged deprivation of plaintiff's rights based on the conduct of Williams. Plaintiff does not allege that any other defendants were involved in that alleged assault.

Finally, as to the alleged assault that occurred on July 9, 2002, plaintiff asserts that he called out to Hospital staff for help but no staff members came to help him. However, there is nothing in the record from which a reasonable juror could find that members of the Hospital's staff observed the alleged assault, or heard plaintiff's call for help and failed to act or to intervene in the assault.

**\*13** Accordingly, because plaintiff has failed to identify a municipal policy or custom that caused injury to plaintiff, the Court finds that no reasonable factfinder could conclude that the City was liable for the alleged deprivation of plaintiff's rights.

E. Other Federal Claims

Plaintiff also alleges various other claims arising from the alleged deprivation of his federal rights. For the reasons that follow, the Court grants summary judgment as to all of defendants' remaining federal claims.

First, because the Court found *supra* that plaintiff has failed to offer any evidence of an agreement between Williams and plaintiff's alleged attackers and because plaintiff has failed to specifically identify any other government officials that entered into such an agreement, plaintiff's Section 1983 and Section 1985 conspiracy claims are dismissed. *See, e.g., Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999). Moreover, because no actionable conspiracy exists, plaintiffs' Section 1986 claims must also fail. *See Dwares v. New York,* 985 F.2d

94, 101 (2d Cir.1993) ("Liability under § 1986 ... is dependent on the validity of a claim under § 1985.") (citing *Dacey v. Dorsey,* 568 F.2d 275, 277 (2d Cir.1978)).

Second, plaintiff's Section 1981 claim is dismissed because plaintiff has failed to allege, or provide any proof, that any individuals intended to discriminate against plaintiff on the basis of race. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999).

Finally, plaintiff's Section 1988 claim for attorney's fees is dismissed because plaintiff is not the "prevailing party" in this case. 42 U.S.C. § 1988; *see Ass'n for Retarded Citizens of Conn., Inc. v. Thorne,* 68 F.3d 547, 551 (2d Cir.1995).

F. State Law Claims

Plaintiff also asserts claims under the New York State Constitution. (Compl.¶ 1.) Defendants argue that plaintiff's pendent state law claims must be dismissed for failure to file a Notice of Claim pursuant to New York General Municipal Law Sections 50-e and 50-i. *See Hardy v. N.Y.C. Health & Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir.1999) (holding that in federal court, state notice-of-claim statutes apply to state law claims). Plaintiff does not dispute defendants' assertion that a Notice of Claim was not filed for any of his state law claims.

Sections 50-e and 50-i require a party asserting a state law tort claim against a municipal entity or its employees acting in the scope of their employment to file a notice of claim within ninety days of the incident giving rise to the claim and requires the plaintiff to commence the action within a year and ninety days from the date on which the cause of action accrues. *See* N.Y. Gen. Mun. Law §§ 50-e, 50-I. "Under New York law, notice of claim is a statutory precondition to filing suit against the City or its employees." *Harris v. Bowden,* No. 03 Civ. 1617(LAP), 2006 U.S. Dist. LEXIS 12450, at *22 (S.D.N.Y. March 23, 2006). "A plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its employees in a federal civil rights action."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)
(Cite as: 2007 WL 805786 (E.D.N.Y.))

*Robinson v. Matos,* No. 97 Civ. 7144(TPG), 1999 U.S. Dist. LEXIS 5447, at *3 (S.D.N.Y. April 19, 1999) (citing *Felder v. Casey,* 487 U.S. 131, 151 (1988)).

**\*14** Furthermore, the Court does not have jurisdiction to allow plaintiff to file a late notice of claim. *Corcoran v. N.Y. Power Auth.,* No. 95 Civ. 5357(DLC), 1997 U.S. Dist. LEXIS 14819, at *19 (S.D.N.Y. Sept. 26, 1997); *see also* N.Y. Gen. Mun. Law § 50(e)(7) ("All applications under this section shall be made to the supreme court or to the county court."). Accordingly, defendants' motion to dismiss plaintiff's state law claims is granted.[FN8] *See Gonzalez v. City of New York,* No. 94 Civ. 7377(SHS), 1996 U .S. Dist. LEXIS 5942, at *5-*6 (S.D.N.Y. May 3, 1996) ("Despite the statute's seemingly plain language, it applies not only to suits against municipal corporations but also to suits against 'officer[s], agent[s] or employee[s]' whose conduct has caused injury.").

> [FN8.] Plaintiff also seeks relief under "[a]pplicable ... State Statutes," but fails to identify, and the Court is unable to discern, which, if any, state statutes apply to this case. (*See* Compl. ¶ 1.) Nevertheless, even assuming *arguendo* that plaintiff had properly alleged state statutory claims, such claims must also be dismissed due to plaintiff's failure to file a Notice of Claim. *See, e.g., Flynn v. New York City Bd. of Educ.,* No. 00 Civ. 3775(LAP), 2002 WL 31175229, at *9-*10 (S.D.N.Y. Sept. 30, 2002) (dismissing New York state statutory claims due to plaintiff's failure to file a notice of claim).

Moreover, even assuming *arguendo* that plaintiff had filed a notice of claim, the Court would, in its discretion, "decline to exercise supplemental jurisdiction over [plaintiff's] state law claims [because] it has dismissed all claims over which it has original jurisdiction." *Kolari v. New York Presbyterian Hospital,* 455 F.3d 118, 121-22 (2d Cir.2006) (quoting 28 U.S.C. § 1367(c)(3)) (internal quotation marks omitted) ("If the federal law claims are dismissed before trial ... the state claims should be dismissed as well."); *Karmel v. Liz Claiborne, Inc.,* No. 99 Civ. 3608(WK), 2002 U.S. Dist. LEXIS 12842, *11 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the

reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

### III. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED and plaintiff's claims are dismissed in their entirety. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

E.D.N.Y.,2007.
Dove v. City of New York
Not Reported in F.Supp.2d, 2007 WL 805786 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

☞ Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Barry Lee VALLEN Plaintiff,
v.
S.H.T.A. CARROL; S.H.T.A. Gantz; S.H.T.A.
Gonzales; S.H.T.A. Malfatone; S.H.T.A. Nelson;
S.H.T.A. Leper; Dr. Beneb Ting; Senior S .H.T.A. John
Doe; S.H.T.A. March; S.H.T.A. Adams; S.H.T.A.
Brown; S.H .T.A. Jones; and Various S.H.T.A. John
Does, Defendants.
**No. 02 Civ. 5666(PKC).**

Sept. 20, 2005.

*MEMORANDUM AND ORDER*

CASTEL, J.

**\*1** Plaintiff Barry Lee Vallen brings this action, pursuant
to 42 U.S .C. § 1983, alleging that he was the victim of
multiple patient-to-patient assaults and deprivations of
property during the time that he resided at the
Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"),
a facility operated by an agency of the state of New York.
In a Memorandum and Order dated September 2, 2004, I
dismissed defendants New York State Office of Mental
Health and Mid-Hudson on the basis of the state's
constitutionally-based immunity from suit. *Vallen v.
Mid-Hudson Forensic Office of Mental Health, 2004 WL
1948756 (S.D.N.Y. Sept. 2, 2004).* I concluded that the
Complaint set forth allegations sufficient to state claims
against the individual defendants for deliberate
indifference to confinement conditions that were seriously
and dangerously unsafe. *Id.* at \*3. I held that plaintiff's
claim did not arise under the Eighth Amendment because
he was not serving a term of imprisonment pursuant to a
conviction, but, generously construed, his *prose*

Complaint could be read as alleging that persons acting
under color of state law had deprived him, as an
involuntarily detained person, of rights protected by the
Fourteenth Amendment. *Id.*

Discovery in this action is now closed. The defendants
have moved for summary judgment dismissing the
plaintiff's claims. For the reasons explained below, the
defendants' motion is granted.

*Background*

The following facts are taken from plaintiff's pleadings,
his sworn deposition testimony or are otherwise not
disputed. Where multiple inferences can be drawn from
the facts, I have considered only the one most favorable to
Mr. Vallen, the non-movant.

In 1984, the plaintiff was charged with two counts of
second-degree murder in connection with the death of his
parents. (Vallen Dep. at 169) Plaintiff pleaded not guilty
by reason of mental illness or defect and was diagnosed as
a paranoid-schizophrenic. (Vallen Dep. at 169-71) A
Justice of the New York Supreme Court, Orange County,
found that, at that point in time, the plaintiff suffered from
a dangerous mental illness and ordered that he be
committed to a psychiatric facility. (Vallen Dep. at 170)
Subsequently, plaintiff was discharged to outpatient care
on two occasions, but in each instance he was later
recommitted. (Vallen Dep. at 172-84) From April 18,
1997 through June 14, 2000, plaintiff was an inpatient at
Mid-Hudson. (Dickson Aff. ¶ 5)

In an order dated July 22, 2002, Chief Judge Michael B.
Mukasey dismissed plaintiff's deprivation of property
claim and ruled that the State of New York provided
adequate post-deprivation remedies for the recovery of
lost property. (July 22, 2002 Order at 3) He also ruled that
the Complaint inadequately detailed the assault claims,
and dismissed those claims without prejudice. (July 22,
2002 Order at 2, 4-5) Plaintiff filed an Amended

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

Complaint ("AC") dated January 24, 2003.

The AC alleges that, during his three years of treatment at Mid-Hudson Forensic Psychiatric Facility, the plaintiff was subjected to violence and threats of violence, and that the individual defendants promoted or failed to prevent these incidents. The individual defendants were employed as security hospital treatment assistants ("SHTAs") who were responsible for assisting psychiatric patients in their day-to-day needs and activities. (DeLusso Aff. ¶¶ 2-3)

**\*2** Each of the incidents set forth in the AC are discussed below. Generally described, the plaintiff alleges that the defendants either encouraged or failed to intervene in violent attacks that other patients inflicted upon the plaintiff. According to the AC, the defendants were aware that various Mid-Hudson patients had violent histories, and placed these patients in close proximity to the plaintiff. On other occasions, the AC alleges that the defendants displayed pleasure at the attacks on plaintiff that allegedly took place. Plaintiff notes, by way of contrast, that since the year 2000 he has resided at a facility in Rochester, New York, and has never been threatened or assaulted.

Helpfully, as part of their motion papers, the defendants have organized the allegations set forth in the Complaint into sixteen distinct incidents or clusters of incidents. Solely for the purposes of facilitating evaluation and discussion of the incidents, I will refer to the sixteen incidents by the number and descriptive title employed in the defendants' motion papers. (Appendix to this Memorandum and Order) I do not in any way treat the defendants' submission as having any evidentiary quality to it.

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the initial burden

of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e). In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. Caution is particularly warranted when considering a summary judgment motion in a discrimination action, since direct evidence of discriminatory intent is rare, and often must be inferred. *Forsyth v. Fed'n Empl. & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

**\*3** The defendants have served the *prose* plaintiff with the notice explaining the manner in which a party may oppose summary judgment, as required by Local Rule 56.2. I am mindful of the latitude afforded to a *prose* party opposing a summary judgment motion. See*Forsyth, 409 F.3d at 570* ("special solicitude" owed to *prose* litigants opposing summary judgment); *Shabtai v. U.S. Dep't of Educ., 2003 WL 21983025, at \*5 (S.D.N.Y. Aug. 20, 2003)* (obligation to construe leniently *prose* opposition papers on a summary judgment motion). However, a party's *prose* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp., 2004 WL 1907310, at \*9 (S.D.N.Y. Aug. 25, 2004).*

*Discussion*

1. *Statute of Limitations Defense*

The applicable limitations period for Section 1983 actions is found in the state statute of limitations for personal injury actions. *Owens v. Okure, 488 U.S. 235, 249-50 (1989).* "Accordingly ... New York's three-year statute of limitations for unspecified personal injury actions, New York Civil Practice Law and Rules § 214(5), governs section 1983 actions in New York." *Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir.1997).* The statute of limitations begins to accrue " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Id.* (quoting *Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir.1980)*).

This action was filed in the *prose* office on December 10, 2001, although the Complaint was not formally accepted for filing until July 22, 2002. The timeliness of the Complaint for statute of limitations purposes is measured from the delivery to the *prose* office on December 10, 2001. See*Ortiz v. Cornetta, 867 F.2d 146 (2d Cir.1999); Toliver v. Sullivan County, 841 F.2d 41 (2d Cir.1988).* It is undisputed that some of the events alleged in the AC occurred more than three years prior to such delivery, *i.e.* prior to December 10, 1998.

Here, plaintiff argues that he is entitled to tolling under New York law by reasons of insanity. Once the defendant demonstrates that the claim facially falls within the limitations period, the plaintiff, not the defendant, bears the burden of proof on tolling. See*Doe v. Holy See (State of Vatican City), 17 A.D.3d 793, 794 (3d Dep't 2005); Assad v. City of New York, 238 A.D.2d 456, 457 (2d Dep't 1997).*

CPLR 208 provides for tolling when "a person entitled to commence an action [was] under a disability because of infancy or insanity at the time the cause of action accrues...." While the words of the statute, taken at face value, might appear to be broad enough to apply to any person suffering from a debilitating mental illness, the New York Court of Appeals has interpreted the statute more narrowly. *McCarthy v. Volkswagen of Am., 55 N.Y.2d 543 (1982).* The *McCarthy* Court reviewed the legislative history of the provision and concluded that the legislature intended that CPLR 208 be "narrowly interpreted". *Id.* at 548. In the words of the Court: "we believe that the Legislature meant to extend the toll for insanity to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society." *Id.* at 548-549. New York courts have consistently applied the *McCarthy* standard to claims of tolling by reason of insanity. See,e.g.,*Eberhard v. Elmira City School Dist., 6 A.D.3d 971, 973 (3d Dep't 2004)* (*McCarthy* standard not satisfied by claim of post-traumatic stress syndrome); *Burgos v. City of New York, 294 A.D.2d 177, 178 (1st Dep't 2002)* ("The doctor's affirmation ... was vague and conclusory in asserting that plaintiff's 'dementia and psychotic disorder [are] due to multiple medical conditions [that] have existed for many years and are permanent,' and thus insufficient to raise an issue of fact" on CPLR 208 tolling under the *McCarthy* standard).

**\*4** The standard articulated in *McCarthy* has two components. First, the party must be "unable to protect [his] legal rights" and, second, the reason he is unable to protect his legal rights is "because of an over-all inability to function in society". I assume for the purposes of this motion that, during the period for which plaintiff seeks tolling, he had "an over-all inability to function in society." In this regard, plaintiff has had several "retention hearings" that have resulted in findings that Vallen should

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

remain in an institutional setting. (Vallen Decl. ¶ 1) However, I still must consider whether plaintiff has raised a triable issue of fact as to his ability to protect his legal rights during the period for which he seeks tolling.

As part of their summary judgment burden, the defendants have come forward with evidence of Vallen's direct, personal and vigorous pursuit of his legal rights in judicial proceedings instituted during the period for which he claims tolling. In November 1998, plaintiff commenced an action in the Court of Claims of the State of New York alleging that the state had been negligent in permitting seven inmate assaults on him over the course of one and one-half years. (Peeples Aff., Ex. C) He was then familiar with the necessity of timely filing a claim, as evidenced by his handwritten complaint dated November 16, 1998, which recites as follows: "This claim is filed within 3 years after the claim accrued, as required by law." (Peeples Aff., Ex. C) [FN1] *Vallen v. State of New York,* Claim No. 100141 (N.Y.Ct.Cl. Sept. 1, 1999). He filed a second Court of Claims action in or around July 1999 alleging that the state had been negligent by permitting a patient identified as C.J. to initiate a physical assault. [FN2] (Peeples Aff. Ex. D) *Vallen v. State of New York,* Claim No. 100803 (N.Y.Ct.Cl. Apr. 17, 2001). Plaintiff filed a third Court of Claims action in July 1999, alleging that the state was negligent in permitting the theft of his personal property; in that action, he set forth a detailed list of each item of lost property and its value, including a "suit for court" ($279) and a pair of ostrich leather western boots ($350) (Peeples Aff. Ex. E) *Vallen v. State of New York,* Claim No. 100804 (N.Y.Ct.Cl. Apr. 17, 2001). Also in July 1999, he filed a Section 1983 action in this District alleging that his constitutional rights had been violated. (Peeples Aff. Ex. I) *Vallen v. Connelly,* 99 Civ. 9947(SAS) [FN3] In March 2000, plaintiff filed a fourth suit in the Court of Claims alleging that falsified claims had been levied against him. (Peeples Aff. Ex. F) *Vallen v. State of New York,* Claim No. 102160 (N.Y.Ct.Cl. Sept. 1, 2000). In toto, between November 1998 and March 2000, Vallen, proceeding *pro se,* filed five separate lawsuits in two different fora in an effort to enforce and protect his legal rights. In two of the pleadings, he affirmatively expressed an understanding of the applicable statute of limitations. The 1999 federal court action evinces an awareness of a federal remedy and the procedural means to invoke it. Cf. *Cerami v. City of Rochester Sch. Dist.,* 82 N.Y.2d 809, 813 (1993) (considering, inter alia, the

numerous lawsuits filed by the party claiming toll in rejecting such a claim).

FN1. The same allegation is set forth in Vallen's 2000 state Court of Claims complaint. (Peeples Aff., Ex. F)

FN2. To protect their privacy, all Mid-Hudson patients other than the plaintiff will be identified via their initials.

FN3. *See also Vallen v. Connelly,* 36 Fed. Appx. 29 (2d Cir. June 11, 2002), *on remand,* 2004 WL 555698 (S.D.N.Y. Mar 19, 2004).

*5 In response to the defendants' evidence submitted on their summary judgment motion, plaintiff has been unable to raise a triable issue of fact as to his ability to protect his legal rights during the period for which he claims tolling. The plaintiff has had a full opportunity to conduct discovery. In his papers in opposition to summary judgment, he has exhibited an understanding of the requirements of Rule 56, which were explained to him in the Local Rule 56.2 Notice. Yet, nowhere does he address his ability or inability to protect his rights during the time he has been in a mental health facility. Indeed, rather than rebut the defendants' evidence, plaintiff notes that, during the period for which he seeks tolling, he "pressed charges and the patient C.J. was convicted and sent to Orange County jail." (Pro Se Affidavit in support to deny [sic] summary judgment) The closest he comes to responding to the defendant's argument is the assertion that he lost some or all of his lawsuits on the basis of "simple technicalities", thereby demonstrating that he was unable to protect his rights. (Pro Se Mot. to Den. Summ. J. at 1) But it does not follow that because other claims he asserted were dismissed on various grounds that, therefore, he was unable to assert the claims that he belatedly asserted in this action. He also asserts that the express reference to the statute of limitations in two of his filings "was only a mere statement I read in a book...." (Pro Se Mot. to Den. Summ. J. at 1) The source of his awareness of his rights is not relevant to this motion.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

To the state employees who are named as individual defendants in plaintiff's Section 1983 claim, it is no small matter to allow a stale claim to stand when there is no basis in the record for tolling. These individuals would be required to defend themselves against allegations concerning events that occurred long ago brought by a plaintiff who has amply demonstrated his ability to file a lawsuit in a timely manner in other instances where he has felt aggrieved.

I conclude that the plaintiff has failed to raise a triable issue of fact on his claim that he was "unable to protect [his] legal rights" for the period commencing from November 18, 1998, the date of his first Court of Claims Complaint. On the issue of tolling, the plaintiff bore the burden of proof and, in response to defendant's motion, he failed to come forward with evidence sufficient to require a trial on this issue. *Holy See (State of Vatican City),* 17 A.D.3d at 794;*Assad,* 238 A.D.2d at 457. However, there remains the question of which incidents occurred more than three years prior to the commencement of this action, *i.e.* prior to December 10, 1998.

Plaintiff has stated that in the "first few months" after his May 18, 1997 assignment to Mid-Hudson, defendant Gonzales predicted that violence would be "coming [his] way." (Vallen Dep. at 216) This is Incident No. 1 in the Appendix. According to the AC, during his first months at Mid-Hudson, defendant SHTA Carrol predicted that the plaintiff would have some accidents, defendant SHTA Malfatone was aware that patient John Doe No. 1 had violent tendencies, and defendant SHTA Gonzales failed to intervene during an assault that John Doe No. 1 made against the plaintiff. (AC at 3, 5, 8; Vallen Tr. at 216, 219-20) Additionally, on November 8, 1998, a patient identified in the AC as "Reshawn" physically attacked the plaintiff in front of defendant Gantz, who allegedly failed to intervene. (Complaint at 17) This is Incident No. 9 in the Appendix. One to two weeks later, defendant SHTA Gantz allegedly threatened and punched the plaintiff. (Vallen Dep. Tr. at 56-59) This is Incident No. 10 in the Appendix. Sometime between the Reshawn incident and the Gantz incident, Malfatone instructed the plaintiff to stop drinking from a water fountain, and knocked him to the ground. (Vallen Dep. Tr. at 230) This is Incident No. 13 in the Appendix.

**\*6** The plaintiff does not dispute that these incidents all occurred between May 18, 1997 and late November 1998. The three-year statute of limitations for these incidents accrued, and plaintiff's claims were thus time-barred, prior to the commencement of this action on December 10, 2001.FN4 The defendants' summary judgment motion is granted as to Incident Nos. 1, 9, 10 and 13 set forth in the Appendix, and this portion of the plaintiff's action is dismissed. Though claims based upon these occurrences are barred by the statute of limitations, I will consider the underlying facts to the extent they are relevant to plaintiff's opposition to the other prongs of defendants' motion. *SeeJute v. Hamilton Sanstrand Corp.,* Docket No. 04-3927 (2d Cir. August 23, 2005) (considering such facts in the context of Title VII).

> FN4. Assuming that the earliest of his claims accrued in May 1997 and was tolled under CPLR 208 from May 1997 to November 18, 1998, plaintiff had three years from November 18, 1998, *i.e.* until November 18, 2001 to assert the claims. He did not assert the claims prior to that date.

2. *Lack of Showing of a Defendant's Personal Involvement*

The defendants, each of whom is individually accused of having deprived plaintiff of constitutionally-protected rights, argue that certain of the plaintiff's claims should be dismissed because there is no evidence of personal involvement in the events giving rise to the asserted claims. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

There are five ways in which a plaintiff may show the personal involvement of a defendant in a constitutional deprivation: (1) the defendant directly participated in the alleged constitutional violation, (2) the defendant, having been informed of a violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

policy or custom under which constitutional violations occurred, or allowed the continuation of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant displayed deliberate indifference to the inmates' rights by failing to act on information that unconstitutional acts were occurring. *See* *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Liability may not be anchored in a theory of *respondeatsuperior.* *Collins v. City of Harker Heights,* 503 U.S. 115, 122 (1992). "The bare fact that [a defendant] occupies a high position in the [institutional] hierarchy is insufficient to sustain [a] claim." *Colon,* 58 F.3d at 874.

The defendants identify six separate incidents for which they claim that the plaintiff can set forth no facts that indicate personal involvement on the part of the various defendants. The plaintiff alleges that a Mid-Hudson patient, C.J., stabbed him with a pen near his eye while SHTA Nelson and John Doe defendants Nos. 2 and 3 were supposed to be supervising. (AC at 11-12) This is Incident No. 4 in the Appendix. SHTA Nelson was never served and is not a party to this action, and the plaintiff has been unable to identify John Does Nos. 2 and 3.[FN5] (Vallen Dep. Tr. at 106-07) As such, his claims arising from this incident (No. 4) are dismissed.

> FN5. According to Donna DeLusso, director of Human Resources at Mid-Hudson, SHTA Nelson has not been employed by Mid-Hudson since his retirement on October 30, 1999. (DeLusso Aff. ¶ 4)

*7 The plaintiff alleges that in a separate incident, patient C.J. approached him, stabbed him near the eye, and attempted to gouge out his eye with his fingers. (AC at 14) This is Incident No. 5 in the Appendix. Plaintiff asserts that John Doe defendants Nos. 1, 2 and 3 observed this incident and failed to intervene. (AC at 14) However, the plaintiff is unable to identify John Does Nos. 1, 2, and 3. (Vallen Dep. Tr. at 120-21) Because there is no evidence of personal involvement on the part of any defendant remaining in this action, plaintiff's claim arising from this incident (No. 5) is dismissed.

In a third incident involving patient C.J., plaintiff alleges that two Mid-Hudson employees permitted C.J. to assault him in a facility dining room. (AC at 10-11) This is Incident No. 6 in the Appendix. Plaintiff alleges that afterward, defendant Carrol laughed about the incident and expressed regret that he had not been present to observe the assault. (AC at 11) However, the plaintiff does not identify any employee who observed the assault, and the alleged after-the-fact laughter and comments of defendant Carrol, while callous and distasteful, do not rise to the level of a constitutional violation. *Cf.* *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (allegation that corrections officer laughed at plaintiff does not state an Eighth Amendment claim). Plaintiff's claims arising out of this incident (No. 6) are dismissed.

Next, the plaintiff asserts that another Mid-Hudson patient, A.A., had a long history of attacking people, and that Mid-Hudson staff intentionally placed A.A. in the plaintiff's proximity. (AC at 15-16) This is Incident No. 7 in the Appendix. Plaintiff alleges that SHTA Nelson positioned A.A. close to the plaintiff, and that A.A. attacked him. (AC at 15-16) However, Nelson was not served in this action, and the plaintiff has identified no other Mid-Hudson employees who were involved in the incident. Because there are no facts in the record before me indicating that any defendant was personally involved in or supervised A.A.'s attack, plaintiff's claim arising out of this incident (No. 7) is dismissed.

The plaintiff claims that SHTA March shouted at him and pushed him in a bathroom. (AC at 23) This is Incident No. 11 in the Appendix. However, March was not served in this action, and none of the defendants who are parties to this action were implicated in these events. Because there are no facts in the record before me indicating that any defendant to this action was personally involved in the attack, plaintiff's claim arising out of this incident (No. 11) is dismissed.

Lastly, defendants move for summary judgment seeking the dismissal of plaintiff's claims arising from three incidents loosely raised in the AC. Plaintiff alleged that another patient, N., kicked and punched him, and that staff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

members laughed because N. was an older man. (AC at 24-25) This is Incident No. 14 in the Appendix. In another incident, the plaintiff alleges that an unidentified staff member gave another patient a key to plaintiff's locker, leading that patient to steal $35. (AC at 25) This is Incident No. 15 in the Appendix. In the third incident, the plaintiff alleges that patient B. punched him in a bathroom. (AC at 25) This is Incident No. 16 in the Appendix. However, the plaintiff has not identified by name any members of the Mid-Hudson staff who were involved in these incidents. As a result, all claims arising from these three incidents (Nos.14-16) are dismissed as to all defendants.

3. *Defendants' summary judgment Motion as to plaintiff's remaining claims*

**\*8** Defendants move for summary judgment dismissing plaintiff's remaining claims and assert that, in response to their motion, plaintiff has come forward with no facts from which a reasonable fact-finder could conclude that that he was deprived of any rights under the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982), the Court concluded that an involuntarily committed person has substantive rights under the Due Process Clause of the Fourteenth Amendment to be free from unsafe conditions of confinement. The Court reasoned that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Id. See also DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 (1989) ("[T]he substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others.").

Although *Youngberg* established that involuntarily committed mental patients have substantive due process rights, the standard articulated in the opinion for adjudicating claims based on those rights does not control here. Like Mr. Vallen, the plaintiff in *Youngberg* had been involuntarily committed to a state institution-albeit one for mentally retarded individuals-and had experienced violent

attacks from other residents while staying there. *See Youngberg,* 457 U.S. at 310. The plaintiff alleged that the institution's director and two supervisors had known, or should have known, that the plaintiff was suffering injuries and that they failed to institute appropriate preventive measures. *Id.* The Court held that only an official's decision that was a "substantial departure from accepted professional judgment, practice or standards" would support a substantive due process claim brought by an involuntarily committed mental patient. *Id.* at 323. This standard reflected the Court's conclusion that a decision in this setting, "if made by a professional, is presumptively valid." *Id.* In defining its use of the term "professional", the Court appeared to include nonprofessionals acting under the direction of professional supervisors. *Id.* at 323 n. 30. Unlike the defendants in *Youngberg,* the defendants here are low-level staff members. The nature of such an employee immediately addressing patient-on-patient assault or theft differs significantly from higher-level decisions like patient placement and the adequacy of supervision. For the latter decisions, it is readily possible to apply a test based on professional judgment, practice or standards. In this case, professionals made none of the challenged decisions, and thus the "substantial departure" test has no applicability.

In addition, the general approach to substantive due process claims appears inappropriate in this case. Usually, in order to establish a substantive due process violation for purposes of Section 1983, a plaintiff must show that the defendant's actions taken under color of state law involved "conduct intended to injure [plaintiff] in some way unjustifiable by any government interest [and] ... most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998). However, for pretrial detainees protected by the Fourteenth Amendment, but not the Eighth Amendment, the Court has applied the lower standard of "deliberate indifference" to Section 1983 claims arising from state officials' inattention to their medical needs.[FN6] In *Lewis,* the Court reasoned:

> FN6. In the Eighth Amendment context, a "prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates" the inmate's constitutional protection. *Farmer v. Brennan,* 511 U.S. 825, 828 (1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

Officials must take " 'reasonable measures to guarantee the safety of the inmates," ' including protection of inmates from other inmates' acts of violence. *Id.* at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)). A failure-to-protect claim requires the plaintiff to satisfy both an objective test and a subjective test. The objective test requires that a deprivation must be "sufficiently serious," with a defendant's act or omission resulting in the denial of "the minimal civilized measure of life's necessities." *Id.* at 834 (citation omitted). To succeed on a deliberate indifference failure-to-protect claim, the plaintiff must also prove that a plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* By contrast, the subjective considerations look to whether a defendant had a "sufficiently culpable state of mind," one that reflects deliberate indifference to an inmate's health or safety. *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)).

**\*9** "Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."

*Id.* at 850 (citations omitted). As in the case of pretrial detainees, the involuntary commitment of mentally ill individuals does not constitute punishment for purposes of the Eighth Amendment. *See DeShaney,* 489 U.S. at 199 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (citations omitted). However, the Fourteenth Amendment still protects these individuals, including the plaintiff in this case. *See,e.g.,Lombardo v. Stone,* 2001 WL 940559, *7 n. 7 (S.D.N.Y. Aug. 20, 2001)* (rejecting the Eighth Amendment as a basis for claims of a patient at a psychiatric facility who had not been convicted of a crime and analyzing them instead under the Fourteenth Amendment). Moreover, the state's central role in supervising and caring for the involuntarily committed-like the pretrial detainees considered in *Lewis*-suggests that the conscience-shocking standard

demands too much of such plaintiffs' substantive due process claims.

I am inclined to agree with the Eighth Circuit that the standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients and based on alleged failures to protect them that violated their substantive due process rights. *See Moore v. Briggs,* 381 F.3d 771, 773 (8th Cir.2004). However, I do not need to reach the issue because whether the defendants' actions are measured under the "conscience-shocking", the "substantial departure" or the "deliberate indifference" standard, the result is the same: no reasonable fact-finder could conclude based upon the evidence, drawing all inferences in plaintiff's favor, that the defendants' conduct either shocked the conscience, was deliberately indifferent or substantially departed from accepted professional judgment, practices or standards.

Defendants argue that four incidents (Nos.2, 3, 8, 12) set forth in the AC should be dismissed because there are no triable issues of fact that support plaintiff's claim. I address them each in turn.

First, the plaintiff asserts that defendant Jones and that SHTA John Does Nos. 1 and 2 permitted patient C.J. to circle the plaintiff, and that C.J. then punched the plaintiff in the face several times. (Vallen Dep. Tr. at 89-96; AC at 9-10) This was the first alleged assault that C.J. inflicted upon the plaintiff, and is designated as Incident No. 2 in the Appendix. The defendants assert that summary judgment is warranted because the plaintiff cannot point to any facts supporting a conclusion that defendant Jones had any advance knowledge of C.J.'s assault upon plaintiff or was deliberately indifferent to the assault once he observed it. The defendants point to Vallen's deposition testimony that Jones "flew out from behind the desk and threw [C.J.] to the ground or something" when he saw that C.J. was attacking the plaintiff. (Vallen Dep. Tr. at 96) There is no dispute that once an attack was underway, Jones actively intervened to stop a physical attack against the plaintiff. After intervening in the attack, Jones told the plaintiff that he saw C.J. "circling you, I knew he was going to do something, and then he did it." (Vallen Dep. Tr. at 95) While such a statement may be open to multiple inferences, this remark standing alone is insufficient to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

raise a triable issue of fact. Based on the plaintiff's own account, as soon as C.J. began the assault upon plaintiff, defendant Jones immediately intervened and restrained C.J. Defendant Jones's conduct was not indifferent to Vallen's fate but rather proactive and protective of him. Plaintiff's claim does not survive under any of the arguably applicable standards-conscience-shocking conduct, deliberate indifference or substantial departure from accepted judgment standards or practices. Defendants' motion for summary judgment as to this incident (No. 2) is therefore granted.

*10 Next, the defendants assert that summary judgment is appropriate for an incident in which defendant SHTA Leper told Mid-Hudson patient C.J. to enter a bathroom that the plaintiff was using because it would not bother the plaintiff. (AC at 16) This is Incident No. 8 in the Appendix. Defendants assert that summary judgment is appropriate because Leper did not infringe the plaintiff's constitutional rights when he suggested that C.J. enter the bathroom. (Def.'s Mem. 20-21) In opposition, the plaintiff asserts that C.J. posed a risk of violence to him at that time, but he does not indicate that he endured any physical injury from C.J.'s presence. (Opp'n Decl. ¶ 8) However embarrassing this incident may have been to the plaintiff, it does not rise to the level of a Constitutional violation. *See,e.g.,Rodriguez v. Ames,* 287 F.Supp.2d 213, 219-20 (W.D.N.Y.2003) (doctor was not deliberately indifferent to inmate's privacy rights when he conducted examination of inmate's bowel condition in prison cell because of lower privacy baseline in prison facilities); *Robinson v. Middaugh,* 1997 WL 567961, at *4 (N.D.N.Y. Sept. 11, 1997) ("plaintiff's claims that he was made to shower, dry off with a pillow case, and his private parts exposed due to the wearing of a 'paper suit', and sleeping on an unsanitized mattress do not rise to the level of deliberate indifference or the wanton infliction of pain."). The deprivation implicated is not sufficiently serious and does not deprive him of the minimal civilized measure of life's necessities. *Cf.Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The defendant's motion is granted as to this incident (No. 8), and it is dismissed from this case.

Defendants move for summary judgment as to the plaintiff's claims concerning defendant SHTA Brown and Mid-Hudson patient F. This is Incident No. 12 in the Appendix. According to the plaintiff, F. commenced an

attack on the plaintiff and began to kick him from behind. (AC at 24) At that point, according to the AC, "S.H.T.A. Brown jumped in to protect the patient who kicked me." (AC at 24) The AC does not assert that S.H.T.A. Brown was responsible for the attack, encouraged the attack, or had foreknowledge of the attack. To the contrary, the record and the allegations indicate only that once an attack was underway, defendant Brown attempted to restrain patient F. from attacking the plaintiff. In his deposition, the plaintiff volunteered that defendant Brown intervened when the plaintiff himself "started to go at [patient F.]." (Vallen Dep. Tr. at 229) Because the record does not support an inference that defendant Brown's conduct shocked the conscience, resulted from deliberate indifference or departed substantially from professional standards or practices, the defendants' motion for summary judgment is granted as to the incident (No. 12), and it is dismissed.

Finally, the defendants' motion for summary judgment is granted as to claims arising from an incident with Mid-Hudson patient S.W. This is Incident No. 3 in the Appendix. Defendants argue that the plaintiff can point to no admissible evidence from which a reasonable fact-finder could find in plaintiff's favor. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *seealsoGallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The plaintiff alleges that he was walking up the staircase when S.W. punched him in the face. (AC at 9-10; Vallen Dep. Tr. at 97-98) He asserts that defendant SHTA Malfatone was present. (Vallen Dep. Tr. at 98) However, there is nothing in the record that shows whether SHTA Malfatone observed the attack and failed to act or intervene, or whether Malfatone was indifferent to the plaintiff's health or safety. As a result, the defendants' summary judgment motion seeking the dismissal of plaintiff's claim based upon this incident (No. 3) is granted because plaintiff has failed to raise a triable issue of fact under any of the applicable standards.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

### 4. *Qualified Immunity and Law of the Case*

**\*11** Because claims arising from these incidents are dismissed on other grounds, I do not consider the defendants' contention that defendants Carrol, Jones and Leper are entitled to qualified immunity. Similarly, I need not consider the defendants' contention that the law of the case bars plaintiff from continuing to pursue his lost property claim for the $35 stolen from his locker.

### CONCLUSION

The defendants' summary judgment motion is GRANTED. The Clerk is directed to enter judgment in favor of the defendants, and to dismiss this case.

SO ORDERED.

### APPENDIX TO MEMORANDUM AND ORDER IN *VALLEN V. CARROL*, 02 CIV. 5666(PKC)

### 1. *Allegations Based on Events that Occurred During Plaintiff's First Few Months at Mid-Hudson Forensic*

SHTA Carrol told plaintiff that he was going to have some accidents. (AC at 3, 5) SHTA Gonzales told Plaintiff that violence was coming his way. (AC at 5) SHTA Gonzales heard patient John Doe # 1 threaten plaintiff, and stood by as patient John Doe # 1 hit plaintiff in the head. (AC at 5) SHTA Malfatone "and other S.H.T.A. staff" were aware that this same patient, John Doe # 1, was violent, but laughed and did nothing when patient John Doe # 1 followed plaintiff to his room and punched him. (AC at 8) The next morning, patient John Doe # 1 came up behind plaintiff at a sink and put a hair pick to his eyes and said that he wanted no more trouble out of plaintiff. (AC at 8) SHTA Gonzales told plaintiff to stop causing trouble. (AC at 8) These events (the "Initial Incidents") allegedly occurred within the first few months of plaintiff's arrival at Mid-Hudson Forensic-within a few months of April 1, 1997. (Vallen Dep. Tr. 216, 219-20)

### 2. *The First Patient C.J. Allegation*

SHTA Jones and SHTAs John Doe # 1 and # 2 "let" patient C.J. "circle around" plaintiff until he got behind plaintiff. (AC at 9) Patient C.J. then punched plaintiff in the face and "tried to take [plaintiff's eye out." (AC at 9) Plaintiff does not know who John Doe # 1 and # 2 are. (Vallen Dep. Tr. 96) This was the first time patient C.J. had assaulted plaintiff. (Vallen dep. Tr. at 89-91, 95-96; AC at 9-10)

### 3. *The Patient S.W. Allegation*

Patient S.W. punched plaintiff on a staircase, and SHTAs Malfatone and Nelson were there (the "S.W. Incident"). (AC at 9-10)

### 4. *The Second Patient C.J. Allegation*

Patient C.J. was on assault precautions in the high observation area in the dayroom. SHTA Nelson and SHTAs John Doe # 2 and # 3 were watching the ward. Patient C.J. walked to where plaintiff was watching television, and stabbed plaintiff near his eye with a pen. (AC at 11-13) Plaintiff cannot identify SHTAs John Doe # 2 and # 3. (Vallen Dep. Tr. 106-07)

### 5. *The Third Patient C.J. Allegation*

Patient C.J. took a pen and left the precaution area while SHTAs John Doe # 1, # 2 and # 3 were observing, walked to where plaintiff was seated watching television, stabbed plaintiff near the eye, and tried to gouge plaintiff's eye with his fingers. (AC at 14) Plaintiff cannot identify John Does # 1, # 2 or # 3. (Vallen Dep. Tr. 120-21)

### 6. *The Fourth Patient C.J. Allegation*

**\*12** SHTAs John Doe # 1 and # 2 allowed patient C.J., who was on assault precautions, to leave his line in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

dining room, and patient C.J. then assaulted plaintiff while plaintiff was carrying his tray. (AC at 10-11, Vallen Dep. Tr. at 101) Plaintiff cannot identify SHTAs John Doe # 1 or # 2. (Vallen Dep. Tr. at 101) An hour later, SHTA Carrol laughed and said he wished he had been present to watch the assault. (AC at 11)

### 7. The Patient A.A. Allegation

Unidentified staff "indicated" that plaintiff was "a good target." (AC at 15) Patient A.A. was attacking people, and after SHTA Nelson placed patient A.A. in a chair a few feet from plaintiff, patient A.A. jumped from his chair and attacked plaintiff. (AC at 15-16)

### 8. The Allegation Against SHTA Leper

Plaintiff was in the bathroom, and SHTA Leper told patient C.J. to go into the bathroom because it would not bother plaintiff if patient C.J. went in (the "Leper Bathroom Incident"). (AC at 16-17)

### 9. The "Reshawn" Allegation

After SHTA Gantz had given plaintiff permission to do laundry, a patient whom plaintiff identifies as "Reshawn" pushed plaintiff in front of Gantz. (AC at 17) Reshawn then punched plaintiff in the mouth. (AC at 17-21) The blow split plaintiff's lip and broke one tooth and loosened another. (Vallen Dep. Tr. at 37-38) Plaintiff received fourteen stitches to his lip. (Vallen Dep. Tr. at 222-23) The Reshawn Incident occurred on November 8, 1998. (Vallen Dep. Tr. at 24; Peeples Aff., Exh. C, at 1)

### 10. The Gantz Bathroom Allegation

SHTA Gantz threatened plaintiff and punched him in the chest in a bathroom (AC at 21-22; Vallen Dep. Tr. at 56-59) The Gantz Bathroom Incident occurred a week or two after the Reshawn Incident, which occurred on November 8, 1998. Vallen Dep. Tr. at 24, 56-57; Peeples

Aff., Exh. C, at 1)

### 11. The SHTA March Bathroom Allegation

SHTA March came into the bathroom at the Canteen, screamed at plaintiff, and pushed plaintiff across a room. (AC at 23)

### 12. The SHTA Brown Allegation

Patient F. kicked plaintiff from behind, and SHTA Brown jumped in to protect patient F. because plaintiff "started to go at" patient F. (AC at 24; Vallen Dep. Tr. at 229)

### 13. The SHTA Malfatone Water Allegation

SHTA Malfatone told plaintiff to stop drinking water from a water fountain in the yard, and came over and knocked plaintiff to the ground. (AC at 24) The Malfatone Water Incident occurred before the Reshawn Incident. (Vallen Dep. Tr. at 231-32)

### 14. The Patient N. Allegation

Patient N. kicked and punched plaintiff, and unidentified staff laughed because patient N. was an old man. (AC at 24-25) Plaintiff cannot identify the staff members. (AC at 24-25; Vallen Dep. Tr. at 233-35)

### 15. The $35.00 Allegation

An unidentified staff member gave the key to plaintiff's locker to another patient, who then took $35.00 in quarters from plaintiff's locker (the "$35.00 Incident"). (AC at 25) Plaintiff cannot identify the staff members. (AC at 25; Vallen Dep. Tr. at 235-39)

### 16. The Patient B. Bathroom Allegation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2296620 (S.D.N.Y.)
(Cite as: 2005 WL 2296620 (S.D.N.Y.))

**\*13** Patient B. punched plaintiff in the bathroom, and
plaintiff chased patient B. out of the bathroom. (AC at 25)
Unidentified staff saw plaintiff chasing patient B, but did
not see patient B. assault plaintiff in the bathroom. (AC at
25; Vallen Dep. Tr. at 238-39)

S.D.N.Y.,2005.
Vallen v. Carrol
Not Reported in F.Supp.2d, 2005 WL 2296620
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Slip Copy, 2009 WL 3644279 (N.D.N.Y.)
(Cite as: 2009 WL 3644279 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James A. SMITH, Plaintiff,
v.
Jean HUGHES, Don Le Brake, and, Harry, Buffardi,
Defendants.
**No. 9:08-CV-1147.**

Oct. 29, 2009.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff, a former inmate in the custody of the Schenectady County Jail brought the instant action pro se pursuant to 42 U.S.C. § 1983 alleging that: (1) he suffered cruel and unusual punishment; (2) he was denied due process; and (3) he was the victim of racial discrimination. Defendants, Jean Hughes (Hughes), Don Le Brake (LeBrake), and Harry Buffardi (Buffardi), filed this motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(5) and 12(b)(6) alleging that: (1) LeBrake and Buffardi were not served with the Complaint or summons; and (2) the Complaint fails to state a claim upon which relief may be granted. *See* Docket No. 13. Plaintiff, has failed to respond to Defendants' motion despite repeated requests to do so and after being advised that "his failure to respond to Defendants' motion may result in the termination of the case in favor of the Defendants." *See* Docket No. 14.

**I. FACTS**

Plaintiff alleges that on September 16, 2008, Hughes, an officer at the county jail, violated Plaintiff's 8th Amendment rights, inflicting cruel and unusual punishment, in connection with Plaintiff's use of the restroom. Plaintiff contends that Hughes maintains a policy that does not allow inmates to use the restroom during prison lock-down. Plaintiff asserts that he has "physical ailments" and is on a medication which increases the frequency of his bathroom needs. Plaintiff alleges that he entered the restroom ten minutes before lock-down and came out five minutes into lock-down. Plaintiff was told to pack his things and was moved from medium security housing to maximum security housing for one day.

Plaintiff next alleges that on September 22, 2008 he was taken to a disciplinary hearing for the alleged bathroom violation before Sgt. LeBrake. Plaintiff alleges that he requested to call witnesses at this hearing but that LeBrake did not allow him to do so. Plaintiff was found guilty, sentenced to five days lock-down, moved back to maximum security housing, and given a ten dollar surcharge. Plaintiff filed an inmate disciplinary appeal form appealing LeBrake's disciplinary sanctions. His appeal was granted on September 30, 2008 and his $10.00 was refunded. *See* Docket No. 1.

Finally, Plaintiff alleges that another inmate, Frank Burns, was also brought to maximum security on September 16, 2008 but was never given a disciplinary hearing or sanctioned. It is not included in the complaint whether Burns, like Plaintiff, also committed a bathroom violation, or whether Burns was later given a disciplinary hearing or further sanctioned. Plaintiff asserts that the difference in treatment constitutes racial discrimination by LeBrake because Plaintiff is African American and Burns is Caucasian.

In their motion to dismiss, Defendants argue that the Complaint must be dismissed because: (1) Defendants LeBrake and Buffardi were not served within 120 days of Plaintiff's filing of the Complaint; and (2) Plaintiff failed to establish that the Defendants violated his constitutional rights.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644279 (N.D.N.Y.)
(Cite as: 2009 WL 3644279 (N.D.N.Y.))

## II. STANDARD OF REVIEW

**\*2** To survive a motion to dismiss, the plaintiff must
provide "the grounds upon which his claim rests through
factual allegations sufficient 'to raise a right to relief
above the speculative level.' " *Camarillo v. Carrols Corp.,*
*518 F.3d 153, 156 (2d Cir.2008)* (citations omitted).
Plaintiff's factual allegations must be sufficient to give the
defendant "fair notice of what the claim is and the grounds
upon which it rests." *Camarillo, 518 F.3d at 156* (citing
*Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d*
*117, 121 (2d Cir.2007)*). When ruling on a motion to
dismiss, "the court must accept the material facts alleged
in the complaint as true and construe all reasonable
inferences in the plaintiff's favor." *Burns v. Trombly, 624*
*F.Supp.2d 185, 196 (N.D.N.Y.2008)* (citing *Hernandez v.*
*Coughlin, 18 F.3d 133, 136 (2d Cir.1994)*.

In deciding a motion to dismiss, the Court may review
documents integral to the Complaint upon which the
plaintiff relied in drafting his pleadings, as well as any
documents attached to the Complaint as exhibits and any
statements or documents incorporated into the Complaint
by reference. *Rothman v. Gregor, 220 F.3d 81, 88 (2d*
*Cir.2000)* (citing *Cosmas v. Hassett, 886 F.2d 8, 13 (2d*
*Cir.1989)*). The Court must "read the pleadings of a pro se
plaintiff liberally and interpret them 'to raise the strongest
arguments that they suggest.' " *McPherson v. Coombe,*
*174 F.3d 276, 280 (2d Cir.1999)* (citing *Burgos v.*
*Hopkins, 14 F.3d 787, 790 (2d Cir.1994)*.

Under N.D.N.Y.L.R. 7.1(b)(3) "[w]here a properly filed
motion is unopposed and the Court determines that the
moving party has met its burden to demonstrate
entitlement to the relief requested therein, the non-moving
party's failure to file or serve any papers as required by
this Rule shall be deemed as consent to the granting or
denial of the motion, as the case may be, unless good
cause be shown." N.D.N.Y. L.R. 7.1(b)(3); *see Tejada v.*
*Mance, 07-CV-0830, 2008 WL 4384460, \*5 (N.D.N.Y.,*
*Sept. 22, 2008)*. Here, because Plaintiff has failed to
oppose Defendant's motion to dismiss and has failed to
show good cause for his failure to oppose, Plaintiff has
"consented" to Defendants' motion to dismiss. "The only

remaining issue is whether Defendants have met their
burden 'to demonstrate entitlement to the relief requested'
" through their submission. *Burns, 624 F.Supp.2d at 197*.
Stated another way, where a movant has properly filed a
motion and the non-movant has failed to respond to that
motion, the only remaining issue is whether the legal
arguments advanced in the movant's motion is *facially*
*meritorious. White v. Verizon, 06-CV-0617, 2009 WL*
*3335897, \*3 (N.D.N.Y.2009); see also Ciaprazi v. Goord,*
*02-CV0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec. 22,*
*2005)* (Sharpe, J.; Peebles, M.J.) (characterizing
defendants' threshold burden on a motion for summary
judgment as "modest") (citing *Celotex Corp. v. Catrett,*
*477 U.S. 317, 323-324 (1986)*); *accord, Saunders v.*
*Ricks, 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60*
*(N.D.N.Y. Oct. 18, 2006)* (Hurd, J., adopting
Report-Recommendation of Lowe, M.J.); *Smith v. Woods,*
*03-CV-0480, 2006 WL 1133247, at \*17 & n. 109*
*(N.D.N.Y. Apr. 24, 2006)* (Hurd, J., adopting
Report-Recommendation of Lowe, M.J.); *see also Race*
*Safe Sys. v. Indy Racing League, 251 F.Supp.2d 1106,*
*1109-1110 (N.D.N.Y.2003)* (Munson, J.) (reviewing
merely whether record contradicted defendant's
arguments, and whether record supported plaintiff's
claims, in deciding unopposed motion to dismiss, under
Local Rule 7.1[b][3] ); *Wilmer v. Torian, 980 F.Supp.*
*106, 106-07 (N.D.N.Y.1997)* (Hurd, M.J.) (applying prior
version of Rule 7.1[b][3], but recommending dismissal
because of plaintiff's failure to respond to motion to
dismiss and the reasons set forth in defendants' motion
papers).

## III. DISCUSSION

a. **Dismissal pursuant to 12(b)(5)**

**\*3** Defendants first allege that the Complaint must be
dismissed as to LeBrake and Buffardi because of
insufficiency of process. Pursuant to *Rule 4(m) of the*
*Federal Rules of Civil Procedure*:

If service of the summons and complaint is not made upon
a defendant within 120 days after the filing of the
complaint, the court upon motion or its own initiative
after notice to the plaintiff, shall dismiss the action

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Slip Copy, 2009 WL 3644279 (N.D.N.Y.)
(Cite as: 2009 WL 3644279 (N.D.N.Y.))

without prejudice as to that defendant or direct that the serve be effected within a specified time.

Pro se plaintiffs are not excused from complying with Rule 4(m). *Rose v. U.S. Postal Service,* No. 09-1219, 2009 WL 3294890, at *1 (7th Cir. October 14, 2009) ("But neither a party's pro se status nor his inexperience as a litigant excuse him from complying with the requirements of Rule 4(m).") (citing to *McMasters v. United States,* 260 F.3d 814, 818 (7th Cir.2001)); see *Kersh v. Derozier,* 851 F.2d 1509,1512 (5th Cir.1988) ("To hold that complete ignorance of Rule 4(j) [predecessor of Rule 4(m) ] constitutes good cause for untimely service would allow the good cause exception to swallow the rule."); *King v. Atiyeh,* 814 F.2d 565, 567 (9th Cir.1987) ("Pro se litigants must follow the same rules of procedure that govern other litigants."). A defendant can challenge the sufficiency of process by filing a motion under Federal Rules of Civil Procedure 12(b)(5).

In this case, Plaintiff filed his Complaint on November 4, 2008. Service of process on Defendants LeBrake and Buffardi was attempted November 20, 2008, however "acknowledgment of receipt of summons and complaint by mail was not returned [ ... ] within thirty days" and therefore was unexecuted. *See* Docket No. 10. Plaintiff did not attempt service again and did not seek leave to extend the time for service. Accordingly, Defendants' argument is facially meritorious and Plaintiff's Complaint against Lebrake and Buffardi must be dismissed for insufficiency of process.

**b. Dismissal pursuant to 12(b)(6)**

Defendants also move for dismissal pursuant to Fed.R.Civ.P. Rule 12(b)(6), for failure to state a claim upon which relief may be granted.

Here, Defendants have met their burden on their unopposed motion given Defendants' legally supported arguments set forth in their memorandum of law. See Docket No. 13. Plaintiff has failed to allege facts plausibly suggesting a violation of the Eighth or Fourteenth

Amendments or of racial discrimination.

**1. Cruel and Unusual Punishment**

Plaintiff's Complaint first alleges that he was subjected to "cruel and unusual punishment," in violation of the Eighth Amendment, in being denied the right to use the bathroom by Defendant Hughes when he was a "person with physical ailments." He further claims, that in violation of the Eighth Amendment, he was moved to maximum security housing, both before and after the disciplinary proceedings, because he was in the bathroom during prison lock down.

**a. Deliberate Indifference to a Serious Medical Condition**

**\*4** Plaintiff's allegation that he was denied the right to use the bathroom when he had "physical ailments" is a claim of deliberate indifference to a serious medical condition. There are two elements to a claim of deliberate indifference to a serious medical condition: (1) the plaintiff "must show that she [or he] had a 'serious medical condition' " and (2) "that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

**(1) Serious Condition**

A serious medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). cert. denied, 115 S.Ct. 1108 (1995). Factors that have been considered in determining whether a condition is serious include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citing *McGuckin v. Smith,* 974 F.2d 1050,1059-60 (9th Cir.1992)); accord Gutierrez, 111 F.3d at 1373 (citing McGuckin and collecting cases from other

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

circuits employing a similar standard). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Plaintiff's Complaint fails to allege that his medical condition is sufficiently serious. In this case, Plaintiff has alleged only that he has a condition that requires medication causing frequent urination and bowel movements. Even if the Court were to resolve all the disputed facts in the Plaintiff's favor, the facts do not rise to the level required for the Eighth Amendment to be implicated. He has not alleged that this condition was serious enough to cause death, degeneration or pain in the event he was denied temporary use of the bathroom. Although a cognizable claim regarding bathroom needs have been based on ailments such as an enlarged prostate and irritable bowel syndrome, Plaintiff fails to allege any condition requiring treatment. *See Hazelton v. NH Dept of Corrections,* 2009 WL 229664 *2 (D.N.H. Jan. 27, 2009) ("Hazelton has two serious medical conditions, irritable bowel syndrome and an enlarged prostate"). Therefore, Plaintiff has failed to allege he suffered from a serious medical condition.

(2) **Deliberate Indifference**

Plaintiff's Complaint also fails to allege that Hughes was "deliberately indifferent to that condition." Deliberate indifference has been interpreted to mean "that [defendant] 'knew of and disregard[ed] an excessive risk to [plaintiff's] health or safety' and that [defendant] was 'both aware of facts from which inference could be drawn that a substantial risk of serious harm existed, and ... also drew that inference.' " Caiozzo, 581 F.3d at 72 (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). Plaintiff alleges only that upon exiting the bathroom he was moved to maximum security housing. He does not allege that he was deprived of his bathroom privileges. Finally, there is no allegation the Hughes had any knowledge that Plaintiff would suffer serious harm as a result of being temporarily deprived of the right to use the bathroom. Temporary deprivations ordinarily do not implicate the Eighth Amendment. *Gill v. Riddick,* 03-CV-1456, 2005 WL 755745, *16 (N.D.N.Y. March 31, 2005) ("the temporary deprivation of the right to use the toilet, in the absence of serious physical harm or serious risk of contamination, does not rise to the level of an Eighth Amendment violation."); *see also Hartsfield v. Vidor,* 199 F.3d 305, 310 (6th Cir.1999) (recognizing that "deprivations of fresh water and access to the toilet for a 20-hour period, while harsh, were not cruel and unusual punishment"); *Dellis v. Corrections Corporation of America,* 257 F.3d 508, 511 (6th Cir.2001) (prisoner who was temporarily denied access to a "working toilet" did not suffer deprivation of "minimized civilized measure of life's necessities"). Plaintiff's allegations do not rise to the standard required by the 8th Amendment.

**b. Lock-in as Cruel and Unusual Punishment**

***5** Finally, Plaintiff's punishment of being moved to maximum security housing for one day after the incident and four days following the disciplinary proceedings does not rise to the level of cruel and unusual punishment. It is well settled that the placement of an inmate in maximum security confinement does not *per se* constitute cruel and unusual punishment. *Courtney v. Bishop,* 409 F.2d 1185 (8th Cir.1969); *Jackson v. Bishop,* 404 F.2d 572 (8th Cir.1968). Therefore, placing Plaintiff in lock-in for five days does not rise to the level of "cruel and unusual punishment." See *McDonald v. Rivera,* 06-CV-410, 2008 WL 268345, *8 (N.D.N.Y.2008) ("[t]he allegation that plaintiff was placed in keeplock confinement under otherwise normal conditions for thirty days similarly does not establish a claim of cruel and unusual punishment."); *Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y 1998) ("the mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment.").

Defendants are correct that Plaintiff's Complaint has failed to allege facts plausibly suggesting that Plaintiff possessed a serious medical condition, that Defendant Hughes acted with deliberate indifference to Plaintiff's condition, or that his change in security status constituted cruel and unusual punishment. Defendant's motion to dismiss the claims against LeBrake, Buffardi, and Hughes must be granted.[FN1]

FN1. Additionally, the Court poinst out that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644279 (N.D.N.Y.)
(Cite as: 2009 WL 3644279 (N.D.N.Y.))

Plaintiff's Complaint fails to allege personal involvement in the Eighth Amendment violation as to LeBrake and Buffard,i as required for an award of damages on a § 1983 claim.

**2. Denial of Due Process**

Plaintiff's Complaint next alleges that he was denied due process when he failed to receive a fair disciplinary hearing. The Complaint alleges LeBrake deprived him of liberty and property, in sanctioning Plaintiff to five days lock-in and a $10.00 fine, without due process of law by refusing to allow him to call witnesses. To "state a § 1983 claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest, and that he was deprived of that interest without due process." *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998); *see Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995).

Plaintiff fails to allege a protected liberty interest. To establish a protected liberty interest, the plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under [the standard set forth in] *Sandin [v. Conner,* 515 U.S. at 472], and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Hynes,* 143 F.3d at 658 (quoting *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). In *Sandin,* 515 U.S. at 472, the Supreme Court found that the plaintiff was not denied due process when an adjustment committee refused to allow him to present witnesses during a disciplinary hearing which sentenced him to segregation for misconduct. The Supreme Court held that the was no due process violation because "Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486.

**\*6** It is clear that Plaintiff has no liberty interest in being housed in a facility of his choice. See *Meachum v. Fano,* 427 U.S. 215 (1976). New York law does not place any restrictions on changes in security status and vests the Commissioner of the Department of Corrections with the discretion to make such classifications. See N.Y. Corr.

Law § 137.1 ("The commissioner shall establish program and classification procedures ...").

Furthermore, although inmates facing disciplinary charges have the right to call witnesses to their defense, the Supreme Court has made it clear that it is a qualified right, subject to restrictions justified by the context of the confinement. *Wolff v. McDonnell,* 418 U.S. 539 (1974). Accordingly, New York has qualified the right of inmates to call witnesses during prison disciplinary hearings and such discretion includes the refusal of a witness on the basis of "irrelevance or lack of necessity." *Id; see also*7 N.Y.C.R.R. § 254.5.

Defendants argument for dismissal of Plaintiff's Due Process claim is meritorious given that Plaintiff has failed to allege any liberty interest specifically granted to prisoners by the State of New York that was infringed or any deprivation "atypical and significant in relation to ordinary prison life." *see Anderson v. Lapolt,* 07-CV-1184, 2009 WL 3232418, at *11 (N.Y.N.D. Oct. 1, 2009) ("Courts in this Circuit have held that a thirty (30) day period of keeplock, absent additional egregious circumstances, is not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause."); *Rivera v. Goord,* 05-CV-1379, 2008 WL 5378372, at *2-3 (N.Y.N.D. Dec. 22, 2008) (holding that forty days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (forty-five days of keeplock is not atypical and significant); *Rivera v. Coughlin,* 92 Civ. 3404, 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (eighty-nine days in keeplock does not create a liberty interest). Furthermore, Plaintiff has failed to allege any facts to show why witness testimony was necessary. Therefore, Plaintiff's allegations are insufficient to confer liability for a violation of 42 U.S.C § 1983 and must be dismissed. [FN2]

FN2. Again, the Court points out that Plaintiff's Complaint fails to allege any personal involvement in a due process violation as to Defendants Buffardi and Hughes.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644279 (N.D.N.Y.)
(Cite as: 2009 WL 3644279 (N.D.N.Y.))

**3. Discrimination Based on Race**

Finally, Plaintiff's Complaint alleges that he was maliciously prosecuted and punished because of his race. Plaintiff does not claim racial discrimination in the disciplinary proceeding, but merely alleges he was disciplined differently from another inmate. Defendants argue that Plaintiff's racial discrimination claim is conclusory and unsupported thereby justifying dismissal.

The Second Circuit has "repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F. Supp 35, 38 (N.D.N.Y.1995) (citing *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987) (citations omitted); *see also Martin v. New York State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978) ("It is well settled in this circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Act, fails to state a claim under Rule 12(b)(6).")). "In order to survive a motion to dismiss, the plaintiff must specifically allege ... circumstances giving rise to a plausible inference of racially discriminatory intent." *Rodriquez v. New York University,* 2007 WL 117775 (S.D.N.Y 2007) (citing *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir.1994).

**\*7** Here, there is no allegation of intentional discrimination and all allegations are conclusory in nature. Plaintiff only alleges he was disciplined and another inmate was not. He then concluded that this action was due to racial discrimination. The Complaint does not contain any factual allegations sufficient to plausibly suggest the Defendants acted with a discriminatory state of mind, that Burns and Plaintiff were similarly situated, or whether Burns was later given a disciplinary hearing or sanctions. Accordingly, the Complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination by Defendants and the cause of action for racial discrimination must be dismissed.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED, and the Complaint is DISMISSED IN ITS ENTIRETY.

IT IS SO ORDERED.

N.D.N.Y.,2009.
Smith v. Hughes
Slip Copy, 2009 WL 3644279 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3698382 (N.D.N.Y.)
(Cite as: 2009 WL 3698382 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Omar OSACIO, Plaintiffs,
v.
Gary GREENE, Former Supt., Great Meadow
Correctional Facility; Lucien J. Leclaire, Dep. Comm'r
Nysdocs; Kenneth McLaughlin; Sgt. C. Murry; CO F.
Deluke; CO D. Beebe; Dr. Albert Pauloano; Julie
Daniels; Nurse K. Bayer; Nurse S. Nichols; et al.,
Defendants.
**No. 08-CV-0018.**

Nov. 2, 2009.

Omar Ocasio, Auburn, NY, pro se.

James Seaman, New York State Department of Law,
Albany, NY, for Defendants.

### *DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff, Omar Osacio, brought the instant action pro
se pursuant to 42 U.S.C. § 1983 alleging that his Eighth
Amendment rights were violated though: (1) the use of
excessive force against him at the Great Meadow
Correctional Facility on January 13, 2006; and (2)
deliberate indifference to his medical condition, arising
from the January 13th incident. Defendants move for
summary judgment arguing that: (1) Plaintiff failed to
exhaust all available administrative remedies; (2) several
Defendants should be dismissed for lack of personal
involvement; (3) Defendants are entitled to qualified
immunity; (4) there was no excessive force in violation of

the Eighth Amendment; (5) Plaintiff's injury did not
constitute a serious medical need; and (6) there was no
deliberate indifference to Plaintiff's medical needs.

### I. FACTS

On January 13, 2006 Plaintiff was being returned to his
special housing unit (SHU) cell by Defendants Officer
Deluke and Officer Beebe. Plaintiff was handcuffed
behind his back. A retention strap was used to secure the
cuffs. Upon returning Plaintiff to his cell, Plaintiff
extended his handcuffed wrists through the feed up port in
order for Defendants to remove the handcuffs. The left
cuff was removed and Plaintiff turned to his right to see
the officers. Defendants ordered Plaintiff to put his arms
back out through the feed up port. Plaintiff testifies that, at
this point, Defendant Deluke pulled, shook, punched, and
scraped Plaintiff's arm against the bars. The retention strap
and handcuffs were removed and the incident ended.

Following the incident, a "use of force report" was
prepared which reported that Plaintiff resisted returning
the cuffs and Defendants took control of Plaintiff's hands
until the cuffs were removed by a third officer, Defendant
Murray. Control was maintained by pulling on the
retention straps with steady continuous tension until the
officers were able to grab Plaintiff's hands.

Following the documented use of force, a nurse was
directed to Plaintiff's cell to evaluate him. An officer was
directed to take photos of Plaintiff's injuries. Plaintiff
refused to be evaluated and turned out the lights so that no
pictures could be taken. Plaintiff stated that if there was to
be a medical exam and pictures taken, he wanted them per
his request and he wanted a full medical evaluation.

In the days following the incident, nurses made daily sick
call rounds. On January 13th Plaintiff did not complain
about any injury to his hand or arm. That day he
complained only of a rash on his forehead and dental pain.
The following day, Plaintiff made no complaints. On

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Slip Copy, 2009 WL 3698382 (N.D.N.Y.)
(Cite as: 2009 WL 3698382 (N.D.N.Y.))

January 15th and 16th, Plaintiff voiced complaints of forearm pain, but the nurse observed no abrasions, swelling, or redness. On January 17th, Plaintiff saw Defendant Nurse Bayer. Plaintiff asked only that a dental appointment be scheduled. Later that day, Plaintiff was escorted to the medical unit for an evaluation. Plaintiff reported right hand and left arm pain. A nurse documented puffiness and bruising in Plaintiff's right hand and two scratches on his left arm. At this time photographs were taken. On January 18th and 19th, Defendant Bayer again saw Plaintiff. He made no complaints referable to his right hand. On January 23rd, Plaintiff again complained of right hand pain. The nurse scheduled a doctor appointment for February 17, 2006. On January 26th, Plaintiff complained to Defendant Bayer of pain and numbness in his hand. She reported that there was no evidence of swelling or of decreased range of motion. Defendant Bayer referred Plaintiff to a physician assistant who saw Plaintiff on January 28th. On January 27th, the nurse on duty noted Plaintiff's complaint of right hand pain and that he was already scheduled to see a doctor. On February 4th, Defendant Nichols saw Plaintiff. He made no complaints of right hand pain. On February 14th, Plaintiff again saw Defendant Nichols. This time Plaintiff complained of right hand pain. On February 17th, Plaintiff was seen by a doctor who ordered an X-ray. The x-ray revealed a healing fracture to the 3rd metacarpal on the right hand. Another doctor appointment was scheduled for March 14th. On March 14th, Plaintiff's doctor reported slight tenderness on the 3rd metacarpal but reported normal range of motion, normal grip strength, and that the fracture was healing. After March 14th, there is no evidence that Plaintiff offered any complaint of pain or problems with his right hand.

**\*2** Defendants Greene, LeClaire, McLaughlin, Goord, and Daniel were not involved in the use of force or with Plaintiff's medical care. Defendant Pauloano never treated Plaintiff.

Plaintiff filed a grievance claiming he did not promptly receive his x-ray. There is no record of any other grievance or appeal by Plaintiff concerning the facts and circumstances of this lawsuit.

## II. STANDARD OF REVIEW

Summary judgment, pursuant to Fed.R.Civ.P. 56(c), is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ( "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."). Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added]. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a Court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698382 (N.D.N.Y.)
(Cite as: 2009 WL 3698382 (N.D.N.Y.))

471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### III. DISCUSSION

### a. Exhaustion of Administrative Remedies

**\*3** The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). The PLRA exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures. *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

DOCS [New York's Department of Correctional Services] has available a well-established three-step grievance program: first an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at \*4 (N.D.N.Y. July 11, 2007) (citing *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6, 2002 WL 31235713 (S.D.N.Y. Oct 3, 2002)) (citing N.Y. Comp.Codes R. & Ergs. Tit. 7, § 701.7).

"Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies." *Muniz,* 2007 WL 2027912 at \*4; *see Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant, as here, contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the Court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the Court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*4** In this case, there is no evidence that Plaintiff filed a grievance alleging the excessive use of force or deliberate indifference to medical needs. *See* Docket No. 75 # 33 ("There is no record in the facility's computer log that [Plaintiff] filed a grievance charging excessive use of force by officers in all of 2006 ."). Plaintiff did file a grievance dated February 22nd and filed March 8th concerning the x-rays taken on his hand. This grievance complains that Plaintiff was not taken for his x-rays as scheduled on February 21st. This grievance was upheld on the ground that Plaintiff did receive x-rays on February

Slip Copy, 2009 WL 3698382 (N.D.N.Y.)
(Cite as: 2009 WL 3698382 (N.D.N.Y.))

23rd (two days later than originally scheduled) and shared with him on March 14th.

It is clear, based on the fact that Plaintiff did file a grievance regarding the x-ray follow up, as well as many other non-related grievances, that the grievance process was ready and available to the Plaintiff. *See* Docket No. 75 # 34. The Defendants have not forfeited this defense as they raise it in their memorandum of law in support of the motion for summary judgment. Furthermore, Plaintiff has made no allegations that Defendants prevented him from filing a grievance or alleged any special circumstances which would justify his failure to exhaust his administrative remedies. Therefore, pursuant to PLRA, Plaintiff's complaint must be dismissed for failure to exhaust administrative remedies for either claim.

**b. A Broken Metacarpal Does Not Constitute a Serious Medical Condition**

Assuming Plaintiff properly exhausted his administrative remedies, Plaintiff's allegations do not support a violation of the Eighth Amendment for deliberate indifference to a serious medical condition. There are two elements to a claim of deliberate indifference to a serious medical condition, first the plaintiff "must show that she [or he] had a 'serious medical condition.'" *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). Secondly, "the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

A serious medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Factors that have been considered in determining whether a condition is serious include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702 (citing *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir.1992)); accord *Gutierrez v. Peters,* 111

F.3d 1364, 1373 (7th Cir.1997) (citing McGuckin and collecting cases from other circuits employing a similar standard). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance,* 143 F.3d at 702 (2d Cir.1998).

**\*5** The most serious injury that Plaintiff alleges is the fracture to his third metacarpal. Plaintiff's deliberate indifference claim fails because a fractured metacarpal does not rise to the level of a serious medical condition. See *Sonds v. St. Barnabas Hospital Correctional Health Services,* 151 F.Supp. 303, 311 (S.D.N.Y.2001) ("Case law holds that the objective prong of the deliberate indifference test is not satisfied even where a finger is broken"); *Ruiz v. Homerighouse,* 01-CV-0266E, 2003 WL 21382896, at *3 (W.D.N.Y. Feb.13, 2003) (claim dismissed as a matter of law because fractured metacarpal is not sufficiently serious medical condition to support a deliberate indifference claim); *Magee v. Childs,* CIV904CV1089-GLSRFT, 2006 WL 681223, at *4 (N.D.N.Y. Feb.27, 2006) ("many courts have held that a broken finger does not constitute a serious injury"). Plaintiff has alleged insufficient facts from which it reasonably may be concluded that the injury to his finger was sufficiently serious.[FN1] Therefore, Plaintiff's claim of deliberate indifference to a serious medical need fails as a matter of law because Plaintiff fails to allege a serious medical condition.

FN1. Evidence shows that the fracture to Plaintiff's finger healed on its own with no resulting loss of motion or grip strength.

Furthermore, returning to Plaintiff's grievance, Defendants' delay in performing an x-ray on Plaintiff's hand does not rise to the level of deliberate indifference to a serious medical condition because x-rays were completed within two days of Plaintiff's grievance and the delay did not cause any further harm or injury.

**IV. CONCLUSION**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698382 (N.D.N.Y.)
(Cite as: 2009 WL 3698382 (N.D.N.Y.))

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED IN ITS ENTIRETY.

IT IS SO ORDERED.

N.D.N.Y.,2009.
Osacio v. Greene
Slip Copy, 2009 WL 3698382 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

⚑  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jonathan ODOM, Plaintiff,
v.
John P. KEANE; Sgt. M. Cooper; Sgt. Leghorn; Sgt.
McClain; R.J. Colon; Officer K. Byrd, et al.,
Defendants.
**No. 95 Civ. 9941(SS).**

Sept. 17, 1997.

Jonathan Odom, pro se, Great Meadow Correctional
Facility, Comstock, N.Y., for plaintiff.

Dennis C. Vacco, Attorney General of the State of New
York, New York City, Michael B. Siller, Ass't. Attorney
General, for defendants.

**OPINION AND ORDER**

SOTOMAYOR, J.

**\*1** Plaintiff, Jonathan Odom, currently incarcerated at
Comstock Correctional Facility, brings this action pro se
under 42 U.S.C. § 1983, asserting that defendants violated
his rights under the First, Eighth, and Fourteenth
Amendments of the United States Constitution. Complaint
at ¶ 5. The gravamen of the Complaint concerns plaintiff's
allegations that on July 10, 1995, while incarcerated at
Sing Sing Correctional Facility, he was housed in an
unsanitary cell without a working toilet. Plaintiff also
contends that chronic plumbing problems in the cell
resulted in the toilet not flushing between the hours of
9:00 p.m. and 7:00 a.m. over a period of two months.
Plaintiff seeks monetary damages and injunctive relief.
Defendants move for summary judgment pursuant to

Fed.R.Civ.P. 56(b). Plaintiff has opposed defendants'
motion and cross-moved for summary judgment. For the
reasons set forth below, defendants' motion for summary
judgment is **granted;** plaintiff's cross motion for summary
judgment is **denied,** and the case is **dismissed** in its
entirety.

**BACKGROUND**

On July 10, 1995, plaintiff was placed in cell number
K-197 (now called K-21S). The toilet in the cell was not
working. A block plumber repaired the toilet several hours
after plaintiff reported the problem. Plaintiff also alleges
that the cell was filthy and that he was forced to clean it
himself with soap and his personal belongings. Finally,
plaintiff contends that even after the toilet was fixed, toilet
did not function between the hours of 9:00 p.m. and 7:00
a.m. from July 10, 1995 through September 1995. Plaintiff
charges that these cell conditions "resulted in the plaintiff
suffering actual damages including, but not limited to,
vomiting and being deprived of sleep due to the nauseous
smell coming from his cell toilet all night long, causing
him to be having migraine headaches, injury to plaintiff,
is pain and suffering and mental anguish." Complaint at ¶
20.

Plaintiff also contends that he made numerous unheeded
complaints about the malfunctioning toilet to the
defendants and other prison authorities. First, plaintiff
asserts that he informed Correction Officer Byrd, assigned
to K-Gallery, about the problem. Plaintiff contends that
defendant Byrd refused to cooperate because plaintiff
would not acquiesce to defendant Byrd's numerous
attempts to extort cigarettes from plaintiff. Plaintiff also
alleges that he submitted inmate grievances on different
occasions that detailed his problems with the cell's
plumbing and defendant Byrd, but that prison authorities
ignored his grievances.

Plaintiff submits as exhibits to his complaint a copy of an
inmate grievance complaint dated July 14, 1995, a copy of
a follow-up memorandum dated August 4, 1995, regarding

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

the status of his grievance; a memorandum dated September 14, 1995 to John Keane, Superintendent and Sergeant M. Cooper regarding the malfunctioning cell plumbing; an inmate grievance complaint dated September 15, 1995, and a memorandum dated September 21, 1995, to Governor Pataki, Philip Coombe, Brian Malone and John Keane detailing allegations of "unprofessional" behavior by defendant Byrd and complaining about the malfunctioning plumbing.

**\*2** Defendants strongly dispute that they had notice of plaintiff's plumbing problems. Defendants agree that plaintiff's toilet was not operating on July 10, 1995, the day that plaintiff moved into the cell. In addition, they do not dispute that the cell was dirty. However, defendants contend, and plaintiff concedes, that Correction Officer Byrd dispatched a plumber to plaintiff's cell and that the toilet was repaired within several hours. Byrd Affidavit at ¶ 7. At plaintiff's request, the Court has personally reviewed the Complaint Log in K Block used between July 10 and September 30, 1995 and found one plumbing related entry for inmate K 197, presumably by plaintiff. The July 30, 1995, entry reads: "12:05 pm called about K197 O.I.C. McCarthy aware of plummbing (sic) difficulties."

Defendants also contend, despite plaintiffs assertions and documentary proof to the contrary, that plaintiff never submitted a grievance to prison officials concerning the continued malfunctioning of the toilet. In support of their position, they argue that extensive discovery has yielded no record of complaints. Assistant Attorney General Pamela M. McLaughlin avers that she conducted two searches for "documents from the Sing Sing Correctional Facility pertaining to any instance regarding plaintiffs claims of faulty plumbing or an unsanitary cell from July to September of 1995," that "turned up nothing." McLaughlin Aff. at ¶ 8. Ms. McLaughlin has also provided the Court a computer print out enumerating the grievances filed by plaintiff during this relevant period. *See* Notice of Motion, Exhibit C. The print out indicates that from 1993 through 1996 plaintiff submitted over 57 grievances, none of which concerned plumbing problems in plaintiff's cell. In his Affidavit, Correction Officer Byrd claims that, other than the initial complaint, "he received no further complaints from plaintiff regarding his toilet or other plumbing facilities."

On October 12, 1995, Deputy Commissioner Wayne Strack responded to plaintiff's September 21, 1995 memorandum stating:

Superintendent Keane has conducted an investigation into your allegation of unprofessional behavior at Sing Sing and has advised me that no evidence was found to substantiate your claim. It was reported that you are constantly begging staff for cigarettes. The plumbing problem in your cell was repaired as soon as the block plumber became available. In the future, address your complaints at the facility level by contacting your area supervisor.

Defendants also dispute plaintiffs allegations of retaliation or extortion. Defendants point out that in a July 2, 1995 deposition, plaintiff characterized the acts of defendant Byrd as "not really retaliatory." Tr. at 9. Defendants also assert that plaintiff filed suit against defendant Byrd because of personal animosity toward this defendant unrelated to this action. As evidence, defendants note that plaintiff conceded that defendant Byrd "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." Tr. at 9.

## THE STANDARD OF REVIEW: DISMISSAL UNDER FED.R.CIV.P. 56(b)

**\*3** Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). It is the moving party who bears the

initial responsibility ... of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

*Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

When deciding a motion for summary judgment, this Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). Where, as here, a party is proceeding pro se, this Court also has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker,* 44 F.3d 169 (2d Cir.1995). However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995). Rather, to overcome a motion for summary judgment, the non-moving party must provide this Court with some basis to believe that his or her "version of relevant events is not fanciful." *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). Thus, in determining whether to grant summary judgment, this Court must determine (i) whether a factual dispute exists based on the evidence in the record, and (ii) whether, based on the substantive law at issue, the disputed facts are material.

### DISCUSSION

Defendants raise three grounds for dismissal: first, they argue that plaintiffs allegations are insufficient to prove a constitutional violation; second, defendants contend that plaintiff's claims of retaliation are wholly conclusory; and third, defendants assert that the complaint should be dismissed as to all defendants because of their lack of personal involvement. I discuss only defendants' first and second grounds for dismissal as my resolution of these grounds in defendants' favor obviates the need to reach defendants' personal involvement argument.

### THE EIGHTH AMENDMENT AND CRUEL AND UNUSUAL PUNISHMENT

*4 Plaintiffs claim is governed by the Eighth Amendment which prohibits cruel and unusual punishment. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To prevail on an Eighth Amendment claim, prisoners must satisfy a two prong test.

The objective prong of *Wilson* asks whether the seriousness of the prison condition rises to an unconstitutional level. In analyzing the objective component, the Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently to form the basis of an Eighth Amendment violation." *Id.;* (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).) Although the Constitution " 'does not mandate comfortable prisons,' " *Wilson,* 501 U.S. at 297, "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Howard v. Adkison,* 887 F.2d 134, 137 (8th Cir.1989). The subjective prong of the *Wilson* test requires that defendants act with a state of mind evincing "deliberate indifference" to an inmate's health and safety. *Wilson,* 502 U.S. at 301. Pursuant to this standard, prison officials must know of, and disregard, an excessive risk to inmate health and safety. *Id.* at 1979. While the Eighth Amendment requires state prison officials to maintain "humane conditions of confinement," including adequate food, clothing, shelter and medical care, *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), conditions of confinement implicate the Eighth Amendment only when they exceed "contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir.1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

Here, plaintiff presents the Court with three distinct Eighth Amendment claims concerning his prison conditions. The first and second claims arose on July 10, 1995, when plaintiff was placed in a cell that (1) was unsanitary, and (2) did not have a working toilet. The third claim relates to the alleged malfunctioning of the toilet during the two month period. The first two claims are insufficient to establish an Eighth Amendment violation because of the very short time these conditions existed and were endured by plaintiff. Indeed, both of these conditions were rectified by the end of the day. It is undisputed that defendants quickly repaired the toilet when plaintiff first complained that it was broken. Defendants' same day response belies plaintiff's assertion that his complaints fell on deaf ears. Plaintiff acknowledges that he cleaned his cell himself on July 10, 1995, using soap and personal clothing. Complaint at ¶ 9. While an unsanitary cell may be deplorable, plaintiff has failed to allege a violation of constitutional magnitude. Similarly, the several hours plaintiff was without a working toilet does not rise to the level of cruel and unusual punishment. *Hutto,* 437 U.S. at 678 (conditions, such as a filthy cell, may "be tolerable for a few days and intolerably cruel for weeks or months."), *see also Miller v. Glanz,* 948 F.2d 1562, 1569-70 (10th Cir.1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in an "awkward position" for two hours); *Harris v. Fleming,* 839 F.2d 1232, 1235-36 (7th Cir.1988) (plaintiff "experienced considerable unpleasantness" for five days due to "filthy, roach-infested cell").

**\*5** Plaintiff's claim that his toilet did not flush between the hours of 9:00 p.m. and 7:00 a.m. for a period of several months also fails to state a constitutional violation. "[R]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment...." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (5th Cir.1994). Although it is difficult to fathom how one toilet flushing mechanism, and not all of the flushing mechanisms on one water line, could malfunction on a regular basis only between the hours of 9:00 p.m. and 7:00 a.m., this condition does not amount to cruel and unusual punishment. While I have no doubt that such a situation would be patently offensive to plaintiff, the fact

that plaintiff was made uncomfortable by the stench, these conditions in and of themselves do not sustain a constitutional claim. *See Rhodes,* 452 U.S. at 347 (inconvenience is considered a part of the penalty criminal offenders pay for their offenses against society). Plaintiff's toilet functioned approximately twelve hours every day, time enough to dispose of plaintiff's bodily wastes. Plaintiff makes no assertion that he risked contamination by contact with human waste.

Plaintiff has failed to prove the objective component of his claim, as required by *Wilson.* It is unnecessary to reach the subjective component of *Wilson* because, without a constitutional violation, defendants clearly could not have acted with "deliberate indifference."

## RETALIATION AND CONSPIRACY

In a claim unrelated to plaintiff's malfunctioning toilet, plaintiff alleges that defendant Byrd retaliated against him by denying him food and water because plaintiff failed to "support [Byrd's] cigarette." Complaint at ¶ 13. Plaintiff reiterated this allegation in his opposition to defendants' motion for summary judgment. *See* Plaintiff's Memorandum in Opposition at ¶ 10. [FN1]

> FN1. In his memorandum in opposition to the defendants' motion for summary judgment, plaintiff contended, for the first time:
>
> that these defendants as prison officials had conspired to concoct false allegations, deprived him of fair hearings, and subjected him to disciplinary action (April 13, 1994 to January 1, 1996) as reprisal in retaliation for his prior lawsuits against officers, agents, servants, and employees employed at Sing Sing Correctional Facility.
>
> Plaintiff's Memorandum in Opposition at ¶ 18. Plaintiff repeats this new allegation of retaliation in a letter dated August 20, 1997, which he has sent to the Court requesting that

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

the Court listen to a tape of a superintendents' hearing held on July 8, 1997. The Complaint before this Court is limited to claims about the malfunctioning toilet and defendant Bryd. Plaintiff's new allegations relate to a "Corrections Officer named Michael Stormer", who is not a defendant in this action, and retaliation because plaintiff was "complaining of being denied to be issued supplies and cell clean up while in S.H.U." Plaintiff's Letter of August 20, 1997. Thus, Plaintiff's letter and the new allegations in his memorandum of law relate to matters outside the scope of the Complaint before the Court. This Court, therefore, does not address these allegations.

The Second Circuit has recognized that prison officials may not retaliate against prisoners for exercising their constitutional rights. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995), (citing Franco v. Kelly, 854 F.2d 584, 589 (2d Cir.1988)). Nevertheless, "because we recognize ... the ease with which claims of retaliation may be fabricated, we examine prisoners claims of retaliation with care." Colon, 58 F.3d at 871, (citing Flaherty v. Couglin, 713 F.2d 10, 13 (2d Cir.1983)). A plaintiff alleging retaliation "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996), (citing In Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Where retaliation claims may have merit, the prisoner making the claim must be accorded the full procedural and substantive safeguards available to other litigants. Colon, 58 F.3d at 872. "[A] retaliation claim supported by specific and detailed factual allegations which amounts to a persuasive case ought to be pursued with full discovery. However, a complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleadings alone." Flaherty, 713 F.2d at 13; accord Colon, 58 F.3d at 872.

*6 Here, plaintiff has failed to present any facts that defendant Byrd acted to deny plaintiff food or water or otherwise retaliate against him. Plaintiff admitted at his deposition that the acts of defendant Byrd were "not really retaliatory" and that defendant Byrd had "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." In addition, defendant Byrd has submitted an affidavit in which he avers, "I would like the Court to know that I have no disciplinary files related to filing a false misbehavior report or false and misleading statement in a grievance or hearing." Despite plaintiffs assertions of "false charges" and "disciplinary action," plaintiff does not provide the Court with any indication that he was actually subject to such discipline by defendant Byrd. Any retaliation claim regarding plaintiffs plumbing problems must be dismissed because, as previously discussed, plaintiff has failed to allege the violation of an underlying constitutional right. See Colon, 58 F.3d at 872.

Claims of retaliation must be examined with skepticism and care. Flaherty, 713 F.2d at 13. Broad and unsubstantiated allegations of retaliation will not defeat a motion for summary judgment. Id. Plaintiff has not set forth any facts that evidence an agreement or understanding between defendant Byrd and any other defendant to retaliate against him. Plaintiff's argument that he has been effectively prevented from producing such evidence by the defendants' refusal to comply with discovery is unavailing. By Order dated March 19, 1997, I found that "the McLaughlin Affidavit responds fully to the Court's discovery order of January 23, 1997" and noted that "[d]efendants cannot produce documents they claim do not exist." Plaintiffs retaliation and conspiracy claims are dismissed in their entirety.

**CONCLUSION**

For the reasons set forth above, plaintiff's cross motion for summary judgment is **DENIED** and defendants' motion for summary judgment is **GRANTED** in its entirety. The Clerk is directed to enter judgment for defendants dismissing the Complaint in its entirety.

**SO ORDERED.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))


Dated: New York, New York September 15, 1997


S.D.N.Y.,1997.
Odom v. Keane
Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jonathan ODOM, Plaintiff,
v.
John P. KEANE; Sgt. M. Cooper; Sgt. Leghorn; Sgt. McClain; R.J. Colon; Officer K. Byrd, et al., Defendants.
**No. 95 Civ. 9941(SS).**

Sept. 17, 1997.

Jonathan Odom, pro se, Great Meadow Correctional Facility, Comstock, N.Y., for plaintiff.

Dennis C. Vacco, Attorney General of the State of New York, New York City, Michael B. Siller, Ass't. Attorney General, for defendants.

**OPINION AND ORDER**

SOTOMAYOR, J.

**\*1** Plaintiff, Jonathan Odom, currently incarcerated at Comstock Correctional Facility, brings this action pro se under 42 U.S.C. § 1983, asserting that defendants violated his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution. Complaint at ¶ 5. The gravamen of the Complaint concerns plaintiff's allegations that on July 10, 1995, while incarcerated at Sing Sing Correctional Facility, he was housed in an unsanitary cell without a working toilet. Plaintiff also contends that chronic plumbing problems in the cell resulted in the toilet not flushing between the hours of 9:00 p.m. and 7:00 a.m. over a period of two months. Plaintiff seeks monetary damages and injunctive relief. Defendants move for summary judgment pursuant to

Fed.R.Civ.P. 56(b). Plaintiff has opposed defendants' motion and cross-moved for summary judgment. For the reasons set forth below, defendants' motion for summary judgment is **granted;** plaintiff's cross motion for summary judgment is **denied,** and the case is **dismissed** in its entirety.

**BACKGROUND**

On July 10, 1995, plaintiff was placed in cell number K-197 (now called K-21S). The toilet in the cell was not working. A block plumber repaired the toilet several hours after plaintiff reported the problem. Plaintiff also alleges that the cell was filthy and that he was forced to clean it himself with soap and his personal belongings. Finally, plaintiff contends that even after the toilet was fixed, toilet did not function between the hours of 9:00 p.m. and 7:00 a.m. from July 10, 1995 through September 1995. Plaintiff charges that these cell conditions "resulted in the plaintiff suffering actual damages including, but not limited to, vomiting and being deprived of sleep due to the nauseous smell coming from his cell toilet all night long, causing him to be having migraine headaches, injury to plaintiff, is pain and suffering and mental anguish." Complaint at ¶ 20.

Plaintiff also contends that he made numerous unheeded complaints about the malfunctioning toilet to the defendants and other prison authorities. First, plaintiff asserts that he informed Correction Officer Byrd, assigned to K-Gallery, about the problem. Plaintiff contends that defendant Byrd refused to cooperate because plaintiff would not acquiesce to defendant Byrd's numerous attempts to extort cigarettes from plaintiff. Plaintiff also alleges that he submitted inmate grievances on different occasions that detailed his problems with the cell's plumbing and defendant Byrd, but that prison authorities ignored his grievances.

Plaintiff submits as exhibits to his complaint a copy of an inmate grievance complaint dated July 14, 1995, a copy of a follow-up memorandum dated August 4, 1995, regarding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

the status of his grievance; a memorandum dated September 14, 1995 to John Keane, Superintendent and Sergeant M. Cooper regarding the malfunctioning cell plumbing; an inmate grievance complaint dated September 15, 1995, and a memorandum dated September 21, 1995, to Governor Pataki, Philip Coombe, Brian Malone and John Keane detailing allegations of "unprofessional" behavior by defendant Byrd and complaining about the malfunctioning plumbing.

**\*2** Defendants strongly dispute that they had notice of plaintiff's plumbing problems. Defendants agree that plaintiff's toilet was not operating on July 10, 1995, the day that plaintiff moved into the cell. In addition, they do not dispute that the cell was dirty. However, defendants contend, and plaintiff concedes, that Correction Officer Byrd dispatched a plumber to plaintiff's cell and that the toilet was repaired within several hours. Byrd Affidavit at ¶ 7. At plaintiff's request, the Court has personally reviewed the Complaint Log in K Block used between July 10 and September 30, 1995 and found one plumbing related entry for inmate K 197, presumably by plaintiff. The July 30, 1995, entry reads: "12:05 pm called about K197 O.I.C. McCarthy aware of plummbing (sic) difficulties."

Defendants also contend, despite plaintiffs assertions and documentary proof to the contrary, that plaintiff never submitted a grievance to prison officials concerning the continued malfunctioning of the toilet. In support of their position, they argue that extensive discovery has yielded no record of complaints. Assistant Attorney General Pamela M. McLaughlin avers that she conducted two searches for "documents from the Sing Sing Correctional Facility pertaining to any instance regarding plaintiffs claims of faulty plumbing or an unsanitary cell from July to September of 1995," that "turned up nothing." McLaughlin Aff. at ¶ 8. Ms. McLaughlin has also provided the Court a computer print out enumerating the grievances filed by plaintiff during this relevant period. *See* Notice of Motion, Exhibit C. The print out indicates that from 1993 through 1996 plaintiff submitted over 57 grievances, none of which concerned plumbing problems in plaintiff's cell. In his Affidavit, Correction Officer Byrd claims that, other than the initial complaint, "he received no further complaints from plaintiff regarding his toilet or other plumbing facilities."

On October 12, 1995, Deputy Commissioner Wayne Strack responded to plaintiff's September 21, 1995 memorandum stating:

Superintendent Keane has conducted an investigation into your allegation of unprofessional behavior at Sing Sing and has advised me that no evidence was found to substantiate your claim. It was reported that you are constantly begging staff for cigarettes. The plumbing problem in your cell was repaired as soon as the block plumber became available. In the future, address your complaints at the facility level by contacting your area supervisor.

Defendants also dispute plaintiffs allegations of retaliation or extortion. Defendants point out that in a July 2, 1995 deposition, plaintiff characterized the acts of defendant Byrd as "not really retaliatory." Tr. at 9. Defendants also assert that plaintiff filed suit against defendant Byrd because of personal animosity toward this defendant unrelated to this action. As evidence, defendants note that plaintiff conceded that defendant Byrd "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." Tr. at 9.

## THE STANDARD OF REVIEW: DISMISSAL UNDER FED.R.CIV.P. 56(b)

**\*3** Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). It is the moving party who bears the

initial responsibility ... of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

*Federal Deposit Ins. Corp. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994).

When deciding a motion for summary judgment, this Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). Where, as here, a party is proceeding pro se, this Court also has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *accord, Soto v. Walker,* 44 F.3d 169 (2d Cir.1995). However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1995). Rather, to overcome a motion for summary judgment, the non-moving party must provide this Court with some basis to believe that his or her "version of relevant events is not fanciful." *Christian Dior-New York, Inc. v. Koret, Inc.,* 792 F.2d 34, 38 (2d Cir.1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). Thus, in determining whether to grant summary judgment, this Court must determine (i) whether a factual dispute exists based on the evidence in the record, and (ii) whether, based on the substantive law at issue, the disputed facts are material.

## DISCUSSION

Defendants raise three grounds for dismissal: first, they argue that plaintiffs allegations are insufficient to prove a constitutional violation; second, defendants contend that plaintiff's claims of retaliation are wholly conclusory; and third, defendants assert that the complaint should be dismissed as to all defendants because of their lack of personal involvement. I discuss only defendants' first and second grounds for dismissal as my resolution of these grounds in defendants' favor obviates the need to reach defendants' personal involvement argument.

## THE EIGHTH AMENDMENT AND CRUEL AND UNUSUAL PUNISHMENT

*4 Plaintiffs claim is governed by the Eighth Amendment which prohibits cruel and unusual punishment. *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To prevail on an Eighth Amendment claim, prisoners must satisfy a two prong test.

The objective prong of *Wilson* asks whether the seriousness of the prison condition rises to an unconstitutional level. In analyzing the objective component, the Supreme Court has stated that "only those deprivations denying 'the minimal civilized measures of life's necessities' are sufficiently to form the basis of an Eighth Amendment violation." *Id.;* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).) Although the Constitution " 'does not mandate comfortable prisons,' " *Wilson,* 501 U.S. at 297, "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." *Howard v. Adkison,* 887 F.2d 134, 137 (8th Cir.1989). The subjective prong of the *Wilson* test requires that defendants act with a state of mind evincing "deliberate indifference" to an inmate's health or safety. *Wilson,* 502 U.S. at 301. Pursuant to this standard, prison officials must know of, and disregard, an excessive risk to inmate health and safety. *Id.* at 1979. While the Eighth Amendment requires state prison officials to maintain "humane conditions of confinement," including adequate food, clothing, shelter and medical care, *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), conditions of confinement implicate the Eighth Amendment only when they exceed "contemporary bounds of decency of a mature, civilized society." *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir.1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

Here, plaintiff presents the Court with three distinct Eighth Amendment claims concerning his prison conditions. The first and second claims arose on July 10, 1995, when plaintiff was placed in a cell that (1) was unsanitary, and (2) did not have a working toilet. The third claim relates to the alleged malfunctioning of the toilet during the two month period. The first two claims are insufficient to establish an Eighth Amendment violation because of the very short time these conditions existed and were endured by plaintiff. Indeed, both of these conditions were rectified by the end of the day. It is undisputed that defendants quickly repaired the toilet when plaintiff first complained that it was broken. Defendants' same day response belies plaintiff's assertion that his complaints fell on deaf ears. Plaintiff acknowledges that he cleaned his cell himself on July 10, 1995, using soap and personal clothing. Complaint at ¶ 9. While an unsanitary cell may be deplorable, plaintiff has failed to allege a violation of constitutional magnitude. Similarly, the several hours plaintiff was without a working toilet does not rise to the level of cruel and unusual punishment. *Hutto,* 437 U.S. at 678 (conditions, such as a filthy cell, may "be tolerable for a few days and intolerably cruel for weeks or months."), *see also Miller v. Glanz,* 948 F.2d 1562, 1569-70 (10th Cir.1991) (plaintiff experienced only "momentary discomfort" when he was handcuffed in an "awkward position" for two hours); *Harris v. Fleming,* 839 F.2d 1232, 1235-36 (7th Cir.1988) (plaintiff "experienced considerable unpleasantness" for five days due to "filthy, roach-infested cell").

**\*5** Plaintiff's claim that his toilet did not flush between the hours of 9:00 p.m. and 7:00 a.m. for a period of several months also fails to state a constitutional violation. "[R]easonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment...." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (5th Cir.1994). Although it is difficult to fathom how one toilet flushing mechanism, and not all of the flushing mechanisms on one water line, could malfunction on a regular basis only between the hours of 9:00 p.m. and 7:00 a.m., this condition does not amount to cruel and unusual punishment. While I have no doubt that such a situation would be patently offensive to plaintiff, the fact

that plaintiff was made uncomfortable by the stench, these conditions in and of themselves do not sustain a constitutional claim. *See Rhodes,* 452 U.S. at 347 (inconvenience is considered a part of the penalty criminal offenders pay for their offenses against society). Plaintiff's toilet functioned approximately twelve hours every day, time enough to dispose of plaintiff's bodily wastes. Plaintiff makes no assertion that he risked contamination by contact with human waste.

Plaintiff has failed to prove the objective component of his claim, as required by *Wilson.* It is unnecessary to reach the subjective component of *Wilson* because, without a constitutional violation, defendants clearly could not have acted with "deliberate indifference."

## RETALIATION AND CONSPIRACY

In a claim unrelated to plaintiff's malfunctioning toilet, plaintiff alleges that defendant Byrd retaliated against him by denying him food and water because plaintiff failed to "support [Byrd's] cigarette." Complaint at ¶ 13. Plaintiff reiterated this allegation in his opposition to defendants' motion for summary judgment. *See* Plaintiff's Memorandum in Opposition at ¶ 10. [FN1]

> FN1. In his memorandum in opposition to the defendants' motion for summary judgment, plaintiff contended, for the first time:
>
> that these defendants as prison officials had conspired to concoct false allegations, deprived him of fair hearings, and subjected him to disciplinary action (April 13, 1994 to January 1, 1996) as reprisal in retaliation for his prior lawsuits against officers, agents, servants, and employees employed at Sing Sing Correctional Facility.
>
> Plaintiff's Memorandum in Opposition at ¶ 18. Plaintiff repeats this new allegation of retaliation in a letter dated August 20, 1997, which he has sent to the Court requesting that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))

the Court listen to a tape of a superintendents' hearing held on July 8, 1997. The Complaint before this Court is limited to claims about the malfunctioning toilet and defendant Bryd. Plaintiff's new allegations relate to a "Corrections Officer named Michael Stormer", who is not a defendant in this action, and retaliation because plaintiff was "complaining of being denied to be issued supplies and cell clean up while in S.H.U." Plaintiff's Letter of August 20, 1997. Thus, Plaintiff's letter and the new allegations in his memorandum of law relate to matters outside the scope of the Complaint before the Court. This Court, therefore, does not address these allegations.

The Second Circuit has recognized that prison officials may not retaliate against prisoners for exercising their constitutional rights. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), (*citing Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). Nevertheless, "because we recognize ... the ease with which claims of retaliation may be fabricated, we examine prisoners claims of retaliation with care." *Colon,* 58 F.3d at 871, (*citing Flaherty v. Couglin,* 713 F.2d 10, 13 (2d Cir.1983)). A plaintiff alleging retaliation "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating fact in the prison officials' decision to discipline plaintiff." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996), (*citing In Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Where retaliation claims may have merit, the prisoner making the claim must be accorded the full procedural and substantive safeguards available to other litigants. *Colon,* 58 F.3d at 872. "[A] retaliation claim supported by specific and detailed factual allegations which amounts to a persuasive case ought to be pursued with full discovery. However, a complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13; *accord Colon,* 58 F.3d at 872.

**\*6** Here, plaintiff has failed to present any facts that defendant Byrd acted to deny plaintiff food or water or

otherwise retaliate against him. Plaintiff admitted at his deposition that the acts of defendant Byrd were "not really retaliatory" and that defendant Byrd had "said something out of his mouth he wasn't supposed to say, so I told him I am going to lace him." In addition, defendant Byrd has submitted an affidavit in which he avers, "I would like the Court to know that I have no disciplinary files related to filing a false misbehavior report or false and misleading statement in a grievance or hearing." Despite plaintiffs assertions of "false charges" and "disciplinary action," plaintiff does not provide the Court with any indication that he was actually subject to such discipline by defendant Byrd. Any retaliation claim regarding plaintiffs plumbing problems must be dismissed because, as previously discussed, plaintiff has failed to allege the violation of an underlying constitutional right. *See Colon,* 58 F.3d at 872.

Claims of retaliation must be examined with skepticism and care. *Flaherty,* 713 F.2d at 13. Broad and unsubstantiated allegations of retaliation will not defeat a motion for summary judgment. *Id.* Plaintiff has not set forth any facts that evidence an agreement or understanding between defendant Byrd and any other defendant to retaliate against him. Plaintiff's argument that he has been effectively prevented from producing such evidence by the defendants' refusal to comply with discovery is unavailing. By Order dated March 19, 1997, I found that "the McLaughlin Affidavit responds fully to the Court's discovery order of January 23, 1997" and noted that "[d]efendants cannot produce documents they claim do not exist." Plaintiffs retaliation and conspiracy claims are dismissed in their entirety.

## CONCLUSION

For the reasons set forth above, plaintiff's cross motion for summary judgment is **DENIED** and defendants' motion for summary judgment is **GRANTED** in its entirety. The Clerk is directed to enter judgment for defendants dismissing the Complaint in its entirety.

**SO ORDERED.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)
(Cite as: 1997 WL 576088 (S.D.N.Y.))


Dated: New York, New York September 15, 1997


S.D.N.Y.,1997.
Odom v. Keane
Not Reported in F.Supp., 1997 WL 576088 (S.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court,
D. New Hampshire.
Timothy W. HAZELTON, Sr.
v.
NEW HAMPSHIRE DEPARTMENT OF
CORRECTIONS, Commissioner, et al.
**Civil No. 08-cv-419-JL.**

Jan. 27, 2009.

West KeySummary
**Civil Rights 78 ⚷ 1457(5)**

78 Civil Rights
　78III Federal Remedies in General
　　78k1449 Injunction
　　78k1457 Preliminary Injunction
　　　78k1457(5) k. Criminal Law Enforcement;
Prisons. Most Cited Cases
In his § 1983 action, prisoner was entitled to preliminary injunctive relief and prison officials were enjoined from denying prisoner prompt access to the nearest inmate bathroom. Prisoner had an enlarged prostate and irritable bowel syndrome and demonstrated that he was likely to succeed on the merits of his Eighth Amendment claim when evidence showed that prison officials denied him adequate access to toilet facilities, which often either interrupted religious or educational activities he was engaged in, or visits with his family. Additionally, prisoner adduced evidence that showed he was denied any modicum of human dignity when he was made to soil himself on the way to the bathroom because he was denied quick access to a nearby bathroom, or was made to soil himself in front of other people, including visiting family members, when he was refused the use of a nearby

bathroom. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Timothy W. Hazelton, Sr., Berlin, NH, Pro Se.

Danielle Leah Pacik, Nh Attorney General's Office, Concord, NH, for Defendants.

*ORDER*

JOSEPH N. LAPLANTE, District Judge.

**\*1** As there is no objection, and after noting the Warden's response, I herewith approve the Report and Recommendation of Magistrate Judge Muirhead dated December 30, 2008.

SO ORDERED.

Timothy W. Hazelton, Sr.

v.

William Wrenn, Commissioner, New Hampshire Department of Corrections, et al. [FN1]

> FN1. In addition to Wrenn, Hazelton names New Hampshire Department of Corrections Deputy Commissioner Christopher Kench and Northern New Hampshire Correctional Facility employees Cpl. Shane Mailhot, Librarian Angela Poulin, Corrections Officer ("C.O.") Timothy Overhoff, C.O. Lemieux, C.O. Trevor Dube, Unit Manager Robert Thyng, C.O. Walter Westbury, Cpl. Edward MacFarland, and Warden Larry Blaisdell as defendants to this action.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

### *REPORT AND RECOMMENDATION*

JAMES R. MUIRHEAD, United States Magistrate Judge.

Timothy Hazelton brought this action, pursuant to 42 U.S.C. § 1983, complaining that his Eighth Amendment right to humane conditions of confinement have been violated by defendants (document no. 1).[FN2] Upon preliminary review of this matter, I construed the complaint as containing a request for preliminary injunctive relief. The matter was referred to me (document no. 5), and a hearing was held before me on Hazelton's request for a preliminary injunction on November 20 and 21, 2008.[FN3] For the reasons explained herein, I recommend the issuance of an injunction requiring the defendants to, except in the event of an institutional emergency or other exceptional circumstance: (1) insure that Hazelton have access to the nearest inmate bathroom no more than five minutes after he requests the use of a bathroom, whether for urination or defecation, (2) insure that Hazelton can immediately return to any activity or visit interrupted by his use of the bathroom, even if returning to that activity or visit means that Hazelton must travel from his unit to his activity or visit outside of a scheduled "movement" time, and (3) insure that Hazelton will not be harassed, mistreated, or subject to any negative consequences as a result of his bathroom needs or requests.

> FN2. I further construed the action as alleging a violation of Hazelton's rights under the Americans with Disabilities Act, 42 U.S.C. 12132, et seq. ("ADA").

> FN3. Hazelton has submitted a document to the Court entitled "Closing Argument" (document no. 12). It appears from that document that Hazelton believes that the hearing held was, in fact, a trial on his underlying action. It was not. I have directed that his underlying action proceed, but that action has not yet been tried. The only matter for consideration before this Court at this time is whether or not the defendants should be subject to an Order of this Court regarding Hazelton's access to the

bathroom during the pendency of this matter.

### *Background*

Timothy Hazelton is a forty-six year old inmate at the Northern New Hampshire Correctional Facility ("NCF"), where he has been housed by the New Hampshire Department of Corrections ("NHDOC") since February 23, 2006. Hazelton suffers from an enlarged prostate and from irritable bowel syndrome. As a consequence of his medical issues, Hazelton has to urinate and defecate more frequently than the average person, and when he feels the urge to either urinate or defecate, he is not able to "hold it," but must get to a bathroom right away in order to avoid soiling his clothing.

When Hazelton arrived at NCF, he fully apprised medical personnel there of his medical issues, including his bathroom-related needs. Judy Baker, a nurse practitioner on the NCF medical staff, subsequently issued him a permanent "medical pass," which advises NCF staff of his medical needs and entitles him to a waiver of certain prison policies and procedures, to the extent they interfere with his ability to use the bathroom as necessitated by his medical conditions. Specifically, the passes issued to Hazelton direct prison staff that he is to be allowed to use the bathroom when needed without terminating his activities or visitation when they are interrupted by his bathroom needs.

Evidence at the hearing came from a number of witnesses, including Hazelton, NCF Major Dennis Cox, Baker, NCF C.O.s Masse, Westbury, Dube, Overhoff, NCF Media Generalist Angela Poulin, NCF Cpl. Shane Mailhot, NCF Sgt. Edward McFarland, Jr., NCF Unit Manager Robert Thyng, and NCF inmates Andrew Parker, Richard Castine, Kerry Kidd, Christopher Cremeans, Alexander Gagnon, Jr., and Mark Holt.[FN4] A number of exhibits were also accepted in evidence at the time of the hearing. Based on the evidence presented, I find the relevant facts as follows.

> FN4. Both plaintiff and defendants have submitted post-hearing pleadings outlining their summations on the question of whether or not a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

preliminary injunction should issue in this matter (document nos. 12-15). Both plaintiff and defendants have presented additional factual information in these pleadings that they did not present at the hearing. I will not accept new evidence at this time that is not subject to cross-examination. Even if accepted, however, the factual information presented in the post-hearing pleadings would not alter my determination of this matter.

**\*2** Hazelton has two serious medical conditions, irritable bowel syndrome and an enlarged prostate, which are known to the NCF staff. Baker testified that, on average, Hazelton would likely be able to wait five minutes before his need to void or defecate would overcome his ability to control those functions. Baker testified that in some circumstances, this time period could be slightly more or less than five minutes. Baker also testified that this is not a condition Hazelton relishes and that he is working with the NCF medical department as well as a urologist to find a treatment or medication that might alleviate or ameliorate the symptoms at issue here.

*Evidence Concerning Visiting Room*

Hazelton testified that he receives approximately three visits a year, and that his family has to travel several hours to see him. He further testified that on one or more occasions, he was forced to choose between early termination of his visits and defecating in his clothing. While Hazelton appears to have chosen to terminate his visits early most of the time, he stated that on at least one occasion he defecated in his clothing during his visit, because he was not allowed to use the inmate bathroom and did not want to return to his unit and terminate his visit.

Witnesses Masse and Westbury testified that NCF security regulations allow inmates to use the inmate bathroom located near the visiting room, but only to urinate. If an inmate needs to defecate during a visit, he must either wait until the end of the visit, or terminate his visit and return to his housing unit to use the toilet there. Westbury specifically testified that he would not alter this procedure,

even if an inmate possessed a medical pass directing him to allow the visits to continue after the inmate is allowed to use the bathroom.

The justification offered by defendants' witnesses for the visiting room bathroom policy is that inmate visitation provides an opportunity for inmates to receive contraband from visitors, and that such contraband might be placed by an inmate into his own rectum if he were allowed to use the bathroom in the visiting area to defecate. The officers testified that for an inmate to use the bathroom to urinate, an additional officer has to be called to the visit room to accompany the inmate to the bathroom. The inmates enter the bathroom and, it appears, an officer stands outside. What prevents a urinating inmate from inserting contraband into his rectum while urinating is unclear, although the officers seemed to think that was unlikely to occur while an inmate was standing up to urinate. None of the officers testified as to whether any other measures, such as stationing an officer inside the bathroom while an inmate defecates, or having an officer conduct a search of an inmate prior to allowing him to defecate, would impose any sort of undue burden on the institution or would undermine institutional security efforts.

The officers testified that inmates undergo a strip search prior to returning to their housing unit after a visit. No cavity searches are routinely conducted, although there is a procedure available for conducting such a search. Specifically, a cavity search must be authorized, and a nurse or other medical professional must be contacted to conduct the search. While a cavity search clearly imposes a greater burden on the institution than a non-cavity strip search, it is unclear whether such a search would be unduly burdensome if conducted only on Hazelton on those occasions when he needs to defecate during a visit. Any burden the accommodation might place upon the institution is minimal compared to the benefit to Hazelton, who would, if accommodated, be able to fully enjoy his visitation time with his family.

**\*3** Testimony from the visitation room officers also included speculation that, were Hazelton allowed to use the inmate bathroom in the visitation room to defecate, he would be targeted by other inmates to be a "mule." Specifically, the officers expressed concern that inmates

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

would pressure Hazelton to smuggle contraband in his rectum for them from people in the visitation area. While I believe this concern is legitimate, it is also speculative. The officers presented no testimony that this has actually occurred, or that no other adequate means, such as cavity searches for inmates who have defecated in the inmate visiting room bathroom or strip searches conducted prior to bathroom use, exist. This concern was also undermined by the fact that one of the officers testified that on several occasions he had allowed inmates to defecate in the inmate visitation area bathroom.

While the officers testified that an early termination of a visit by an officer would generate a report, and that no such report existed for Hazelton, the testimony also revealed that if an inmate voluntarily terminated his visit in order to return to his housing unit to defecate, that no report would be generated. Accordingly, there is no written record available to either prove or disprove Hazelton's account of events in the visitation room.

I find, that there is no reason to disbelieve Hazelton's testimony regarding what has occurred during his visitation. Hazelton testified credibly and, I believe, quite openly about embarrassing and humiliating events. Additionally, Hazelton's testimony on this point was corroborated by Mark Holt, Hazelton's cellmate at NCF. Holt testified that on one occasion he actually saw Hazelton return to his cell with his clothing soiled as a result of not being able to reach a bathroom in time. Additionally, Holt testified that he was aware of other occasions when Hazelton had soiled his clothing, disposed of it on his own, and reported the clothing lost in the laundry.

Hazelton's testimony regarding his experiences in the visitation room was not adequately countered by the correctional officers, who could only state that they did not recall Hazelton being forced to choose between his family visit and using the bathroom, and that they were not aware of any instance in which Hazelton defecated in his clothing during a visit. The officers' testimony that Hazelton was not provided with any special consideration for his medical condition, considered in conjunction with Nurse Baker's testimony regarding the effects of those conditions, actually strengthen Hazelton's testimony that

he was forced to choose between risking defecating in his pants and cutting his visits short.

*Evidence Concerning Education Department at NCF*

The NCF Education Department ("ED") includes the institution's chapel, classrooms, and libraries. Hazelton works in the chapel five mornings a week, Monday through Friday, for approximately three and a half hours a day. Hazelton also regularly visits the chapel on all days of the week for religious services. Hazelton attends classes and piano lessons in the ED, and uses the law library as necessary. The ED is equipped with two inmate bathrooms which are kept locked at all times, except between 9:00 and 9:30 each morning when they are cleaned. Cpl. Mailhot is the officer in charge of the ED and its security. In that capacity, he is the person to whom a request to use the bathroom, and to unlock the bathroom first, must be made. Inmates do not have unimpeded access to bathrooms in the ED, but must request that the bathrooms be unlocked or, in the event that the bathrooms are already unlocked for cleaning, must alert NCF staff that they are going to use the bathroom.

**\*4** Hazelton alleges that the NCF staff members who work at NCF generally and in the ED specifically, and named as defendants to this action, have not allowed him to use the bathroom as necessary. Instead, defendants have significantly delayed granting, or altogether denied, his requests to use inmate bathrooms, or effectively terminated his activities in the ED if he has to return to his housing unit to use the bathroom during those events. Hazelton testified that he and other inmates often have to wait fifteen minutes to use a bathroom, and that it is not uncommon for an inmate to have to wait thirty to forty minutes or more for Mailhot to unlock an inmate bathroom in the ED. Hazelton also testified that he is rarely allowed to use the bathroom more than once a morning, and never more than twice. Hazelton stated that frequent inmate requests to use the bathroom "upset" Mailhot. Sometimes, Hazelton testified, Mailhot simply denies him the use of the bathroom in the ED, requiring him to return to his housing unit to use the bathroom prior to completing his activity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

Hazelton is then prevented from returning to the ED to complete his activity unless he happens to use the housing unit bathroom during a "movement" period, when inmates are permitted to move to different locations within the institution. Such movements occur for ten minutes once, or sometimes twice during an hour. Accordingly, returning to his housing unit to use the bathroom often results in Hazelton being unable to return to chapel services, being forced to terminate his class or lesson early, or being made to leave the library before his work there is done.

Mailhot testified at the hearing that it takes approximately three to four minutes to respond to an inmate's request to use an inmate bathroom, and that no inmate has ever had to wait longer than that to use a bathroom on his watch. Mailhot further testified that he has never limited the number of times a day an inmate can use the inmate bathrooms in the ED, and has never required an inmate to leave the ED and return to his housing unit to use the bathroom. Mailhot testified that he had only required Hazelton to leave work and go to his housing unit once, and that was due to Hazelton being ill that day.

In addition to Mailhot, Hazelton reports that on at least one occasion, he was prevented from timely use of the inmate bathrooms in the ED by Angela Poulin, NCF's librarian, who questioned him as to why he had to use the bathroom and, when he explained his medical pass, Poulin became irritated, summoned Mailhot, and advised him that Hazelton was giving her a hard time. Mailhot sent Hazelton back to his housing unit to use the bathroom, causing Hazelton to terminate his trip to the library, where he was waiting for legal copies to be made.

Mailhot testified that he had no memory of this incident. Poulin testified that she did have a conversation with Hazelton in the library about bathroom use. While Poulin did not remember specifics of the conversation, she said she follows a security-based policy that prohibits inmates from using the bathrooms in the ED unless they are in the library for more than two hours. Poulin stated that, because plaintiff claimed that he had medical issues and needed to use the bathroom for that reason, she referred him to Mailhot. Poulin testified she did not recall being upset by Hazelton's behavior during this incident, and that she did not write a disciplinary incident report regarding

this incident.

**\*5** Hazelton reported that other officers participate in making this an ongoing issue and problem for inmates, particularly those with medical needs that cause them to use the bathroom more frequently than average, or with more urgency than average. Hazelton names NCF officers Dube, Westbury, Overhoff, and Lemieux as participating in creating and maintaining impediments to adequate bathroom use for himself and other inmates.

Several inmates other than Hazelton testified to counter Mailhot's assertion that no one ever waited more than a few minutes to use the bathroom in the ED, or was denied the use of a bathroom at the ED and instead sent back to their unit. Inmate Kerry Kidd stated that he too has been refused bathroom use by Mailhot in the ED, and that he has had to wait up to forty minutes for Mailhot to unlock the bathroom while he was using the law library. Kidd further testified that even though he had complained to the NCF Warden in writing and at an inmate-warden meeting, the situation had not improved. Kidd stated that he had stopped going to the library or spending any length of time in the ED at all, when possible, in order to avoid the "headache" of obtaining access to a bathrooms there. Kidd also testified he had seen other inmates wait for more than a few minutes to use the bathroom in the ED. In the library in particular, Kidd stated, delays in gaining access to a bathroom are significant, as an inmate first must notify Poulin that he needs a bathroom, who then notifies Mailhot, who then "takes his time" in opening the bathroom. Kidd stated that instead of waiting for a bathroom to be opened, he has opted in the past to cut his library time short in order to return to his housing unit on a movement.

Inmate Alexander Gagnon testified that he has prostate cancer and, therefore, has to use the bathroom with some frequency. He also goes to the chapel frequently. Gagnon testified that on at least three occasions Mailhot refused to let him use the bathroom if he requested to go more than once during a visit to ED. Instead, Mailhot would send him to his unit, preventing him from returning to the chapel because it was not a movement period. In order to avoid missing religious services, Gagnon testified he has waited for Mailhot to unlock the door for up to an hour,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

and once waited for two and a half hours. Gagnon testified that although it causes him to miss time in the chapel, he often returns to his housing unit to use the bathroom because it is easier than waiting for Mailhot to open a bathroom.

Inmate Andrew Parker testified that he is diabetic and takes water pills, which causes him to have to use a bathroom frequently. Although Parker advised Mailhot of his medical condition, he has had to wait for up to forty-five minutes for Mailhot to unlock a bathroom for him, and that twice Mailhot denied him the use of an inmate bathroom in the ED and sent back to his housing unit to use the bathroom there instead. Parker reports he has had to leave his GED class to go to his housing unit to use the bathroom. Parker reports that Mailhot told him that if he had medical problems, he should just stay on his unit and not come to the ED. Parker stated that he would attend more chapel activities if it were not for the difficulties he has faced gaining access to the ED bathrooms. Parker also testified to having seen Hazelton being made to wait more than a few minutes for the bathroom, and being denied access to the ED bathrooms.

**\*6** After considering the testimony of all of the witnesses, as well as the evidence presented, I find that neither Mailhot nor Poulin presented credible testimony in this matter, particularly with regard to the issue of inmates' access to bathrooms in the ED. I find that the testimony proffered by Hazelton and the other inmate witnesses on this topic was consistent and worthy of belief.

Hazelton testified that on weekends, while in the chapel attending services, he often needs to use the bathroom. Hazelton has to ask an official to open an inmate bathroom near the chapel so that he does not have to return to his housing unit and miss the services. On February 24, 2008, Cpl. McFarland was summoned to the chapel area to unlock the bathroom for Hazelton. McFarland responded, but refused to open the bathroom, first because it was not a movement time, and then because it was too busy during movement. Hazelton had to return to his housing unit to use the bathroom, but, on that occasion, returned to the chapel for the remainder of his religious service because he was able to use the bathroom before the movement period ended. After this

incident, Hazelton asked a woman who witnessed it to write down McFarland's name for purposes of filing a grievance. McFarland would not let her write his name down for Hazelton. McFarland admitted at the hearing that he told her not to write his name down for Hazelton, as he did not believe that it was necessary.

Hazelton testified he takes piano lessons in the chapel from inmate Richard Castine once a week. Castine testified that Hazelton nearly always has to use the bathroom during his hourlong lesson, and that Mailhot has refused to unlock the bathroom for him during his lessons, or made him wait for up to fifteen minutes. Castine has also seen Hazelton forced to miss chapel services to return to his housing unit to use the bathroom.

Unit Manager Robert Thyng testified at the hearing. At first Thyng admitted he recalled that, while making rounds, he had had several discussions with Hazelton about his issues with bathroom use. Thyng then stated, however, that he had never discussed any issues relating to Hazelton's medical pass not being honored, did not recall any specific instances discussed, and that he had no conversations with Hazelton before receiving a grievance on February 24, 2008, that he had no discussion with Hazelton between February 2008 and April 2008, and that he has had no discussions with Hazelton regarding this issue since April 2008. I find that Thyng's initial admission that Hazelton discussed this issue with him many times, immediately followed by his insistence that they essentially never had discussions on the subject, renders Thyng's testimony incredible.

On May 16, 2008, Hazelton filed a final appeal of the denial of his grievances, by both Thyng and the NCF Warden, with NHDOC Commissioner William Wrenn. Hazelton reiterated his complaints and stated that he had been unable to resolve these issues with staff, despite repeated efforts to do so. Specifically, Hazelton complained that, despite his medical condition and his medical pass, NCF staff continued to send Hazelton to his housing unit to use the bathroom, rather than allowing him to use a closer inmate bathroom, and that this resulted in the termination of his activities and visitation. Christopher Kench, Wrenn's assistant, responded on behalf of Wrenn. Kench's response was: "This has been policy and practice

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

for some time now, and we believe that it will withstand discussion." The testimony at the hearing demonstrated that the NCF defendants followed this policy, which caused them to disregard Hazelton's medical situation and his medical pass. This has resulted in the denial of educational and religious activities, library usage, and visitation time that Hazelton would have enjoyed were he not afflicted with his particular medical conditions.

*Discussion*

I. *Standard of Review*

**\*7** Preliminary injunctive relief is available to protect the moving party from irreparable harm, so that he may obtain a meaningful resolution of the dispute after full adjudication of the underlying action. See *Jean v. Mass. State Police,* 492 F.3d 24, 26-27 (1st Cir.2007). Such a situation arises when some harm from the challenged conduct could not be adequately redressed with traditional legal or equitable remedies following a trial. See *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 18 (1st Cir.1996) (finding irreparable harm where legal remedies are inadequate); *see also Acierno v. New Castle County,* 40 F.3d 645, 653 (3d Cir.1994) (explaining irreparable harm and its effect on the contours of preliminary injunctive relief). Absent irreparable harm, there is no need for a preliminary injunction. The need to prevent irreparable harm, however, exists only to enable the court to render a meaningful disposition on the underlying dispute. See *CMM Cable Rep., Inc. v. Ocean Coast Props.,* 48 F.3d 618, 620-21 (1st Cir.1995) (explaining the purpose of enjoining certain conduct as being to "preserve the 'status quo' ... to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs"); *see also Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir.1978) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").

A preliminary injunction cannot issue unless the moving party satisfies four factors which establish the need for such relief. See *Esso Std. Oil Co. v. Monroig-Zavas,* 445

F.3d 13, 17-18 (1st Cir.2006) (discussing the requisite showing to obtain a preliminary injunction); *see also Ross-Simons,* 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction). Those factors are: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Esso Std. Oil,* 445 F.3d at 18. If the plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," insufficient to carry the weight of this extraordinary relief on their own. *See id.* (the "sine qua non of the four-part inquiry is likelihood of success on the merits"). Yet, "the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem." *Ross-Simons,* 102 F.3d at 19. Applying this standard, I will assess plaintiff's claims and request for injunctive relief.

2. *The Preliminary Injunction Factors*

A. *Likelihood of Success on the Merits*[FN5]

> **FN5.** In both their objection to the issuance of a preliminary injunction and their post-hearing memorandum, defendants argue that Hazelton is unlikely to succeed on the merits of his underlying claims, in part, because he has failed to demonstrate complete exhaustion of administrative remedies. A claim of failure to exhaust is an affirmative defense. See *Jones v. Bock,* 549 U.S. 199, 212, 127 S.Ct. 910, 166 L.Ed.2d 798 (2006). At this stage in the proceedings, where discovery has not yet been conducted and the record is undeveloped, I decline to require plaintiff to provide further proof of exhaustion than his submissions to date already demonstrate. Further, at the hearing, defendants agreed to reserve the issue of exhaustion until summary judgment.

**\*8** Hazelton's civil action raises claims alleging that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

was subject to inhumane conditions of confinement in violation of the Eighth Amendment. FN6 The crux of Hazelton's underlying claims is that the failure to provide Hazelton with prompt and frequent access to a nearby bathroom when he needs one violates rights guaranteed to him by the federal constitution and laws. While defendants have interpreted Hazelton's complaint as challenging three instances where a bathroom was denied, the complaint is more accurately read to allege an ongoing series of frequent violations of Hazelton's Eighth Amendment right to humane conditions of confinement, using three instances of such violations of examples. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *see Giroux v. Somerset County,* 178 F.3d 28, 31 (1st Cir.1999). Hazelton's claim that he was wrongfully denied access to necessary sanitary facilities implicates the Eighth Amendment's proscription against the imposition of cruel and unusual punishment.

> FN6. Hazelton's complaint also asserts a claim under the ADA. Because I find that Hazelton has sufficiently demonstrated likelihood of success on the merits of his Eighth Amendment claim, it is not necessary for me to determine whether he is likely to prevail on his ADA claim for purposes of making a decision on the preliminary injunctive relief sought.

The Supreme Court has adopted a two-part test for reviewing claims under the Eighth Amendment's cruel and unusual punishment clause. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Helling,* 509 U.S. at 25; *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). "First, the deprivation alleged must be, objectively, 'sufficiently serious,' a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.' " *Farmer,* 511 U.S. at 834 (internal citations to *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), *Hudson,* 503 U.S. at 5, and *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) omitted). "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Helling,* 509 U.S. at 31 (citing

*Rhodes,* 452 U.S. at 349). The Eighth Amendment imposes duties on prison officials to ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates. *See Farmer,* 511 U.S. at 832-33; *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Helling,* 509 U.S. at 31-32; *Washington v. Harper,* 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *Estelle,* 429 U.S. at 103. Conditions of confinement which do not lead to deprivations of essential food, medical care, or sanitation do not amount to an Eighth Amendment violation. *See Williams v. McWilliams,* 20 F.3d 465 (5th Cir.1994) (citing *Rhodes,* 452 U.S. at 348).

To satisfy the second prong of an Eighth Amendment claim, a prisoner must allege that prison officials "have a 'sufficiently culpable state of mind.' In prison-conditions cases, that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer,* 511 U.S. at 834 (internal citations omitted). Treating a disabled inmate without regard for "the basic concept of human dignity at the core of the Eighth Amendment," can suffice to create a constitutional violation. *Schmidt v. Odell,* 64 F.Supp.2d 1014, 1031 (D.Kan.1999) (internal citations omitted). This is particularly true where the challenged conditions of confinement " 'shock the conscience,' are 'barbarous,' or 'result in a deprivation of the minimal civilized measures of life's necessities.' " *Boland v. Coughlin,* 622 F.Supp. 736, 737 (E.D.N.Y.1985) (citing *Rhodes,* 452 U.S. at 347)

*9 Here, by demonstrating a pattern of denying him access to necessary sanitary facilities, Hazelton has shown a sufficiently serious deprivation to satisfy the first prong of the Eighth Amendment violation test. Hazelton has also established that defendants were aware of his medical situation, his need for quick access to a bathroom, and knew he had received a medical pass exempting him from the normal policies of the institution regarding bathroom use by inmates. Despite this knowledge, the evidence showed that defendants denied him adequate access to toilet facilities, which often either interrupted religious or educational activities he was engaged in, or visits with his family. Additionally, Hazelton adduced evidence that showed he was denied any modicum of human dignity when he was made to soil himself on the way to the bathroom because he was denied quick access to a nearby

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

bathroom, or was made to soil himself in front of other people, including visiting family members, when he was refused the use of a nearby bathroom. While not every defendant admitted to being specifically apprised of the pass, the testimony at the hearing made clear that Hazelton had advised people of his medical situation and his medical needs, including his need to use the bathroom. Mailhot and others specifically testified that they were made aware of the issue. Rather than deny knowledge of Hazelton's frequent need for bathroom facilities, defendants simply denied that Hazelton was ever delayed in going to the bathroom or ever refused the use of a nearby bathroom. This testimony, however, defies credibility. All of the inmates who testified stated that they had experienced and witnessed delays in gaining access to a bathroom in the ED for much longer than the three to four minute wait Mailhot claims to always provide. Witnesses testified that the wait was frequently fifteen minutes and sometimes was more than two hours. Nurse Baker testified that normally Hazelton would not be able to wait more than five minutes to use a bathroom. Accordingly, as his need for quick bathroom use was not honored, he would be forced to either soil himself or return to his housing unit.

The defendants all testified that Hazelton's choice to return to his housing unit would essentially terminate the activity he was involved in as, despite the instructions in his medical pass not to terminate activities for allowing bathroom use, defendants testified they would follow established security procedures. This evidence is sufficient to demonstrate at this preliminary stage in the proceeding that Hazelton was deprived of adequate sanitary facilities, and that this deprivation falls below the standard of a "minimal civilized measure of life's necessities." *See Rhodes,* 452 U.S. 347. Accordingly, Hazelton has demonstrated that he is likely to succeed on the merits of his Eighth Amendment claim.

B. *Irreparable Harm*

The evidence before the Court demonstrates that, if no injunction is granted, Hazelton will continue to be subject to the inhumane treatment evidenced by the testimony at the hearing. The evidence demonstrated that NCF officials have acted in accordance with what they perceive to be NCF policy, and that they intend to continue to do so without regard for the exceptions or allowances necessitated by Hazelton's genuine and serious medical conditions and required by his medical pass. While I find that Hazelton has not, at this time, demonstrated that he has suffered physical injury as a result of the defendants' actions, I do find that he has alleged that he is being subjected to repeated and frequent indignities that are beneath the level of civilized and non-barbaric conduct to which the defendants are constitutionally bound to adhere. Accordingly, I find that this conduct, and continued deprivation of basic human dignity suffered by Hazelton, is demonstrably likely to cause irreparable harm if allowed to continue.

C. *Balance of Hardships*

**\*10** The injunction Hazelton seeks is an order for defendants to act in a manner strikingly similar to what the defendants testified already occurs at NCF. Defendant Mailhot testified that (1) inmates are always granted access to the bathroom in the ED in three to four minutes, without regard to the number of times they have used the bathroom on a particular day, (2) inmates are never required to return to their housing units to avoid a delay in gaining access to an ED bathroom, (3) inmates are, on occasion, allowed to use the visitation area inmate bathroom to defecate, and (4) security measures exist that would assist in preventing the introduction of contraband in visitation area inmate bathrooms. While I do not find the defendants' testimony regarding past events to be credible regarding the conduct they actually engaged in, I do find credibility in defendants' apparent assertion that adherence to the practices they described would not cause significant hardship to prison operations. To the extent that increasing security procedures in the visitation area, on occasions when Hazelton uses the inmate bathroom to defecate, would increase the burden on NCF staff, I find that such a burden, given the infrequency of Hazelton's family visits and the existence of established procedures for assuring institutional security, does not outweigh the substantial burden that would be placed on Hazelton by allowing the current inhumane practices to continue.

D. *Public Interest*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 229664 (D.N.H.)
(Cite as: 2009 WL 229664 (D.N.H.))

The public interest is well-served by assuring adherence to the Eighth Amendment prohibition against cruel and unusual treatment that includes subjecting human beings to severe indignities during their incarceration. There is no public interest served by failing to provide sanitary facilities, as needed, to inmates in accordance with their documented medical needs, without disrupting the inmate's educational, legal or religious activities and practices. For that reason, I find the public interest weighs in favor of issuance of this injunction.

*Conclusion*

Because I find that Hazelton is likely to succeed on the merits of his underlying claims, that he will likely be irreparably harmed in the absence of an injunction, that the balance of hardships weighs in favor of the plaintiff, and that the public interest is best served in this matter by granting the requested relief, I recommend that the following injunction issue:

1. Each of the defendants, and those acting under their direction, are enjoined from denying Hazelton prompt access to the nearest inmate bathroom. Specifically, absent exceptional or emergency circumstances:

A. Hazelton must be allowed to use a bathroom within five minutes of a request to do so;

B. Hazelton must be allowed to use the inmate bathroom closest to him at the time of his request;

C. Hazelton must be allowed to return immediately to the activity in which he was participating (i.e. library use, chapel work, chapel services, visitation and other educational programming or lessons) upon completion of his use of the bathroom, whether or not it is a scheduled "movement" time in the institution.

**\*11** Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives

the right to appeal the district court's order. *See Unauthorized Practice of Law Comm. v. Gordon,* 979 F.2d 11, 13-14 (1st Cir.1992); *United States v. Valencia-Copete,* 792 F.2d 4, 6 (1st Cir.1986).

D.N.H.,2009.
Hazelton v. NH Dept. of Corrections
Slip Copy, 2009 WL 229664 (D.N.H.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)
(Cite as: 1999 WL 305515 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
James BARNA and Jason B. Nicholas, Plaintiffs,
v.
Brion D. TRAVIS, Chairperson, New York State Div.
of Parole et al., Defendants.
**No. CIV97CV1146(FJS/RWS).**

April 22, 1999.

James Barna, Wallkill Correctional Facility, Walkill,
Plaintiff Pro Se.

Jason B. Nicholas, Walkill Correctional Facility, Walkill,
Plaintiff Pro Se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Attorney for Defendants, Department of Law,
Albany, Steven H. Schwartz, Esq., Asst. Attorney General,
of Counsel.

ORDER AND REPORT-RECOMMENDATION

SMITH, Magistrate J.

**\*1** Plaintiffs bring this civil rights action pursuant to 42
U.S.C. § 1983. This case has been referred to the
undersigned for report and recommendation by the
Honorable Rosemary S. Pooler, then United States District
Judge,[FN1] pursuant to 28 U.S.C. Section 636(b) and
N.D.N.Y.L.R. 72.4. Pending before the court is a motion
by the defendants to dismiss plaintiffs' complaint.
Plaintiffs allege violations of both due process and the Ex
Post Facto Clause. Each plaintiff has filed a memorandum
of law in opposition to the motion. For the reasons which

follow, it is recommended that defendants' motion be
granted, dismissing plaintiffs' complaint in its entirety.

FN1. Judge Pooler now serves as a member of
the Second Circuit Court of Appeals. This action
has been reassigned to the Honorable Frederick
J. Scullin, United States District Judge.

*The Underlying Convictions and Sentences*

Plaintiff Barna was sentenced in 1977 following a
conviction for second degree murder and first degree
burglary, for which he received concurrent prison
sentences of fifteen years to life and zero to fifteen years,
respectively. The New York State Division of Parole
considered and denied him parole in 1991, 1993, 1995,
and 1997. Barna's next appearance before the Board is
scheduled for July 1999.

Plaintiff Nicholas was sentenced in 1991 following a
conviction of first degree manslaughter and a youthful
offender crime, for which he received consecutive prison
sentences of five to fifteen years and one and one-third to
four years, respectively. The New York State Division of
Parole considered and denied him parole in 1997.
Nicholas was scheduled to appear before the Board for the
second time in January 1999.

DISCUSSION

*Due Process Claim*

Plaintiffs first allege that defendants systematically deny
parole applicants due process safeguards in parole release
determinations. It is a fundamental principle of
constitutional law that the first inquiry in the analysis of an
alleged due process violation is whether there exists a
protected liberty interest. *Kentucky Dep't of Corrections
v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)
(Cite as: 1999 WL 305515 (N.D.N.Y.))

104 L.Ed.2d 506 (1989). As a predicate to their due process claim, then, plaintiffs must establish that they enjoy a protected liberty interest under New York's statutory scheme for determining whether to grant or deny an inmate's application for parole (i.e., a legitimate expectation of release).

In 1979, the Supreme Court announced that an inmate is entitled to due process safeguards in parole determinations only when the state's parole provisions create a legitimate expectation of release. *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 11-13, 99 S.Ct. 2100, 2106-07, 60 L.Ed.2d 668 (1979). The *Greenholtz* Court held that the presence of mandatory language in state parole schemes, directing that an inmate "shall" be released upon a finding that the relevant criteria have been met, creates a presumption that parole release will be granted and thus gives rise to an expectation of release. *Id.* at 12, 99 S.Ct. at 2106. In accordance with the principles set forth in *Greenholtz,* the Second Circuit thereafter held that New York's statutory scheme creates no such expectation because the state's parole provisions "do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist." *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979). On the contrary, under New York's scheme, the decision to release is a matter committed to the discretion of the Parole Board. [FN2] N.Y. Exec. Law § 259-i(2)(c) (McKinney Supp.1999). "Decisions that are purely discretionary or ultimately discretionary with the parole authorities do not create a protectible liberty interest ...." *Berard v. State of Vermont Parole Bd.,* 730 F.2d 71, 75 (2d. Cir.1984) (citations omitted). As a result, pursuant to *Boothe,* prisoners in New York state are not entitled to the safeguards afforded by federal due process with respect to parole release determinations.

FN2. New York's statute provides the following:

Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release

is not incompatible with the welfare of society and will not so deprecate the seriousness of the crime as to undermine respect for law.

N.Y. Exec. Law § 259-i(2)(c) (McKinney 1993 & Supp.1999).

**\*2** Until recently, discussion of plaintiffs' due process claim would have concluded with reference to *Greenholtz* and *Boothe.* In 1995, however, the Supreme Court reformulated the liberty interest analysis under which federal courts determine whether state law confers a liberty interest on inmates. *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Under *Sandin,* the presence or absence of mandatory language, while still relevant, is no longer dispositive in determining whether a particular statute gives rise to a protectible liberty interest. *Id.* Rather, the focus of the inquiry should be on the nature of the interest allegedly created by the state. *Id.* State created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to ordinary prison life." *Id.*

In light of *Sandin,* the validity of the conclusion that New York's parole provisions do not create a protectible liberty interest must be reexamined. Such a reexamination reveals, however, that although *Sandin* changes the analysis, it does not change the result. Even assuming, arguendo, that the "absence of procedural safeguards attending a decision denying an inmate's application for parole is one that 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life,' " the discretionary language of New York's parole provisions nonetheless militates against a finding of a protectible liberty interest. *Quartararo v. Catterson,* 917 F.Supp. 919, 963 (E.D.N.Y.1996) (*quoting Sandin,* 515 U.S. at 483, 115 S.Ct. at 2300). Although *Sandin* expressly rejects the approach of drawing negative implications from mandatory language, it does not render language considerations irrelevant to the liberty interest analysis. *See id.* at 964; *see also, Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir.1995). Given the broad discretion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)
(Cite as: 1999 WL 305515 (N.D.N.Y.))

afforded the Parole Board under New York's statutory scheme, *Sandin* does not alter the conclusion that inmates in this state have no legitimate expectation of release. Accordingly, plaintiffs are not entitled to federal due process protection with respect to parole release determinations.

Finally, even if New York's parole provisions conferred upon inmates a protectible liberty interest, plaintiffs fail to state a claim against the Parole Board under § 1983. The Second Circuit recently held that Parole Board officials are entitled to absolute immunity from liability for damages under § 1983 for their decisions to grant, deny, or revoke parole. *Montero v. Travis,* No. 98-2063, 1999 WL 163554, at *4 (2d Cir. Mar. 26, 1999).

*Ex Post Facto Claim*

Plaintiffs further allege that the Parole Board's enforcement of the "Pataki policy" to eliminate parole of violent offenders, particularly those convicted of homicide and sex-related offenses, violates their right to be free of ex post facto punishment under Article I, § 10 of the federal Constitution. Plaintiffs do not cite to any specific legislative enactment or measure as having violated the Ex Post Facto Clause. Rather, they allege only that they have been aggrieved by the enforcement of a "policy," one that is both unwritten and unofficial. In other words, the basis of plaintiffs' claim is the purported "get-tough" approach recently adopted by the New York State Parole Board. Assuming, without deciding, that such a "policy" does in fact exist, plaintiffs' claim lacks an arguable basis in law and thus fails.

**\*3** It has long been held that the Ex Post Facto Clause prohibits laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood,* 497 U .S. 37, 43, 110 S.Ct 2715, 2719-20, 111 L.Ed.2d 30 (1990) (*citing Calder v. Bull,* 3 Dall. 386, 391-392 (1798)). In large part, ex post facto jurisprudence centers on whether a particular enactment, measure, or regulation runs afoul of the Clause under that definition. *See e.g., California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Lee v. Governor of the State of New York,* 87 F.3d

55 (2d Cir.1996).

Although such an inquiry is determinative in many cases, the analysis of plaintiffs' claim begins, and ultimately ends, on a much more fundamental level. Simply stated, the "policy" upon which plaintiffs rely as the basis of their claim is not a law subject to ex post facto analysis. This is not to say, of course, that a policy can never constitute a law for purposes of the Ex Post Facto Clause. A number of circuit courts have addressed, or at least made reference to, the issue of whether an administrative policy or regulation can be an ex post facto law.[FN3] The focus of the inquiry in those courts has been whether the policy or regulation is binding on the Parole Board, or merely serves as a guideline for the exercise of discretionary decisionmaking. *See e.g., Shabazz v. Gabry,* 123 F.3d 909, 914-915 (6th Cir.1997), *cert denied,*118 S.Ct. 1061, 140 L.Ed.2d 122 (1998) (finding memoranda and directives not laws for ex post facto purposes); *Hamm v. Latessa,* 72 F.3d 947, 956 n. 14 (1st Cir.1995) (identifying the nature of the inquiry); *Bailey v. Gardebring,* 940 F.2d 1150, 1156-57 (8th Cir.1991) (finding parole regulations merely aid Parole Board in exercise of discretionary authority); *Devine v. New Mexico Dep't of Corrections,* 866 F.2d 339, 343 n. 7 (10th Cir.1989) (finding guidelines that merely channel discretion of Parole Board do not constitute ex post facto laws); *Prater v. United States Parole Comm'n,* 802 F.2d 948, 952-53 (7th Cir.1986) (finding written policies do not qualify as laws for purposes of ex post facto analysis). Under such an analysis, binding regulations fall within the purview of the Clause whereas those that merely function as discretionary guides are not subject to ex post facto review.

FN3. The Second Circuit is not among the courts that have considered this issue.

When viewed in accordance with this distinction, it is clear that the policy relied upon by the plaintiffs in the instant case is not one that is binding on the Parole Board. No official promulgation of the policy, either through legislative mandate or internal directive, requires the Board to follow or adopt it. The Board remains free to ignore the policy if it is so inclined. The most such a policy can be said to do is guide or channel the discretion of the Parole Board, thereby effectively removing it from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)
(Cite as: 1999 WL 305515 (N.D.N.Y.))

the reach of the Ex Post Facto Clause. Simply put, this policy does not have the force and character of law necessary to invoke ex post facto analysis.

**\*4** Finally, plaintiff Barna contends that the application of parole guidelines enacted after his 1976 conviction, instead of those in force at the time of his offense, similarly violates the Ex Post Facto Clause. Specifically, Barna asserts that the guidelines now permit consideration of both the seriousness of the offense and the defendant's prior criminal record, two criteria that allegedly worked to his detriment. It is well-established in the Second Circuit, however, that federal parole guidelines are not laws within the meaning of the Ex Post Facto Clause. *Beltempo v. Hadden,* 815 F.2d 873, 875 (2d Cir.1987); *DiNapoli v. Northeast Regional Parole Comm'n,* 764 F.2d 143, 145 (2d Cir.1985). To the extent that *Beltempo* and *DiNapoli* involved the application of federal, rather than state, parole guidelines, such a distinction is one without a difference. Accordingly, Barna cannot establish an ex post facto violation with respect to the application of amended parole guidelines.

CONCLUSION

For the reasons stated above, it is hereby

RECOMMENDED, that defendants' motion to dismiss be granted and that the complaint be dismissed in its entirety.

IT IS HEREBY ORDERED that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health & Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1999.
Barna v. Travis
Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

Only the Westlaw citation is currently available.

United States District Court,
D. Minnesota.
Elliott HOLLY
v.
Amy ANDERSON et al.
**No. 04-CV-1489 (JMR/FLN).**

April 15, 2008.

Elliot Holly, pro se.

Barbara Berg Windels, for Defendants.

ORDER

JAMES M. ROSENBAUM, Chief District Judge.

**\*1** Plaintiff objects to the Report and Recommendation issued February 20, 2008, by the Honorable Franklin L. Noel, United States Magistrate Judge. The Magistrate recommended granting in part and denying in part defendants' motion to dismiss. Plaintiff's objections to the Report were timely filed pursuant to Local Rule 72 .2(b).

Based on a de novo review of the record herein, the Court adopts the Magistrate's Report and Recommendation [Docket No. 48]. Accordingly, IT IS ORDERED that defendants' motion to dismiss [Docket No. 35] is granted in part and denied in part as follows:

1. To the extent plaintiff alleges a violation of his due process rights under the Fourteenth Amendment against defendants Deborah Konieska and Mike Smith, the motion

is denied.

2. The motion is granted in all other respects.

**ORDER AND REPORT AND
RECOMMENDATION**

FRANKLIN L. NOEL, United States Magistrate Judge.

THIS MATTER came before the undersigned United States Magistrate Judge on Defendants' motion to dismiss [# 35] and Plaintiff's motion to appoint counsel [# 44]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court orders that Plaintiff's motion [# 44] be granted and recommends that Defendants' Motion [# 35] be granted in part and denied in part.

**I. PROCEDURAL HISTORY**

In 2004, Plaintiff served two complaints in this action. The first complaint named Amy Anderson, Deborah Konieska, Tony Kaufenberg, Mike Smith, and Sandi Davis as defendants. The second complaint attempted to add two defendants, Carl Haglund and Sue Eccles, and also added new claims. The Court found that Holly intended this second complaint to supplement, not replace the original complaint. On September 15, 2004, the action was dismissed without prejudice. The Plaintiff appealed.

On December 4, 2006, the Eighth Circuit Court of Appeals reversed the District Court's Order for dismissal and remanded the matter so that the Plaintiff could file an amended complaint. On January 3, 2007, the Court gave Plaintiff another opportunity to submit an amended complaint that complies with Local Rule 15.1. The Court provided that, if Holly did not timely file an amended complaint, "the action will proceed based on the claims set forth in Holly's original pleadings, which together will be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

treated as the operative complaint in this case." (*See* Docket # 33 at 4.) Holly did not file an amended complaint, but instead chose to proceed using his original two complaints.

Only three of the seven named Defendants have been served in this case, Deborah Konieska, Carl Haglund and Sue Eccels.[FN1] On February 15, 2007, the United States Marshals Service attempted to serve Amy Anderson, Tony Kaufenberg, Mike Smith and Sandi Davis, but could not do so because the Plaintiff had provided the wrong address.

> FN1. Defendants' motion to dismiss [# 35] was filed only on behalf of the Defendants who were served, Sue Eccels, Carl Haglund, Deborah Konieska.

The Court does not find it problematic that Defendants Amy Anderson, Tony Kaufenberg and Sandi Davis were not served because we addressed all of Plaintiff's allegations on the merits and recommend that all claims against these Defendants be dismissed. Pursuant to Federal Rule of Civil Procedure 4(m), the Court recommends dismissing the action without prejudice as to these Defendants. The Court does, however, recommend that more time be given to the Plaintiff to serve Mike Smith, against whom a claim survives this motion to dismiss. Nothing was posted on the docket regarding the Marshals' inability to serve these four Defendants until January 25, 2008[# 45]. Until that time, the Plaintiff had no way of knowing why the four Defendants were not served. In his Response to Defendants' Motion to Dismiss [# 41], the Plaintiff requested to know why the Marshals had not served the remaining Defendants. He should be given 30 days from the issuance of the District Court's Order on this Report and Recommendation to serve Mike Smith at the proper address.

## II. PLAINTIFF'S ALLEGATIONS.

**\*2** The Plaintiff, Elliot Holly, is an indeterminately civilly committed patient at the Minnesota Sex Offender Program in Moose Lake, Minnesota. *See In the Matter of Elliot B.*

*Holly,* No. C9-94-492, 1994 WL 396314, \*1 (Minn.App.1994).

Plaintiff alleges that on February 23, 2004, he and another patient were "houseplaying" [sic] and the Plaintiff poked the other patient in the forehead with a pen. (Compl.¶ 2.) During the horseplaying, the Plaintiff and the other patient fell to the ground and the other patient hit his head on a wooden chair. (*Id.*) Both men were given three days of cell bock restrictions for this altercation. (*Id.*)

Plaintiff alleges that on February 24, 2004, two staff members searched Plaintiff's room for a weapon. (*Id.*) During the search, a staff member allegedly told the Plaintiff to "sit his black ass down." (*Id.*) After this comment was allegedly made, the Plaintiff threatened to throw a chair if the two staff members did not leave his room. (*Id.*) Because Plaintiff made this threat, he was placed in "isolation lock-down" for 31 hours. (*Id.*)

Plaintiff alleges that on February 25, 2004, the Defendants took all of Plaintiff's property out of his room. (Compl.¶ 3.) The individuals who removed the items determined that a pen removed from the cell was a weapon. (*Id.*) The Plaintiff alleges that the staff members determined the pen was a weapon in retaliation for Plaintiff's threat to throw the chair on February 24, 2004. (*Id.*)

Plaintiff alleges that on February 25, 2004, he told a staff member at the 10:30 p.m. hour check that he was going to kill himself. (Compl.¶ 5.) Plaintiff alleges that the staff members were angry because they had to monitor him that night. (*Id.*) At one point during the night, the Plaintiff alleges he told a staff member he was going to throw hot coffee and soup on himself at breakfast. (*Id.*) Plaintiff alleges that Defendant Deborah Konieska lied when she reported to other staff members that Plaintiff threatened to throw hot coffee and soup on the staff. (*Id.*) Plaintiff alleges that Defendants Deborah Konieska and Tony Kaufenberg created an unfair "behavioral program" on the basis of this lie. He alleges they did this in an attempt to transfer Plaintiff to a facility in the Department of Corrections. (*Id.*)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

Plaintiff alleges that Defendant Mike Smith interviewed him on February 26, 2004. He alleges that Mike Smith lied when he told Plaintiff that he knew Plaintiff did not like his "behavioral program" and could help remove it from Plaintiff's file. (Compl.¶ 6.) He alleges that Mike Smith did not let Plaintiff call his attorney; that Smith told him that he was really there to help the staff send the Plaintiff to prison and that the staff wanted to send Plaintiff back to prison because they did not like black people. (*Id.*)

Plaintiff alleges that on May 9, 2004, Defendants Amy Anderson and Sandi Davis lied to the hospital review board when they said that Plaintiff threatened to throw hot food on the staff on February 25, 2004. (Compl.¶ 7.) He alleges they also lied when they told the board that Plaintiff had a weapon-a pen-on February 24, 2004. Plaintiff alleges that Anderson and Davis unfairly stated that Plaintiff violated his court stay by having a weapon. (*Id.*)

**\*3** The Plaintiff alleges that he was placed in the Carlton County Jail on March 10, 2004. (Compl.¶ 8.) He claims that he was sent back to the sex offender facility in Moose Lake by Carlton County Judge Robert E. MacAulay on March 12, 2004.

Plaintiff claims that when he returned to the sex offender facility the Defendants placed him in isolation on "administrative lock-up" until they could get him another court date in order to send him back to the jail. (Compl.¶ 9.) Plaintiff claims that Defendant Deborah Konieska said that the staff would do whatever it took for Plaintiff to violate his court stay. (*Id.*)

Plaintiff alleges that, during an unspecified period when he was placed in Administrative Isolation, he was not allowed to shower and was not given clean clothing for 11 days. (*Id.*) He also alleges that, during that same unspecified time period, he was not given food to eat for 8 days, and he was not given exercise time outside his cell. (*Id.*) He alleges that he was allowed to shower only after unspecified staff members started telling the Plaintiff that "he smells like a porch monkey nigger." (*Id.*)

Plaintiff alleges that, when he was in administrative lock-up, he was given only two hours to use a pen, he was not allowed to make legal phone calls, and he was not allowed to order legal pads. (Compl.¶ 13.)

Plaintiff alleges that he was in administrative isolation for eight days before he received a hearing. (Compl.¶ 14.) He alleges that he was in administrative isolation for three days before he was allowed any exercise. (*Id.*)

Plaintiff also alleges that he was not given all of his personal property back after the incidents at the end of February even though he signed a written statement swearing that he would not harm himself. (Compl.¶ 10.)

The Plaintiff alleges that he his blood pressure has increased due to the Defendants' actions and that he has suffered anxiety and extreme embarrassment (Compl.¶ 17.)

In his Second Complaint filed on June 4, 2004, Plaintiff alleges that Carl Haglund "assaulted" him. (Second Compl. ¶ 2.) Plaintiff alleges that Sue Eccels filed false criminal charges against him and caused him to be incarcerated. (*Id.*) [FN2]

> **FN2.** In Plaintiff's Response to Defendants' Motion to Dismiss, he alleges new facts and allegations. The Court declines to consider these. *See* Fed.R.Civ.P. 12(b). The Plaintiff has already been allowed to proceed using two complaints rather than filing an amended complaint.

## III. STANDARD OF REVIEW

Defendants move to dismiss the Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). In analyzing the adequacy of a complaint under Rule 12(b)(6), the Court must construe the complaint liberally and afford the plaintiff all reasonable inferences to be drawn from those facts. *See Turner v. Holbrook,* 278 F.3d 754, 757 (8th Cir

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

.2002). For the purpose of a motion to dismiss, facts in the complaint are assumed to be true. *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 738 (8th Cir.2002).

Under Rule 8 of the Federal Rules of Civil Procedure, the Plaintiff must set forth in his complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The Supreme Court has determined that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

**\*4** Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. *Neitzke v. Williams,* 490 U.S. 319, 326-327 (1989). To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and not merely legal conclusions. *Springdale Educ. Ass'n v. Springdale Sch. Dist.,* 133 F.3d 649, 651 (8th Cir.1998). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief about the speculative level on the assumption that all the allegations in the complaint are true." *Bell Atlantic Corp.,* 127 S.Ct. at 1965 (internal citations omitted).

*Pro se* pleadings should be liberally construed, and are held to a less stringent standard when challenged by motions to dismiss. See *Haines v. Kerner,* 404 U.S. 519, 520 (1972); *Horsey v. Asher,* 741 F.2d 209, 211 n. 3 (8th Cir.1984). Although it is to be liberally construed, a *pro se* complaint must still contain specific facts to support its conclusions. *Kaylor v. Fields,* 661 F.2d 1177, 1183 (8th Cir.1981).

**IV. LEGAL ANALYSIS**

**A. Plaintiff's damages claims against Defendants in their official capacities are barred by the Eleventh Amendment.**

Plaintiff is suing the Defendants in both their official and individual capacities. A lawsuit "against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office" and "[a]s such is no different from a suit against the state itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt,* 469 U.S. 464, 471 (1985). A suit by a private party seeking to recover damages to be paid by the state is barred by the Eleventh Amendment absent the state's consent to the suit. *Edelman v. Jordan,* 415 U.S. 651, 662-663 (1974). The State of Minnesota has not waived its immunity in this case. (Def. Br. at 14 .) To the extent that Plaintiff seeks damages from Defendants in their official capacity, the claims are barred by the Eleventh Amendment.

**B. Holly's Fifth Amendment claims must be dismissed.**

Holly claims that Defendants' actions violated his Fifth Amendment rights. The Fifth Amendment applies only to actions taken by the federal government. *U.S. v. McClinton,* 815 F.2d 1242, 1244 n. 3 (8th Cir.1987). Here, the Plaintiff does not allege that the Defendants work for the federal government or that the Minnesota Sex Offender Program in Moose Lake, Minnesota, is a federal facility. Indeed, the Minnesota Sex Offender Program is run by the State. See Minn.Stat. § 246B.02. Accordingly, Plaintiff's claim that his Fifth Amendment rights have been violated must be dismissed.

**C. Holly's Eighth Amendment claims must be dismissed.**

**\*5** Plaintiff claims that Defendants' attempts to send him to jail amounted to cruel and unusual punishment in violation of the Eighth Amendment. The Eighth Amendment protection against cruel and unusual punishment applies only to those being punished for conviction of a crime. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979). A challenge to the conditions of a civilly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

committed patient are analyzed under the Due Process Clause. *Youngberg v. Romeo,* 457 U.S. 307, 315-17 (1982). The Plaintiff was civilly committed under the Minn.Stat. § 246B.02 which provides that the Minnesota Sex Offender Program "shall provide care and treatment in secure treatment facilities to persons committed by the courts as sexual psychopathic personalities or sexually dangerous persons, or persons admitted there with the consent of the commissioner of human services." Therefore his claims are properly analyzed under the Due Process Clause, not the Eighth Amendment.

**D. Plaintiff states a Due Process claim against Defendants Konieska and Smith.**

**1. Plaintiff states a Due Process claim under the Fourteenth Amendment and pursuant to the Supreme Court's holding in *Bell v. Wolfish,* 441 U.S. 520 (1979).**

The Plaintiff alleges that sometime shortly after February 25, 2004, Defendant Deborah Konieska lied when she reported that Plaintiff threatened to throw hot coffee and hot soup on staff members. (Compl.¶ 5.) He alleges that she did this in an attempt to transfer Plaintiff to a facility in the Department of Corrections. (*Id.*) He alleges that on February 26, 2004, Defendant Mike Smith told him in an interview that he was there to help the staff send the Plaintiff to prison. (Compl.¶ 6.) Plaintiff alleges that he was transferred to the Carlton County Jail on March 10, 2004. (Compl.¶ 8.) He claims that he was sent back to the sex offender facility on March 12, 2004 by Carlton County Judge Robert E. MacAulay. Plaintiff alleges that when he returned to the Moose Lake Facility, Defendant Deborah Konieska said that the staff would do whatever it took for Plaintiff to violate his court stay. (Compl.¶ 9.) He also alleges that when he was in administrative isolation, he was not given food for eight days and was not allowed to exercise. (Compl.¶ 10.)

A challenge to the conditions of a civilly committed patient are analyzed under the Due Process Clause. *Youngberg v. Romeo,* 457 U.S. 307, 315-17 (1982). In addressing such a claim, a court must first determine whether the officials in question acted with an intent to punish the patient. *Wolfish,* 441 U.S. at 561. If the court

finds that the officials were not acting with an intent to punish, the court then determines whether the restrictions/practices constitute punishment, which requires an analysis of whether the restrictions/practices are rationally related to a legitimate governmental purpose and whether they appear excessive in relation to that purpose. *Id.*

Here, the Plaintiff has alleged that Defendants Konieska and Smith were acting with an intent to punish him. The Supreme Court has held, in part, that a sanction can be deemed to be punitive if "it has historically been regarded as punishment." *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168 (1963). Certainly, jail time has historically been regarded as punishment. Therefore, Plaintiff has properly stated a claim for violation of his due process rights. To the extent that Plaintiff claims the other Defendants violated his Due Process rights by inflicting punishment upon him, the claim is dismissed. Holly alleges that when he was on "administrative restriction," he was not given food for eight days and was not given exercise. However, Holly does not allege that any of the Defendants were personally involved in this claim. The claim is not therefore pleaded with sufficient specificity and must be dismissed. *See Cooper v. Schriro,* 189 F.3d 781, 783 (8th Cir.1999) (holding that in order to state a claim for relief under sec.1983, a complaint must explain how defendants are responsible for the alleged violations); *Frey v. City of Herculaneum,* 44 F.3d 667, 672 (8th Cir.1995) (complaint which did not indicate how defendants were involved in alleged violations and was conclusory failed to meet notice-pleading standard).

**2. Plaintiff also states a claim for a Due Process violation under the standard set forth in *Youngberg v. Romeo,* 457 U.S. 307 (1982).**

**\*6** The Court analyzes Plaintiff's claim under the *Youngberg* standard as well because in *Green v. Baron,* 879 F.2d 305 (8th Cir.1989) the Eighth Circuit applied both the *Bell* standard and the *Youngberg* standard to a claim where a pretrial detainee alleged that the staff at a mental facility violated his civil rights. In *Youngberg,* the Supreme Court held that punishment of a civilly committed patient violates his due process rights where the court determines that the institution or officials did not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

exercise professional judgment. 457 U.S. at 321. Liability is imposed where the decision made by the professional is such a "substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323.

Plaintiff claims that Defendant Konieska lied to other institution staff members that the Plaintiff threatened to throw hot liquids on staff in an attempt to send the Plaintiff to jail. He claimed that she also told Plaintiff that she would do what was necessary to send the Plaintiff back to jail. He also claimed that Defendant Smith said that he intended to help the other staff send the Plaintiff to jail. These allegations establish a claim that Defendants Konieska and Smith intended to punish the Plaintiff, an allegation that constitutes "a substantial departure from accepted professional judgment." Youngberg, 457 U.S. at 323.FN3

> FN3. As noted above, the Court is compelled to assume the truth of all factual allegations in the complaint when ruling on a motion to dismiss. The Court expresses no opinion regarding whether Plaintiff will be able to prove any of the allegations at trial.

**E. Holly's claim that Defendants violated his Equal Protection rights under the Fourteenth Amendment must be dismissed.**

Plaintiff alleges that on February 24, 2004, two staff members searched Plaintiff's room for a weapon. (Id.) During the search, a staff member allegedly told the Plaintiff to "sit his black ass down." (Compl.¶ 2.) Plaintiff also alleges that when he was in administrative lockup in March after he returned from the jail, he was allowed to shower only after unspecified staff members started telling the Plaintiff that "he smells like a porch monkey nigger." (Id.) First, the Plaintiff fails to identify who made these statements and therefore fails to state an actionable claim. See Cooper v. Shriro, 189 F.3d at 783.

The claim also fails on the merits. "[T]he use of racially

derogatory language, unless it is pervasive or severe enough to amount to racial harassment, will not by itself violate the fourteenth amendment." Blades v. Schuetzle, 302 F.3d 801, 805 (8th Cir.2002) (holding that a security guards comment regarding the color of the Plaintiff's palms and a comment telling Plaintiff to smile so that he could be seen in the dark was offensive but did not rise to the level of a constitutional violation). The statements Plaintiff alleges were made are certainly offensive but do not rise to the level of a constitutional violation.

**F. Holly fails to state a claim that Defendants denied him his First Amendment right of access to the courts.**

*7 The Plaintiff alleges that Mike Smith did not let Plaintiff call his attorney during an interview. (Compl.¶ 6.) Plaintiff also alleges that, when he was in "administrative lock-up", he was given only two hours to use a pen, he was not allowed to make legal phone calls, and he was not allowed to order legal pads. (Compl.¶ 13.)

Even though the Plaintiff is a civilly committed sex offender and not a prisoner, the court may seek guidance from the cases addressing a prisoner's right to access the courts because, as courts have recognized, the confinement of civilly committed patients is similar to that of prisoners. Morgan v. Rabun, 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). A number of courts have applied to civilly committed patients, the rule developed by the Supreme Court in connection with a prisoner's right to access the courts. See Zigmund v. Foster, 106 F.Supp.2d 352, 358 (D.Conn.2000) (applying the rule from Lewis v. Casey, 518 U.S. 343, 351 (1996), a case involving prisoners' rights to access the courts to a civilly committed patient's claim that his right to access the courts was infringed); Cornett v. Donovan, 51 F.3d 894, 897-98 (9th Cir.1995) (applying Bounds v. Smith, 430 U.S. 817, 828 (1977), a case involving prisoners' rights to access the courts to a civilly committed patient's claim that his right to access the courts was infringed); Ward v. Kort, 762 F.2d 856, 858-61 (10th Cir.1985) (same).

In order to state a claim for a violation of a confined

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

person's right to access the courts, the Plaintiff must allege that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis,* 518 U.S. at 351. That is, the Plaintiff must allege an actual injury. *Id.* The Plaintiff must show, for example, that his complaint was dismissed on a technicality for which he could not have known because the legal facilities at the prison were deficient. *Id.* Or that he could not even file a complaint because the legal facilities were deficient. *Id.*

In this case, Plaintiff alleges that he was not allowed to call his lawyer on one occasion and that while he was in "administrative lock-up," he was only given access to a pen for two hours and could not make legal phone calls or order legal pads. Plaintiff does not, however, allege that his inability to access his lawyer or legal materials prevented him from filing a claim or caused some other actual injury. Therefore Plaintiff's claim must be dismissed.

**G. Holly's procedural due process claim must be dismissed.**

Plaintiff alleges that he was in administrative isolation for eight days before he received a hearing. (Compl.¶ 14.)

"[D]ue process rights of prisoners and pretrial detainees are not absolute; they are subject to reasonable limitation or retraction in light of the legitimate security concerns of the institution." *Bell,* 441 U.S. at 554. In *Bell,* the Supreme Court held that pretrial detainees could not be punished without procedural due process protections, but it did qualify that rule: "[t]here is, of course, a *de minimus* level of imposition with which the Constitution is not concerned." *Id.* at 539 n. 21 (quoting *Ingraham v. Wright,* 430 U.S. 651, 674 (1974)). In *Wilkerson v. Austin,* 545 U.S. 209, the Supreme Court held that an inmate's due process rights were violated when he was placed in solitary confinement indefinitely with a 30-day review. He was also disqualified for parole because he was placed there. In solitary confinement, he had almost no human contact, exercise for one hour daily and control over almost every aspect of his life. The court held that his treatment constituted an "atypical and significant

hardship" in which the inmate had a liberty interest. The court considered that nature of the conditions in relation to "the ordinary incidents of prison life," the duration of the placement and the ancillary effects of the placement.

**\*8** In this case, the Plaintiff alleges that he was placed in "administrative isolation" for eight days without a hearing. However, Plaintiff also alleges that he had been in a fight with another prisoner and had "poked" him in the head with a pen. The allegations indicate that Plaintiff had some idea of why he was being placed in "administrative isolation" even if he did not agree with being confined there. The allegations are unclear, but it appears that Plaintiff was only placed there for eight days. The alleged facts to do not constitute an "atypical and significant" hardship. The alleged facts indicate that the institution had legitimate security concerns about the Plaintiff.

**H. The Defendants Konieska and Smith, against whom a claim survives, are not entitled to qualified immunity.**

The Defendants contend that even if the Plaintiff has stated a claim, they are still entitled to qualified immunity. A government official is entitled to qualified immunity "from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). In making this determination, a court must decide: (1) whether the facts alleged show the officer's conduct violated a constitutional right; and (2) if such a finding is made, whether the constitutional right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

The Defendants in this case are not entitled to qualified immunity. Plaintiff's allegations, if proven, would establish that Defendants Konieska and Smith knowingly violated Plaintiff's Fourteenth Amendment Due Process rights by deliberately attempting to send the Plaintiff to jail.

**I. Holly's state law claims must be dismissed.**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

Assuming, without deciding, that the Court will grant supplemental jurisdiction over Plaintiff's state law claims, those claims must be dismissed. In his Second Complaint, Plaintiff alleges the Defendant Carl Haglund "assaulted" him. The Plaintiff fails to allege any other facts. This allegation is conclusory and must be dismissed. Similarly, in his Second Complaint, the Plaintiff alleges that Defendant Sue Eccels "filed false criminal charges" against him. Again, Plaintiff does not allege any other facts with respect to this conclusory claim. Because the allegation is conclusory, it must be dismissed.

**J. Plaintiff has not demonstrated that he is entitled to injunctive relief.**

Plaintiff requests a preliminary injunction. The Court considers the following factors in determining whether or not to grant a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." _Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir.1981)._ A preliminary injunction is a "drastic and extraordinary" remedy and should only issue in exceptional circumstances when "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." _Id._ at 113. Holly requests that an "immediate" injunction be issued that: (1) "forbids Defendant from implementing their proposed new behavioral program;" (2) releases the Plaintiff from "administrative isolation;" (3) returning all of Plaintiff's personal property to him; and (4) prohibits the Defendants from engaging in "various other forms of harassment, retaliation, and discrimination against the Plaintiff." (Compl. at 32.)

**\*9** The Plaintiff has failed to demonstrate that the harm caused to him by these four conditions above is irreparable. As to the state of balance between the alleged harm to the Plaintiff and the injury that granting the injunction will inflict on other parties litigant, the Court does not find that the balance favors granting the injunction. The Moose Lake facility should not be kept from taking administrative steps to keep its facility safe.

Indeed Plaintiff acknowledges in his Complaint that he was fighting with another Plaintiff before he was disciplined. The Plaintiff himself acknowledges in his allegations that he has disciplinary problems.

As to the third factor, the Plaintiff has not demonstrated that he will succeed on the merits; indeed, only one claim survives this motion to dismiss. Finally, the public interest weighs in favor of allowing the Moose Lake facility to continue to implement restrictions necessary to the safety and security of the institution.

**K. Holly's motion to appoint counsel [# 44].**

In his motion to appoint counsel, Plaintiff contends that he has tried without success to find a lawyer to assist him with this case. He attaches some correspondence to his motion. Plaintiff fails to mention that in December of 2006, immediately after the case was returned from the Eighth Circuit, this Court sent the Plaintiff a letter referring him to the Volunteer Lawyers Network (VLN). The record is silent with respect to whether Plaintiff ever contacted the VLN as directed in the letter.

A court may "request an attorney to represent any person unable to afford counsel." _28 U.S.C. § 1915(e)(1)._ The standard for appointment of counsel in such cases is whether both petitioner and the court would benefit from the assistance of counsel. _Johnson v. Williams, 788 F.2d 1319, 1322 (8th Cir.1986)_ (quoting _Reynolds v. Foree, 771 F.2d 1179, 1181 (8th Cir.1985)_ (per curiam)). "Factors bearing on this determination include: the factual complexity of the issues; the ability of an indigent to investigate the facts; the existence of conflicting testimony; the ability of an indigent to present his claim; and the complexity of the legal issues." _Nachtigall v. Class, 48 F.3d 1076, 1082 (8th Cir.1995)._

In this case, only one of Plaintiff's claims withstands this Motion to Dismiss, the Plaintiff's due process claim alleging that he has been punished. The issue is: whether Defendants Smith and Konieska's actions in sending the Defendant to jail in March of 2004 were an improper attempt to punish the Plaintiff or whether they were

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 1773093 (D.Minn.)
(Cite as: 2008 WL 1773093 (D.Minn.))

justified in light of the Plaintiff's altercation with another inmate at the end of February. This claim involves factual issues and the ability of the Plaintiff to adequately investigate the facts is certainly compromised by his confinement. The claim also involves due process issues which would be better handled by a trained professional. The Court concludes that both the Court and the Plaintiff would benefit from the assistance of counsel. To the extent contemplated by Title 28, U.S.C., Section 1915(e), the Court hereby requests that the VLN find an attorney to represent Plaintiff.

**V. ORDER AND RECOMMENDATION**

**\*10** Based upon all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion to appoint counsel [# 44] is **GRANTED** to the extent that, consistent with Title 28, U.S.C., Section 1915(e), counsel to be located by the VLN is requested to represent Plaintiff.

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's motion to dismiss be **GRANTED in part** and **DENIED in part [# 35],** as follows:

1. To the extent that Plaintiff alleges a violation of his Due Process rights under the Fourteenth Amendment against Defendants Konieska and Smith, the Court recommends that the motion be **DENIED .**

2. The Court recommends the motion be **GRANTED** in all other respects.

D.Minn.,2008.
Holly v. Anderson
Slip Copy, 2008 WL 1773093 (D.Minn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)
(Cite as: 2008 WL 794546 (E.D.Wis.))

☞  Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
Hung Nam TRAN, Plaintiff,
v.
Robert S. KRIZ, Kimberly M. Roberts, Jennifer
Hielsberg, Defendant.
No. 08-C-228.

March 21, 2008.

Hung Nam Tran, Winnebago, WI, pro se.

**ORDER**

WILLIAM C. GRIESBACH, District Judge.

*1 Plaintiff Hung Nam Tran, who is serving a civil
commitment at the Wisconsin Resource Center ("WRC")
in Winnebago County, Wisconsin, under Wis. Stat. Ch.
980 (Sexually Violent Person Commitments), has filed an
action under 42 U.S.C. § 1983. Ordinarily, a plaintiff must
pay a statutory filing fee of $350 to bring an action in
federal court. 28 U.S.C. § 1914(a). Tran, however, has
requested leave to proceed *in forma pauperis,* pursuant to
28 U.S.C. § 1915.

Section 1915 is meant to ensure indigent litigants
meaningful access to federal courts. *Nietzke v. Williams,*
490 U.S. 319, 324 (1989). An indigent plaintiff may
commence a federal court action, without paying required
costs and fees, upon submission of an affidavit asserting
inability "to pay such fees or give security therefor" and
stating "the nature of the action, defense or appeal and
affiant's belief that the person is entitled to redress." 28 U
. S.C. § 1915(a)(1). Tran filed the required affidavit of

indigence. Upon review of that affidavit, it appears that he
could not pay the $350 filing fee. Because plaintiff is
under a civil commitment, as opposed to serving a
sentence for a crime, he is not a prisoner within the
meaning of the Prison Litigation Reform Act and 28
U.S.C. § 1915's provisions requiring the assessment and
collection of the full filing fee over time do not apply.
*West v. Macht,* 986 F.Supp. 1141, 1142 (W.D.Wis.1997).
Thus, *in forma pauperis* status will be granted.[FN1]

> FN1. Although he mentions additional plaintiffs
> in his caption and styles his complaint as a class
> action, Tran is advised that he may bring his pro
> se complaint on behalf of himself only. Pro se
> litigants may not proceed on behalf of another.
> *See Navin v. Park Ridge Sch. Dist. 64,* 270 F.3d
> 1147, 1149 (7th Cir.2001). To certify a class
> action, the court must find, among other things,
> that "the representative parties will fairly and
> adequately protect the interests of the class."
> Fed.R.Civ.P. 23(a)(4). "Since absent class
> members are bound by a judgment whether for or
> against the class, they are entitled at least to the
> assurance of competent representation afforded
> by licensed counsel." *Campbell v. Secretary,*
> *Dept. of Corrections,* 2005 WL 2917465, *10
> (W.D.Wis.2005).

I nevertheless maintain a duty to "screen" all complaints
under 28 U.S.C. § 1915(e)(2) to ensure that they comply
with the Federal Rules of Civil Procedure and that they
state at least plausible claims for which relief may be
granted. "[W]hen the allegations in a complaint, however
true, could not raise a claim of entitlement to relief, 'this
basic deficiency should ... be exposed at the point of
minimum expenditure of time and money by the parties
and the court.' " *Bell Atl. Corp. v. Twombly,* 127 S.Ct.
1955, 1966 (2007) (citing 5 Wright & Miller § 1216, at
233-234); *see also Asahi Glass Co. v. Pentech*
*Pharmaceuticals, Inc.,* 289 F.Supp.2d 986, 995
(N.D.Ill.2003) (Posner, J., sitting by designation) ("Some
threshold of plausibility must be crossed at the outset...."). 
In reviewing a complaint under this standard, the court
must accept as true the allegations of the complaint in

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)
(Cite as: 2008 WL 794546 (E.D.Wis.))

question, *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 740 (1976), construe the pleading in the light most favorable to the plaintiff, and resolve all doubts in the plaintiff's favor, *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969). The court is obliged to give the plaintiff's pro se allegations, however inartfully pleaded, a liberal construction. *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). To state a claim for relief under 42 U .S.C. § 1983, a plaintiff must allege: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon him by a person acting under color of state law. *Gomez v. Toledo,* 446 U.S. 635, 640 (1980).

**\*2** Tran has named as defendants in this case three employees of the WRC where Tran resides: Institutional Unit Supervisor Robert Kriz, Social Worker Kimberly Roberts, and Psychiatric Care Technician Jennifer Heilberg. All of the named defendants have been sued in their individual and official capacities. [FN2]

> **FN2.** To the extent Tran has attempted to assert damage claims against the defendants in their official capacities, his suit is, in effect, an action against the state and is be barred by the Eleventh Amendment. *See Shockley v. Jones,* 823 F.2d 1068, 1070 (7th Cir.1987) ("A suit for damages against a state official in his or her official capacity is a suit against the state for Eleventh Amendment purposes."). Tran's official capacity damage claims are therefore dismissed.

*Sexual Harassment*

Tran alleges violations of his rights under the United States Constitution, federal, and state law. He claims he was subject to sexual harassment by defendant Roberts, a social worker at WRC. According to Tran, defendant Roberts called him into her office to ask whether he wanted a formal hearing regarding documentation by defendant Kriz that Tran had received mail from a Philadelphia, Pennsylvania address, and a source identified only as "Gail, P.G.," which contained pornographic pictures of female genitalia. Tran claims he informed Roberts that he did not order the pictures, and

would have no motivation to do so, because he is homosexual. He requested that he be allowed to destroy the pictures, but Roberts told him they were necessary evidence for Tran's future evaluations and proceedings. Tran alleges that Roberts then admitted to sending the pornography herself, telling Tran that she wanted him to have "appropriate" sexual materials, and that he needed to exhibit heterosexual behavior. Tran alleges that Roberts provided him with her sister's contact information so that he could contact her, suggesting she could assist him in walking toward "moral correctness." He claims he reported Robert's behavior to Defendant Kriz, who did nothing but accuse him of fabricating his allegations.

"[S]exual harassment or abuse may form the basis of an Eighth Amendment claim under § 1983." *Tineybey v. Peters,* 2001 WL 527409, *2 (N.D.Ill.2001) (citing *Walker v. Taylorville Correctional Center,* 129 F.3d 410, 413 (7th Cir.1997)). However, "[t]o rise to the level of a constitutional violation, such harassment or abuse must be objectively and sufficiently serious. Despite this vague language, the case law is replete rulings that verbal harassment and minor physical contact fail to meet this criteria." *Tineybey,* at *2 (internal citation omitted); *see Howard v. Everett,* 208 F.3d 218, *1 (8th Cir.2000); *Dewhart v. Carlety,* 2007 WL 1876469 (W.D.Mich.2007) (collecting cases); *Walker v. Akers,* 1999 WL 787602, *5 (N.D.Ill.1999) ("Absent physical contact, a single incident of verbal harassment does not rise to the level of an Eighth Amendment violation.") Here, Tran alleges a single incident of harassment without any physical contact. This is insufficient to state a cognizable claim. *See Adkins v. Rodriquez,* 59 F.3d 1034 (10th Cir.1995) (entering female inmate's cell and making sexually suggestive remarks insufficient to state Eighth Amendment claim for sexual harassment); *Walker,* at *5 (entering an inmate's cell with a stun gun and demanding that the inmate perform a sexual act does not rise to the level of an Eight Amendment violation).

**\*3** Although Tran suggests that his harassment by Roberts was motivated in part by his sexual orientation, "[v]erbal harassment about sexual preference cannot state an Eighth Amendment claim." *Murray v. U.S. Bureau of Prisons,* 106 F.3d 401, *3 (6th Cir.1997). Thus, Tran may not proceed with his sexual harassment claim against Roberts. It follows that his claim that Kriz was deliberately

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)
(Cite as: 2008 WL 794546 (E.D.Wis.))

indifferent to the sexual harassment likewise fails.

*Verbal Abuse*

Tran also claims that in the past, Roberts called him a "gook;" however, this is insufficient to state an actionable claim. "Although racial slurs are unprofessional and deplorable, they do not constitute a deprivation of constitutionally protected rights." *Worthon v. Dowhen,* 81 F.3d 164, * 1 (7th Cir.1996) (citing *Patton v. Przybylski,* 822 F.2d 697, 700 (7th Cir.1987)).

*HIPAA Violation*

Tran claims Roberts also disclosed his patient records to a Wisconsin Department of Corrections parole agent in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §§ 1320d et seq. But because the HIPAA does not create a private right of action, I need not consider whether Roberts' actions offended the statute. *Johnson v. Quander,* 370 F.Supp.2d 79, 99-100 (D.D.C.2005); *University of Colorado Hosp. v. Denver Publishing Co.,* 340 F.Supp.2d 1142, 1144-46 (D.Colo.2004).

*Clothing*

Tran claims that Kriz violated his rights by destroying or withholding Tran's clothing that displayed screen printing Kriz considered "morally offensive" and "counter-therapeutic." However, the Seventh Circuit has held that Chapter 980 patients "may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others." *Allison v. Snyder,* 332 F.3d 1076, 1079 (7th Cir.2003). These conditions include incarceration that is essentially identical to the conditions found in a common jail or prison. Restrictions on the type of clothing a person is permitted to wear are commonplace in such a setting. *See Thielman v. Leean,* 140 F.Supp.2d 982, 988, 999 (W.D.Wis.2001) (finding no constitutional violation where Chapter 980 patients were required to wear state-issued clothing when they left their assigned living units.) [FN3] Therefore, Tran's allegations fail to state

a claim.

FN3. Tran does not specifically allege that withholding his clothing violated the Wisconsin Mental Health Act, which he references elsewhere in his complaint. The statute provides that a civilly committed patient may "use and wear his ... own clothing and personal articles." Wis. Stat. § 51.61(1)(q). However, even if Tran intends by his allegations to challenge Kriz's actions as a violation of state law, state statutes generally cannot be enforced via federal lawsuits. *Allison v. Snyder,* 332 F.3d 1076, 1078-79 (7th Cir.2003) ("[T]he Constitution does not compel states to follow their own laws. Nor does it permit a federal court to enforce state laws directly.")

*Catalogs and Magazines*

Tran also alleges that Kriz withheld from him magazines Kriz found "morally offensive," and clothing catalogs which contained photographs of children acting as clothing models. Tran states that he prefers to order children's clothing from such catalogs because of his small stature. "[A]lthough courts have not defined the contours of civilly detained persons' rights to free speech, the rights of civilly confined persons can be no more restrictive than those afforded prisoners." *Everett v. Watters,* 2007 WL 2005264, *2 (W.D.Wis.2007) (citing *City of Revere v. Massachusetts Gen. Hospital,* 463 U.S. 239 (1983) ("[T]he due process rights of a [pretrial detainee or other persons in state custody] are at least as great as the Eighth Amendment protections available to a convicted prisoner."). In the prison context, regulations that restrict a prisoner's access to publications are "valid if [they are] reasonably related to legitimate penological interests." *Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989) (citing *Turner v. Safley,* 482 U.S. 78, 89 (1987)). "Conversely, when such a connection is lacking, restrictions on publications constitute an impermissible infringement of inmates' First Amendment rights." *Riley v. Doyle,* 2006 WL 2947453, *1 (W.D.Wis.2006) (granting plaintiff leave to proceed with his claim that defendants violated his right to free speech by prohibiting him from receiving pornography and books about psychology). Defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)
(Cite as: 2008 WL 794546 (E.D.Wis.))

may well have a valid reason for denying plaintiff certain catalogs and magazines, but it is their burden to articulate that reason. *Id.* Broadly construing the complaint in Tran's favor, he has alleged enough to state a claim that defendant Kriz violated his rights under the First Amendment.

### Transfer

**\*4** Tran also alleges that under Kriz's direction, he is subject to transfer between the WRC and Sand Ridge Secure Treatment Center ("Sand Ridge") every eight months as a matter of policy, or upon filing a lawsuit, for the purpose of rendering moot any claims he may have regarding his confinement. Yet although Tran alleges he is "subject to" transfer, he does not claim that he has in fact been transferred, or even that his transfer has been threatened. Thus, he cannot maintain a claim for retaliation. Although he complains of a general policy that patients are transferred between the facilities every eight months, Tran has no constitutional right to be housed in the facility of his choice. *See McGee v. Thomas,* 2007 WL 2440990, \*3 (E.D.Wis.2007) (holding that transfer from the WRC to Sand Ridge did not constitute impermissible punishment); *Falcon v. U.S. Bureau of Prisons,* 852 F.Supp. 1413, 1420 (S.D.Ill.1994) ("A pre-trial detainee does not have the right to be housed at the facility of his choice, nor does he have a right to remain in the institution to which he was initially, or even at one time, assigned."). Therefore, this claim will be dismissed.

### 72 Hour Reassignment

Tran further alleges that Kriz improperly punished him by placing him on two "72 hour reassignments." The first was imposed after an altercation in which Tran had directed profanity at a WRC staff member who was escorting other residents to the recreation area, and asked him if he was being a "tough guy." Tran admits that he engaged in the behavior, but claims he had already received a verbal warning for his behavior from the staff member involved in the incident, such that further punishment violated the Double Jeopardy Clause. However, "[t]he [Double Jeopardy] Clause ... protects only against the imposition of multiple *criminal* punishments for the same offense."

*Hudson v. United States,* 522 U.S. 93, 99 (1997). Accordingly, this claim will be dismissed.

Kriz imposed the second 72 hour reassignment after he was notified by defendant Hielsberg that Tran was being disruptive and disrespectful in the unit to which he had been reassigned. Tran claims he was merely talking with other patients about the defendants' improper behavior and that of other correctional employees. Defendant Hielsberg issued a conduct report regarding the incident. According to Tran, he was placed "in seclusion for three days from January 14 to January 17, 2008. This period of time is called '72 hours reassignment' which [is] in itself a disciplinary punishment." (Compl.¶ 39.) However, "72 hour re-assignment is not intended as punishment," and does not implicate a liberty interest protected by the Constitution. *Clark v. Taggart,* 2007 WL 1655160, \*4 (E.D.Wis.2007); *see Robinson v. Fergot,* 2005 WL 300376, \*6 (W.D.Wis.2005) ("Temporary reassignment is not grounded in punitive intent; it is merely a part of the process by which officials at the facility investigate alleged misconduct and determine what steps need to be taken in response.")

**\*5** In addition, although Chapter 980 inmates may not be punished in a traditional sense, the fact that they are involuntarily incarcerated means that they are subject to standard rules of confinement, and may be punished for violating the rules of the institution in which they are confined. *McGee v. Thomas,* 2007 WL 2440990, \*2 (E.D.Wis.2007) ("If seclusion is justified on either security or treatment grounds, the institution may impose such a condition."). According to Tran, his reassignment, or "seclusion," was ordered by Kriz, a Unit Supervisor. In determining whether the conditions of civil confinement are unconstitutionally punitive in nature, the court must defer to the judgment exercised by such qualified professionals. *Youngberg v. Romero,* 457 U.S. 307, 321 (1982). To overcome the presumptive validity of a decision made by a professional who is "competent, whether by education, training, or experience, to make the particular decision at issue," *Id.* at 323, a plaintiff must present facts that indicate the defendant did not base his or her decision on professional judgment. *Robinson,* at \*5. Tran has not made any allegations that Kriz did not exercise professional judgment when imposing the 72 hour reassignments. Accordingly, his claims regarding his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)
(Cite as: 2008 WL 794546 (E.D.Wis.))

reassignments will be dismissed.

*Due Process*

Tran further claims he was sanctioned on the basis of four conduct reports without due process of law. However, this claim too must fail. In order for a person detained under Chapter 980 to state a due process claim, he must "identify a right to be free from restraint that imposes atypical and significant hardship in relation to the ordinary incidents of his confinement." *Thielman v. Leean,* 282 F.3d 478, 484 (7th Cir.2002.) Here, Tran's sanctions included a loss of dayroom privileges for a total of twenty days, a prohibition on off-unit movement for twenty days, and two weeks on "Level D" status, which involved further restrictions on his use of the library, personal electronics, other equipment, and group activities, as well as demotion to the lowest pay scale. It is questionable whether such restrictions amount to an atypical an significant hardship in relation to the ordinary incidents of Tran's confinement. But even if a liberty interest was at stake, Tran's claim would still fail, because he admits that when notified of a hearing regarding his conduct reports, he refused to participate. *See King v. Prince,* 221 F.3d 1338, *3 (7th Cir.2000)* (holding that a pretrial detainee could not prevail on his claim that his placement in segregation violated his right to due process after waiving his right to a disciplinary hearing.) Furthermore, the actions Tran challenges were again ordered by a professional, identified by Tran as Karen Leitner, a psychiatric attendant supervisor, who is not named as a defendant in this action.[FN4] For these reasons, Tran may not proceed with his claim that his sanctions were imposed without due process.

FN4. Although Tran suggests that Leitner was not a clinical staff member and that only clinical personnel would be qualified to exercise professional judgment and authorize sanctions, there is no such restriction. Non-clinical personnel may also exercise professional judgment in imposing sanctions for violations of institution rules. *See Williams v. Nelson,* 2004 WL 2830666, * 11 (W.D.Wis.2004).

*Other Statutory Claims*

*6 Tran alleges that by their actions, the defendants violated the Developmentally Disabled Assistance and Bill of Rights Act of 1975 ("DDA"), 42 U.S.C. § 6000 et seq. However, the DDA does not create a private right of action. *Pennhurst State School & Hosp. v. Halderman,* 451 U.S. 1 (1981). Although he argues that the defendants have violated the Americans with Disabilities Act of 1990, ("ADA") 42 U.S.C.A. § 12131 et seq., and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 et seq., Tran has not alleged any way in which he was discriminated against on the basis of a disability. Thus, he has failed to state a claim under the ADA or Rehabilitation Act, and those claims will also be dismissed. Tran alleges generally that the entire "behavioral management system" at the WRC violates the Wisconsin Mental Health Act, Wis. Stat. 51.001, et seq., by utilizing the procedure set forth in Wis. Stat. § DOC 303, et seq. To the extent this state law claim is even intelligible, it appears entirely unrelated to Tran's sole remaining claim under federal law. I decline to exercise supplemental jurisdiction over the claim, and it will be dismissed without prejudice.

*Preliminary Injunction and Temporary Restraining Order*

Also pending before the court is Tran's motion for a preliminary injunction and temporary restraining order, in which he requests that the court order the defendants to "submit and implement a plan correcting the constitutional deficiencies alleged in [his] complaint." (Compl.15.) Tran claims he is under "extreme pressure and stress as a result of the defendants' policy and actions." (Br. Supp. Mot. for Temporary Restraining Order at 4.)

The standards for a temporary restraining order and preliminary injunction are identical. The applicant has the burden of showing: (1) a reasonable likelihood of success on the merits, (2) no adequate remedy at law, and (3) irreparable harm if injunctive relief is denied. *Graham v. Med. Mut. of Ohio,* 130 F.3d 293, 295 (7th Cir.1997). If the petitioner satisfies the initial three-step burden, the court must balance the irreparable harm to the nonmoving

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)
(Cite as: 2008 WL 794546 (E.D.Wis.))

party if the injunction is granted against the irreparable harm to the moving party if the injunction is denied. *Id.* The court also must consider the effect of the injunction on nonparties. *Id.*

The court concludes that neither a preliminary injunction nor a temporary restraining order should issue in this matter. Tran's allegations in support of his motion allege generally that he is being subjected to punishment in violation of his rights as a Chapter 980 patient, but do not set forth specific facts demonstrating the likelihood of immediate and irreparable harm, or indicate that Tran lacks adequate remedy at law. Tran's motion for a preliminary injunction and temporary restraining order will therefore be denied.

*Conclusion*

Tran has stated one cognizable claim. He may proceed with his claim that he was denied magazines and catalogs in violation of his rights under the First Amendment. Tran's claim under the Wisconsin Mental Health Act is dismissed without prejudice. All other claims are dismissed with prejudice. Accordingly, defendant Jennifer Hielsberg is dismissed from this action.

**\*7THEREFORE, IT IS ORDERED** that plaintiff's request to proceed *in forma pauperis* is granted.

**IT IS ORDERED** that plaintiff's motion for a preliminary injunction and temporary restraining order is denied.

**IT IS ORDERED** that the U.S. Marshals Service shall serve a copy of the complaint, a waiver of service form and/or the summons, and this order upon the defendants pursuant to Fed.R.Civ.P. 4. Plaintiff is advised that Congress requires the U.S. Marshals Service to charge for making or attempting to make such service. 28 U.S.C. § 1921. The current fee for waiver-of-service packages is $8 .00 per item. The full fee schedule is provided in 28 C.F.R. § 0.114(a)(2), (a)(3). Even though Congress requires the court to order service by the U.S. Marshals Service when an impoverished person is permitted to

proceed *in forma pauperis,* Congress has not provided for these fees to be waived, either by the court or the U.S. Marshals Service.

**IT IS ORDERED** that the defendants shall file a responsive pleading to the complaint.

**IT IS ALSO ORDERED** that copies of this order be sent to the warden of the institution where the inmate is confined and to Corey F. Finkelmeyer, Assistant Attorney General, Wisconsin Department of Justice, P.O. Box 7857, Madison, Wisconsin, 53707-7857.

The plaintiff is hereby notified that he is required to send a copy of every paper or document filed with the court to the opposing parties or their attorney(s). Fed.R.Civ.P. 5(a). Plaintiff should also retain a personal copy of each document. If the plaintiff does not have access to a photocopy machine, he may send out identical handwritten or typed copies of any documents. The court may disregard any papers or documents which do not indicate that a copy has been sent to each defendant or to their attorney(s).

The plaintiff is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute.

In addition, the parties must notify the Clerk's Office of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Nothing in this order or in § 1915A precludes a defendant from moving to dismiss any claim identified in this order or potentially existing in the complaint if the defendant disagrees with my analysis or believes I have overlooked something during my screening.

E.D.Wis.,2008.
Tran v. Kriz
Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 794546 (E.D.Wis.)
(Cite as: 2008 WL 794546 (E.D.Wis.))


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp.2d, 2008 WL 2009287 (S.D.N.Y.)
(Cite as: 2008 WL 2009287 (S.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Diane Julia WYLIE, Plaintiff,
v.
BEDFORD HILLS CORRECTIONAL FACILITY of
the State of NEW YORK, Dr. Kramer, Nurse Robert's
Office of Mental Health, of Ficer Gentile, and Central
New York Psychiatric Center, Defendants.
**No. 07 Civ. 6045(DLC).**

May 8, 2008.

ICP-A-321 Hospital Building, Bedford Hills Correctional
Facility, Diane Wylie, Bedford Hills, NY, pro se.

Daniel A. Schulze, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

DENISE COTE, District Judge.

**\*1** Plaintiff Diane Wylie ("Wylie") is an inmate in the
Psychiatric Center at the Bedford Hills Correctional
Facility ("Bedford Hills"). She reports that she is serving
a sentence of 25 years to life imprisonment. She has f iled
a complaint pursuant to 42 U.S.C. § 1983 alleging
principally that she was not given adequate dental care,
was given unnecessary medication which caused brain
damage and other injuries to her, was sexually assaulted,
and had her personal property stolen. Wylie seeks
monetary damages, and also requests that her personal
safety and medical and dental care be assured in the
future.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Motions to dismiss have been filed by defendants Central
New York Psychiatric Center ("CNYPC"), Bedford Hills,
Officer Gentile, and Nurse Roberts ("Roberts"). Following
a February 13, 2008, conference with the parties held
before Magistrate Judge Douglas F. Eaton in which Wylie
participated by telephone, an Order dated February 14,
2008, was issued permitting Wylie to file opposition to the
pending motions on or before March 31; any reply to her
opposition was to be filed by April 16. Since that time,
Wylie has submitted letters of February 16, March 8, 10,
and 16, and April 5, some portions of which are intended
to present Wylie's opposition to the pending motions. FN1
Counsel for the defendants has waived reply. For the
following reasons, the motions to dismiss filed by Bedford
Hills, CNYPC, and Officer Gentile are granted; the
motion to dismiss filed by Roberts is denied.

    FN1. Wylie's letter of December 25, 2007, also
    indicates that it is in response to CNYPCs
    motion.

When considering a motion to dismiss under Rule
12(b)(6), a trial court must "accept as true all factual
statements alleged in the complaint and draw all
reasonable inferences in favor of the non-moving party."
*McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191
(2d Cir.2007) (citation omitted). At the same time,
"conclusory allegations or legal conclusions masquerading
as factual conclusions will not suffice to defeat a motion
to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,*
464 F.3d 328, 337 (2d Cir.2006) (citation omitted). A
court must apply a "flexible plausibility standard, which
obliges a pleader to amplify a claim with some factual
allegations in those contexts where such amplification is
needed to render the claim plausible." *Iqbal v. Hasty,* 490
F.3d 143, 157-58 (2d Cir.2007) (citation omitted). "To
survive dismissal, the plaintiff must provide the grounds
upon which his claim rests through factual allegations
sufficient to raise a right to relief above the speculative
level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d
87, 98 (2d Cir.2007). Finally, in applying these standards
here, it should also be noted that Wylie is proceeding *pro*

Not Reported in F.Supp.2d, 2008 WL 2009287 (S.D.N.Y.)
(Cite as: 2008 WL 2009287 (S.D.N.Y.))

*se,* and that this Court has an obligation to read her submissions liberally and interpret them to raise the strongest arguments that they suggest. *See, e.g., Wright v. Comm'r,* 381 F.3d 41, 44 (2d Cir.2004).

First, Wylie's claims against Bedford Hills and CNYPC must be dismissed because those entities are both agencies of the State of New York, and thus are not subject to suit under § 1983. *See Will v. Michigan Dept's of State Police,* 491 U.S. 58, 71 (1989). Her claims against these defendants for damages are also barred by the Eleventh Amendment. *See generally Bd. Of Trustees of the Univ. of Alabama v. Barrett,* 531 U.S. 356, 363-64 (2001); *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984); *Quern v. Jordan,* 440 U.S. 332, 338 (1979).

*2 Second, Wylie's allegations against Officer Gentile do not state a claim under § 1983 and the Eighth Amendment. Wylie describes one offensive comment made by Officer Gentile and alleges that he "sexually harassed" her "on several other occasions." While "there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison officer can ... constitute an Eighth Amendment violation," where the alleged conduct is limited to "isolated episodes of harassment," and no single incident is severe, a plaintiff does not state a claim under the Eighth Amendment. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) (citation omitted). Such actions "are despicable ... [b]ut they do not involve a harm of federal constitutional proportions as defined by the Supreme Court." *Id.* Wylie's claim against Officer Gentile must therefore be dismissed.

Third, Wylie alleges that Roberts "administered medication which was unnecessary and rendered me unconscious," and that, while unconscious, she was "sexually assaulted by unidentified officers." She also alleges that these mediations gave her "brain damage" that rendered her "incompetent and unable to understand basic reading and writing." Roberts argues that this claim must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(i),[FN2] which provides that in proceedings *in forma pauperis* (such as the instant action), a district court may dismiss a claim when it determines that the claim is "frivolous." *Cf. Fitzgerald v. First East Seventh Street Tenants Corp.,* 221

F.3d 362, 363 (2d Cir.2000) (noting that this standard also applies in cases in which the filing fee has been paid). "A court may dismiss a claim as factually frivolous only if the facts alleged are clearly baseless, a category encompassing allegations that are 'fanciful,' 'fantastic,' and 'delusional.' " *Denton v. Hernandez,* 504 U.S. 25, 32-33 (1992) (citation omitted) (discussing a prior version of § 1915). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them," but dismissal under this provision is not appropriate "simply because the court finds the plaintiff's allegations unlikely." *Id.* at 33. Here, although Roberts has identified several accusations made by Wylie in her various letters that would meet this standard, the specific allegations made against Roberts in the complaint cannot be considered "fanciful." Even if the scenario described in the complaint is considered "unlikely," that is simply not sufficient to obtain dismissal under 28 U.S.C. § 1915(e)(2)(B)(i).[FN3]

FN2. Roberts cites § 1915(d), the section in which this rule was previously stated.

FN3. Roberts also makes a one-sentence argument that Wylie's "incredible allegations are not sufficient to overcome her qualified immunity defense." This cursory presentation of the qualified immunity defense is insufficient to allow the Court to dismiss Wylie's claim against Roberts at this stage. If necessary, such a defense may be presented in greater detail in connection with a motion for summary judgment.

Nevertheless, it should be noted that Judge Eaton's Order of February 14, 2008, indicates that Wylie has expressed that she would "probably consent to dismissal of her Complaint as to Nurse Roberts ." This Order directed Wylie to indicate in her opposition whether she consented to dismissal of her complaint as to any specific defendants. A review of her letters does not reveal that she has done so, however. Accordingly, an Order issued in conjunction with this Opinion will direct Wylie to indicate in writing, no later than June 6, 2008, whether she intends to continue with her action against Roberts. Failure to make such a submission to the Court will result in dismissal of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2009287 (S.D.N.Y.)
(Cite as: 2008 WL 2009287 (S.D.N.Y.))

claim against Roberts.

<div align="center">CONCLUSION</div>

**\*3** The motions to dismiss filed by defendants Bedford
Hills, CNYPC, and Officer Gentile are granted; the
motion to dismiss filed by defendant Roberts is denied.

SO ORDERED:

S.D.N.Y.,2008.
Wylie v. Bedford Hills Correctional Facility of New York
Not Reported in F.Supp.2d, 2008 WL 2009287
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.



Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Scott LOMBARDO, Plaintiff,
v.
James STONE, Renate Wack, Paula Crescent, Gerald
Greene, Frank Burgos, Carlos Rosario, Romy Rousseau,
and Kin Wah Lee, Defendants.
**No. 99 CIV 4603 SAS.**

Aug. 20, 2001.

Scott Lombardo, Mid-Hudson Forensic Psychiatric
Centric, New Hampton, New York, Plaintiff, pro se.

Jonathan Birenbaum, Assistant Attorney General of the
State of New York, New York, New York, for
Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

**\*1** Pro se plaintiff Scott Lombardo, a former patient at
Kirby Forensic Psychiatric Center ("Kirby"), is suing
Secure Health Treatment Aid ("SHTA") Paula Crescent,
SHTA Gerald Greene, SHTA Frank Burgos, SHTA Carlos
Rosario, Registered Nurse Romy Rousseau, James
Stone-the Commissioner of the New York State Office of
Mental Health, Dr. Renate Wack-the former Executive
Director of Kirby, and Kin Wah Lee-the Director of
Quality Assurance at Kirby. Plaintiff brings this suit under
42 U.S.C. § 1983 alleging various violations of his
constitutional rights. Pursuant to Rule 56(b) of the Federal
Rules of Civil Procedure, defendants move for summary
judgment on all of plaintiff's claims. For the reasons stated
below, defendants' motion is granted in its entirety with
respect to Stone, Wack and Lee and is granted in part and
denied in part as to all other defendants.

**I. BACKGROUND**

**A. Lombardo's Assault on Reede**

Plaintiff's allegations arise out of a string of incidents that
occurred while plaintiff was a patient at Kirby. At
approximately 3:50 a.m. on January 4, 1998, plaintiff
became irrationally angry with SHTA Pamela Reede
because, in his words "she was giving me a bunch of shit."
Deposition of Scott Lombardo ("Lombardo Dep."), Ex. B
to 3/8/01 Affidavit of Assistant Attorney General Jonathan
Birenbaum ("Birenbaum Aff."), at 70. The parties do not
dispute that plaintiff attacked Reede when his back was
turned and choked her until she lost
consciousness.[FN1] *Seeid.* at 69-72. Staff members and
security personnel quickly subdued Lombardo and took
him to the seclusion room where he was placed in a
five-point restraint. *Seeid.* at 73-77.

> FN1. Plaintiff was accused of attempted first
> degree rape, attempted second degree assault,
> and third degree assault. *See* Deposition of New
> York State Safety Officer Kenneth Young, Ex. N
> to Birenbaum Aff., at 1. Lombardo pled guilty to
> attempted second degree assault and was
> sentenced to one to three years imprisonment.
> *See* Defendant's Rule 56.1 Statement
> ("Def.56.1") ¶ 30.

**B. Lombardo's Time in Restraints**

After the assault on SHTA Reede, plaintiff was placed in
a bed and restrained. *See* Lombardo Dep. at 92-93. In
plaintiff's words, "as I was being restrained, I heard Paula
Crescent say, 'I saw it, I saw what you did. You struck Mr.
Burgos; understand, okay?' Like she was giving them [sic]
an order." *Id.* at 93. Lombardo was wheeled into the

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

seclusion room where he alleges that Greene told him "[y]ou're going to get this all week long." *Id.* at 95.

While restrained, plaintiff received range of motion exercises at fairly regular intervals. For example, on January 4, plaintiff received range of motion exercises at 6:00 a.m., 11:15 a.m., 12:45 p .m., 2:30 p.m., 4:00 p.m., 6:00 p.m., 9:15 p.m. and 11:15 p.m. *See* Med. Rec. at 1138-40. Plaintiff claims, and the medical records reflect, that he did not receive range of motion exercises after 11:15 p.m. on January 4 until 6:00 a.m. on January 5. *Seeid.* at 1140.

It is undisputed that later in the morning of January 4, at approximately 4:30 a.m., SHTA Doeman brought plaintiff a urinal and allowed him to urinate. *Seeid.* at 101-02. Defendants contend that plaintiff was toileted at 7:00 a.m. However, plaintiff denies being toileted at this time and defendants' records concerning this assertion are vague.[FN2]*Seeid.* at 102-04. Plaintiff claims that at about 8:00 a.m. he asked for a urinal. *Seeid.* at 79-80. He contends that his request was ignored and, at approximately 8:20 a.m., he urinated on himself. *Seeid.*

> [FN2.](#) An SHTA whose name has been redacted wrote that patient was toileted at 7:00 a.m. *See* Kirby Medical Records ("Med.Rec."), Ex. F to Birenbaum Aff., at 1130. As plaintiff points out, the Patient Monitoring Form does not contain any entries for 7:00 a.m. *Seeid.* at 1139-1140.

**\*2** Defendants claim that plaintiff did not give staff adequate advance warning of the problem, and the accident was caused "because [Lombardo] could not wait." Def. 56.1 ¶ 14. At 11:15 a.m., Lombardo, who had been lying in his own urine for approximately three hours, informed Crescent of his predicament. *See* Lombardo Dep. at 81. Plaintiff alleges that Crescent responded with the words "fuck you." *Id.*

Lombardo was then medicated and, at approximately 12:30 p.m., given a cup of water. *Seeid.* at 98-99; Def. 56.1 24. The medication caused plaintiff to sleep for much of the time. *Seeid.* Sometime during the evening of

January 4, 1998, plaintiff claims he informed Rousseau that he had to use the bathroom. *See id.* at 100. She allegedly responded "you get nothing" and left the seclusion room. *Id.* Lombardo claims to have subsequently urinated on himself again. *Seeid.* at 101. Plaintiff's medical records indicate that he refused a urinal three times between 3:00 p.m. and 11:00 p.m. on January 4 and make no mention of plaintiff urinating on himself during that time period. *See* Med. Rec. at 1131-34.

Plaintiff admits that he was given an Ensure dietary supplement around 12:15 a.m. on January 5, 1998. *See* Lombardo Dep. at 103-04. Plaintiff also admits that he drank half a cup of water with the [Tylenol](#) given to him at 12:30 p.m. on January 4, 1998. *Seeid.* at 104. Defendants contend that plaintiff was hydrated several times. *See* Def. Mem. at 12-14. They further contend that he repeatedly refused food and water and that his behavior was such that it was unsafe to attempt to feed him. *Seeid.* Plaintiff remained in restraints until approximately 2:30 p.m. on January 5 when he was allowed to shower and change his clothes before being placed in padded restraints. *See* Lombardo Dep. at 104-05. At approximately 4:30 p.m., the state police took him into custody. *See* Def. 56.1 ¶ 28.

### C. The Alleged Assault of Lombardo by Kirby Staff

Shortly thereafter, Greene, Burgos, and Rosario released plaintiff from his restraints and escorted him to the shower room so that he could wash himself. [FN3]*Seeid.* at 81-85. After showering, Lombardo was escorted back to the seclusion room by Greene, Burgos and Rosario while Crescent watched. *Seeid.* at 84-86. According to plaintiff, Burgos suddenly grabbed him from behind. *Seeid.* at 87-88. Burgos allegedly choked plaintiff to the point where plaintiff nearly lost consciousness and then dropped him to the ground. *Seeid.* Plaintiff claims that Greene, Burgos and Rosario proceeded to kick and "stomp" him for approximately five to ten minutes as he lay on the ground. *Seeid.* at 87-91. During the beating, Greene allegedly admonished plaintiff "you don't do this to a[SH]TA." *Id.* at 93. According to plaintiff, Greene, Burgos, and Rosario continued to kick him until just moments before security officers arrived. *Seeid.* at 90-92.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

**FN3.** Plaintiff claims that he drank water from the showerhead. *See* Complaint ¶ 18.

**\*3** Defendants' version of events is different from plaintiff's. According to defendants, plaintiff was walking back from the shower room when, without provocation, he suddenly turned around and punched Burgos in his left temple. *See* Deposition of Frank Burgos ("Burgos Dep."), Ex. K to Birenbaum Aff., at 22, 26, 29. Defendants presented substantial corroborating evidence of Burgos' claimed injuries. *Seeid.* at 20-23, 29-30. Specifically, Burgos suffered a head injury, a shoulder injury, and a knee injury. *Seeid.* As a result of these injuries, Burgos was unable to work for approximately five months and received Workers Compensation. *See* 10/29/99 Workers Compensation Board form of Frank Burgos, Ex. L to Birenbaum Aff., at 2; 5/6/98 Letter from Renate Wack to Frank Burgos, Ex. L to Birenbaum Aff.

Defendants also contend that Lombardo's injuries are much more consistent with reasonable restraint than with assault. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem.") at 16. Defendants' records indicate that plaintiff

sustained slight swelling and hematoma[FN4] (bluish discoloration) over the nasal bridge and in between the eyebrows ... five[FN5] scratches over [Lombardo's] shoulder ... small hematoma over midback ... no swelling, no limitation of movement ... [n]o difficulty of breathing through nose, no bleeding.

**FN4.** A hematoma is defined as "a tumor or swelling containing blood ." Webster's Ninth New Collegiate Dictionary 563 (9th ed. 1987) ("Webster's").

**FN5.** The reporting nurse's handwriting was unclear and in the bulk of their materials defendants contend that she wrote "fine" instead of "five." In their 56.1 statement, defendants contend that plaintiff suffered "line" scratches. Def. 56.1 ¶ 24.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Med. Rec. at 1117-18. A later document refers to an "erythema [FN6] over his upper back" that appeared around the time of the alleged assault. 2/27/98 Memorandum of Maryse Chardonet, Treatment Team Leader ("Chardonet Mem."), Ex. R to Birenbaum Aff., at 2.

**FN6.** An erythema is defined as an "abnormal redness of skin due to capillary congestion (as in inflammation)." Webster's at 423.

Chardonet investigated plaintiff's complaint and wrote:

[t]he injuries sustained by pt. Lombardo on his back and one shoulder are more consistent with his being accidentally scratched by his being combative during applications of restraints, his agitating himself while in the restraints, trying to get out of the restraints, and the first time he was in restraints having been naked ... They were not, however, consistent with being 'yoked, thrown down to the ground, kicked and stomped,' by three men.

*Id.* at 3-4. The erythema was explained as having possibly been caused by Lombardo "lying on his back." *Id.* at 2. The explanation for the nose injury was that plaintiff was "out of control and [had] to be restrained." *Id.* at 4.

D. Lee's Involvement

Lee was Director of Quality Assurance at Kirby when the incidents in question occurred. *See* Def. 56.1 ¶ 31. Plaintiff alleges that during a phone call from Rikers Island, he asked Lee to preserve the security video footage of the room where the alleged beating occurred. *See* Lombardo Dep. at 92, 116; Plaintiff's Answer to Defendant's [sic] Motion for Summary Judgment ("Pl.Resp.") at 6-7. Lee denies that plaintiff made this request. *See* Telephonic Deposition of Kin Wah Lee ("Lee Dep."), Ex. P to Birenbaum Aff., at 14.

E. Dr. Wack's Involvement

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

**\*4** Dr. Wack was the Executive Director of Kirby when the events in question occurred. *See* Def. 56.1 ¶ 31. Her only direct involvement in the case occurred when she reviewed a report of plaintiff's allegations and declined to take action. *See* Deposition on Written Interrogatories of Renate Wack ("Wack Dep."), Ex. Q to Birenbaum Aff., at 3-5, 8.

F. Stone's Involvement

Stone is the Commissioner of the New York State Office of Mental Health. *See* Def. 56.1 ¶ 31. Plaintiff notes that section 45.07 of the New York Mental Hygiene Law obligates the Commission on Quality Care to "[m]ake findings concerning matters referred to its attention and, where it deems appropriate, make a report and recommendations. Such report shall be delivered to the commissioner and the director of the facility involved." N.Y. Mental Hyg. Law § 45.07 (McKinney 2001). Plaintiff contends that Stone "had notice of prior occurrences which should have alerted defendants to the necessity of closer supervision or better training of their subordinates." Pl. Resp. at 8.

II. LEGAL STANDARD

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord* Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 55 (2d Cir.1997). The moving party has the burden of identifying the absence of any genuine issues of material fact. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997).

Once the moving party has satisfied this burden, the opposing party must produce sufficient evidence that a reasonable jury could return a verdict in its favor, identifying "specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986); *see also* Gonzalez v. City of New York,

No. 99 Civ. 9128, 2000 WL 1678036, at \*3 (S.D.N.Y. Nov. 8, 2000).

The Second Circuit has recently summarized this standard: "genuineness runs to whether disputed factual issues can 'reasonably be resolved in favor of either party,' materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 5 (2d Cir.1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)). In determining whether summary judgment should be granted, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See* Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir.1994). Ultimately, "[a] court may grant summary judgment only when no rational jury could find in favor of the non-moving party." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998).

**\*5** The papers of a party proceeding pro se should be read liberally and interpreted "to raise the strongest arguments that they suggest ." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (quotation marks and citations omitted); *see also* Haines v. Kerner, 404 U.S. 519, 520 (1972). However, a pro se party's bald assertions, if unsupported by evidence, are not sufficient to overcome a motion for summary judgment. *See* Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991).

III. DISCUSSION

A. Lombardo Fails to State a Valid Claim Under the New York Mental Hygiene Law

Plaintiff alleges "[t]he actions of defendants ... violated state Mental Hygiene Law." Complaint ¶ 25. However, "[t]he Mental Hygiene Law is a regulatory statute." McWilliams v. Catholic Diocese of Rochester, 536 N.Y.S.2d 285, 286 (4th Dep't 1988). "No private cause of action is authorized for violations of the Mental Hygiene Law." *Id.* Accordingly, plaintiff's claims under New York's Mental Hygiene Law must be dismissed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

B. Elements of a Section 1983 Claim

In order to state a cause of action under section 1983, a plaintiff must establish that: (1) the conduct complained of was "committed by a person acting under color of state law; and (2) the conduct complained of ... deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994); *seealsoOverhoff v. Ginsburg Dev., L.L.C.,* 143 F.Supp.2d 379 (S.D.N.Y.2001). Section 1983 creates no substantive rights, but it does provide a "procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

"Once the State assumes responsibility for a patient by admitting him to a State mental hospital that is operated under State authority, the state is acting under color of law." *Seide v. Prevost,* 536 F.Supp. 1121, 1136 (S.D.N.Y.1982) (citing *O'Connor v. Donaldson,* 422 U.S. 563 (1975)). Furthermore, "[s]tate employment is generally sufficient to render the defendant a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 n .18 (1982). Here, defendants do not contest that they were acting under color of state law. Thus, the only question is whether Lombardo suffered a violation of his constitutional rights. *SeeGonzalez,* 2000 WL 1678036, at *4.

C. Lombardo Fails to State a Valid Claim Against Stone

Plaintiff does not contend that Stone had any direct involvement in the alleged events. Instead, he alleges that "Stone [is] responsible for the training, supervision, discipline, and control of the actions of SHTA staff at Kirby." Complaint ¶ 20. However, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

*6 The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright,* 21 F.3d at 501;*Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Lombardo's claims against Stone fail to satisfy any of the prongs of the *Williams* test. Obviously, Stone did not participate directly in the alleged constitutional violation. Stone was never informed that a violation had occurred and therefore cannot be held liable for failing to remedy the situation. There is no evidence that he created any policies or customs that would have allowed the alleged constitutional violations to take place. Stone was not grossly negligent in supervising his subordinates, nor did he exhibit deliberate indifference to the rights of patients.

It has been established that "[t]he bare fact that [defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain" a section 1983 claim. *Colon,* 58 F.3d at 874 (citing *Wright,* 21 F.3d at 501;*Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). The same principle applies to the mental health field. Accordingly, Lombardo's claims against Stone are dismissed.

D. Lombardo Fails to State a Valid Claim Against Dr. Wack

Plaintiff claims that Dr. Wack was "responsible for the training, supervision, discipline, and control of the actions of SHTA staff at Kirby." Complaint ¶ 20; *seealso* Pl. Resp. at 7. In 1996, Dr. Wack received a letter from the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

Commission on Quality Care that pointed out various instances where staff did not adhere to mental hygiene standards when dealing with Lombardo. The Commission found that the Kirby staff had committed several violations including: denying Lombardo his privacy while he showered, failing to give him all of his range of motion exercises, and failing to serve him lunch one day. *See* 4/3/96 Letter from Randall Holloway, Mental Hygiene Facility Review Specialist, to Renate Wack ("Holloway Let."), Ex. S to Birenbaum Aff., at 1-3. Dr. Wack testified that a committee reviewing these incidents "found that Kirby's corrective actions were satisfactory and they closed the case." Wack Dep. at 7. Dr. Wack was also alerted of plaintiff's current allegations by letter. *See id.* at 4.

**\*7** Plaintiff cites *Fundiller v. City of Cooper City,* 777 F.2d 1436 (11th Cir.1985), to support his claim that, because of the 1996 violations, "Dr. Wack knew of a[c]onstitutional violation and failed to do anything about it, and must be held liable." Pl. Resp. at 8. This argument is dubious for two reasons. One, it is highly doubtful that any of the 1996 violations rose to a constitutional level. Two, even if the staff's misdeeds were constitutional violations, Dr. Wack did not fail to do anything about them; staff was counseled on how to properly treat patients and supervisors were told to ensure that "procedures are properly adhered to by all staff." Holloway Let. at 3. There were no deficiencies in Dr. Wack's handling of the 1996 violations that could render her responsible for the events alleged here. *See Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986) (noting that "[c]ausation is an essential element of a section 1983 cause of action.").

When Dr. Wack was informed of the current allegations she supervised a full investigation. Chardonet reported "the allegations of abuse, neglect, and mistreatment made by pt. Lombardo are not substantiated." Chardonet Mem. at 3. Dr. Wack's decision to accept Chardonet's report as accurate was reasonable. Even if plaintiff's allegations concerning the assault are correct, Dr. Wack simply cannot "reasonably be expected to guard against the deliberate criminal acts of [her] properly trained employees when [s]he has no basis upon which to anticipate misconduct." *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir.1994). Accordingly, Lombardo's claims against Wack are dismissed.

**E. Lombardo Fails to State a Valid Claim Against Lee**

For purposes of this motion, the Court must assume that plaintiff asked Lee to preserve the video footage and that she refused to do so. Even assuming that Lee failed to preserve the video footage, plaintiff's claims against Lee must fail. Lombardo does not allege that Lee directly participated in any of the alleged violations of his constitutional rights. Nor does he allege that Lee could have intervened on his behalf and failed to do so. Plaintiff's claims against Lee is that she failed to investigate her subordinates and preserve evidence against them. The failure to investigate is not sufficient to sustain an Eighth Amendment claim. *See Vukadinovich v. McCarthy,* 901 F.2d 1439, 1444 (7th Cir.1990) (failure to investigate alleged physical abuse cannot render supervisory defendants liable unless there is evidence that the failure to investigate caused the abuse); *see also Wilson v. Detella,* No. 97 Civ. 7833, 1999 WL 1000502, at *5 (N.D.Ill. Nov. 1, 1999) ("[f]ailure to investigate or to impose discipline on the wrongdoers after the fact [does] not amount to a constitutional violation [if] the omission was not the cause of [p]laintiff's injuries."). Accordingly, plaintiff's claims against Lee are dismissed.

**G. The Fourteenth Amendment Claims** [FN7]

> **FN7.** Plaintiff asserts all of his claims under both the Eighth and Fourteenth Amendments. However, at the time of the alleged events, plaintiff was had not been convicted of any crime. Accordingly, plaintiff's claims are more appropriately analyzed under the Fourteenth Amendment's Due Process Clause. *See DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 n.6 (1989) ("The Eighth Amendment applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.' ") (quoting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

*Ingraham v. Wright,* 430 U.S. 651, 671-72 (1977) (alterations in original).

**\*8** The Supreme Court has stated, in dicta, that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with adequate food, shelter, clothing and medical care. See *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982). Such patients also retain liberty interests in safety and freedom from bodily restraint. See *id.* at 315-16, 324 ("The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution. And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety....").

In determining whether there has been a due process violation, it is necessary to balance " 'the liberty of the individual' ' and ' 'the demands of an organized society.' ' *Id.* at 320 (quoting *Poe v. Ullman,* 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). In doing so, it must be noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22. Accordingly, whether a plaintiff's "constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests" in restraining individual liberty. *Id.* at 321.

There is a presumption of correctness that applies when determining whether the State has met its obligations with respect to reasonable care, safety and non-restrictive confinement conditions. *Seeid.* at 324. Thus, decisions made by appropriate professionals are presumptively valid. *Seeid.* at 323. Therefore, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

1. The Alleged Assault by Greene, Burgos, Rosario and Crescent

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff alleges that Greene, Burgos, Rosario, and Crescent violated his Fourteenth Amendment rights by assaulting him after he left the shower. *See* Part I.C. *supra.* Defendants do not contend that the unprovoked choking, kicking, and stomping alleged by plaintiff can be justified as a necessary exercise of force. Rather, they contend that plaintiff's version of the events is fabricated. *See* Def. Mem. at 15-16. Defendants claim that Lombardo caused them to use reasonable force when he assaulted Burgos, and that their use of force was appropriately limited to restraining plaintiff. *Seeid.*

Defendants do not dispute that the amount of force alleged by plaintiff was gratuitous and excessive. Nor do they contend that the decision to assault Lombardo was a professional judgment made within accepted medical practice.

What defendants are really asking this Court to do is decide an issue of fact, namely whether the beating really took place. The fact that plaintiff testified to the beating at his deposition is sufficient to raise a genuine issue of material fact. This Court is both unwilling and unable to decide this issue against plaintiff on summary judgment.

**\*9** *Showers v. Eastmond,* No. 00 Civ. 3725, 2001 WL 527484, at \*3 (S.D.N.Y. May 16, 2001) (citing *Payne v. Coughlin,* No. 82 Civ. 2284, 1987 WL 10739, at \*3 (S.D.N.Y. May 6, 1987); *Crawford v. Braun,* No. 99 Civ. 5851, 2001 WL 127306, at \*4 (S.D.N.Y. Feb. 9, 2001)). "Credibility assessments and choices between conflicting versions of the events are matters for a fact-finder at trial, not for the Court on a summary judgment motion." *Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at \*6 (N.D.N.Y. June 29, 2000) (citing *Fischl v. Armitrage,* 128 F.3d 50, 55 (2d Cir.1997)). Accordingly, plaintiff's assault claims against Greene, Burgos, Rosario, and Crescent cannot be dismissed on summary judgment.[FN8]

FN8. Although Crescent is not accused of physically participating in the beating, she is potentially liable because plaintiff alleges that

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

her presence sanctioned the assault and because she failed to intervene on plaintiff's behalf. See *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988); *Davis v. Patrick,* No. 92 Civ. 548, 2000 WL 1154065, at *4 (S.D.N.Y. Aug. 14, 2000); *Newland v. Achute,* 932 F.Supp. 529, 534 (S.D.N.Y.1996).

**2. The Denial of Toileting**

People in custody have no constitutional right to use the bathroom whenever they please. *See, e.g., Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4 (S.D.N.Y. Sept. 17, 1997) (plaintiff's claim that he was denied access to the bathroom for ten hours was not sufficient to survive summary judgment). This same principle applies to mental patients being held in restraints. Nonetheless, "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs...." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir.1994).

Plaintiff contends that his requests to be toileted were repeatedly ignored, as a result of which he urinated on himself twice, and on one occasion was forced to lie in his own urine for over three hours.[FN9] Defendants do not argue that under the circumstances alleged by plaintiff, no constitutional violation occurred. Instead, defendants again argue that Lombardo's account is false. Defendants cite their own records which: make no mention of plaintiff's requests to urinate; note only one instance of plaintiff urinating on himself; and do not record plaintiff being forced to lie in his own urine. *See* Med. Rec. at 1113-40. Because a jury is best equipped to resolve these types of factual conflicts, Lombardo's failure to toilet claims against Rousseau and Crescent must proceed to trial.

FN9. Rousseau and Crescent are the only defendants alleged to have ignored his requests to use the bathroom.

**3. The Forced Administration of Medication**

Plaintiff alleges that his Fourteenth Amendment right to refuse medication was violated when defendants medicated him against his will. The Second Circuit has held:

"It is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to control the course of his medical treatment." Such a right may be set aside only in narrow circumstances, including those where the patient "presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution."

*Kulak v. City of New York,* 88 F.3d 63, 74 (2d Cir.1996) (quoting *Rivers v. Katz,* 67 N.Y.2d 485, 492, 495 (1986)); *see also Project Release v. Prevost,* 722 F.2d 960, 978-80 (2d Cir.1983).

**\*10** The right to refuse medication is derived from the policy stated in the New York Code of Rules and Regulations ("N.Y.C.R.R."), which provides:

(c) Patients who object to any proposed medical treatment or procedure ... may not be treated over their objection except as follows: (1) Emergency treatment. Facilities may give treatment, except electroconvulsive therapy, to any inpatient, regardless of admission status or objection, where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness. Such treatment may continue only as long as necessary to prevent dangerous behavior.

14 N.Y.C.R.R. § 527.8(c)(1); *see also Kulak,* 88 F.3d at 74 (noting that this right is protected under the Fourteenth Amendment's due process clause); *Johnson v. Silvers,* 742 F.2d 823, 825 (4th Cir.1984) (the Fourteenth Amendment creates a liberty interest protecting patients from being unnecessarily forced to take anti-psychotic drugs); *Doe v. Dyett,* No. 84 Civ. 6251, 1993 WL 378867, at *2

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

(S.D.N.Y. Sept. 24, 1993) ("The Due Process Clause of the Fourteenth Amendment prohibits the involuntary administration of anti-psychotic drugs.").

There is no dispute that plaintiff was medicated on three separate occasions from January 4 to January 5, 1998. *See* Def. Mem. at 5-7. At 4:00 a.m. on January 4, plaintiff was given an intramuscular dose of 50 milligrams of Benadryl.[FN10]*See* Def. 56.1 ¶ 10. At 11:00 a.m. later that day, another 50 milligrams of Benadryl was administered. *Seeid.* at 11. Finally, at 8:00 p .m. on January 4, plaintiff was given Ativan and another 50 milligrams of Benadryl.[FN11]*Seeid.* at 26.

> **FN10.** Plaintiff does not contend that his rights were violated when he was medicated immediately after attacking Reede. *See* Pl. Resp. at 2. Rather, he contends that his rights were violated on the two later occasions when he was medicated. *Seeid.* at 2-3.

> **FN11.** Benadryl is a antihistamine having sedative side effects. *See* 2001 Physicians' Desk Reference at 2420 (55th ed.). Ativan is an anti-anxiety agent similar in action to the benzodiazepines (Valium). *Seeid.* at 3348.

Defendants argue that plaintiff was assaultive and dangerous throughout this period and that medication was therefore necessary to protect his safety and the safety of others.[FN12]*See, e.g.,*Doe, 1993 WL 378867, at *3 (administering medicine to a dangerous patient in order to make the patient less dangerous does not violate the Fourteenth Amendment). Plaintiff disputes that he was dangerous throughout this period. *See* Pl. Resp. at 2. According to plaintiff, "defendants collaborated [sic] a story of an alleged assault on defendant Burgos to justify continued restraint and medication on plaintiff to sadistically cause harm to plaintiff as revenge for his attack on SHTA Reede." *Id.* at 3.

> **FN12.** A dangerous patient is defined as one who "engages in conduct or is imminently likely to engage in conduct posing a risk of physical harm

to himself or others." 14 NYCRR § 527.8(a)(4).

Plaintiff's conclusory allegations of a purported conspiracy by defendants do not raise a triable issue of fact. *See*Project Release, 722 F.2d at 969 ("a non-moving party may not rely on mere conclusory allegations but must set forth 'concrete particulars' "). In defendants' professional medical judgment, plaintiff was dangerously and unpredictably assaultive throughout the period of medication.[FN13]*See* Med. Rec. at 1119, 1123, 1125, 1128. Such judgment is entitled to a presumption of correctness, *see*Youngberg, 457 U.S. at 324, especially where there is no evidence that defendants were not appropriately reacting to an emergency situation in giving plaintiff mild, non-psychotropic sedatives such as Benadryl and Ativan.[FN14]*See*Odom v. Bellevue Hosp. Ctr., No. 93 Civ. 2794, 1994 WL 323666, at *3 (S.D.N.Y. July 5, 1994) ("[A] patient's liberty interest in not being involuntarily medicated is overridden in an emergency, where failure to medicate forcibly would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution."). Accordingly, plaintiff's forced medication claim is dismissed.

> **FN13.** Indeed, it is undisputed that plaintiff was initially medicated because he violently attacked a staff member.

> **FN14.** Most of the case law in this area involves the forced administration of anti-psychotic drugs. *See generally* Project Release, 722 F.2d at 977-79. While there is no logical reason to limit such claims to a particular class of drugs, plaintiff's liberty interest in not being involuntarily medicated is surely not as strong when relatively innocuous, non-psychotropic medications are being forcibly administered.

**4. The Unconstitutional Restraint**

**\*11** " 'Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." ' Youngberg v. Romeo, 457 U.S. at 316 (quoting Greenholtz

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

*v. Nebraska,* 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part). *See also Branham v. Meachum,* 77. F.3d 626, 629 (2d Cir.1996); *Wells v. Franzen,* 777 F.2d 1258, 1261-62 (7th Cir.1985) ("Freedom of bodily movement is a substantive right derived from the due process clause, and it is breached when a [patient] is bodily restrained except pursuant to an appropriate exercise of judgment from a health professional ... it is the duty of a court to ensure that professional judgment in fact was exercised in the decision to restrain.").

Plaintiff was placed in restraints shortly after the attack on SHTA Reede, at approximately 3:50 a.m. on January 4, 1998, and was kept in restraints until approximately 2:30 p.m. on January 5, 1998. Plaintiff received adequate range of motion exercises on January 4, 1998. *See* Part I.B. *supra.* Plaintiff's restraint claims can thus be summarized as: (1) failure to receive proper range of motion exercises between 11:15 p.m. and 5:45 a.m. on January 4-5; *see* Pl. Resp. at 4; and (2) failure to timely release plaintiff from restraints during the time he claims he was not dangerous. *See id.* at 2-3. Plaintiff's range of motion claim represents, at most, a de minimis imposition on his liberty interests [FN15] while his failure to release claim is not supported by any evidence whatsoever. [FN16] Because plaintiff's restraint claims do not rise to the level of a constitutional violation, they are dismissed.

FN15. Kirby's medical records indicate that plaintiff was agitated during the period from 11:15 p.m. on January 4 through 5:30 a.m. on January 5. *See* Med. Rec. at 1140. This further justifies the medical staff's decision to withhold exercises on a short-term basis. Furthermore, section 33.04(f) of New York's Mental Hygiene Law provides that "[a] patient in restraint shall be released from restraint at least every two hours, *except when asleep.* " (emphasis added). If plaintiff was not in an agitated state, presumably he would have been sleeping between 11:00 p.m. and 6:00 a.m. Thus, the decision to keep him in restraints during the night, without release for exercise, is justified as a matter of law.

FN16. Plaintiff has offered no competent

evidence to rebut defendants' conclusion that he remained dangerous throughout the period of restraint. Plaintiff's conclusory allegations as to his state of mind, without any supporting evidence or corroboration, cannot contradict defendants' medical decision in keeping plaintiff restrained.

5. The Denial of Food and Water

"[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *see also Williams v. Coughlin,* 875 F.Supp. 1004, 1015 (S.D.N.Y.1995); *Demaio v. Mann,* 877 F.Supp. 89, 93 (N.D.N.Y.1995); *Moss v. Ward,* 450 F.Supp. 591 (W.D.N.Y.1978). A constitutional violation occurs when the government " 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs' including food ..." *Reed v. McBride,* 178 F.3d 849, 852 (7th Cir.1999) (quoting *Helling v. McKinney,* 509 U.S. 25, 32 (1993)).

Plaintiff alleges that he was denied meals for approximately twenty-four hours. *See* Complaint ¶ 26. Plaintiff contends further that the denial of meals and fluids was in violation of his Fourteenth Amendment rights. *See* Pl. Resp. at 4. Plaintiff's claimed deprivations are, however, contradicted by both the evidence of record and plaintiff's own admissions. During his deposition, plaintiff admitted to receiving half a cup of water with some Tylenol at approximately 12:30 p.m. on January 4. *See* Lombardo Dep. at 98-99; *see also* Med. Rec. at 1131. Earlier that day, at approximately 11:15 a.m., plaintiff was allowed to shower in a bathroom where he had access to a sink and water. *See* Lombardo Dep. at 82. Plaintiff also admitted to having received an Ensure dietary supplement at approximately 12:15 a.m. on January 5. *See id.* at 104. In addition to these admissions, Kirby's medical records note that plaintiff drank one cup of water at 6:00 a.m. on January 4, *see* Med. Rec. at 1130, that he accepted eight ounces of water at 11:00 p.m. that same day, *see id.* at 1134, and that he accepted two cups of water at 3:30 a.m. on January 5, *see id.* at 1147.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)
(Cite as: 2001 WL 940559 (S.D.N.Y.))

**\*12** Furthermore, the medical records also show that plaintiff was offered, but refused, fluids and meals on several occasions. For example, the Progress Notes show that at 7:00 a.m. on January 4, plaintiff was offered fluids. *See* id. at 1114. Later on that day, at 5:00 p.m. and some time between 9:15 p.m. and 11:15 p.m., plaintiff was offered dinner but refused it. *See* id. at 1118. In light of the above, plaintiff's claimed deprivations simply do not rise to the level of a constitutional violation. *Cf. Buthy v. Commissioner of the Office of Mental Health of New York State,* 818 F.2d 1046, 1050 (2d Cir.1987) ("[S]ome restrictions on individual liberty rise only to a 'de minimis level of imposition with which the Constitution is not concerned.' ") (quoting *Ingraham v. Wright,* 430 U.S. 651, 674 (1977)). Accordingly, plaintiff's denial of food and water claims are dismissed.

H. Defendants Are Not Entitled to Qualified Immunity

The Supreme Court has recognized that government officials acting under color of law enjoy qualified immunity from section 1983 claims: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (quoting *Harlow,* 457 U.S. at 819). The constitutional right must have been clearly established at the time when the alleged infringement occurred. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998).

Here, defendants are accused of several severely abusive acts. As "reasonably competent public officials," defendants should have been aware that these acts, if actually committed, were objectively unreasonable and violated established constitutional rights. *Harlow,* 457 U.S. at 819; *McCormack v. Cheers,* 818 F.Supp. 584, 599 (S.D.N.Y.1993). Because defendants have failed to raise any "extraordinary circumstances [or prove] that [they] neither knew nor should have known of the relevant legal

standard," their request for qualified immunity must be denied. *Harlow,* 457 U.S. at 819.

If, at trial, it appears that plaintiff can only prove offenses much less severe than those currently alleged, qualified immunity may become appropriate. At present, there is no basis to grant defendants' motion for summary judgment based on the doctrine of qualified immunity.

IV. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted except as to plaintiff's assault and denial of toileting. A conference is scheduled for August 31, 2001 at 12:30 p.m.

**\*13** SO ORDERED:

S.D.N.Y.,2001.
Lombardo v. Stone
Not Reported in F.Supp.2d, 2001 WL 940559 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jose ORRACA, Plaintiff,
v.
T, McCREERY; M. Bertone; Mr. Andrews; T.
Nasaveria; Mr. Wright; Mr. Maly; and Mr. Mayberry,
Defendants.
**No. 9:04-CV-1183.**

April 25, 2006.

Jose Orraca, Pine City, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, Stephen M. Kerwin, Esq., Asst. Attorney General,
Albany, NY, for Defendants.

### *ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jose Orraca, brought this civil rights action
pursuant to 42 U.S.C. § 1983. In a Report
Recommendation dated February 14, 2006, the Honorable
David E. Peebles, United States Magistrate Judge,
recommended that defendants' motion be granted, in part,
and plaintiff's claims against them in their official
capacities for damages be dismissed, based upon the
Eleventh Amendment; that plaintiff's claims against
defendant Maly be dismissed, with leave to replead, based
upon the lack of his personal involvement in the
deprivations alleged; and that plaintiff's claim for
compensatory damages for mental anguish and emotional
distress be dismissed; but that defendants; motion be
denied in all other respects. (Docket No. 33). The

defendants have filed timely objections to the
recommendations of the Magistrate Judge. (Docket No.
34). The plaintiff filed a response. (Docket No. "35").

Based upon a de novo determination of the portions of the
Report-Recommendation to which the parties have
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and
DENIED in part;

2. Plaintiff's claims for damages against defendants in their
official capacities is DISMISSED, based upon the
Eleventh Amendment;

3. Plaintiff's claims against defendant Mr. Maly are
DISMISSED;

4. Plaintiff's claim for compensatory damages for mental
anguish and emotional distress is DISMISSED;

5. Defendants' motion is DENIED in all other respects;
and

6. The defendants shall file and serve an answer to the
remaining allegations in the complaint on or before May
10, 2006.

IT IS SO ORDERED.
DAVID E. PEEBLES, Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

*REPORT AND RECOMMENDATION*

Plaintiff Jose Orraca, a New York state prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against seven individuals employed by the New York State Department of Correctional Services ("DOCS") at the prison facility in which he was incarcerated at the relevant times. In his complaint, plaintiff alleges that the defendants took various actions against him in retaliation for having complained of the loss or destruction of legal documents and personal property. Plaintiff's complaint names the seven defendants in both their individual and official capacities, and seeks recovery of compensatory and punitive damages.

In response to plaintiff's complaint, defendants have moved seeking dismissal of all or portions of plaintiff's claims on various bases including, *inter alia,* plaintiff's failure to exhaust available administrative remedies before commencing suit. Based upon my review of plaintiff's complaint and defendants' moving papers, I recommend dismissal of plaintiff's damage claims against the defendants in their official capacities, and of his claim for compensatory damages for mental anguish and emotional distress based upon his failure to plead the existence of physical injury, but denial of the portions of defendants' motion seeking additional relief.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of this case, the following facts are taken from plaintiff's complaint, which has been interpreted in a light most favorable to him, and with all inferences drawn and ambiguities resolved in his favor. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

*2 Plaintiff is a New York State prison inmate entrusted to the custody of the DOCS and, at the times relevant to his complaint, was confined within the Shawangunk Correctional Facility ("Shawangunk"). While at Shawangunk, plaintiff has complained to prison officials regarding the loss or destruction of legal transcripts and other court papers, as well as personal property, apparently including civilian clothes which were sent to him for use when appearing in United States District Court for the Western District of New York in connection with a civil action brought by him in that forum.[FN2]

> FN2. An attachment to plaintiff's complaint reflects that he brought an action in the United States District Court for the Western District of New York, entitled *Orraca v. Cetti, et al.,* Civil Action No. 96-CV-6385 (W.D.N.Y., filed 1996). According to publicly available records regarding that suit, that action concerned matters which occurred during the course of plaintiff's imprisonment in the Attica Correctional Facility.

After lodging complaints regarding the loss and destruction of property while at Shawangunk and pursuing grievances associated with those issues, plaintiff began experiencing recrimination. In retaliation for voicing those complaints, plaintiff has been issued five drug-related misbehavior reports by defendants T. McCreary and M. Bertone, beginning in October of 2003, resulting in Tier III disciplinary proceedings against him.[FN3] According to the plaintiff, defendants' actions have resulted in periods of disciplinary keeplock and special housing unit ("SHU") confinement for him, the requirement that he undergo drug counseling, denial of his participation in a family reunion program, and the further destruction of legal materials and corresponding denial of court access.

> FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

II. *PROCEDURAL HISTORY*

Plaintiff, who appears to be an experienced *pro se* litigant, commenced this action on February 14, 2004.[FN4] Dkt. No. 1. Named as defendants in plaintiff's complaint are seven DOCS workers employed at Shawangunk, including T. McCreary, a corrections officer; M. Bertone, a corrections sergeant; (first name unknown) Andrews, a hearing officer; T. Nasaveria, a property officer; (first name unknown) Wright, a corrections lieutenant; (first name unknown) Maly, Deputy Superintendent of Security at the facility; and C. Mayberry, a recreational officer. Although somewhat ambiguous on this score, plaintiff's complaint appears to assert only a claim of unlawful retaliation against the various defendants.

> FN4. A search of this court's records reflects the filing by plaintiff of six other lawsuits in this district, in addition to the instant action, arising from the terms of his confinement. *See Orraca v. Pilatich,* Civil Action No. 9:05-CV-1305 (DNH/GHL) (N.D.N .Y., filed Oct. 14, 2005); *Orraca v. Lee,* 9:04-CV-1249 (DNH/DRH) (N.D.N.Y., filed Oct. 27, 2004); *Orraca v. Clark,* Civil Action No. 9:00-CV-766 (TJM/GJD) (N.D.N.Y., closed May 11, 2004); *Orraca v. Estabrook,* Civil Action No. 9:99-CV-1216 (NAM/GLS) (N.D.N.Y., closed Mar. 28, 2002); *Orraca v. Maloy,* Civil Action No. 9:96-CV-2000 (NAM/DEP) (N.D.N.Y., closed Mar. 22, 2001); *Orraca v. Walker,* Civil Action No. 6:98-CV-448 (LEK) (N.D.N.Y., closed March 29, 2000). In addition, it appears that plaintiff has filed at least two suits in the Western District of New York, including *Orraca v. Cetti,* Civil Action No. 96-CV-6385 (DGL/JWF) (W.D.N.Y., filed 1996); and *Orraca v. Kelly,* Civil Action No. 1:95-CV-729 (WMS) (W.D.N.Y., filed 1995). Plaintiff's responsive motion papers also disclose the existence of at least one action commenced by the plaintiff in the Southern District of New York, *Orraca v. Walker,* Civil Action No. 00-CV-5503 (LMM) (S.D.N.Y., filed 2000). *See* Orraca Decl. (Dkt. No. 32) at 3. All of the foregoing matters appear to have involved claims associated with his DOCS confinement. Notwithstanding the

commencement of these actions, when asked in the form complaint which he filed with the court in this action whether he had commenced other lawsuits in state or federal court relating to his imprisonment, plaintiff responded that he had not. *See* Complaint (Dkt. No. 1) § I(a).

In lieu of answering plaintiff's complaint, defendants have instead moved seeking its dismissal on a variety of grounds, arguing that 1) plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment; 2) plaintiff's complaint is subject to dismissal in its entirety based upon his failure to exhaust available administrative remedies; 3) plaintiff's complaint fails to allege the requisite personal involvement with regard to all or some of the defendants named; and 4) plaintiff's compensatory damages cause of action is subject to dismissal under 42 U.S.C. § 1997e(e), in light of his failure to allege that he suffered physical injury as a result of defendants' actions. Dkt. No. 21. Plaintiff has since submitted both a declaration and exhibits (Dkt. No. 32) in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Dismissal Motion Standard*

**\*3** A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, applying a standard which is neither controversial nor rigorous in its requirements. Under that provision, a court may not dismiss a complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him [or her] to relief." *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citing, *inter alia, Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)). In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper,*

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

378 U.S. at 546, 84 S.Ct. at 1734;*Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,*540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005)(Kahn, J.). The court's determination as to the sufficiency of a complaint must take into consideration the fact that the governing rules require only that the defendant be afforded "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 103;*see Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005).

When assessing the sufficiency of a complaint against this backdrop, particular deference must be afforded to a *pro se* litigant; a court must generously construe a *pro se* plaintiff's complaint when determining whether it states a cognizable cause of action. *Davis,* 320 F.3d at 350 (citation omitted). A complaint drafted by an uncounselled plaintiff should not be dismissed unless "it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations." *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) (citation omitted). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim could potentially be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also*Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

B. *Eleventh Amendment*

In his description of the parties to this action, plaintiff identifies the seven DOCS employees named as defendants and states that "[e]ach defendant is being sued in their [sic] individual and official capacity." Complaint (Dkt. No. 1) at 3 (unnumbered). Plaintiff's prayer for relief reiterates his intention to recover damages against the defendants both individually and in their official capacities, stating that he requests the entry of judgment

[i]n favor of plaintiff for actual compensatory and consequential damages in the amount of $350,000.00 *(three hundred and fifty thousand dollars),* three hundred and fifty thousand dollars in punitive damages against

defendants *T. McCreery, M. Bertone, and T. Nagaveria* [sic] in their individual and official acting capacity [sic].

**\*4***Id.* at 7 (emphasis in original). Defendants assert that plaintiff's damage claims against them in their official capacities are barred by the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest. *Richards v. State of New York Appellate Division, Second Department,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91 102 S.Ct. 2325, 2328-29 (1982)). "To the extent that a state official is sued for damages in his official capacity ... the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [FN5]*Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991); *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985).

> FN5. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

Plaintiff's complaint in this action seeks only money damages, without additionally requesting equitable relief.[FN6] Since plaintiff's damage claims against the defendants in their official capacities are plainly barred by the Eleventh Amendment, I recommend their dismissal.

> FN6. The Eleventh Amendment does not preclude maintenance of an action against a governmental employee in his or her official capacity seeking only equitable relief. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2312 n. 10 (1989).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

C. *Exhaustion of Remedies*

Responding to questions set forth in his form complaint, the plaintiff answered both "yes" and "no" to inquiries regarding both the existence of a grievance procedure at Shawangunk and the filing of grievances related to the matters set forth in his complaint. Complaint (Dkt. No. 1) at 4. When asked to describe the steps taken to present grievances relating to the matters in suit, plaintiff answered that "[g]rievance does not provide relief that I am seeking." *Id.* Responding to an inquiry regarding the result of his grievance filings, plaintiff stated that

[a]llegations of employee harassment/discrimination are of particular concern to the administrators of department facilities. Prison Directive 4040(VII) after exercising initial obligations (reported the incidents to supervisors first) after being again threaten [sic] plaintiff was discouraged to process with this complaint any further with the facility out of fear for his safety.

*Id.* Citing the equivocal nature of this response, defendants argue that plaintiff's complaint fails to reflect compliance with the requirement that he exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N .Y.2002) (citing, *inter alia,* *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809234, at \*3 (S.D.N.Y. Dec. 11, 2000)).

FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

In their motion, defendants interpret plaintiff's responses to the form complaint's grievance inquiries as a concession that he did not avail himself of the Inmate Grievance Program with regard to the claims now raised. See Defendants' Memorandum (Dkt. No. 21) at 8. Interpreted in a light most favorable to him, however, plaintiff's complaint could be construed as avowing both that he did file grievances, where appropriate, and that in certain instances he was discouraged by prison officials from pursuing matters through the grievance process. Since the exertion of threats and intimidation by prison officials in an effort to dissuade a prisoner from pursuing claims through the grievance process can, under appropriate circumstances, provide a basis for excusing the PLRA's exhaustion requirement, *Hemphill v. State of New York,* 380 F.3d 680, 683-84, 688 (2d Cir.2004), I am unable to

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

conclude as a matter of law, based upon plaintiff's complaint, that his claims are subject to dismissal for failure to exhaust.[FN8]

> [FN8.] Among the materials submitted by the plaintiff in opposition to defendants' motion are documents reflecting the filing by him of several grievances, many of which addressed the matters at issue in this suit, and some of which were pursued by him to the CORC. See, e.g., Orraca Decl. (Dkt. No. 32) at 9, 29, 43, 45, 47-49. While as a technical matter the court may not directly consider these documents in connection with defendants' dismissal motion without converting it to a summary judgment application, in light of plaintiff's pro se status I will read plaintiff's opposition papers in conjunction with his complaint in order to assess the sufficiency of evidence as to plaintiff's efforts to exhaust his administrative remedies. Massey v. Fisher, No. 02CIV10281, 2004 WL 1908220, at *3 (S.D.N.Y. Aug.26, 2004); Negron v. Macomber, No. 95 Civ. 4151, 1999 WL 608777, at *5 (S.D.N.Y. Aug. 11, 1999); see also Gill v. Mooney, 824 F.2d 192, 195 (2d Cir.1987); Tsai v. The Rockefeller Univ., 137 F.Supp.2d 276, 280 (S.D.N.Y.2001); Donahue v. United States Dep't of Justice, 751 F.Supp. 45, 49 (S.D.N.Y.1990)

Because plaintiff's complaint, construed in a light most favorable to him and with all ambiguities resolved in his favor, does not firmly establish that plaintiff failed to satisfy his administrative exhaustion requirement under the PLRA before commencing this action, I recommend denial of defendants' motion to dismiss plaintiff's complaint for failure to exhaust available administrative remedies.

D. *Personal Involvement*

In their motion, defendants also attack the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged.

**\*6** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (citing Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991) and McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003); Wright, 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. Richardson, 347 F.3d at 435; Wright, 21 F.3d at 501; Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir.1986).

Defendants' motion apparently concedes the sufficiency of plaintiff's allegations regarding the conduct of defendants McCreery and Bertone, particularly in filing false misbehavior reports allegedly in retaliation for Orraca having engaged in protected activity. Defendants' Memorandum (Dkt. No. 21) at 1. Defendants do, however, challenge the sufficiency of plaintiff's allegations of personal involvement on the part of the remaining defendants.

In his complaint, Orraca alleges that defendants Andrews, Nasaveria, Wright and Mayberry "are either part of the writing of misbehavior reports or conducted the hearings of the violations [sic] or were aware of the harassment and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

discrimination against the plaintiff and did nothing to stop the violations." Complaint (Dkt. No. 1) at 3. While these allegations are both conclusory and skeletal, they reveal a potential basis for finding their personal involvement in the violations alleged in plaintiff's complaint. *See Richardson,* 347 F.3d at 435.

The allegations against the remaining defendant, Deputy Superintendent Maly, stand on different footing. A thorough search of plaintiff's complaint and the attached documents fails to disclose any basis on which to conclude that defendant Maly was personally involved in any of the retaliatory conduct alleged to a sufficient degree to support a finding of liability on his part. Accordingly, I recommend dismissal of plaintiff's claims as against defendant Maly, with leave to replead. *See Hucks v. Artuz,* No. 99 Civ. 10420, 2001 WL 210238, at *5 (S.D.N.Y. Feb. 27, 2001) (no personal involvement when defendant named in caption but not described in body of complaint); *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) (same); *Brown v. Costello,* 905 F.Supp. 65, 77 (N.D.N.Y.1995) (same)

E. *42 U.S.C. § 1997e(e)*

*7 In their next and final point, defendants argue that plaintiff's failure to allege he suffered physical injury as a result of the acts complained of is fatal to his claims altogether, and should result in his dismissal of his complaint. Plaintiff opposes the granting of that relief.

Section 1997e(e), a provision added by the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), provides in relevant part that

[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). Section 1997e(e) includes within its purview alleged constitutional violations. *Thompson v.*

*Carter,* 284 F.3d 411, 417-18 (2d Cir.2002); *Petty v. Goord,* No. 00 Civ.803, 2002 WL 31458240, at *8-*9 (S.D.N.Y. Nov. 4, 2002). Claims brought by inmates pursuant to section 1983 for emotional damages unrelated to any physical injury should be dismissed. *Shariff v. Coombe,* No. 96 Civ. 3001, 2002 WL 1392164, at *4 (S.D.N.Y. June 26, 2002). The absence of physical injury does not totally bar claims by inmates under section 1983, however, since section 1997e(e) does not preclude claims for nominal damages, punitive damages, or declaratory or injunctive relief. *Id.,* at *5 (citation omitted).

A thorough search of plaintiff's complaint fails to reveal any indication that he has suffered physical injury as a result of the retaliatory acts of which he complains. The lack of such an allegation is fatal to Orraca's quest for recovery for compensatory damages for mental anguish and emotional distress, in light of the preclusive effect of 42 U.S.C. § 1997e(e). As plaintiff correctly argues, however, that section does not require dismissal of his complaint, as now sought by the defendants; instead, plaintiff should be afforded the opportunity to pursue his claims and seek recovery of other forms of appropriate relief, including nominal damages, which are potentially recoverable despite operation of section 1997e(e).[FN9]*See Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002). I therefore recommend that this portion of defendants' motion be granted only to the extend of dismissing plaintiff's claim for compensatory damages for mental anguish and emotional distress.

FN9. I note that plaintiff may well be found entitled to recover compensatory damages for the loss of any property allegedly taken or destroyed in retaliation for his having engaged in protected activity. Such a recovery would not be precluded by 42 U.S.C. § 1997e(e) based upon plaintiff's failure to plead and prove the existence of physical injury. *See, e.g., Lipton v. County of Orange, New York,* 315 F.Supp.2d 434, 457-58 (S.D.N.Y.2004).

IV. *SUMMARY AND RECOMMENDATION*

Having reviewed the four corners of plaintiff's complaint

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

and interpreted its allegations liberally, and in a manner most favorable to him, I find that it adequately pleads a basis for finding personal involvement on the part of all of the defendants, with the exception of Deputy Superintendent for Security Maly, in the constitutional violations alleged. As to defendant Maly, since his involvement in the violations alleged is not readily apparent, Orraca's claims against him should be dismissed, with leave to replead.

At this early juncture, and based upon the scant record now before the court, I am unable to conclude that plaintiff either did not pursue available administrative remedies with regard to the matters complained of or cannot establish a basis for being excused from that requirement. I therefore recommend denial of the portion of defendants' motion seeking dismissal of his complaint for failure to exhaust administrative remedies.

*8 Turning to the legal sufficiency of plaintiff's damage claims, I find that to the extent he has named the defendants in their official capacities, such claims are barred by the Eleventh Amendment. Additionally, I find that plaintiff's claims for recovery of compensatory damages for mental anguish and emotional distress are subject to dismissal under 42 U.S.C. § 1997e(e), in light of his failure to plead the existence of physical injury resulting from the constitutional violations alleged.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion be GRANTED, in part, and plaintiff's claims against them in their official capacities for damages be DISMISSED, based upon the Eleventh Amendment; that plaintiff's claims against defendant Maly be DISMISSED, with leave to replead, based upon the lack of his personal involvement in the deprivations alleged; and that plaintiff's claim for compensatory damages for mental anguish and emotional distress be DISMISSED; but that defendants' motion be DENIED in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties by regular mail.

N.D.N.Y.,2006.
Orraca v. McCreery
Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.